# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

### Northern Division

|  |  |  |
|---|---|---|
| PSEG RENEWABLE TRANSMISSION, LLC, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | | Case No. 1:25-cv-01235 |
| ARENTZ FAMILY, LP, *et al.*, | * | |
| | * | |
| Respondents. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### PETITIONER PSEG RENEWABLE TRANSMISSION, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AND EX PARTE MOTION FOR EXPEDITED SCHEDULING ORDER

Kurt J. Fischer (Bar No. 03300)
Venable LLP
210 W. Pennsylvania Avenue
Suite 500
Towson, MD 21204
(410) 494-6200
kjfischer@venable.com

J. Joseph Curran III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7400
csgunderson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Petitioner PSEG*
*Renewable Transmission LLC*

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................ 6

**BACKGROUND** .................................................................................................................. 10

    I.     Threats to the Reliability and Stability of the Regional Electric Grid ................................................................................................................ 10

    II.    The MPRP .................................................................................................... 11

    III.   The CPCN Application Process ................................................................... 12

    IV.   The Company's CPCN Application ............................................................. 13

**LEGAL STANDARD** ........................................................................................................... 16

**ARGUMENT** ....................................................................................................................... 17

    I.     The Company is Likely to Succeed on the Merits of Its Claim. ................... 17

         A.    The Company is "A Body Politic or Corporate Having the Power of Eminent Domain" ....................................................... 19

         B.    The Company Has Made Real and Bona Fide Efforts to Obtain the Consent of Each Respondent to Enter the Subject Properties ........................................................................ 24

    II.    The Company is Likely to Suffer Irreparable Harm Without Preliminary Relief. .................................................................................... 25

    III.   The Balance of Equities Weighs in Favor of Preliminary Relief. ............... 31

    IV.   Preliminary Relief is in the Public Interest. ................................................ 31

**CONCLUSION** .................................................................................................................. 32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*American Federation of Teachers v. Bessent*,
-- F.Supp.3d --, 2025 WL 582063 (D. Md. Feb. 24, 2025) ....................................................23

*Andrews & Lawrence Professional Services, LLC v. Mills*,
467 Md. 126 (2020) .............................................................................................................17

*Barr v. Atlantic Coast Pipeline, LLC*,
295 Va. 522 (2018) ..............................................................................................................21

*Broadway Services v. Comptroller of Maryland*,
478 Md. 200 (2022) .............................................................................................................22

*City of Baltimore Development Corporation v. Carmel Realty Associates*,
395 Md. 299 (2006) .............................................................................................................22

*ClearOne Advantage, LLC v. Kersen*,
710 F. Supp. 3d 425 (D. Md. 2024) ....................................................................................23

*East Tennessee Natural Gas Co. v. Sage*,
361 F.3d 808 (4th Cir. 2004) ....................................................................................... *passim*

*Elsberry v. Stanley Martin Companies, LLC*,
482 Md. 159 (2022) .............................................................................................................19

*Frazier v. Prince George's County*,
86 F.4th 537 (4th Cir. 2023) ...............................................................................................15

*Jensen v. Maryland Cannabis Administration*,
719 F. Supp. 3d 466 (D. Md. 2024) ....................................................................................15

*King v. Mayor and Council of Rockville*,
52 Md. App. 113 (1982), *cert. denied*, 294 Md. 442 (1982), *cert. denied*, 461
U.S. 914 (1983) ........................................................................................................16, 17, 20

*Lafontaine's Heirs v. Lafontaine's Heirs*,
205 Md. 311 (1954) .............................................................................................................20

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes
Powell*,
915 F.3d 197 (4th Cir. 2019) .............................................................................25, 26, 27, 28

*National Association of Diversity Officers in Higher Education v. Trump*,
Case No. 25-cv-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) .............................29

*Nexus Gas Transmission, LLC. v. Sprague*,
    No. E-15-069, 2016 WL 3654532 (Ohio Ct. App. Jul. 7, 2016) ............................................22

*Palmer v. Atl. Coast Pipeline, LLC*,
    293 Va. 573 (2017) ...................................................................................................................21

*Property Reserve, Inc. v. Superior Court*,
    1 Cal. 5th 151 (2016) ...............................................................................................................22

*Railroad Company v. Whitton's Administrator*,
    80 U.S. 270 (1871)....................................................................................................................16

*State v. Roshchin*,
    446 Md. 128 (2016) ..................................................................................................................18

*Steuart v. Baltimore*,
    7 Md. 500 (1855) ......................................................................................................................20

*Town of Upper Marlboro v. Prince George's County Council*,
    480 Md. 167 (2022) ..................................................................................................................17

*Transource Maryland, LLC v. Scott*,
    Case No. 12-C-18-000549 (Harford Cnty. Cir. Ct. June 24, 2018)..................................17, 21

*Wideman v. Innovative Fibers LLC*,
    100 F.4th 490 (4th Cir. 2024) ..................................................................................................16

**Statutes**

16 U.S.C. § 824(a) .............................................................................................................................8

Federal Power Act, 16 U.S.C. § 791a *et seq.*...................................................................................8

Md. Code Ann., Nat. Res. § 3-303..................................................................................................5

Md. Code Ann., Nat. Res. § 3-306...............................................................................11, 19, 20, 27

Md. Code Ann., Pub. Util. § 7-207.....................................................10, 11, 12, 18, 19, 20, 21

Md. Code Ann., Real Property § 12-111 ............................................................................ *passim*

**Other Authorities**

Code of Maryland Regulations 20.79.04.02-.03............................................................10, 11, 12

Federal Rule of Civil Procedure 12 ...............................................................................................27

Federal Rule of Civil Procedure 65(a)(2) ......................................................................... 4, 15, 30

FERC Order No. 1000, 136 FERC ¶ 16,051, available at
  https://www.ferc.gov/sites/default/files/2020-04/OrderNo.1000.pdf .......................................8

## INTRODUCTION

Petitioner, PSEG Renewable Transmission LLC ("PSEG Renewable Transmission," the "Company," or the "Petitioner"), pursuant to Fed. R. Civ. P. 65(a), moves the Court to issue a preliminary injunction that permits the Company to exercise its statutory right under Md. Code Ann., Real Property ("RP") § 12-111 to enter the properties owned by each Respondent (collectively, "Respondents") to conduct certain environmental surveys and gather related information.  The Company has applied for a Certificate of Public Convenience and Necessity ("CPCN") with the Maryland Public Service Commission ("PSC") to construct an overhead high voltage transmission line in the State of Maryland.  The surveys that form the basis of this action have been requested by certain Maryland state agencies so that they may evaluate and provide a recommendation to the PSC regarding the Company's pending application.

