# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### Northern Division

PSEG RENEWABLE
TRANSMISSION LLC,

      Petitioner,

        v.

ARENTZ FAMILY, LP, *et al.*,

      Respondents.

\*  \*  \*

\*

\*

Case No. 1:25-cv-01235-ABA

\*

\*

\*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## RESPONDENT PETER AND JOHN RADIO FELLOWSHIP, INC.'S OPPOSITION TO PSEG RENEWABLE TRANSMISSION, LLC'S MOTION FOR PRELIMINARY INJUNCTION

Jennifer L. Wazenski (Bar No.12564)
WATERSHED LEGAL COUNSEL
1011 Bay Ridge Rd. #145
Annapolis, MD 21403
(410) 897-7843
jennifer@watershedlc.com

*Attorney for Respondent*
*Peter and John Radio Fellowship, Inc.*

## Table of Contents

**Introduction**………………………………………………………………………..……..5

**Regulatory Scheme** ………………………………………………………………....…..6

**Background** ………………………………………………………………………..……..8

    I. River Valley Ranch …………………………………………………..……8

    II. The Proposed Project ………………………………………………….…..10

    III. PSEG RT's Right of Entry Efforts …………………………………….....11

    IV. PSEG's CPCN Application ………………………………………….…….12

    V. Recent Developments in the Regional Energy Outlook …………………….13

**The Proposed Preliminary Injunction** ……………………………………..………..14

**Legal Standard**………………………………………………………………...…..…..15

**Argument** …………………………………………………………………………. 16

    I. Petitioner is Unlikely to Succeed on the Merits …………………………… 16

       A. Petitioner is Not a "Body Corporate with the Power

       of Eminent Domain" within the Meaning of § RP 12-111 ……………….…17

       B. Petitioner has not made "every real and bona fide effort"

       to notify Respondent of a proposed entry as required by RP 12-111 ……..….22

    II. Petitioner will not Suffer Irreparable Harm if the Relief is Not Granted ……..…26

    III. The Balance of Equities Weighs in Favor of Denying the Motion………………29

    IV. The Public Interest Weighs Against Granting Preliminary Relief…………….. ….30

    V. Lack of Nexus of the Proposed Injunction to Any Need Undercuts All Elements 32

**Conclusion**………………………………………………………………………………..34

## TABLE OF AUTHORITIES

**Cases**

*Barr v. Atl. Coast Pipeline, LLC,*
  295 Va. 522 (2019) ……………………………………………..…..21
*Di Biase v. SPX Corp,*
  872 F.3d 224 (4th Cir. 2017)……………………………………15,16
*East Tennessee Natural Gas Co. v. Sage,*
  361 F.3d 808 (4th Cir. 2004)……………………………..…….....26
*King v. Mayor and Council of Rockville,*
  52 Md. App. 113 (1982)………………………………………..…..33
*Mackie v. Town of Elkton,*
  265 Md. 410 (1972) ……………………………………………..…24
*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,*
  915 F.3d 197 (4th Cir. 2019)………………………………………26-27
*Nexus Transmission, LLC v. Sprague,*
  No. E-15-069, 2016 WL 3654532 (Ohio Ct. App. Jul. 7, 2016)…………………….…..21
*Palmer v. Atl. Coast Pipeline, LLC,*
  293 Va. 537 (2017) …………………………………………………...21
*Pashby v. Delia,*
  709 F.3d 307 (4th Cir. 2013)………………………………………16
*Prop. Rsrv., Inc. v. Super. Ct..*
  1 Cal 5th 151 (2016) …………………………………………………21
*WMATA v. One Parcel of Land,*
  514 F.2d 1350 (D.C. Cir. 1975)…………………………………..…24
*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ………………………………………………15, 26

**Statutes and Codes**

16 U.S.C. § 824(b)(1)…………………………………………………….6
16 U.S.C. § 824(e)…….……………………………………………………19
16 U.S.C. § 824s (2018) ……………………………………………….6
Md. Code Ann., Public Utilities § 3-101 to § 3-111 ………………………..………………5
Md. Code Ann., Public Utilities § 3-106…………………………………………5
Md. Code Ann., Public Utilities § 7-207(b)(3)(i) ……………………………………6
Md. Code Ann., Public Utilities § 7-207(b)(3)(v) ……………………………………16
Md. Code Ann., Public Utilities § 7-207(c), (d), (e), (f)…………..………………..……………5
Md. Code Ann., Real Property § 12-111 ..………………………………14-15, 1.7-18, 20-24, 31

Virginia Code
Va. Code § 56-49.01(A)…………………………………………………………21

**Administrative Orders and Reports**

*PPL Electric Utilities Corp.*,
 188 FERC ¶ 61,084 (Aug. 29, 2024) ……………………………………………6, 7
*PJM Interconnection, LLC*,
 Order Dismissing Waiver Request, 191 FERC ¶ 61,056 (Apr. 17, 2025) ……………7
*Promoting Transmission Investment Through Pricing Reform*,
 Order No. 679, 116 FERC ¶ 61,057 (2006) …………………………………….……6
*PSEG Renewable Transmission LLC*,
 Order Granting Pet. for Declaratory Order, 188 FERC ¶ 61,142 (Aug. 29, 2024) …11, 31
*Transmission Planning and Cost Allocation by Transmission Owning and
 Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011) ………………6

## INTRODUCTION

Invoking the State's power of eminent domain, Petitioner PSEG Renewable

Transmission, LLC ("PSEG RT") moves for extraordinary preliminary relief granting it an

immediate, open-ended right of entry to more than 90 private properties—including the

approximately 500-acre River Valley Ranch campus owned by nonprofit Respondent Peter and

John Radio Fellowship, Inc. Petitioners seeks this right in order to conduct unspecified field

surveys in support of a project that has yet to receive regulatory approval: a 67-mile, high-

voltage transmission project known as the Maryland Piedmont Reliability Project ("MPRP"). To

obtain the requested relief, PSEG RT must establish a likelihood of success on the merits,

irreparable harm, and that the balance of equities and public interest weigh in its favor—factors

that must be assessed in light of the still-pending state proceeding on the company's application

for a certificate of public convenience and necessity ("CPCN"). It cannot.

PSEG RT has no current eminent domain authority, failed to make "every real and bona

fide effort" before seeking an entry to property as required by Maryland law, and faces, at most,

delay in its private business plan—a harm that is speculative and monetary, not irreparable. By

contrast, granting the requested relief would inflict real and serious harm on Respondent's

agricultural, recreational and restorative programs by disrupting operations and creating

unacceptable safety and operational risks for staff, vulnerable young campers and other visitors.

There is a strong public interest in ensuring that PSEG RT fully justifies its proposed

project and route through the CPCN process, rather than short-circuiting it through premature

litigation that could impose unnecessary survey costs on Maryland ratepayers. Because fewer

than all parties affected by the project have been joined in this suit, a decision granting the

requested relief would not only be unfair to Respondents, but to those who have yet to be sued

and may nevertheless be constrained by its terms. While grid reliability is a serious concern, recent regional planning actions have alleviated any urgency. Whether and when this proposal should proceed must first be determined through the pending CPCN proceeding before the Maryland Public Service Commission.

