# EXHIBIT E



750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
T 410.244.7400   F 410.244.7742   www.Venable.com

April 28, 2025

t 410.244.5466
f 410.244.7742
JCurran@Venable.com

*VIA ELECTRONIC MAIL AND E-FILING*

Andrew S. Johnston, Executive Secretary
Maryland Public Service Commission
6 St. Paul Street, 16th Floor
Baltimore, MD 21202

    Re:    Case No. 9773: PSEG Renewable Transmission LLC's Application for a Certificate of Public Convenience and Necessity to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll, and Frederick Counties

Dear Executive Secretary Johnston:

On April 1, 2025, the Maryland Public Service Commission (the "Commission") issued a Notice and Request for Comments on PSEG Renewable Transmission LLC's ("PSEG" or the "Company") Motion Requesting a Pre-Hearing Conference to Rule on Intervention Petitions and Establish a Procedural Schedule to Meet PJM's Required In-Service Date (the "Motion") and the Maryland Department of Natural Resources – Power Plant Research Program's ("PPRP") Notice of Recommendation on Completeness ("Completeness Letter") of the Company's Application for a Certificate of Public Convenience and Necessity ("CPCN") to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll, and Frederick Counties in the above-captioned case (the "Application").[1] To date, parties and persons interested in these matters have filed over 225 comments.[2]

As discussed further herein, many of the comments raised a handful of common themes or concerns related to the pending petitions to intervene and PPRP's Completeness Letter, which the Company addresses below. Many of the issues raised by commenters, however, go to the merits of the CPCN Application—not its administrative completeness—and are therefore the types of issues that will be addressed through the Commission's CPCN process and evaluated by the

---

[1] *See* Case No. 9773, Notice and Request for Comments (April 1, 2025) (ML No. 317397).

[2] To the Company's knowledge, 108 of the comments filed in response to the Commission's April 1 Notice were filed by persons who have not petitioned to intervene in this case.

Andrew Johnston, Executive Secretary
April 28, 2025
Page 2

Commission before issuing its final order.[3] As a result, after reviewing the comments, the Commission should not be dissuaded from determining that the Company's Application is administratively complete for the purposes of establishing a procedural schedule that will allow for a final order regarding the Company's Application by the end of January 2026. A final order by that date would provide the Company the opportunity to comply with PJM Interconnection LLC's ("PJM") required in-service date of June 2027 to address severe and widespread reliability criteria violations forecasted to impact the regional transmission system serving Maryland and the surrounding states.[4]

### A. Pending Petitions to Intervene

In total, 175 petitions to intervene are now pending in this proceeding.[5] As the Company previously explained, the Company does not object to the Commission granting any intervention petitions filed by individual landowners whose properties are on or directly adjacent to the Project's proposed route.[6]

As to the individual landowners whose properties are not on or adjacent to the Project's route (48 petitioners), and to the special interest groups who have filed pending petitions to intervene (6 petitioners),[7] the Company understands the interests these petitioners have expressed and appreciates that the Commission will be interested in hearing from these petitioners as the case proceeds forward. Consistent with the PUA and prior Commission practice, the Company

---

[3] Given the number of comments filed, and the various issues raised therein, the Company does not intend this reply to address all issues raised in the comments. The Company continues to review the comments and reserves the right to address the same in future Commission proceedings and by not specifically addressing all the comments filed to date, the Company is not waiving the right to address or respond to any specific comments related to the merits of the Company's CPCN application which are more appropriately addressed in testimony and during hearings. This reply focuses on issues related to intervention in these proceedings, the administrative completeness of the Application, the procedural schedule, and other preliminary matters.

[4] *See* Case No. 9773, Application of PSEG Renewable Transmission LLC for a Certificate of Public Convenience and Necessity for the Maryland Piedmont Reliability Project ("Application"), (ML No. 314555) (Dec. 31, 2024), Direct Testimony of Abdulsalam at 7:10-12, 43:14-18, 44:8-12, 45:11-13.

[5] After the Company filed its Motion, two petitions to intervene were filed: (i) Thomas Custance (ML No. 318018) and (ii) Patricia Wilmsen (ML No. 318152). The Company has confirmed that each property associated with these two petitions are located on or adjacent to the proposed right of way, therefore the Company does not object to the Commission granting these petitions.