In accordance with the authority granted to it by the Federal Energy Regulatory Commission ("FERC"), PJM Interconnection, LLC ("PJM"), the independent regional transmission organization that serves a 13-state region, including Maryland, has directed the Company to construct an approximately 67-mile 500 kilovolt ("kV") transmission line across portions of Maryland.[1]  After months of extensive analysis, PJM determined that this proposed transmission line, known as the Maryland Piedmont Reliability Project ("MPRP"), is needed to prevent serious and widespread violations of numerous reliability criteria from occurring on the region's high voltage electric grid.  PJM enforces these reliability criteria to ensure the continued safe and reliable operation of the transmission system that serves customers in Maryland and across the PJM region.  Unless the MPRP is constructed and operational by June 1, 2027, PJM forecasts that these reliability criteria violations could lead to blackouts and voltage collapse

---

[1] PJM's region includes all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia.

conditions on the regional transmission system that serve Maryland and surrounding states. PJM and the Company have executed a Designated Entity Agreement ("DEA"), which has been accepted by FERC and which obligates the Company to construct and place the MPRP into service by June 1, 2027. To meet this deadline, the Company must begin construction of the MPRP by January 2026.

Before beginning construction, however, the Company must first obtain a CPCN from the PSC, the state agency with siting authority over the construction of transmission lines in Maryland. The Company filed its application for a CPCN on December 31, 2024. Maryland law requires that the PSC engage in a detailed review of the Company's CPCN application that involves multiple stakeholders, including various state agencies. The Power Plant Research Program ("PPRP"), a division of the Maryland Department of Natural Resources ("DNR"), is statutorily mandated to analyze the environmental and socioeconomic impacts of a high voltage transmission line proposed in a CPCN application and to make a licensing recommendation to the PSC on behalf of the Maryland Energy Administration and the Maryland Departments of the Environment, Agriculture, Commerce, and Planning (the "State Agencies"). Md. Code Ann., Nat. Res. ("NR") § 3-303.

As a first step, the State Agencies (through the PPRP) have requested that the Company conduct several non-invasive field measured surveys to obtain environmental information from certain properties along the proposed route for the MPRP, including those owned by Respondents. The properties owned by Respondents will hereafter be referred to as the "Subject Properties." Because such surveys and information have been traditionally sought in connection with prior CPCN applications, the Company has undertaken real and bona fide efforts over the course of months to obtain Respondents' consent to enter the Subject Properties to conduct these surveys

pursuant to Md. Code Ann., RP § 12-111, which, in turn, authorizes entry onto property for the limited purpose of conducting non-invasive surveys necessary to proceed with property acquisition for a public project.  Notwithstanding this statutory authority, Respondents have refused the Company entry.

But without the ability to enter the Subject Properties to conduct the requested surveys, the Company cannot provide the requested information and data to the PPRP and the State Agencies. Without that information, the PPRP contends that that it cannot fulfill its statutory duty to assess and make a recommendation on the MPRP's anticipated environmental and socioeconomic impacts on behalf of the State Agencies, thereby preventing the Company's CPCN application from reaching a final resolution by the PSC.  The cascading effect of such a situation would mean that the Company will not be able to obtain a CPCN in time to begin construction of the MPRP in January 2026, and the Company will not be able to meet PJM's in-service deadline of June 1, 2027, as set forth in the FERC-approved DEA between PJM and the Company.  In that event, the risks to the reliability of the regional electric grid that serves Maryland and the surrounding states—and the risks to commercial and residential electricity consumers alike—cannot be overstated.

Accordingly, the Company respectfully moves for a preliminary injunction and final judgment that will permit it to immediately enter the Subject Properties for the limited purpose of conducting the surveys requested by the PPRP on behalf of the State Agencies and as authorized by law.  Each of the four requirements to issue a preliminary injunction is met here.

*First*, the Company is likely to succeed on the merits of its petition.  RP § 12-111 affords legal entities with condemnation authority the right to enter private property to perform surveys and inspections—like those the State Agencies have requested here—if they have made "real and

bona fide efforts" to obtain the property owners' consent. The Company is a legal entity with condemnation authority because it will be subject to FERC's regulation as a public utility at the time the MPRP goes in service. The Company is in the process of obtaining a CPCN to establish the proposed transmission line's alignment. The Company has also made real and bona fide efforts to obtain Respondents' consent to enter each of the Subject Properties. As a result, the Company is entitled to an order under RP § 12-111 permitting it to enter the Subject Properties to conduct the surveys requested by the State Agencies.

*Second*, the Company will suffer irreparable harm absent preliminary relief. The Fourth Circuit has ruled that, where an energy company has been directed to provide energy services by a date certain, and a delay in construction attributable to litigation will prevent the company from meeting that deadline, the company will suffer irreparable harm without preliminary relief. Here, if the Company cannot immediately enter the Subject Properties, its CPCN application cannot proceed to a timely final resolution, and the Company will not be able to begin construction on the MPRP with sufficient time to meet the in-service deadline for the MPRP set by PJM and approved by FERC. The Company will also suffer monetary harm if this delay occurs, which the Fourth Circuit has recognized also constitutes irreparable harm under similar circumstances.

*Third*, the balance of equities favors the Company. As set forth above and in more detail below, the Company will suffer irreparable harm if preliminary relief is not granted. In contrast, Respondents have no basis under Maryland law to deny the Company's entry onto the Subject Properties. In the unlikely event that the Company's surveying activities causes damage to the Subject Properties, Maryland law affords Respondents the ability to pursue a claim against the Company for damages.

*Fourth*, the preliminary relief the Company requests is in the public interest. PJM has determined that, if the MPRP is not in service by June 1, 2027, the consequences to the region's electric grid will be severe. Millions of residential and commercial consumers, in Maryland and elsewhere, run the risk of experiencing rolling blackouts and grid collapse. To avoid this result, preliminary relief that entitles the Company to enter the Subject Properties to perform PPRP's requested surveys is essential. The Company's motion for preliminary injunction should be granted as a result.

Finally, given that the Company is seeking to exercise its express authority under RP § 12-111 to conduct surveys for this important public project, the Company requests the Court consider this preliminary injunction on an expedited schedule that will permit the Company to meet the deadlines established by PJM. The County has filed a separate *Ex Parte* Motion requesting the Court to issue an expedited schedule, and a proposed scheduling order is attached thereto.