The disruption and safety threats posed by granting preliminary access, the lack of any legal right to enter at this stage, and the immaturity of the CPCN process all counsel strongly against the extraordinary relief Petitioner seeks. Accordingly, the Motion should be denied.

## REGULATORY SCHEME

The construction and siting of high-voltage electric transmission lines in the United States are subject to federal planning requirements but remain under the primary authority of the States. The Federal Energy Regulatory Commission ("FERC") oversees transmission planning and cost allocation through regional transmission organizations ("RTO's") like PJM Interconnection, L.L.C. ("PJM"), and authorizes financial incentives to encourage investment.[1] Through Regional Transmission Expansion Plans ("RTEPs"), PJM identifies system needs and recommends projects for development.[2] However, participation in a regional plan does not authorize construction or confer rights to access land.

The Federal Power Act preserves state jurisdiction over transmission siting and construction. *See* 16 U.S.C. § 824(b)(1). As recently emphasized by FERC leadership, "FERC regulates RTOs and ISOs such as PJM, [but] in no way does that regulatory oversight represent

---

[1] *See* 16 U.S.C. § 824s (2018) (directing FERC to establish incentive-based rate treatments for transmission investments); *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011) (requiring regional transmission planning and cost allocation processes); *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 (2006) (implementing incentive-based rate treatments under FPA § 219).

[2] *See PPL Electric Utilities Corp.*, 188 FERC ¶ 61,084, at P 14 (Aug. 29, 2024).

any intent to preempt the states' decades-old authority to conduct CPCN proceedings that consider issues of need and prudence."[3]

In Maryland, the construction of an overhead transmission line designed to carry more than 69,000 volts requires a Certificate of Public Convenience and Necessity ("CPCN") from the Maryland Public Service Commission ("PSC"). Md. Code Ann., Public Utilities ("PUA") § 7-207(b)(3)(i). The CPCN process combines general procedural protections applicable to all PSC proceedings under Title 3 with additional substantive requirements for transmission projects under Title 7.

Title 3 ensures that PSC proceedings allow for public participation, intervention by interested persons, and the development of a full administrative record. PUA §§ 3-101 to 3-111; PUA § 3-106. Title 7 requires that an applicant submit a detailed CPCN application addressing project need, alternative routes, and environmental, land use, and reliability impacts. PUA § 7-207(b), (c), (e). Upon receipt, the PSC coordinates a multi-agency review through the Maryland Department of Natural Resources' Power Plant Research Program ("PPRP") and solicits public comment, providing notice to affected property owners, local governments, and elected officials. PUA § 7-207(c)(2), (d). Public hearings must be held in each affected jurisdiction. PUA § 7-207(d). In deciding whether to grant a CPCN, the PSC must consider, among other factors, the need for the project, alternative routes, and the environmental and land use impacts. PUA § 7-207(f)(1).

---

[3] *Id*.(Christie, Comm'r, dissenting); *See also PJM Interconnection, LLC*, Order Dismissing Waiver Request, 191 FERC ¶ 61,056 (Apr. 17, 2025) (Christie, Chair, concurring, at ¶ 4" The claim that because PJM and other RTOs are federally regulated, the inclusion of a PJM-planned transmission project in PJM's RTEP effectively preempts a State's inherent police power authority to approve that and other utility projects within its borders is, frankly, outrageous.")

Until a CPCN is granted, an applicant is prohibited from beginning construction of a qualifying transmission line or exercising any right of condemnation to acquire property for the project. PUA § 7-207(b)(3)(i).

## BACKGROUND

This case arises from PSEG Renewable Transmission, LLC's efforts to gain physical access to more than ninety privately owned properties in central Maryland--including land owned by Peter and John Radio Fellowship, Inc. ("PJRF"), which operates River Valley Ranch ("RVR"), a Christian youth camp and retreat center in Carroll County. The right of entry is sought for unspecified purposes "relating to the acquisition and future use of the properties in connection with the Maryland Piedmont Reliability Project." (Petitioner's Proposed Order, ECF 75-6 at 1.)

### I.    River Valley Ranch

RVR is a camp and retreat center located on approximately 500 acres in northern Carroll County. Its facilities include a certified Maryland Horse Discovery Center, ADA-accessible retreat spaces, high and low ropes courses, paint ball fields, wooded trails, and other outdoor adventure elements. These facilities are used year-round for youth development programs, including outdoor education, equestrian programs, overnight camps, youth and adult retreats, and spiritual enrichment events. RVR is located in a natural, rural setting that is central to its restorative programming. Home to forests and agricultural fields, the property is crossed by the Upper Gunpowder Falls and its tributaries—high-quality waters and wetlands that support sensitive aquatic species, including native brook trout and the federally threatened bog turtle. RVR's stewardship of these lands also protects neighboring Gunpowder Falls State Park.

RVR has been targeted for property access and this lawsuit because it is directly in the path of the proposed route of PSEG's proposed transmission line. Specifically, the MPRP as designed would sever the northern and southern halves of the property, eliminate existing and future use of a roughly 5,000-foot, 17-acre corridor, and cripple continued use of the entire property for its intended purposes. Among other serious physical impacts, PSEG plans to place at least four massive structural supports on the property, and permanently eliminate acres of mature forest habitat. (Exhibit 1, Declaration of J. Bisset at 1 and Exhibit 1thereto (Location Map)). Remarkably, there is an existing transmission corridor adjacent to and immediately to the north of the RVR property. (*Id*. at Ex. 1.)

If built as proposed, this project would threaten RVR's current operations, long-term viability and the safety of its mission. Because the RVR property is devoted entirely to the care and development of thousands of children each year, even the access sought in this case would be extremely problematic. (*Id.* at 2 ¶ 6.) Each year, RVR hosts about 8,000 minors on-site. (*Id.* at ¶ 7.) From May through August, it operates residential summer camps serving approximately 2,500 children during the busiest and most financially significant season. (*Id.*) Outside the summer months, RVR continues to host children almost daily, including through school field trips, weekend youth group events, and seasonal retreats. (*Id.*) Virtually all programming at RVR is centered around youth engagement, and minors are present on the property throughout the entire calendar year. (*Id.* at ¶ 9.) The property entry sought threatens to disrupt this programming with little or no notice or ability to object. (*Id.* at 10-11.)

RVR is concerned that the presence of contractors on the camp property presents serious safety and security risks to staff and guests, particularly those who are vulnerable and for whom unsupervised or unexpected contact with outside parties poses particular risks. (*Id.*at ¶ 12.) For

example, some children attending RVR are subject to court orders limiting parental contact, and any unsanctioned outside access could violate those protections. (*Id.*) RVR hosts individuals who are recovering from trauma. (*Id.*) RVR also serves guests in substance abuse recovery programs for whom uncontrolled outside contact could expose these individuals to influences they are working hard to avoid. Unplanned interactions with contractors could trigger trauma responses or worsen emotional distress. (*Id.*) Respondent PJRF has strict legal and ethical obligations to protect the children in their care. Unlike any unvetted contractors that PSEG RT might send to the property, all staff and volunteers are background-checked, trained in child protection, and integrated into structured supervisory protocols. (*Id.* at ¶ 9.)