[6] In total, there are 116 individual landowners who have petitioned to intervene. *See* Motion at 5 and Ex. C (listing the 114 timely-filed petitions). As mentioned in the note above, the Company does not object granting party status to the two recently filed petitions to intervene, referenced in the note above.

[7] The Valleys Planning Council had originally petitioned to intervene as a party, however, on April 9, 2025, for reasons unrelated to the Company's Motion, it withdrew that petition and instead accepted status as an interested person. *See* ML No. 317752.

Andrew Johnston, Executive Secretary
April 28, 2025
Page 3

respectfully suggests that the Commission should grant "interested person" status to these 54 petitioners and allow these petitioners to participate through the public comment and public hearing process.[8]

In relation to petitioners whose properties are not on or adjacent to the Project's route (48 petitioners), the Maryland Office of People's Counsel ("OPC") suggests that "[i]f a potential intervenor does demonstrate that their interests are not adequately represented, the Commission should grant intervention; if not, the potential intervenor should participate as an interested person."[9] The Company agrees that this is a reasonable approach. Moreover, it is important to emphasize that the Company anticipates that any petitioner the Commission grants interested person status to will absolutely have the right and opportunity to present to the Commission any concerns they may have regarding the Project through the public comment and public hearing process.

In relation to the special interest groups (6 petitioners),[10] the Company values the interests expressed by these petitioners, and in fact the Company has already met with some of these organizations to discuss their concerns.[11] Upon review of their comments (and the comments of the many individual members of the community who share similar interests), the primary issues they seek to raise in this proceeding relate to the Project's impact on certain important environmental or natural resources.[12] While the Commission has previously granted interested person status to persons seeking to raise environmental issues, which the Commission has determined is "the province of" the Department of Natural Resources Power Plant Research Program ("PPRP"),[13] the Company agrees that these constituencies should have a full and fair

---

[8] *See* Motion at 5 and Ex. B.

[9] Case No. 9773, OPC Comments (April 11, 2025) (ML No. 317883).

[10] The six special interest groups are STOP MPRP, Land Preservation Trust, Maryland Farm Bureau, Sierra Club, Gunpowder Riverkeeper, and Potomac Riverkeeper Network.

[11] *See* Case No. 9773, Application, Direct Testimony of Dawn Shilkoski, Ex. DHS-3.

[12] *See*, *e.g.*, STOP MPRP Comments (April 11, 2025) (ML No. 317857) (impacts to "family farms and conservation easements, fragmented forests, degraded waterways" and the need for the project to address "data center demand"); Land Preservation Trust Comments (April 11, 2025 (ML No. 317866) (impacts to "conservation and agriculture"); Maryland Farm Bureau Comments (April 11, 2025) (ML No. 317884) (how "farms would be impacted by the transmission line"); Sierra Club Comments (April 11, 2025) (ML No. 317933) (interest "in a sustainable environment"); Gunpowder Riverkeeper Comments (April 11, 2025) (ML No. 317984) (interest in "protecting, conserving, and restoring the Gunpowder River, its watershed, and its resources"); Potomac Riverkeeper Network Comments (April 11, 2025) (ML No. 317894) (interest in "the Project's impacts to the Potomac River watershed").

[13] Case No. 9031, Hearing Examiner's Ruling on Petition to Intervene, ML No. 97210 (May 6, 2005) (finding that "environmental" issues are "the province of the Department of Natural Resources Power Plant Siting Program" and denying CSX Transportation's petition to intervene but granting CSX "interested person status" in the case); s*ee also*

**VENABLE** LLP

Andrew Johnston, Executive Secretary
April 28, 2025
Page 4

opportunity to voice their concerns to the Commission. The Company therefore defers to the Commission's sound discretion to determine whether the participation and sharing of their views can be achieved through the public comment and public hearing process as interested persons or whether these six special interest groups should be granted party status.

Regardless of the outcome of the 175 pending petitions to intervene, the Company strongly agrees with the Commission's Technical Staff ("Staff") that the Commission should include in its procedural order language that strongly encourages parties to this proceeding to coordinate their filings and presentations where their interests and positions are similar.[14] The Company additionally repeats the recommendation it made in its Motion that the Commission give consideration to scheduling a status conference to occur shortly before the start of the evidentiary hearing to implement procedures for the orderly and efficient administration of the evidentiary hearing in this case.