## BACKGROUND

### I.    Threats to the Reliability and Stability of the Regional Electric Grid

PJM is the regional transmission organization responsible for managing the high-voltage electricity grid for 13 states in the region, including Maryland. (ECF 3 (Declaration of Dawn Shilkoski) ¶ 8.) Under the Federal Power Act, 16 U.S.C. § 791a *et seq*., Congress provided FERC with broad powers and authority to regulate "the transmission of electric energy in interstate commerce." 16 U.S.C. § 824(a). FERC has, in turn, charged PJM with planning and maintaining the electric transmission system for its region in accordance with FERC-mandated reliability criteria and standards. *See* FERC Order No. 1000, 136 FERC ¶ 16,051, available at https://www.ferc.gov/sites/default/files/2020-04/OrderNo.1000.pdf.

For several years, PJM has observed a significant load growth in Maryland and Virginia. (ECF 3 ¶ 9.) Compounding this fact, PJM has been notified that approximately 11,100 megawatts

("MW") of power generation within its region has been deactivated (*i.e.*, retired), or is in the process of deactivating. (*Id.*) As a result, in 2022, PJM identified numerous 500 kV lines within its region that will become severely overloaded in 2027, meaning that they will transmit more power than that for which they were designed. (*Id.*) Transmission lines at the 500 kV level are a critical part of the region's electric system and allow electricity to flow across states from where power is generated to where it is needed. For example, PJM has observed that, absent intervention, the key 500 kV transmission lines located in Maryland will become severely overloaded, with these lines carrying between 115% to 213% of their rated capacity. (*Id.* ¶ 10.) PJM has also observed that thousands of voltage collapse violations (the inability of the transmission system to deliver power to load) and extreme low voltage (non-sustainable) violations will occur by 2027 in various areas. (*Id.* ¶ 11.)

PJM has concluded that, if these reliability criteria violations are left unaddressed, overall system reliability for Maryland customers and others within PJM's region could be compromised, which could, in turn, lead to widespread and extreme conditions, including system voltage collapse and blackouts. (*Id.*) The forecasted reliability violations are so severe and widespread that PJM has determined that simply upgrading existing electric transmission lines would be insufficient. (*Id.*) Instead, PJM has determined that an entirely new 500 kV transmission line is needed by 2027 to ensure the reliable delivery of power. (*Id.*)

## II.    The MPRP

On February 24, 2023, PJM solicited proposed solutions from qualified transmission owners and developers to prevent these reliability violations from occurring. (*Id.* ¶ 12.) In response, PJM received 72 separate proposals from various transmission developers, including proposals submitted by the Company, to address these severe and widespread reliability criteria violations that PJM has forecast to occur as soon as 2027. (*Id.* ¶¶ 12–13.)

11

After several months of evaluation, PJM selected the MPRP, along with several other transmission upgrades, to address and prevent these forecasted reliability criteria violations. (*Id.* ¶ 13.)  As noted above, the MPRP is an approximately 67-mile 500 kV single circuit overhead transmission line that will traverse portions of Baltimore, Carroll, and Frederick Counties. (*Id.* ¶ 6.)  The MPRP will extend from Allegheny Power System's existing Doubs Station, which is located in Frederick County, to an interconnection or demarcation point west of Baltimore Gas and Electric Company's Conastone Station in northern Baltimore County.  (*Id.* ¶ 7.)

In April 2024, PJM and the Company entered into the DEA, which requires the Company to "design, engineer, procure, install and construct" the MPRP and place it into service by June 1, 2027.  (*Id.* ¶ 14, ECF 3-1 ¶ 4.0, Schedule C.)  If the Company does not place the MPRP into service by June 1, 2027, then the Company is in breach of the DEA.  (ECF 3 ¶ 15, ECF 3-1 ¶ 4.1.0.)  PJM filed the DEA with FERC on May 10, 2024, which FERC accepted for filing on September 10, 2024.  (ECF 3 ¶ 14.)

### III.    The CPCN Application Process

Maryland law requires that any person seeking to construct an overhead transmission line must obtain a CPCN from the PSC before beginning construction.  *See* Md. Code Ann., Pub. Util. ("PUA") § 7-207(b)(3)(i).  The application must include detailed information on the project, an alternative route analysis, and an assessment of the project's anticipated impacts.  Code of Maryland Regulations ("COMAR") 20.79.04.02-.03.  Among other things, the application must also include detailed information regarding the anticipated environmental and socioeconomic effects of construction, including a description of any unavoidable impacts and the applicant's recommended mitigation.  COMAR 20.79.04.04.  Simultaneous with filing, the applicant is obligated to provide notice of its application to various interested stakeholders, including certain

state agencies and any person owning land through which the line is proposed to run or adjacent land.  PUA § 7-207(c)(1)(i)-(vii); COMAR 20.79.02.02.

The PPRP is required by law to coordinate the review and analysis of the Company's CPCN application by the State Agencies and provide the PSC with proposed recommended licensing conditions that address environmental and socioeconomic impacts of the MPRP.  *See* Md. Code Ann., NR § 3-306(b)(1) (requiring PPRP to "complete an independent environmental and socioeconomic project assessment report"); NR § 3-306(b)(2) (requiring PPRP to submit proposed licensing conditions within six months of an application's completion); (*see also* ECF 3 ¶ 19.)

The PSC establishes a procedural schedule that sets deadlines for parties and intervenors to the application to file testimony.  COMAR 20.79.02.03.  As part of this process, parties and intervenors are permitted to issue written discovery requests, referred to as "data requests" to the applicant.  The PPRP also provides, as part of its written testimony, proposed licensing conditions for the applicant's proposed project that speak to the project's anticipated environmental and socioeconomic impacts.

Following the submission of testimony, the PSC holds public hearings regarding the proposed project, as well as an evidentiary hearing that address the testimony filed by each of the parties and intervenors.  Thereafter, the PSC issues an order granting or denying the application, in which the PSC must assess various aspects of the proposed project, including its effect on the environment, conservation of natural resources, and the preservation of natural quality.  *See* PUA § 7-207(e) (including factors for consideration prior to PSC issuing a final decision).

## IV.    The Company's CPCN Application

The Company filed its CPCN application with the PSC on December 31, 2024, which is now pending as Case No. 9773.  The Company's application included testimony from various

Company witnesses, an environmental review document prepared by the Company's environmental consultants that discusses the MPRP's anticipated environmental impacts, and a routing study that identifies the MPRP's proposed route and explains why alternative routes were not selected. The proposed route was determined after several months of study and evaluation that included the consideration and analysis of multiple alternative routes to determine the least environmentally and socioeconomically impactful route. The proposed route traverses each of the Subject Properties.