Allowing uncontrolled third-party access would not only threaten the safety of vulnerable guests, but would also expose RVR to significant legal liability. (*Id.* at ¶ 13.) Any incident involving unauthorized contact could result in claims against RVR for negligence, breach of duty, or violations of child protection statutes. This is particularly concerning to Respondent in light of the open-ended and virtually unlimited access that the developer seeks to perform unidentified surveys and studies on the RVR property even without having any approval for this project.

## II.    The Proposed Project

The MPRP, was identified through PJM Interconnection, L.L.C.'s 2022 Regional Transmission Expansion Plan (RTEP), which projected reliability violations in the 2027 timeframe due to forecasted retirements of approximately 11,000 megawatts of generation and increased electricity demand from data centers and other large loads in Virginia and Maryland. (Ex. 2, PJM FAQ on 2022 RTEP Window 3, at 2; Petitioner's Memorandum of Law, ECF 75-1, at 10.) In response, PJM conducted a competitive solicitation (Window 3), received 72

proposals, and ultimately selected a portfolio of projects including PSEG RT's proposal to build a new 67-mile long 500 kV transmission line running between the Doubs Station in Frederick County and the Conastone Station in Baltimore County. (Memo. in Supp., ECF No. 75-1 at 10–12.) The MPRP is a greenfield project, meaning it would construct an entirely new line rather than upgrade existing infrastructure. (Ex. 2 at 2.)

In April 2024, PJM and PSEG RT entered into a DEA for construction of the MPRP project. The DEA includes a Return on Equity for the project of 9.6%. (Petition Ex. 2, PJM Letter to FERC (May 10, 2024) ECF 3-2 at 6.) Because there were known risks that the project might never be built or could be modified substantially during the State's review of the project, the DEA includes provisions to manage the risk by giving generous financial incentives to PSEG. Specifically, the DEA includes an Abandoned Plant Incentive, approved by FERC, that allow the company to recover 100% of all prudently incurred costs if the project is abandoned for reasons outside its control. (Petition Ex. 3, ECF 3-1; PSEG Renewable Transmission LLC, Order Granting Petition for Declaratory Order, 188 FERC ¶ 61,142 (Aug. 29, 2024).)

After initially considering three possible corridors for the project, PSEG selected a proposed route in fall 2024 that spans three Maryland counties—Baltimore County, Carroll County, and Frederick County, and impacts hundreds of properties, including RVR, as described above.

## III.    PSEG RT's Right of Entry Efforts

Soon thereafter, the company and its right-of-way contractor, Contract Land Staff, LLC ("CLS"), began contacting property owners along the proposed route to request access for field surveys. (Declaration of Roger Trudeau, ECF No. 70 ¶¶ 5–8.)  In many cases, they appear to have delivered a standard-form Right of Entry (ROE) document offering a one-time $1,000

payment for one year of survey access, including permission to conduct geotechnical borings, environmental assessments, and other preliminary studies. (*See* various Declarations of R. Trudeau and exhibits thereto e.g., ECF 5-2) Landowners were advised that the ROE did not convey an easement but anticipated future negotiation.

PSEG RT first contacted RVR in fall 2024 to request access for environmental surveys. RVR declined, citing concerns about child safety, operational disruption, and long-term mission impacts. (Ex.1 at 3 ¶ 14.) The company did not follow up with alternative proposals or additional outreach. *Id.*

Neither PSEG RT nor CLS were registered to do business in the State of Maryland at the time of any of these communications. (*See* Ex. 3, PSEG SDAT Report; Ex. 4, CLS SDAT Report)

## IV.    PSEG's CPCN Application

On December 31, 2024, PSEG RT filed its application for a CPCN with the Maryland Public Service Commission.[4] A month and a half later, PSEG RT amended its application, filing a supplemental environmental report on the impacts associated with construction roads and a visual impact analysis.[5] More than 170 individual property owners, local governments, and nonprofit organizations, including Respondent PJRF and its affiliate River Valley Ranch, LLC, filed petitions to intervene in the CPCN case. (*See* PSC Docket, Case 9773.)

In March 2025, the Maryland Department of Natural Resources' Power Plant Research Program ("PPRP") issued a report recommending that the PSC find the application

---

[4] PSC Docket, Case 9773, https://webpscxb.psc.state.md.us/DMS/case/9773, Application for a Certificate of Public Convenience and Necessity to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll, and Frederick Counties. Case No. 9773 (ML 314555).
[5] PSC Docket, Case 9773, Update to ERD and Appendix A-1, Appendix B (Update), Appendix F, and Appendix G. Case No. 9773 (ML 315863).

administratively incomplete, in part because it lacks required information about PSEG RT's Routing Study, including "sufficient detail to review the choices/decisions made during the siting process and validate how the proposed route was selected, such as why the routes with the fewest environmental impacts and the highest percentage of routing by parallel existing transmission lines were rejected, and why lines paralleled by the proposed line could not be used or rebuilt to accommodate the project. (PPRP Report on Completeness, ECF 3-5 at 2–3.) PPRP also considered the application incomplete because, lacking certain enumerated field studies, it did not comply with regulatory requirements to summarize environmental and social effects of the construction of the project and include copies of all studies on the environmental impacts of the project. (*Id*.)  Numerous comments were filed in support of that recommendation. (See PSC Docket for Case 9773.)  As of this filing, the PSC has not scheduled a prehearing conference, nor has it ruled on the pending intervention requests.[6]

Despite this early stage in the administrative process, and without having secured voluntary access from many landowners, PSEG RT filed this federal lawsuit on April 15, 2025, seeking preliminary injunctive relief to enter more than ninety properties. (Petition, ECF No. 1 ¶ 11.) The lawsuit does not name all affected landowners as defendants, and PSEG RT has indicated it expects to pursue field surveys on "a rolling basis."[7]

## V.     Recent Developments in the Regional Energy Outlook

Since its issuance of the 2022 RTEP Window 3 plan, the PJM board has approved a number of changes to its scope and related projects. These include changes to a 500 kV line from "502 Junction to Woodside to Aspen" "based on "collaborative discussions with the incumbent

---

[6] (*See* PSC Docket, Case No. 9773, https://webpscxb.psc.state.md.us/DMS/case/9773.)
[7] (*See* PSC Docket Case No. 9773, Notice of Petition. Case No. 9773 (ML 318136))

transmission owners . . . to investigate a more feasible route that would minimize impact." The resulting modification "rerouted [the line] from the originally proposed greenfield line route to an alternate route within existing transmission line rights-of-way" along the affected corridor.[8] These changes indicate that projects identified in the PJM planning process remain fluid, and are subject to change when projects are infeasible as planned.