### B. Administrative Completeness

On April 10, 2025, the Company filed a letter and two exhibits responding to PPRP's Completeness Recommendation.[15] Then, on April 11, PPRP filed comments responding to the Company's Motion.[16] Upon review of PPRP's Response to the Company's Motion, and the many comments filed by others who have now echoed PPRP's recommendations, the Company largely anticipated and responded to PPRP's positions in its April 10 Letter. A brief reply regarding these issues is set out below.

#### 1. Routing Study and Alternative Transmission Line Routes

PPRP's Response to the Company's Motion did not raise any additional issues or argument regarding the completeness of the Company's Routing Study and evaluation of alternative routes. In its April 10 letter, the Company provided substantive responses to PPRP's questions and clarification requests regarding how and why the Company came to select the proposed route and rejected the alternative routes. The Company would not object to incorporating the information provided in those responses into Supplemental Direct Testimony to address PPRP's concerns. As

---

Md. Code Ann., Nat. Res. § 3-306 (requiring PPRP to analyze on behalf of several Maryland state agencies the environmental and socioeconomic impacts of proposed transmission lines).

[14] Staff Comments (April 11, 2025) (ML No. 317928).

[15] *See* Case No. 9773, PSEG Renewable Transmission LLC - Responses to PPRP's Completeness Recommendation (April 10, 2025) (ML No. 317760).

[16] *See* Case No. 9773, DNR/PPRP Comments (April 11, 2025) (ML No. 317927).

**VENABLE** LLP

Andrew Johnston, Executive Secretary
April 28, 2025
Page 5

to the COMAR application routing requirements,[17] however, the Commission should find that the Company has in fact provided the three COMAR-required pieces of information to render the Application administratively complete for the purposes of setting a procedural schedule for the matter.

2. **Field-Measured Surveys**

As the Company set forth in its March 26, 2025 Motion, the Company's December 31, 2024 CPCN Application included, among other supporting materials, an Environmental Review Document ("ERD") developed and prepared by the Company's expert environmental consultants (Stantec Consulting Services, Inc.). The ERD provided a comprehensive analysis of the environmental and socioeconomic impacts of the Project, including a description of the unavoidable impacts and recommended mitigation measures related to each of those impacts in accordance with the Commission's COMAR requirements.[18] As the Company explained in its Application, the COMAR-required information and data contained in the ERD is supported with publicly available desktop-level and GIS survey-level data obtained from federal, state, and local governmental sources.[19]

Nevertheless, the Company agrees with PPRP that non-invasive field-measured surveys of the proposed 150-foot ROW (*i.e.*, wetland delineations, forest stand delineations, and sensitive species project review areas ("SSPRA")) can both validate and augment the data contained in the Company's ERD. The Company also acknowledges that field surveys may be required for certain permits that the Company will be seeking concurrently with this CPCN proceeding to construct the Project.[20] It is for this very reason that the Company has been attempting for several months

---

[17] In relation to alternative transmission line routes, COMAR required the Company to provide in its Application: (i) "[t]he description of each alternative route considered for the transmission line," (ii) "[a]n estimate of the capital and annual operating costs for each alternative route," and (iii) "[a] statement of the reason why each alternative route was rejected." *See* COMAR 20.79.04.03.

[18] COMAR 20.79.01.06 requires a CPCN applicant to provide certain information for transmission line projects. *See* Case No. 9773, PSEG Renewable Transmission LLC's Application for a Certificate of Public Convenience and Necessity to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll, and Frederick Counties at 35-38 (Dec. 31, 2024) (ML No. 314555) (providing the locations within the application each COMAR 20.79.01.06 requirement is addressed).

[19] Section 5 of the ERD contains a comprehensive list of the information and databases that Stantec relied upon to develop the information required under COMAR. *See* Case No. 9773, Application, ERD, Section 5 (References).

[20] For instance, such permits include but are not limited to the Erosion and Sediment Control permit administered by Maryland Department of the Environment and Baltimore, Carroll, and Frederick Counties; U.S. Army Corps. of Engineers Joint Permit Application; National Pollutant Discharge Elimination Stormwater administered on the federal and state authorities.

Andrew Johnston, Executive Secretary
April 28, 2025
Page 6

to obtain voluntary temporary, non-intrusive survey access to private properties along the proposed route to provide field-measured information to PPRP.