On January 10, 2025, the Commission issued a notice directing the PPRP to report by March 26, 2025, to the PSC on its recommendations as to whether the Company's CPCN is administratively complete. (ECF 3 ¶ 19, ECF 3-4.) Thereafter, on March 26, 2025, PPRP provided its recommendation. (ECF 3 ¶ 20; *see also* COMAR 20.79.01.10(C); COMAR 20.79.01.09.) PPRP advised the PSC it "does not consider the Application to be administratively complete," in part because it "lacks a sufficient summary of the environmental and socioeconomic effects from the construction and operation of the Project, including field studies, which are necessary to meet the requirements of COMAR 20.79.04.04(B) and (C)." (ECF 3 ¶ 20, ECF 3-5 at 1, 4.) PPRP explained:

> Field studies are imperative to verify and augment initial desktop information to confirm that the Project's effects are correctly documented, ensuring that all unavoidable impacts are accurately evaluated and that appropriate mitigation is proposed. This is especially important for this Project given its significant length and impacts to land uses, which will be necessary for its construction and operation. Yet, desktop-based information has been the only data available for developing the proposed ROW and, currently, is the only information available to PPRP to begin its independent assessment. **Without field-based information, PPRP cannot fully evaluate the Project's impacts to Maryland's socioeconomic and natural resources.**
>
> PPRP understands that PSEG currently does not have the necessary access to conduct field studies on the parcels located in the proposed 150-foot wide [right-of-way] and has put considerable effort into providing as much desktop-based

environmental information as is currently available.   **PSEG has indicated that field-based studies have been delayed due to circumstances beyond PSEG's control and that PSEG is currently working to obtain the required temporary access to the properties within the Project ROW so that these studies can be initiated.   However, a desktop survey is insufficient** to determine whether the proposed location of the ROW and transmission line poles have been positioned such that they best avoid and/or mitigate environmental and socioeconomic impacts and comply with relevant laws.

(*Id*. at 4 (emphasis added).)   PPRP further advised that, for the Company's application to be administratively complete, the Company must complete the following field-based surveys: (1) wetland delineations, (2) forest stand delineations, (3) geotechnical surveys, (4) Sensitive Species Project Review Area surveys; and (4) any field surveys required by the Maryland Historical Trust. (*Id*. at 4.)   PPRP emphasized that it will "need" this information "to undertake its independent assessment" of the Company's application.   (*Id*. at 6.)   "[U]ntil the deficient information identified in PPRP's report is filed with the [PSC]," PPRP continued, "PPRP recommends that the CPCN Application for the MPRP be deemed incomplete."   (*Id*.)

On April 1, 2025, the PSC issued a Notice and Request for Comments, and on April 10 and 11, 2025, Carroll, Frederick and Baltimore Counties filed comments in response.   (*See* Exhibit 1 (Comments from Carroll County); Exhibit 2 (Comments from Frederick County); Exhibit 3 (Comments from Baltimore County).)   Carroll County contended that State law appears to exempt the Company from forest conservation and other similar County regulation regimes once the PSC issues a CPCN, and as a result, the Company should be required to perform required environmental surveys prior to the PSC proceeding with the Company's CPCN application.   (*See* Exhibit 1, at 1.)   Frederick and Baltimore Counties concurred in the position that the PSC should require the Company to perform the surveys before the PSC proceeds with the CPCN application.   (*See* Exhibit 2, at 3 ("Frederick County . . . supports both the PPRP's determination that the application was not complete as filed, and the scope of detailed information PPRP requests be provided);

15

Exhibit 3, at 2 (stating that "[t]he Commission, DNR/PPRP, Baltimore County, and other participants lack the required information about these factors that would come from requisite field studies that have not yet been conducted."))

The Company cannot begin the field-based surveys that PPRP says it needs until the Company gains access to the Subject Properties. Without this access, the PSC's consideration of the Company's application cannot proceed with sufficient time for the Company to obtain a CPCN by January 2026. This, in turn, will prevent the Company from meeting PJM's in-service deadline of June 1, 2027. Accordingly, the Company seeks a preliminary injunction that permits the Company to enter the Subject Properties for the purpose of conducting the field-based surveys requested by PPRP.

Because the PPRP on behalf of the State Agencies has consistently requested CPCN applicants to conduct field surveys of this nature in the past, the Company began contacting landowners along the MPRP's proposed route as early as October 2024. As set forth in the Declarations of Roger J. Trudeau and in more detail below, the Company and its land agents made real and bona fide efforts to obtain consent from each Respondent to enter their property. (*See* ECFs 4–29, 31–73.) Each Respondent has either refused entry or ignored multiple outreach attempts. Further, an organized and funded opposition, led by STOP MPRP, Inc., has urged property owners to refuse the Company access. As a result, the Company has been unable to enter the Subject Properties to perform the surveys and obtain the information requested by the PPRP.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff or petitioner must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an injunction is in the public

interest.  *Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 3d 466, 473 (D. Md. 2024); *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023).  Under Fed. R. Civ. P. 65(a), this Court has authority to consolidate a preliminary injunction proceeding with a trial and final decision on the merits.

## ARGUMENT

### I.    The Company is Likely to Succeed on the Merits of Its Claim.

The Company is likely to succeed on the merits of its claim for injunctive relief because RP § 12-111 affords the Company the right to enter onto the Subject Properties to perform the surveys and inspections requested by PPRP.  RP § 12-111(a) provides that civil engineers, land surveyors, real estate appraisers (and their assistants) acting on behalf of "any body politic or corporate having the power of eminent domain," after having made every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry, may:

> (1)    Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement;
>
> (2)    Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and
>
> (3)    Enter on any private land and perform any function necessary to appraise the property.

Simply stated, RP § 12-111(a) creates a right of entry for certain persons operating on behalf of a body politic or body corporate with condemnation authority to enter properties for limited purposes related to the power of eminent domain.  *King v. Rockville*, 52 Md. App. 113, 122 (1982) ("The right to enter property pursuant to § 12-111 is a 'key element' in the exercise of the power of eminent domain."), *cert. denied*, 294 Md. 442 (1982), *cert. denied*, 461 U.S. 914 (1983).  Recognizing that a right of entry necessarily runs up against a landowner's right to exclude, the General Assembly included a procedure for navigating landowner refusals when such

refusals impede the statutorily granted right of entry. *See id.* at 122–23. Specifically, should the landowner refuse to permit agents of a qualifying entity from entering, RP § 12-111(c) provides a remedy, namely a court order, forbidding the landowner from interfering with the qualifying entity's entry onto the land.[2] *See King*, 52 Md. App. at 122.

RP § 12-111 does not require that a legal entity make any additional showing, beyond the two elements above (*i.e.*, that they are body politic or corporate having condemnation authority and that they made bona fide efforts to notify landowners in writing of the proposed entry) to be entitled to an order prohibiting interference with that right of entry.