In January 2025, PJM and other stakeholders reached a settlement requiring the Brandon Shores and H.A. Wagner power plants—originally scheduled to retire by 2027—to remain operational through May 31, 2029, under reliability-must-run agreements.[9] These agreements were described as necessary to maintain grid reliability in the Baltimore area while other transmission upgrades are completed. *Id*. They alter one of the key assumptions underlying PJM's 2022 RTEP, which had identified reliability violations based in part on the planned retirement of those generating units.

### THE PROPOSED PRELIMINARY INJUNCTION

The proposed order would grant PSEG RT access to each respondent's property, as identified by address and tax parcel number, "to make surveys, run lines or levels, or obtain information relating to the acquisition and future use of the properties" in connection with the Maryland Piedmont Reliability Project. (Proposed Order ¶¶ 2–3.) Access would be authorized to the entire property without geographic limitation and would continue "from the date of this Order until Petitioner's application for a Certificate of Public Convenience and Necessity...is granted or denied," a process that could extend for years. (Proposed Order ¶ 2.) Notice of entry

---

[8] *See* PJM Inside Lines (Aug. 8, 2024), https://insidelines.pjm.com/pjm-board-approves-updates-to-regional-transmission-expansion-plan-2/.

[9] *See* Talen Energy Press Release (Jan. 27, 2025) https://ir.talenenergy.com/news-releases/news-release-details/talen-energy-other-parties-reach-reliability-must-run-settlement

would require "not less than 24 hours" and could be provided "by taping a notice on the front

door of the Respondent," with permission for a single notice to cover multiple days. (Proposed

Order ¶ 4.) Additional notice, to be provided by overnight mailing to the house on the property,

appears directed exclusively at residential properties. It provides no guidance on how notice

should be given for commercial, recreational, or agricultural properties that have multiple

buildings, dispersed facilities, or no residence at all. The order does not require Petitioner to

identify who will enter the property, when or where they will enter, how long they will remain, or

what specific activities will be conducted. Nor does it provide any mechanism for coordination

to avoid operational conflicts, safety issues, or disruption of activities on the properties.

The relief outlined in the proposed order closely tracks the relief sought in the Petition's

prayer for relief, which requests temporary access to conduct non-invasive field surveys pursuant

to Md. Code Ann., Real Property § 12-111, pending resolution of the CPCN application.

(Petition ¶ Prayer for Relief (b)–(e).) There appear to be no material differences between the

activities authorized by the proposed order and the relief sought in the petition. As a result,

granting the proposed order would afford PSEG RT substantially all of the access it seeks on a

final basis through this litigation.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *Di Biase v. SPX Corp.*, 872 F.3d 224,

230 (4th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To

obtain a preliminary injunction, a petitioner must establish four elements: (1) a likelihood of

success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary

relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public

interest. *Id.*; *Benisek v. Lamone*, 266 F. Supp. 3d 799, 814 (D. Md. 2017), aff'd, 138 S. Ct. 1942 (2018).

Each of these elements must be satisfied; a preliminary injunction cannot issue based on a "sliding scale" or by demonstrating only a "serious question" on the merits. *Di Biase*, 872 F.3d at 230. Moreover, preliminary injunctions are intended primarily to preserve the status quo pending final judgment, not to grant the movant the ultimate relief it seeks or to alter existing relationships. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) ("The status quo to be preserved by a preliminary injunction is the last uncontested status between the parties.").

The relief requested would alter the status quo and effectively grant the ultimate relief sought in this case—an outcome disfavored at the preliminary injunction stage and unjustified on this record. In any event, as set forth below, Petitioner fails to satisfy any of the four elements required for preliminary injunctive relief.

## ARGUMENT

### I.    Petitioner is Unlikely to Succeed on the Merits.

Petitioner asserts that it is likely to succeed on the merits, because Maryland Real Property Code ("RP") § 12-111 "affords the company the right to enter onto the Subject Properties to perform the surveys and inspections requested by PPRP." (*See* Petitioner's Memorandum of Law, ECF 75-1 at 17.)  To the contrary, under the applicable Maryland real property and public utility law, Petitioner is not only unlikely but unable to prevail.

RP § 12-111 is clear: only certain professionals "working on behalf of the State, one of its instrumentalities, or a *body politic or corporate with the power of eminent* domain after every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry" may enter on private land for the purpose of making surveys and collecting other

information relating to the acquisition or future use of the property. RP § 12-111(a)(emphasis added). Petitioner does not have a CPCN, so it does not have the power of eminent domain, and the limited and general communications made by a land agent on its behalf before Petitioner had even submitted an application for a CPCN were neither "real" nor "bona fide" to support any entry onto RVR property.

### A. Petitioner is Not a "Body Corporate with the Power of Eminent Domain" within the Meaning of § RP 12-111.

Petitioner looks to § 7-207(b)(3)(v) of the Public Utility Article ("PUA") to find the claimed power of eminent domain necessary to support its asserted right of entry. But that provision does precisely the opposite, stating that only a person holding a CPCN—which Petitioner does not-- has the power of eminent domain. Specifically, PUA § 7-207(b)(3)(v) states that "*On issuance of a CPCN* for the construction of an overhead transmission line, a person may acquire by condemnation, in accordance with Title 12 of the Real Property Article, any property or right necessary for the construction or maintenance of the line." This is the only source of eminent domain authority for a public utility building a transmission line in the State. Contrary to Petitioner's assertion, § 7-207(b)(3)(v)2 does not distinguish between the power of eminent domain and the holder's right to exercise it. The statute does not authorize any right of entry for environmental or social surveys prior to CPCN issuance, nor does it create or acknowledge any latent or partial power of eminent domain that inures to an applicant before a CPCN is granted.

One threshold reason seems obvious—without an approved route for a transmission project, it would be impossible to identify the land over which eminent domain extends. The issues raised at the very preliminary stages of the PSC proceedings here highlight the soundness

of this logic. The PPRP concluded in its completeness report on the application that PSEG RT

has not justified its route selection and has rejected other routes that, by PSEG RT's own

analysis, appear to be less adversely impactful. As such, it is not clear that PSEG RT will

ultimately be allowed to advance its application, much less receive a CPCN for a transmission

line across RVR or the other respondents' properties. And it would be unfair to subject

respondents to potentially unwarranted property invasions for surveys that may never be

necessary.

State law charges the PSC with resolving these and other issues related to the CPCN by

means of a robust administrative process. CPCN proceedings include the filing of preliminary

motions, submission of written testimony by the parties, discovery, evidentiary hearings, and

post hearing briefings. In this case, 174 petitions for intervention are pending, and the parties to

that proceeding have not yet been determined. Once the PSC has ruled on those petitions, there

will be an opportunity to resolve access and other issues in that tribunal.

PSEG RT's entity status illustrates another reason why it would be inappropriate to read

the law as Petitioner suggests.  PSEG RT is a foreign LLC with no current facilities in Maryland

or any State, and was not even registered to do business in Maryland when it submitted its CPCN

application. Under these undisputed facts, PSEG RT is not an "electric company" within the

definition of the PUA,[10] and as such is only eligible to apply for a CPCN as a company that, "on

the start of commercial operation of the overhead transmission line, will be subject to regulation

as a public utility by an officer or an agency of the United States."  *See* PUA § 7-207(b)(3)(iii)2.