Unfortunately, despite the fact that PPRP, the environmental special interest groups, and each of the county governments for the counties in which the Project is proposed to be located all agree that the Company should perform field-measured surveys to confirm the environmental resources located within the proposed ROW,[21] one of the special interest groups that petitioned to intervene in this case has been urging property owners to refuse access to their properties for these surveys.[22] As a result, despite the Company's substantial efforts to obtain voluntary access to perform the studies requested by PPRP and other state agencies, the Company had no choice but to file a petition in federal court to obtain court orders enforcing the Company's right to conduct these very surveys that were requested to protect the environmental resources that may be located on these properties.[23]

Nevertheless, while the Company agrees that field-measured surveys can help to verify the desktop data already provided, and while the Company has been expending great effort to obtain field-measured information for PPRP, neither the PUA nor the controlling COMAR provisions require a transmission line CPCN applicant to produce field survey data as an application requirement. Because the Company's Application addresses each of the Commission's COMAR filing requirements,[24] the Commission should determine that the Application is administratively complete for the purposes of setting a procedural schedule. In parallel, the Company will continue to seek temporary access to conduct non-intrusive field surveys and later provide to PPRP any

---

[21] *See* Baltimore County Comments (April 11, 2025) (ML No. 317918) (agreeing that the Company should conduct "requisite field studies"); Carroll County Board of Commissioners Comments (April 11, 2025) (ML No. 317811) (agreeing that the Company should conduct "field-based studies"); Frederick County Comments (April 11, 2025) (ML 317710) (agreeing with PPRP and "the scope of detailed information PPRP requests").

[22] *See*, *e.g.*, https://stopmprp.com/landowner-hub/f/landowner-alert-on-pseg-tactics ("We encourage everyone to 'Just Say No!' and not allow any survey or study of their property."). Despite its own campaign to prevent the Company from negotiating with landowners for voluntary access to perform environmental surveys, this same group also piggybacks on PPRP's stated need for these surveys in its filings with this Commission. *See* STOP MPRP Comments (April 11, 2025) (ML No. 317857) (arguing that the group "has not been able to evaluate the full range of issues that it may pursue" because "PPRP determined that PSEG's application is deficient" and that "the record indicates, the PSEG CPCN filing is incomplete").

[23] *See* Case No. 9773, PSEG Renewable Transmission LLC – Notice of Petition (April 18, 2025) (ML No. 318136).

[24] COMAR 20.79.04.04(B) requires that "the environmental information in the CPCN application for a transmission line must include …[a] summary of the environmental and socioeconomic effects of the construction and operation of the project, including a description of the unavoidable impacts and recommended mitigation." COMAR 20.79.04.04(C) requires "a copy of all studies of the environmental impact of the proposed project prepared by the applicant" to be included in the CPCN application.

**VENABLE** LLP

Andrew Johnston, Executive Secretary
April 28, 2025
Page 7

survey data it is authorized to obtain.[25]  As further described below in Section C of this letter, such a ruling would be consistent with how the Commission handled field-measured surveys in the *Transource* case.

### 3. Field-Measured Surveys Outside the Proposed 150-foot ROW

Several commenters have repeated PPRP's initial request that the Company conduct field-measured surveys well beyond the Project's proposed 150-foot ROW corridor.[26]  Such requests go well beyond the properties along the proposed ROW.  The Company is only seeking a 150-foot ROW for the proposed route.

In reply, the Company emphasizes two points made in respect to this request in its April 10 Letter:

*First*, requiring field-measured surveys of a "study area" *outside* of the proposed ROW would be *unprecedented* in Commission transmission line CPCN proceedings.  The Company is not aware of—and no party or person of interest has cited to—any prior Commission order requiring surveys of land for a "study area" outside of the proposed ROW for the entire proposed route.  As the Company has stated in its sworn testimony supporting the Application, *if* the need to adjust the centerline arises due to some unforeseen circumstances, then the Company has already agreed that it would notify property owners, PPRP, and applicable permitting agencies to ensure any necessary surveys are completed and permits are acquired *at that time* and prior to construction of the adjusted alignment.[27]