Indeed, the Appellate Court of Maryland (then the Court of Special Appeals of Maryland) has confirmed that RP § 12-111 does not afford the owner or occupant an opportunity for a hearing prior to the issuance of an order under RP § 12-111. *King*, 52 Md. App. at 120–23 (1982) (holding that landowners were not entitled to a hearing prior to issuance of order granting governmental agency access to survey their land pursuant to RP § 12-111); *see also* Memorandum Opinion, *Transource Maryland, LLC v. Scott*, Case No. 12-C-18-000549, at 3 (Harford Cnty. Cir. Ct. June 24, 2018) (issuing order pursuant to RP § 12-111 permitting utility to access private land for surveying purposes and noting that "[i]t is not a violation of due process for this court to proceed without a hearing" (citing *King*, 52 Md. App. at 123)).[3]

---

[2] RP § 12-111(c) states that, if any civil engineer, surveyor, real estate appraiser (or their assistants) is refused permission to enter onto a property to conduct a survey or study permitted by RP § 12-111(a), the qualifying entity may apply to "a law court of the county where the property, or any part of it, is located" for an order authorizing entry onto the property. Although RP § 12-111(c) identifies the County in which the property sits as an appropriate *venue*, RP § 12-111(c) does not assert "exclusive" jurisdiction for right of entry petitions in state court. Rather, it states that such petitions "may" be filed in those courts. Additionally, a state may not, as a technical matter, divest a federal court sitting in diversity from jurisdiction to hear a state dispute. While a federal court sitting in diversity looks to state law to define the substantive rights of the parties, *Wideman v. Innovative Fibers LLC*, 100 F.4th 490, 496 (4th Cir. 2024) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)), a state "cannot limit the subject matter jurisdiction of federal courts, even in diversity cases," *id.* at 497; *see Ry. Co. v. Whitton's Adm'r*, 80 U.S. 270, 286 (1871) ("Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such case, is not subject to State limitation.").

[3] A copy of the *Transource* opinion is attached hereto as Exhibit 4.

As a result, so long as the Company (1) is a "body politic or corporate . . . having the power of eminent domain," and (2) has "made every real and bona fide effort to notify" each Respondent of the Company's need to enter their property, the Company is entitled to an order under RP § 12-111(c) that permits entry onto the Properties to conduct the surveys and inspections that PPRP has requested. The Company meets both of these requirements, as set forth below.

### A.    The Company is "A Body Politic or Corporate Having the Power of Eminent Domain"

First, the Company is legally entitled to enter each of the Properties because it is a "body politic or corporate" that has the "power of eminent domain" within the meaning of RP § 12-111(a). When interpreting a statute, the Supreme Court of Maryland asks courts to examine "the plain language . . . within the context of the statutory scheme to which it belongs." *Town of Upper Marlboro v. Prince George's Cnty. Council*, 480 Md. 167, 193 (2022) (quoting *State v. Bey*, 452 Md. 255, 266 (2017)). Further, the Supreme Court of Maryland presumes that the General Assembly "intends its enactments to operate together as a consistent and harmonious body of law, and, thus, [] seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* (citation omitted); *Andrews & Lawrence Prof'l Servs., LLC v. Mills*, 467 Md. 126, 149 (2020) ("[S]tatutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory."); *State v. Roshchin*, 446 Md. 128, 140–41 (2016) ("[I]t is a common maxim of statutory construction that related statutes governing the same subject are to be construed together and harmonized.").

PUA § 7-207(b)(3)(iii)(2) authorizes the PSC to grant CPCNs to an applicant that "is or, on the start of commercial operation of the overhead transmission line, will be subject to regulation as a public utility by an officer or an agency of the United States." As noted above, PUA § 7-

207(b)(3)(v)(2) further permits these "public utilit[ies]" to exercise condemnation authority to construct transmission lines for which they receive a CPCN. The Company will be subject to regulation by FERC as a "public utility" at the time the MPRP goes in-service. (ECF 3 ¶ 16.) As such, under Maryland law, the Company is vested with the power of eminent domain for a high voltage transmission line that receives a CPCN from the PSC. PUA § 7-207(b)(3)(i). Accordingly, under RP § 12-111(a), the Company is a "body politic or corporate" with the "power of eminent domain" and, as such, it is legally entitled to enter the Properties to survey and obtain necessary information for its ultimate construction of a PSC-authorized transmission line. This power of eminent domain may not be exercised until the PSC grants a CPCN establishing the location of the alignment for the transmission line. *Id.*

Critically, the plain text of RP § 12-111(a) does not mandate that all conditions precedent to the actual exercise of eminent domain be satisfied before the "body politic or corporate" is authorized to enter land to conduct surveys. In other words, in relation to the Company's development of the MPRP, RP § 12-111(a) does not require the Company to first obtain a CPCN, or even exercise condemnation authority, before being granted the right of entry that RP § 12-111 codifies. This plain reading of RP § 12-111 makes logical sense in the context of the extensive environmental and other reviews that public use projects must undergo prior to being authorized to exercise eminent domain along the approved alignment and prior to beginning actual construction.

For example, as explained above for the MPRP, PUA § 7-207 requires the PSC to review CPCN applications for, among other things, the effects of a proposed transmission line of the impacted property and adjacent properties. Moreover, NR § 3-306 requires the PPRP to complete an extensive environmental and socioeconomic project assessment and propose licensing

conditions supporting the same. None of this information—which is antecedent to the Company's obtaining a CPCN—could be gathered if the Company were required to obtain a CPCN before being permitted entry onto the Properties under RP § 12-111. In other words, the requirements for the Company—or any energy services provider—to obtain a CPCN work in concert with the natural interpretation of RP § 12-111.

The harmonized reading of NR § 3-306, PUA § 7-207, and RP § 12-111, then, is that a "body politic or corporate" may obtain land surveys pursuant to RP § 12-111(a) for purposes of supporting a CPCN application, which thereby permits the PPRP to complete its statutorily required environmental and socioeconomic assessment, and recommendation which also permits the PSC to consider the PPRP's recommendations in determining the issuance of a CPCN to the Company.