Although their contract with PJM has been the subject of FERC incentive proceedings, they are a

---

[10] "Electric company" is defined by § 1-101 of the PUA as "a person who physically transmits or distributes electricity in the State to a retail electric customer."

new company with no existing facilities anywhere. So, it is unclear that PSEG RT is yet a public utility within the definition of the Federal Power Act[11] or any other federal law. In short, PSEG RT seeks to assert powers that Maryland law reserves for companies it actually regulates—not companies merely hoping to be.

Petitioner argues that RP § 12-111 does not require that "all conditions precedent to the exercise of eminent domain" be satisfied to gain a right of entry. *See* Petitioner's Memorandum at 20. This is not correct. While § 12-111 does not mandate that eminent domain powers be exercised by condemning a property before survey access may be sought, it plainly presumes that the entity seeking access *possesses* the power of eminent domain. PUA § 27-207 does not confer the power of eminent domain or any attendant right of entry upon PSEG RT, and so it lacks the authority necessary to support a right of entry under RP § 12-111.

It is PUA § 7-207(b)(3)(v)2 that *confers* eminent domain authority on a public utility—*not* merely the ability to exercise an authority already in existence. Until a CPCN is issued, an applicant has no such authority under Maryland law. To read the statute otherwise is simply wishful thinking on the part of a company seeking to bypass a potentially contentious administrative process. But that is precisely the process the Maryland General Assembly has directed these decisions to, and Petitioner's dissatisfaction with it does not justify judicial intervention.

Petitioner argues that giving the statute its plain meaning creates an untenable situation: its CPCN application remains incomplete without field surveys, yet it cannot lawfully conduct

---

[11] "Public utility" is defined by the Federal Power Act as "any person who owns or operates facilities subject to the jurisdiction of the Commission," i.e., "any person who owns or operates" facilities for "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce" (16 USC § 824(e)).

those surveys unless a CPCN is first granted. In essence, Petitioner suggests that it must be allowed to exercise rights dependent on CPCN approval in order to obtain that very approval. But this is not a statutory incongruity or gap—it reflects a deliberate policy choice by the General Assembly to commit the question to the Maryland Public Service Commission. The statute withholds eminent domain authority, and any associated right of entry, unless and until a CPCN is granted. To interpret it otherwise would invert that structure, allowing an applicant to exercise powers it does not yet—and may never—lawfully possess in order to support its bid to obtain them. The sequencing is intentional: the right to access private property flows from the outcome of the CPCN process, not the other way around. If additional access is necessary to support a complete application, that is a matter properly addressed through the administrative process already underway—not through premature judicial intervention.

In fact, *Petitioner's* theory is unworkable. Petitioner doesn't exactly commit to when it thinks the right of entry attaches. (*See* ECF at 19-20.) Is it when *any* application is submitted? Is it when a *substantially complete* application is submitted? Because the statute makes no mention of such a right existing at any point prior to issuance of the CPCN, Petitioner appears to invite the court to establish its own rule. That cannot have been the intent of the General Assembly when it enacted PUA § 7-207(b)(3)(v).[12]

Petitioner asks this court to give weight to a 2019 Harford County Circuit Court decision in another transmission case that appears to have accepted some of the arguments PSEG RT makes here. (*See* ECF 75-1, and Ex. 4, ECF 75-4.) State trial court rulings have no precedential value and this decision should be given no weight, where the subject ruling was made in response to *ex*

---

[12] *See* SB 969, 2017 Session, Maryland General Assembly, Fiscal and Policy Note, https://mgaleg.maryland.gov/2017RS/fnotes/bil_0009/sb0969.pdf (making no reference to pre-CPCN eminent domain authority or pre-condemnation study authority).

*parte* motions, the posture of the proceedings before the PSC were different than in this case,[13]

and, for the reasons articulated above, the case was decided incorrectly.

The Virgina and Ohio cases cited by Petitioner, see ECF 75-1, p 23, also fail to support

their argument. Those cases interpret State law provisions that, unlike the Maryland law

applicable here, give express authority to natural gas companies undertake pre-condemnation

surveys *before* receiving a CPCN in order to evaluate possible pipeline routes.[14] Likewise, the

California case cited by Petitioners is inapposite, because it involved a government agency

seeking access under a statute applicable to government agencies with condemnation authority.[15]

No Maryland statute confers such authority on transmission line developers.

Perhaps realizing the weakness of its primary argument, Petitioner posits in the alternative that a

pre-CPCN right of entry might be implied "on behalf of instrumentalities of the State as the

PPRP of the DNR is demanding the Company to obtain land surveys as a prerequisite to CPCN

completion and approval." (*See* ECF 75-1 at 24 fn. 4.) While the law requires certain surveys in

---

[13] At the time of the Harford County Circuit Court ruling in Transource, the parties to the CPCN proceeding had been determined and Petitioner there asserted that the PSC had directed the company to undertake certain bog turtle studies under State and federal Endangered Species Acts. See Exh. 4, Document 75-5 at 9.

[14] The Virginia law cited in *Palmer v. Atl. Coast Pipeline*, LLC, 293 Va. 537 (2017) *and Barr v. Atl. Coast Pipeline , LLC*, 295 Va 522 (2019) provides that a natural gas company "may make such examinations, tests, hand auger borings, appraisals, and surveys for its proposed line or location of its works as are necessary (i) to satisfy any regulatory requirements *and* (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities, and for such purposes . . ." Va. Code § 56-49.01(A). The Ohio statue cited in *Nexus Transmission, LLC. V. Sprague*, No. E-15-069, 2016 WL 3654532 (Ohio Ct. App. Jul. 7, 2016) provides: "If a company is organized for the purpose of * * * transporting natural or artificial gas, petroleum, coal or its derivatives, water, or electricity, through tubing, pipes, or conduits, or by means of wires, cables, or conduits[,] then such company may enter upon any private land to examine or survey lines for its tubing, pipes, conduits, poles, and wires, * * * and may appropriate so much of such land, or any right or interest therein, as is deemed necessary . . ." Slip Op. at 6.

[15] *See Prop. Rsrv., Inc. v. Super. Ct.*, 1 Cal 5th 151, 175-76 (2016) (rev'ing authority of Cal. Water Resources Bd. under eminent domain statutes to conduct certain pre-condemnation studies).

order for an application for a CPCN to be considered complete, DNR's role is limited to evaluating completeness and making recommendations to the PSC, which is the only body with authority over the CPCN proceedings.

As stated above, the PSC has yet to make any determination or even ruled on who will be the parties to the case. Further, no basis has been asserted to establish that DNR has eminent domain authority under the Public Utilities Act, and the Department is not a party to this case to offer one. For all of these reasons, it would be inappropriate for this court to decide that Petitioner has any implicit eminent domain authority.

Petitioner, lacking a CPCN for the proposed transmission line, does not have the power of eminent domain and is therefore unlikely to succeed in claiming any relief under RP § 12-111.