*Second*, requiring field-measured surveys *outside* of the proposed ROW for the entire proposed route would require the Company to disturb literally *hundreds* of new landowners outside of the proposed ROW to obtain access to their properties to conduct these additional requested surveys, even though the Company does not anticipate and has no intention to need access to their land for the Project.  And, given the concerted effort to oppose such access for even properties on the ROW, inevitably this means the Company could eventually be required to file additional

---

[25] As previously noted, PPRP requests that the Company perform certain invasive surveys (*e.g.*, "geotechnical surveys") that would require the Company to disturb the land or conduct underground boring.  The Company is not legally authorized to conduct any surveys that involve invasive activities on private property prior to the issuance of a CPCN without the express approval of the property owner.  *See Mackie v. Mayor and Com'rs of Town of Elkton*, 265 Md. 410, 419 (1972), (survey authority extends only to activities similar to "making surveys, running lines or levels, [or] setting stakes, markers[, and] monuments" that are "innocuous and temporary[,] effecting only minimal incidental damage and little, if any, disturbance").

[26] *See* PPRP Completeness Recommendation at 5-6 (requesting surveys of a 550-foot "study" corridor); *see also*, *e.g.*, Maryland Farm Bureau Comments (April 11, 2025) (ML No. 317884) (requesting surveys of a 700-foot study corridor).

[27] *See* Case No. 9773, Application, Direct Testimony of Dawn Shilkoski at 19:12-22.

Andrew Johnston, Executive Secretary
April 28, 2025
Page 8

petitions against hundreds of these additional landowners seeking court orders to access properties outside of the proposed ROW as well. The Company does not believe that the additional legal actions or community disruption that would result from this unprecedented request is either warranted or an efficient use of resources.

### C. Proposed Procedural Schedule

PJM has directed the Project to be placed in service by June 1, 2027 to prevent the "severe" overloading of "numerous 500 kV (and lower voltage) lines in Maryland and the surrounding PJM system" and "thousands of voltage collapse and extreme low voltage (non-sustainable) violations."[28] To meet PJM's deadline and ensure the continued reliability of the electric transmission system in Maryland, the Company must begin construction of the MPRP by January 2026.[29] These realities underpin the Company's proposed schedule.

Moreover, implementing a full procedural schedule while the Company attempts to obtain field-measured survey data is consistent with the Commission's handling of this issue in the Transource Maryland, LLC ("Transource") greenfield transmission CPCN case. In that case, as in this case, Transource did not have access to private properties along the proposed route for their project and therefore did not include field-measured survey data with their application. PPRP requested Transource to provide forest stand delineations, wetland delineations, and certain SSPRA surveys. While Transource worked to obtain access rights and provide field-measured survey data to PPRP, the Commission entered a full procedural order, setting deadlines for testimony and evidentiary hearings to occur within one year.[30] The Commission should follow the same process here.

The Company agrees that it will take a collective effort to review the Application and issue a decision thirteen months after the Application was filed. But the critical reliability issues facing the regional transmission system warrant such an effort. PPRP's proposal to only set a limited procedural schedule at this time, and provide parties an unprecedented *nine months after* field-measured survey data is provided to file their *direct testimony*, is not only contrary to Commission precedent, but it entirely discounts the testimony and analysis provided by PJM's subject matter

---

[28] *See* Case No. 9773, Application, Direct Testimony of Dr. Sami Abdulsalam at 7:10-12, 43:14-18, 44:8-12, 45:11-13. If left unaddressed, PJM has determined that these violations "could compromise overall system reliability" and lead to "widespread and extreme conditions, such as system collapse and blackouts" for Marylanders and other customers in the region. *Id*.

[29] *See* Case No. 9773, Application, Direct Testimony of Dawn Shilkoski at 27.

[30] *See* Case No. 9471, Order No. 88585 (Feb. 22, 2018). The procedural schedule in that case was later extended by several months (*see* Order No. 88849), but the Transource project was selected by PJM to address market efficiency issues on the transmission system, not critical reliability issues like the MPRP is designed to address.

Andrew Johnston, Executive Secretary
April 28, 2025
Page 9

experts regarding the critical and urgent need for this Project.[31]  Parties have already had four full months to analyze a robust Application supported by ten (10) witnesses and thousands of pages of environmental data and analysis.[32]  The Company is diligently working to provide field-measured survey data to augment those analyses, but the circumstances here warrant the parties reviewing the Application in parallel with those efforts to avoid unnecessary delays.