In contrast, an interpretation in which a CPCN must issue *before* a "body politic or corporate" can obtain the land surveys necessary to obtain a CPCN would render the statute unworkable, "illogical," "unreasonable," and "inconsistent with common sense." *Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159, 180 (2022) (quoting *Patton v. Wells Fargo Fin. Md., Inc.*, 437 Md. 83, 97–98, (2014) (internal citation omitted)). Not only would such an interpretation disrupt the carefully balanced statutory scheme in NR § 3-306, PUA § 7-207, and RP § 12-111, but it would also contradict the very purpose of the statute by allowing a landowner to halt the right of entry and prevent a CPCN from issuing in the first instance. *See King*, 52 Md. App. 113, 122–23 (1982) (noting "it is apparent that the purpose" of a court order to enter property for conducting land surveys "is to bring a recalcitrant landowner under the contempt power of the court pursuant to [RP] § 12-111(e)" and noting a landowner is not entitled to a hearing before such an order may issue). If a landowner is not entitled to be heard prior to a right of entry order, the

General Assembly could not have intended to authorize a single landowner's refusal prior to issuance of a CPCN to halt a CPCN application's review and thereby halt the entire proposed project. Ultimately, the purpose of RP § 12-111, to navigate landowner refusals and issue right of entry orders, is only effectuated under the Company's interpretation of the statute, and it would be illogical for a carefully crafted system of interworking agencies to be halted by a single landowner who denies land surveyors entry.

Moreover, the Company's interpretation of RP § 12-111 conforms with longstanding Maryland precedent that has regarded temporary rights of entry prior to condemnation as constitutionally permissible. *See Lafontaine's Heirs v. Lafontaine's Heirs*, 205 Md. 311, 320 (1954) ("Authorized temporary occupancy or momentary entry for purposes of survey or inspection is not a taking and may be done without compensation."); *Steuart v. Baltimore*, 7 Md. 500, 516 (1855) ("The constitutional prohibition against taking private property for public use, until compensation is first paid or tendered, means *taking* the property from the owner, and *actually* applying it to the use of the public. It does not mean the preliminary measures necessary in such cases. To hold that compensation must be paid or tendered, before a survey should be made, or other preparatory steps taken, would be a construction of the constitution not required by its language, or necessary for the protection of private rights.").

Relying on the above rationales, at least one Maryland court interpreting RP § 12-111 has reached this same conclusion. In *Transource*, a subsidiary of a public utility applied for a CPCN to construct a transmission line through Washington and Harford Counties. Like the Company here, PPRP requested Transource to conduct surveys along the proposed line route in order for its CPCN application to be considered administratively complete. After being refused entry by certain landowners, Transource filed a petition in the Circuit Court for Harford County, seeking

22

an order pursuant to RP § 12-111 that would permit Transource to enter the properties for this purpose. (*See* Ex. 4.)

Then-Judge Eaves (now a Justice of the Supreme Court of Maryland) granted Transource's petition. In so doing, Judge Eaves rejected the argument that Transource was not a body politic or corporate" with the "power of eminent domain" within the meaning of RP § 12-111 because it had not yet obtained a CPCN. (Ex. 4, at 8–9.) Judge Eaves explained that the factors the PSC must consider when evaluating a CPCN application, as set forth in PUA § 7-207:

> must be read in conjunction with the reasons for entry onto private property permitted pursuant to [RP] § 12-111(a). No other reading makes sense. In other words, [PUA] § 7-207(b) contemplates the [PSC] making its decision after first obtaining <u>all</u> information pertinent to the award of a certificate that could lead to a taking by eminent domain.

(Ex. 4, at 8 (emphasis in original).)

Other state courts interpreting statutes closely analogous to RP § 12-111 have reached the same conclusion as the court in *Transource*. *See Palmer v. Atl. Coast Pipeline, LLC*, 293 Va. 573, 582–83 (2017) (explaining that a state statute analogous to RP § 12-111 granted permission for entry to conduct surveys to natural gas companies applying for CPCNs from FERC); *Barr v. Atl. Coast Pipeline, LLC*, 295 Va. 522, 533–34 (2018) (declining to read limit into utility's ability to enter property under an analogous state statute where doing so "would be completely unworkable"); *Nexus Gas Transmission, LLC. v. Sprague*, No. E-15-069, 2016 WL 3654532, at *3 (Ohio Ct. App. Jul. 7, 2016) (rejecting argument that utility was not entitled, under state statute analogous to RP § 12-111, to enter property to conduct surveys until after CPCN from FERC was issued); *see also Prop. Rsrv., Inc. v. Super. Ct.*, 1 Cal. 5th 151, 197 (2016) ("The entire purpose of precondemnation entry and testing is to enable the public entity to determine whether or not the property is suitable and should be acquired for a public project and whether a classic condemnation action should be commenced. It is counterintuitive to maintain that the commencement of a classic

condemnation action is required *before* such precondemnation activities may be undertaken." (citation omitted)).

In short, because the Company will be subject to regulation by FERC once its CPCN is obtained, it will be a "public utility" with condemnation authority as defined under federal and Maryland law.  Consistent with prior case law in and around Maryland, and pursuant to principles of statutory interpretation employed in Maryland, the Company has established it is a "body politic or corporate having the power of eminent domain" for the purpose of RP § 12-111(a).[4]

### B.    The Company Has Made Real and Bona Fide Efforts to Obtain the Consent of Each Respondent to Enter the Subject Properties

As set forth above, in addition to being a "body politic or corporate having the power of eminent domain," the Company must have made "real and bona fide efforts" to obtain a property owner's consent before seeking an order under RP § 12-111(c).  The Company has made these "real and bona fide efforts" with respect to each Respondent, as set forth in the Declarations of Roger J. Trudeau.  (*See* ECFs 4–29, 31–73.)  Notwithstanding these real and bona fide efforts, each Respondent has refused consent for the Company to enter their property, as also set forth in the Declarations of Roger J. Trudeau.  (*Id.*)

In sum, because the Company (1) is a "body politic or corporate having the power of eminent domain" and (2) has made real and bona fide efforts to obtain the consent of each Respondent to enter the Subject Properties, the Company is entitled to an order under RP § 12-111 that permits it to enter the Subject Properties to perform the surveys and obtain the information

---

[4] Finally, and as an alternative argument supporting the Company's entitlement to the Order, the Company may also be implicitly authorized to survey land on behalf of instrumentalities of the State as the PPRP of the DNR is demanding the Company to obtain land surveys as a prerequisite to CPCN completion and approval.  *See Broadway Servs. v. Comptroller of Md.*, 478 Md. 200, 216 (2022) (outlining implicit agency principles).  *Cf. City of Balt. Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 307 (2006) (holding a private entity was an "instrumentality of Baltimore City" for purposes of exercising eminent domain authority).

that PPRP has requested.  The Company is thus likely to succeed on the merits of its petition and has satisfied the first requirement for preliminary relief.