## B. Petitioner has not made "every real and bona fide effort" to notify Respondent of a proposed entry as required by RP 12-111.

Petitioner asserts that it satisfied the statute's requirement of "real and bona fide efforts" to obtain consent to entry through communications made before it filed its CPCN application. But if, as Petitioner argues, eminent domain authority attaches only upon filing a CPCN application, then any notice given beforehand necessarily lacked the legal predicate for invoking § 12-111. The statute permits entry only by or on behalf of an entity with existing eminent domain authority. Efforts undertaken before that authority existed cannot retroactively satisfy this requirement.

Moreover, PSEG RT was not authorized to conduct business in Maryland at the time it initiated these communications. (*See* Ex. 3 at 1-2). Thus, at the time it claims to have satisfied § 12-111's notice requirement, Petitioner had no legal presence in Maryland and no corporate authority to act here. Compounding the issue, Petitioner's outreach was conducted through

Contract Land Staff ("CLS"), a land agent whose own business registration in Maryland had been forfeited years earlier. (*See* Ex. 4 at 1-3.)  Maryland law does not contemplate that an out-of-state entity with no legal standing—and acting through an unregistered agent—can satisfy the statutory prerequisites for judicial relief. Such efforts cannot be considered "real" or "bona fide."

The content of Petitioner's communications also fell well short of what § 12-111 demands. The statute authorizes only certain professionals—licensed land surveyors, real estate appraisers, and their assistants—to enter property for limited, enumerated purposes, and requires "notice in writing with respect to *the proposed entry*." RP § 12-111(a) (emphasis added). PSEG RT never provided such notice. Its October 2024 form letter merely stated that it would be "seeking temporary access" to" evaluate suitability of the property," without identifying any specific activities, personnel, or locations to be accessed at any requested time. (ECF 70-2 at 11–12.)  A second letter introducing CLS similarly referenced a "temporary right of entry" form that was never provided. (ECF 70-2 at 9–10.) At no point did Petitioner notify River Valley Ranch of a specific proposed entry for a qualifying professional under § 12-111. (ECF 70, 70-1, 70-2, and Ex. 1 at 3-4, ¶13-14.)

River Valley Ranch, through its Executive Director, declined the vague request but identified himself as the appropriate contact for any future communications. (ECF 70-2 at 2–3). Yet Petitioner made no further effort to specify who would enter, when, or for what lawful purpose. (Ex. 1 at 3-4, ¶13-14)

Some owners appear to have been sent a "Temporary Right of Entry Form," seeking access for broad categories of potential activities: "for purposes of conducting . . . preliminary analyses and site studies which may include but not be limited to: appraisals, property boundary and utility surveys, engineering studies, wetland delineation, environmental assessment/

investigation and geotechnical borings." (*See, e.g.* ECF 5-2 at 4.) Access was requested with 48 hours-notice and for the entire duration of the CPCN process. (*Id* at 5.) PSEG RT fails to identify any particular test that will be conducted in any location at any given date- or period-certain. A such, these expansive and yet undetermined proposals, like the vague invitation posed to RVR, do not provide reasonable notice of any identified entry proposed to occur. Accordingly, even if Petitioner had the power of eminent domain or was properly authorized to do business—which it was not—it failed to make the "real and bona fide" effort that § 12-111 requires.

Further, Maryland's highest court held in *Mackie v. Town of Elkton*[16] that "geological investigations" involving the drilling of "boring test holes" were beyond the scope of the right of entry provisions now codified in Real Property § 12-111.[17] Accordingly, notwithstanding PSEG's contradictory statements as to whether their surveys are "non-invasive" or will include geotechnical borings, it appears that at least some of the field work anticipated by the requested injunction would exceed even the authority PSEG RT claims to have by virtue of its status as a CPCN applicant.

Even now, it remains unclear what specific entries Petitioner seeks or what actions it intends to undertake. Although Petitioner acknowledges that PPRP's review identified missing

---

[16] 265 Md. 410, 421 (1972) (interpreting prior version of RP 12-11 then codified at MD Code (1971, Repl. Vol.) Art. 33A § 11).

[17] Although the *Mackie* court stopped short of holding that the test borings proposed by the municipality there constituted a taking, it acknowledged that the holding would be have that practical effect. Further, such actions are at least sometimes presumed to exercise condemnation authority not just by the courts, but by government agencies seeking to undertake them. *See, e.g.*, *WMATA v One Parcel of Land*, 514 F.2d 1350, 1352-53 (D.C. Cir. 1975) (D.C. Metro authority seeking access for geotechnical borings in Rock Creek cemetery by condemnation a temporary right of use and occupancy; attorneys referred to actions as a "taking" in pleadings).

field surveys, it disputes that those surveys are necessary.[18] Petitioner's Proposed Order merely parrots the general statutory language, seeking permission to "make surveys, run lines or levels, or obtain information" related to the project, without any further specificity. Like Petitioner's earlier communications, the Proposed Order fails to meet the statutory requirements of any identified entry.

The Proposed Order would authorize PSEG RT to enter River Valley Ranch on 24 hours' notice and remain for an indefinite period—extending until the PSC rules on a CPCN application that may remain pending for a year or more even after being deemed complete. As explained in the Affidavit of Jon Bisset, River Valley Ranch is an active, youth-centered nonprofit serving thousands of children and vulnerable guests year-round through summer camps, equestrian programs, and spiritual retreats. [Revised Bisset Aff. ¶¶ 3–10]. Allowing unbounded and undefined access would create serious operational, safety, and legal risks wholly incompatible with the Ranch's mission. [Revised Bisset Aff. ¶¶ 11–15].

This situation underscores why the General Assembly could not have intended § 12-111 to authorize indefinite and disruptive intrusions based merely on general notice or a preliminary judicial petition. Maryland law presumes careful, case-specific protection of property rights—not blanket authorizations lasting months or years while an administrative permitting process plays out. Because Petitioner lacks the authority, standing, and required diligence to satisfy § 12-111, it is unlikely to succeed on the merits of its claim, and its Motion should be denied.

---

[18] *See* PSC Docket, Case No. 9773, Notice of Petition. (ML 318136, Apr. 18, 2024)) ("neither the plain language of the [PUA] or {COMAR] requires field-level surveys for ·the purposes of administrative completeness."

**II.        Petitioner will not Suffer Irreparable Harm if the Relief is Not Granted.**

Petitioner argues that it will suffer irreparable harm if it is not immediately granted access to Respondents' property to perform surveys requested by the Power Plant Research Program (PPRP). Specifically, Petitioner claims that without access, it will be unable to complete field surveys necessary to obtain a CPCN and meet the June 1, 2027 in-service date established in its Designated Entity Agreement (DEA) with PJM. To obtain a preliminary injunction, Petitioner must make a "clear showing" that it will suffer harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); see also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008) (requiring likelihood, not mere possibility, of irreparable injury). The harm alleged by Petitioner does not meet the applicable legal standard.

Petitioner relies on two Fourth Circuit natural gas pipeline cases, *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004), and *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019), to argue that the threatened loss of its contractual rights constitutes irreparable harm. Petitioner's reliance on these cases is misplaced.