As PJM recently explained to PPRP in discovery propounded in these proceedings, if the MPRP is delayed beyond June 1, 2027, "system operators may need to implement emergency or temporary mitigation measures," including "discontinuing electric service to certain customers or groups of customers in specific areas to reduce the line loading in order to prevent the consequences of potential transmission line overloads."[33]  The Company is making every effort to meet its required in-service deadline to avoid the need for those types of emergency measures, which the Company respectfully requests the Commission to consider when setting the procedural schedule for this case.

> **D.** **Miscellaneous Matters**

Several petitioners, including STOP MPRP and the Maryland Farm Bureau, raised two ancillary matters in their comments, which the Company addresses below.

> **1.** **PUA § 7-208**

The above petitioners mistakenly state that the Application is subject to the requirements of PUA § 7-208, which provides that an applicant must wait two years from the time a person applies for a CPCN for the "[j]oint construction of generating station and transmission lines" to begin construction, unless waived by the Commission for good cause.[34]  The Company is not constructing any generating station associated with the Project, therefore PUA § 7-208 does not apply.

---

[31] On April 4, 2025, PJM asked the Commission to strongly consider the Project's required in-service date (June 1, 2027) and the need to timely address impending reliability criteria violations when setting the procedural schedule in this case.  *See* Case No. 9773, PJM Comments (ML 317516).

[32] The COMAR-required information and data contained in the Company's ERD is based on publicly available desktop-level and GIS survey-level data obtained from federal, state, and local governmental sources.  *See* Case No. 9773, Application, Attachment A (ERD) at 40-41.  In previous cases, PPRP has noted that "[t]oday's advanced siting methods use [GIS] to identify high-impact, protected areas that should be avoided and lower impact areas that can provide alternatives."  (Case No. 9471, PPRP Project Assessment Report at 23 (Dec. 16, 2019) (ML No. 227861)).

[33] PJM Response to PPRP 2-2 (April 18, 2025), attached hereto as **Exhibit A**.

[34] PUA § 7-208 (Joint construction of generating station and associated transmission lines).

Andrew Johnston, Executive Secretary
April 28, 2025
Page 10

PUA § 7-207 governs applications for CPCNs for the construction of (or exercising a right of condemnation for) overhead transmission lines in excess of 69kV: "unless a certificate of public convenience and necessity for the construction is first obtained from the Commission, a person may not begin construction of an overhead transmission line that is designed to carry a voltage in excess of 69,000 volts or exercise a right of condemnation with the construction."[35] PUA § 7-208 supplements the requirements of PUA § 7-207 *if* a CPCN applicant is constructing (or exercising a right of condemnation for) both a "generating station and its associated overhead transmission lines designed to carry a voltage in excess of 69,000 volts," including for offshore wind projects.[36] Subpart (b) of PUA § 7-208 reads as follows:

> (b) This section applies to any person:
>
> (1) constructing a generating station and its associated overhead transmission lines designed to carry a voltage in excess of 69,000 volts;
>
> (2) exercising the right of condemnation in connection with the construction; or
>
> (3) constructing a qualified submerged renewable energy line.

The above petitioners misread subpart (b)(2) to mean that § 7-208 applies any time that *any* transmission line CPCN applicant, even one who is *not* jointly constructing a generating station, is "exercising the right of condemnation."[37] Such a reading is inconsistent with the plain text of the statute and its legislative history.

Subparts (b)(1) and (b)(2) clearly are to be read together. Subpart (b)(2) states that the section applies when a person is "exercising the right of condemnation in connection with *the construction*." "The construction" that is otherwise mentioned in subpart (b) is in the preceding subpart (b)(1) regarding "constructing a generating station and its associated overhead transmission lines." Therefore, the clear intent of § 7-208 is to apply to a CPCN application that requests authority to construct or exercise the right of condemnation for constructing both a generating station and its associated overhead transmission lines.

This reading of subpart (b) is confirmed by the provision's legislative history. What is now PUA § 7-208 was first enacted in 1971 through the Power Plant Siting and Research Act of 1971.[38]

---

[35] PUA § 7-207(b)(3).

[36] PUA § 7-208(b).

[37] *See*, *e.g.*, Case No. 9773, STOP MPRP Comments at 8 (April 11, 2025) (ML No. 317857).