## II.    The Company is Likely to Suffer Irreparable Harm Without Preliminary Relief.

The Company is also likely to suffer irreparable harm in the absence of preliminary relief entitling it to access the Subject Properties.  "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent' and that the harm 'cannot be fully rectified by the final judgment after trial.'"  *Am. Fed'n of Tchrs. v. Bessent*, -- F.Supp.3d --, 2025 WL 582063, at *13 (D. Md. Feb. 24, 2025) (including the standard for irreparable harm in the context of a temporary restraining order) (citing *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019)); *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024) ("The standards for granting a TRO and granting a preliminary injunction are the same.").  Primarily, absent preliminary relief, the Company will suffer irreparable harm because it will not be able to timely complete the surveys and gather the information requested by PPRP.  This, in turn, will prevent the Company's CPCN application from proceeding to a final resolution with enough time that the Company may begin construction on the MPRP in January 2026 and, in turn, place the MPRP into service by June 1, 2027, as directed by PJM.

Two cases from the Fourth Circuit are instructive in this regard.  In the first, *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004), the court affirmed that a gas company who possessed a CPCN from FERC was entitled to a preliminary injunction permitting it to take immediate possession of private property before just compensation was paid and determined in a condemnation action.  *Id.* at 818.  There, the company ("ETNG") obtained a CPCN from FERC to construct a 94-mile natural gas pipeline through portions of Tennessee, Virginia, and North

Carolina. *Id.* at 819. FERC's order granting the CPCN to ETNG both (1) authorized ETNG to acquire land for the pipeline by eminent domain, as necessary, and (2) required ETNG to complete construction and make the pipeline available for service by January 1, 2005. *Id.* ETNG thereafter pursued negotiations with the various affected landowners from whom rights of way were needed. *Id.* ETNG was unable to reach agreements with roughly ten percent of these landowners, however, and filed 133 corresponding actions in the Western District of Virginia seeking orders of condemnation for easements over those tracts. *Id.* At the same time, ETNG filed motions for preliminary injunctions entitling ENTG to immediate access to the requested easements to prevent delays in construction. *Id.*

The district court granted the motions, and the Fourth Circuit affirmed. *Id.* at 818. The court found that ETNG made the requisite showing that it would suffer irreparable harm without a preliminary injunction entitling it to immediate access to the properties, explaining:

> Constructing a ninety-four-mile pipeline is a complex project that can only progress in phases. Certain portions of the project have to be completed before construction can begin on other portions. Therefore, as the district court recognized, "any single parcel has the potential of holding up the entire project." Continuing, the court said, to "require ETNG to build up to a parcel of land it does not possess, skip that parcel, and then continue on the other side would be wasteful and inefficient." Furthermore, ETNG is under an order from FERC to complete construction and have the pipeline in operation by January 1, 2005. It would not be possible to meet FERC's deadline without a preliminary injunction.

*Id.* at 828–29. The court further found that ETNG would have suffered irreparable harm absent a preliminary injunction because: (1) ENTG was party to several contracts requiring it to provide natural gas by certain dates that a delay caused by the condemnation proceedings would have required ETNG to breach; (2) utilities relying on the pipeline would not be able to meet their customers' demand for gas if the pipeline were not constructed on time; and (3) ETNG would lose

$5 million if construction delays caused it to breach its contractual obligations to supply gas. *Id.* at 829.

The Fourth Circuit reached the same conclusion in *Mountain Valley*. 915 F.3d at 209. There, like ETNG, Mountain Valley obtained a CPCN from FERC to construct an interstate natural gas pipeline, which required that the pipeline be complete and available for service by October 2020. *Id.* Though Mountain Valley acquired rights-of-way to construct the pipeline along 85 percent of the properties along the approved route, it was required to file condemnation actions against the remaining 15 percent of landowners, totaling in the "hundreds," in various district courts. *Id.* at 210. Mountain Valley simultaneously sought preliminary injunctions granting it immediate access and possession during the pendency of the condemnation proceedings to prevent construction delays. *Id.*

The various district courts granted Mountain Valley's motions, and the Fourth Circuit again affirmed, holding that it was "undisputed that without preliminary relief, Mountain Valley almost certainly would be unable to meet FERC's October 2020 in-service deadline." *Id.* at 216. The court continued:

> As the court explained in *Sage*, construction of a pipeline is a lengthy and complex process: "Certain portions of the project have to be completed before construction can begin on other portions," and "any single parcel has the potential of holding up the entire project." The district courts found that this case is no exception, describing the eleven distinct segments of pipeline construction that must be sequenced around a limited window during which federal regulations allow for necessary tree-clearing. But at the same time, determining just compensation for the multiple tracts of land affected by a pipeline is itself a lengthy and complex process, which in this case could extend for three years or more, taking it past [FERC's] deadline of October 2020. The combined effect is that without a preliminary injunction, Mountain Valley would likely lose the right to construct the pipeline altogether – an outcome that qualifies as irreparable injury under *Sage*.

27

*Id*. at 216–17 (citing *Sage*, 361 F.3d at 829).

In sum, *Sage* and *Mountain Valley* stand for the proposition that, where an energy company has been directed to provide services by a date certain, and the length of litigation would prevent the company to meet that deadline, the company will suffer irreparable harm if it is not granted preliminary relief.  *See id.*; *Sage*, 361 F. 3d at 829.  The same circumstances exist here.  Though the Company has not yet been issued a CPCN, it has been directed by PJM—who acts pursuant to authority granted to it by FERC—to construct and place the MPRP into service by June 1, 2027.  The DEA, filed with and approved by FERC, further obligates the Company to meet this deadline.

Moreover, just like ETNG and Mountain Valley, who could not proceed piecemeal with the construction of their pipelines, the Company cannot proceed piecemeal with its CPCN application.  In other words, the Company cannot get approval for certain portions of its proposed transmission line while waiting for approval on the remainder.  The PSC must approve one alignment from beginning to end.  Accordingly, if the Company is prevented from meeting the deadline for service set by PJM and approved by FERC, then it will suffer irreparable harm, just like the Fourth Circuit found that the energy providers would have suffered in *Sage* and *Mountain Valley*.

Preliminary relief on an expedited schedule is necessary for the Company to avoid this result.  As set forth above, in order to meet PJM's deadline of June 1, 2027, the Company must begin construction on the MPRP no later than January 2026.  In order to begin construction by that time, the Company must have obtained its CPCN by that time.  As explained above, however, Maryland law demands PPRP and the PSC's review of certain environmental and socioeconomic factors before a CPCN can be issued, and without the environmental surveys and information the PPRP has requested from the Company, the Company's CPCN application will not proceed to a

final resolution by January 2026. *See also* NR § 3-306(b)(2) (providing the PPRP may take up to six months after an application's completion to provide its recommendation to PSC). To ensure that the Company's application proceeds in a timely fashion (such that it may obtain a CPCN before January 2026), the Company must be able to access the Subject Properties as soon as possible to provide the requested information to PPRP.