As Petitioner acknowledges, the pipeline companies in *Sage* and *Mountain Valley*, possessed FERC CPCNs directing them to build natural gas pipelines. Those CPCNs created both a right and an obligation in the holder, as highlighted in the language from those cases quoted by Petitioner. *See* Petitioner's Memorandum of Law at 26 ("ETNG is under an order from FERC to complete construction and have it in operation by [a date certain]") and 27 ("Mountain Valley would lose the right to construct the pipeline"). PSEG RT does not hold a certificate ordering them to take action, as the FERC CPCNs in those cases did. As such, it has neither a

regulatory right or obligation to build the proposed MPRP. Rather, Petitioner's deadline arises solely from a private contractual arrangement—the Designated Entity Agreement with PJM.

Moreover, PPRP's conclusion that PSEG RT's application is incomplete does not constitute an enforceable mandate; it is a recommendation to the PSC in an ongoing administrative process that has yet to be ruled on. (*See* ECF 3-5; PSC Case 9773 Docket.) Petitioner remains at the very beginning of the State's review process. As such, any harm Petitioner speculates it may suffer from not meeting PJM's contractual schedule is not analogous to the regulatory harms at issue in *Sage* or *Mountain Valley*.

Petitioner also claims harm based on potential financial consequences under the DEA. It is well-established that monetary loss alone does not constitute irreparable harm sufficient to support a preliminary injunction. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("[M]onetary loss is not ordinarily considered irreparable."); *Bethesda Softworks, LLC v. Interplay Ent. Corp.*, No. 09-2357, 2011 WL 1559308, at *6 (D. Md. Apr. 21, 2011) (economic loss alone insufficient to establish irreparable harm).

Even if monetary losses were redressable by a preliminary injunction, PSEG RT's claim that it will suffer monetary harm if required to abandon the proposed route for the MPRP is refuted by the financial protections afforded under both the Federal Energy Regulatory Commission (FERC) order and the Designated Entity Agreement (DEA). The FERC order explicitly grants PSEG RT the Abandoned Plant Incentive, allowing it to recover 100% of prudently incurred costs if the project is abandoned for reasons beyond its control, such as

regulatory or siting challenges (FERC Order, 188 FERC ¶ 61,421 p. 11, ¶ ii; p. 12, ¶ ii). Similarly, the DEA incorporates this incentive, ensuring cost recovery in the event of project abandonment due to external factors, and further provides mechanisms like the Regulatory Asset Incentive to defer pre-commercial costs for later recovery and the Hypothetical Capital Structure Incentive to manage financing risks during construction (DEA, Article 8.0; Schedule E, Section III, ECF 3-1 at 23-27). These provisions collectively mitigate the financial risks associated with project abandonment, rendering PSEG RT's argument of monetary harm unsubstantiated.

The suggestion that denying this access order will necessarily require them to abandon the route –though that is what Respondents have widely called for—or miss any meaningful deadline for implementing any appropriate transmission project is itself speculative. As PPRP noted in its response to PSEG's ambitious scheduling request in the CPCN proceedings, there is no magic to the deadline in the DEA.[19] Further, the assumptions underlying PJM's 2022 projections may no longer be valid. *See supra*, Background at 10-11.

Finally, PSEG RT's attempt to claim, as harm to itself, any speculative risk to the electrical grid by any delay presented by denial of the requested injunction is unfounded. PSEG RT is not the government, an entity possessing any power of the government, nor the public, and its claimed harms are limited to those of a business entity under contract.

Thus, Petitioner's alleged harms are either (1) speculative (based on future administrative outcomes or contractual deadlines not yet missed), or (2) compensable through the DEA. They do not support a finding of irreparable harm necessary to obtain preliminary injunctive relief.

---

[19] *See* PSC Docket Case No. 9773, DNR/PPRP Comments (ML 317927, Apr. 11, 2024) ("the basis for determining that June 1, 2027 is the requisite in-service date . . . is uncorroborated").

**III.    The Balance of Equities Weighs in Favor of Denying the Motion.**

Petitioner argues that the balance of equities favors granting its requested injunction because "the harms to the Company far outweigh the possible harms to the Respondents." Petitioner's Motion at 31. But as explained above, Petitioner's alleged harms are both speculative and compensable through monetary damages, and thus carry little equitable weight.

In contrast, the harms that the requested relief would inflict on River Valley Ranch (RVR) and other Respondents are substantial and immediate. As set forth in the Declaration of PJRF President Bisset, the broad, undefined access Petitioner seeks—on just 24 hours' notice, with no significant limitation on location, purpose, or coordination—would create serious disruptions to ongoing ranch operations and pose potential safety risks to thousands of campers, vulnerable guests, and even Petitioner's own contractors. (Ex. 1 at 2-3 ¶ 10-13.)

Granting PSEG RT the sweeping right to enter and conduct unspecified activities over an indefinite period would, in practice, amount to an occupation of RVR's 450-acre campus throughout the duration of the CPCN process. If Petitioner's field activities conflict with RVR's scheduled programming, the Ranch could face significant reputational harm, lost business, and potential legal claims from camp participants for failure to deliver promised experiences. (*Id*. at 3, ¶13.)

Moreover, notwithstanding Petitioner's assurances that its field work will be "noninvasive," the record reveals that some contemplated activities—such as geotechnical surveys involving soil borings—are invasive by nature and could trigger still further compensable takings. (Shilkoski Decl., ECF 3-1 at 12-13, ¶ 17-20).

Finally, preliminary relief would harm not only RVR's operations but also the integrity of the CPCN process itself. RVR and more than 90 other Respondents have sought to intervene in

the PSC proceeding to contest whether the project serves the public interest and whether the selected route is justified. Judicially granting Petitioner the effective right to occupy these properties before the PSC can evaluate the project would improperly short-circuit the state's deliberative process and prejudice the rights of property owners seeking a full hearing. For all these reasons, the balance of equities overwhelmingly favors denial of the Motion.

## IV.    The Public Interest Weighs Against Granting Preliminary Relief.

Petitioner argues that failure to grant the injunction will prevent it from undertaking unspecified field surveys and delay meeting the private contractual deadlines set forth in its agreement with PJM. Even if true, these concerns do not establish that the public interest favors preliminary relief.

First, it is far from clear that missing the June 1, 2027 in-service date would create the dire consequences Petitioner suggests. As PPRP noted in its Completion Report [cite] and in subsequent comments [cite if you have it], there is no regulatory mandate tied to that date, and no "magic" to its timing. The project remains subject to full review by the PSC to determine whether it is needed at all and whether the proposed route is justified.

Second, Petitioner's litigation conduct undermines its claims of urgency tied to the public interest. Rather than promptly pursuing access against all necessary property owners, Petitioner waited months before filing this case, and has expressly acknowledged that it plans to pursue access actions against other owners at a later time. *See* Venable letter to PSC (Apr. 18, 2025). Granting preliminary relief now could unfairly prejudice those other landowners, who have not yet been joined here or sued in another forum but whose rights would be seriously affected by a preliminary ruling.