[38] This is the same Act that created the PPRP.

This Act included enacting both Art. 78, § 54A ("Construction of generating station or overhead transmission line carrying in excess of 69,000 volts"), which later became PUA § 7-207, and Art. 78, § 54B ("Consolidated Public Hearing, Long-Range Plans and Establishing Rate of Charge on Generated Electric Energy"), which later became PUA § 7-208. Section 54B provided that "in order to obtain the certificate of public convenience and necessity as required by Section 54A of this Article for construction to begin after July 1, 1974, shall file the application for the certificate with the Public Service Commission at least two (2) years prior to commencement of construction of *an electric generating station and its associated overhead transmission lines* designed to carry a voltage in excess of 69,000 volts, *or exercising the right of eminent domain in connection therewith*."[39] This language was later recodified in 1998 to its current form, "without substantive change from former Article 78, § 54B(a)."[40]

Moreover, the fact that Art. 78, § 54B (and later PUA § 7-208) only applies when a CPCN applicant seeks authority to construct (or exercise condemnation) of both a generating station and its associated transmission lines is further demonstrated by the provision's regulatory history. In the years following the provision's original enactment, the Commission reviewed several "greenfield" transmission line CPCN applications filed by electric companies. In those instances, the Commission applied Art. 78, § 54A (which later became PUA § 7-207) and not Art. 78, § 54B (which later became § 7-208).[41]

In short, § 7-208 only applies to a CPCN application that requests authority to construct or exercise the right of condemnation for constructing both a generating station and its associated overhead transmission lines, which is not applicable here. In any event, the statute also expressly provides that the "Commission may waive the 2-year requirement on a showing of good cause."[42] Therefore, when the Commission issues its final order in this case, and if the Commission approves the Application prior to the expiration of this two-year period, then the Commission can determine at that time whether § 7-208 applies and whether the two-year requirement should be waived for good cause.

---

[39] Maryland Session Laws, 1971, Vol. 707, Pages 96-97 (emphasis added), available at: https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000707/html/am707--97.html.

[40] 1998 Maryland Laws, Chapter 8 (SB 1), Revisor's Note to PUA § 7-208.

[41] *See, e.g.*, *Re Baltimore Gas and Elec. Co.*, 69 Md.PSC. 217 (March 1, 1978) (only applying what became PUA § 7-207 to review an application for construction and condemnation authority of a new overhead transmission line); *Re Potomac Edison Company*, 74 Md.PSC. 347 (August 4, 1983) (same).

[42] PUA § 7-208(c)(2).

Andrew Johnston, Executive Secretary
April 28, 2025
Page 12

### 2. Registration to Conduct Business in Maryland

The above petitioners also claim that the Application cannot be reviewed by the Commission because the Company had not "registered to do business in Maryland."[43] It is true that the Company was not previously registered to do business in Maryland with the Maryland Department of Assessments and Taxation ("SDAT"). However, that is only because the Company was not required to do so in order to file and maintain the Application. Under Md. Code, Corp. & Assoc. § 7-103(1), "[m]aintaining" an "administrative . . . proceeding" does "not constitute doing intrastate business in this State." All activities the Company has engaged in thus far have been in maintenance of the Application and it is therefore expressly exempted from registration. In any event, to avoid any doubt, the Company has since registered with SDAT and is currently in good standing.[44]

### E. Conclusion

The Company respectfully requests that the Commission determine that the Company's Application is administratively complete for purposes of establishing a procedural schedule that will allow for the Commission's issuance of a final order on the Application by the end of January 2026. The Company reiterates its appreciation of PPRP's review of the Application and supporting materials, and the extensive comments and interest in this Project by property owners, the community, and special interest groups. The Company looks forward to continuing to work with the parties throughout the CPCN process to demonstrate why the Application should be approved.

Sincerely,

*/s/ J. Joseph Curran, III*

J. Joseph Curran, III

*Counsel for PSEG Renewable Transmission*

Enclosures
cc:    Case No. 9773 Parties Service List

---

[43] *See*, *e.g.*, Case No. 9773, STOP MPRP Comments at 6-7 (April 11, 2025) (ML No. 317857).

[44] The Company's registration may be accessed through the SDAT website, available at: https://egov.maryland.gov/businessexpress/entitysearch/.