If this matter proceeds along the normal course to trial, however, this timeline will be impossible. Federal Rule of Civil Procedure 12 affords Respondents 21 days after service of the petition in this action to file a responsive pleading. Fed. R. Civ. P. 12(a)(1)(A)(i). If any Respondent moves to dismiss the Company's petition (which, for the reasons set forth in Section I, *supra*, would be meritless), then briefing and argument on that motion would occupy, at the very least, an additional month. *See* Loc. R. 105.2(a) (D. Md. 2023) (requiring that "all memoranda in opposition to a motion shall be filed within fourteen (14) days of service of the motion and any reply memoranda within fourteen (14) days after service of the opposition memoranda."). The Court's resolution of the motion would thus not occur until, at the very earliest, June. The Company's efforts to conduct the surveys and obtain the information required by PPRP by that time would be derailed entirely—without even considering how long it would take to resolve the Company's petition on the merits. As a result, the Company will suffer irreparable harm if preliminary relief is not granted to the Company now.

The Company will also suffer irreparable harm in the form of monetary harm if its construction of the MPRP is delayed. Both *Sage* and *Mountain Valley* held that anticipated financial losses attributable to a construction delay were sufficient to meet the irreparable harm requirement. *See Sage*, 361 F.3d at 829–30 (finding that lost contracts due to the delay in construction and service constituted irreparable harm); *Mountain Valley*, 915 F.3d at 217–19

(holding that "lost revenues from the delay in pipeline service," "charges and penalties for the breach of construction contracts," and "carrying costs to prolong the project, such as storage and personnel expenses," were sufficient to establish irreparable harm) (noting that *Sage* "expressly treats prospective economic injuries flowing from a delay in pipeline construction as a form of irreparable injury.").

Here, similarly, if the Company is not able to obtain access to the Subject Properties, then it will suffer monetary harms. In this instance, the Company would be required to redraw the proposed line for the MPRP and submit a new CPCN application to the Commission to attempt to meet its obligations under the DEA. This would impose significant costs on the Company. In addition to other costs incurred by the Company to prepare the Company's CPCN application, the Company has spent $1,576,860 in fees to siting and environmental consultants, who have assisted the Company in analyzing numerous specific properties through available public data and assessing the feasibility of the properties for a high voltage transmission line as well as the impact of the line on sensitive environmental areas for the purpose of identifying a proposed route that is designed to both function effectively and minimize the scope of environmental impacts as much as possible. (ECF 3 ¶ 29.) The Company has also spent $1,323,120 in fees to a real estate firm that has assisted, among other things, with contacting property owners to gain access for surveying purposes. (*Id.*) To prepare a new application that reflects a new proposed route, the Petitioner would be required to again incur these fees, in addition to significant legal fees and the cost of time spent by PSEG Services Corporation and PSEG employees.

In sum, beyond the essential fact that a significant delay of the Company's construction of the MPRP would risk serious disruptions to the electric grid across Maryland and other states within PJM's territory, if preliminary relief to the Company is not granted, then the Company will

30

suffer irreparable harm: both in that it will be unable to meet PJM's in-service deadline, and that it will suffer monetary harms associated with the cost of submitting a new CPCN application. The Company thus satisfies this second factor required for preliminary relief.

### III. The Balance of Equities Weighs in Favor of Preliminary Relief.

"To balance the equities, the Court considers 'the relative harms to the applicant and respondent, as well as the interest of the public at large.'" *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, Case No. 25-cv-00333-ABA, 2025 WL 573764, at *28 (quoting *Barnes v. E-Sys., Inc. Grp. Hosp. Med & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)), *opinion clarified*, No. 25-CV-0333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025*).  Here, the relative harms to the Company far outweigh the possible harms to Respondents. As set forth above, the Company will suffer irreparable injury if preliminary relief is not granted. Respondents, in contrast, will suffer no material harm. As explained in Section I, *supra*, RP § 12-111 entitles the Company to access Respondents' properties as a matter of right. Respondents have no legal basis under Maryland law to refuse entry onto their properties. Even if the Company *did* cause any damage to any Respondent's property, the Respondent would have recourse under RP § 12-111(c), which permits a Respondent to file "a cause of action for damages" against the individual who caused the damage *and* the Company in the event that Respondent's land or personal property is "damage[d] or destroy[ed]."  In sum, whereas the Company will suffer irreparable injury absent preliminary relief, Respondents will not, as they have no legal basis to object to the Company's entry, the surveys the Company will perform are non-invasive, and Respondents have a legal cause of action in the unlikely event any damage to their land or personal property is sustained.

### IV. Preliminary Relief is in the Public Interest.

Finally, preliminary relief is in the public interest. As explained above, PJM has determined that, beginning in 2027, its territory (which encompasses 13 states) is at risk of

significant service disruptions, including system collapse and electric service blackouts. (ECF 3 ¶ 11.) PJM selected the MPRP and has directed that it be placed in service by June 1, 2027, to avoid this nightmare scenario. If the MPRP is not timely constructed and placed into operation, the reliability of an electric grid that serves millions of residential and commercial electricity consumers will be put at risk. An order that permits the Company to access the Properties now—which keeps the Company on the path toward meeting its in-service deadline—is in the public interest.

## CONCLUSION

For the foregoing reasons, the Company respectfully asks this Court to enter a preliminary injunction that permits the Company to enter Respondents' Properties to conduct the surveys and gather the information required by PPRP. Pursuant to Federal Rule of Civil Procedure 65(a)(2), the Company respectfully requests that the Court advances trial on the merits of the Company's Petition and consolidate it with a hearing on the Company's motion. Further, the Company requests that this Court issue an expedited scheduling order requiring Respondents to file any response to this Motion with seven business days of service and the Company to file any reply to a response within three business days of the filing of a response.

Date: April 15, 2025                                    Respectfully submitted,

                                                        */s/ Kurt J. Fischer*
                                                        Kurt J. Fischer (Bar No. 03300)
                                                        Venable LLP
                                                        210 W. Pennsylvania Avenue
                                                        Suite 500
                                                        Towson, MD 21204
                                                        (410) 494-6200
                                                        kjfischer@venable.com

J. Joseph Curran III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
(410) 244-7400
csgunderson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Petitioner PSEG*
*Renewable Transmission, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify on this 15th day of April, 2025, I electronically filed the foregoing with the Court by using the CM/ECF system.  There is currently no counsel of record for Respondents.  I certify that I will serve the foregoing on Respondents.

*/s/ Emily J. Wilson*
Emily J. Wilson