Third, granting preliminary access based on the current record would subvert the ongoing CPCN administrative process. Neither RVR nor the other Respondents whose petitions to intervene are pending have yet had an opportunity to conduct discovery in the PSC proceeding or test the analysis that led to selection of the proposed MPRP route. The public interest demands that the State's comprehensive administrative process be allowed to proceed without premature judicial intervention that could bias or interfere with ultimate agency findings.

Moreover, granting the requested relief would shift financial risks onto the public inappropriately. Petitioner seeks access to conduct costly field studies across more than 90 properties, even though the justification for the proposed route remains unproven. Under FERC regulations, costs associated with transmission incentives—including the Abandonment Incentive secured by PSEG RT—may ultimately be recovered from ratepayers. *See* 18 C.F.R. § 35.35(d). FERC Commissioner Christie, now Chair, dissenting in part to the approval of PSEG RT's incentive ruling on this DEA that "the Abandonment Plant Incentive is nothing more than a transfer of wealth from consumers to transmission developers and risk from developers to consumers."[20]  Authorizing access now increases the risk that ratepayers will bear the costs of studies, land disturbance, and project preparation for a route that may yet be rejected. Such speculative and unnecessary impositions on Maryland ratepayers are contrary to the public interest.

Finally, the public opposition to the MPRP underscores where the public interest truly lies. RVR, the more than 90 Respondents, and the 174 petitioners seeking to intervene in the CPCN proceeding—joined by hundreds of residents across Baltimore, Carroll, and Frederick Counties—have voiced strong opposition to the project because of the lasting damage it would

---

[20] *PSEG Renewable Transmission LLC*, 188 FERC ¶ 61,142 Dissent at 2, P3. (Aug. 29, 2023).

inflict on Maryland's unique rural landscapes, family businesses, historic vistas, and sensitive environmental areas. The public interest is not served by forcing premature and disruptive land access before that broad opposition has even been meaningfully considered by the PSC. In short, neither the project itself nor the sweeping, poorly defined field studies Petitioner seeks to advance it serve the public interest. The Motion should be denied.

## V.     Lack of Nexus of the Proposed Injunction to Any Need Undercuts All Elements

The sweeping nature of the proposed injunction confirms Petitioner's failure to satisfy any of the elements required for preliminary relief. The order would authorize indefinite and unrestricted access to entire properties for broadly stated purposes, without any demonstrated connection to the transmission corridor Petitioner proposes. Petitioner has identified no specific study plan or need justifying access beyond the proposed right-of-way, and Maryland law does not authorize speculative or unlimited property entry under RP § 12-111.

The proposed order is less detailed and protective than the voluntary right-of-entry forms Petitioner offered to some landowners. *See* ECF 5-2. It imposes fewer notice requirements and no meaningful safeguards to prevent disruption, underscoring that Petitioner seeks to obtain through court order what it could not secure by agreement. Petitioner's shifting positions further undermine its claim to extraordinary relief: in proceedings before the Public Service Commission, Petitioner has argued that no environmental field studies are necessary for its CPCN application to be considered complete, yet here it asserts an urgent need for sweeping and immediate survey rights. By advancing inconsistent positions in different forums to suit its strategic interests, Petitioner has forfeited any entitlement it might otherwise have claimed to equitable relief, which in any event was doubtful from the outset. See *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244–45 (1933) (recognizing that a party seeking equitable

relief must act with candor and fairness and that violations of equitable principles bar the grant of such relief).

Petitioner has failed to demonstrate a likelihood of success on the merits, irreparable harm, or that the balance of equities and public interest favor preliminary relief. It lacks a CPCN and thus lacks eminent domain authority; it failed to make the "real and bona fide effort" required to notify Respondents of any lawful proposed entry; its claimed harms are either speculative or compensable by monetary relief; and the serious disruption threatened to River Valley Ranch's ongoing youth-centered operations far outweighs any alleged private contractual inconvenience to Petitioner.

The Court should give little weight to Petitioner's asserted urgency in evaluating this Motion or deciding if a hearing should be provided prior to ruling. Petitioner delayed for months after Respondents declined access before filing suit, and the project deadlines it cites are purely private contractual goals—not mandates of any governmental authority. Moreover, Petitioner has acknowledged that it intends to bring additional access litigation against other landowners, further undermining any claim that immediate injunctive relief is necessary now. Urgency manufactured by litigation tactics cannot justify the extraordinary remedy of preliminary injunctive relief.

Even if the Court had any inclination to consider granting relief, it should not do so without hearing[21] or before addressing any timely filed motions to dismiss. Respondents and

---

[21] Petitioner cites *King v. Mayor and Council of Rockville*, 52 Md. App. 113 (1982), for the proposition that a hearing is not required before granting preliminary relief. *King* is meaningfully distinguishable. There, the petitioners—municipal and county governments—unquestionably possessed eminent domain authority, and the eminent domain decisions at issue were legislative in character, rendering them nonjusticiable. By contrast, Petitioner here is a private, foreign company that has no current eminent domain power, has not completed the administrative

others anticipate raising jurisdictional and abstention arguments stemming from the pendency of the incomplete CPCN process before the Maryland PSC. The administrative process is still in its infancy, with no hearing held, no procedural schedule set, no ruling on the completeness of the application, and no determinations regarding intervenors. Resolution of these jurisdictional and comity-based issues may be dispositive and would render ruling on the present Motion unnecessary and premature.

## CONCLUSION

For all of the foregoing reasons, Respondent Peter and John Radio Fellowship, Inc. respectfully asks this court to deny Petitioner's Motion for Preliminary Injunction as to and all Respondents. If the court concludes that it is unable on the present record to rule in Respondents' favor, Respondent PJRF requests that the court defer further action on the Motion for Preliminary Injunction until it has addressed any timely Motions to Dismiss, and if the case remains in this court, only rule on the Motion for Preliminary Injunction only after providing the parties (1) discovery on the issue of harm to Petitioner and the public alleged by Petitioner, (2) an opportunity to brief the appropriate scope and conditions and terms of any right of entry to be provided and (2) a hearing.

Date: April 30, 2025

_/s/ Jennifer L. Wazenski_____
Jennifer L. Wazenski (Bar No.12564)
WATERSHED LEGAL COUNSEL
1011 Bay Ridge Rd. #145
Annapolis, MD 21403
(410) 897-7843
jennifer@watershedlc.com

*Attorney for Respondent*
*Peter and John Radio Fellowship, Inc.*

---

process necessary to obtain it, and has targeted Respondents' properties in the absence of any lawful authority. The decision whether to allow preliminary access is justiciable.

## CERTIFICATE OF SERVICE

I certify that on April 30, 2025, I electronically filed the foregoing Opposition Memorandum and corresponding Exhibits with the Court by using the CM/ECF system, that they are available for viewing and downloading from the Court's CM/ECF system, and that any Respondents not participating in electronic filing will be served when they are identified.

_s/ Jennifer L. Wazenski__

Jennifer L. Wazenski