**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **PSEG RENEWABLE TRANSMISSION LLC** | |
| *Petitioner,* | |
| v. | **Case No.** 1:25-cv-01235-ABA |
| **ARENTZ FAMILY, LP,** *et al.* | |
| *Respondents.* | |

**RESPONDENTS' MEMORANDUM IN SUPPORT OF
<u>OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Respectfully submitted,

*/s/ Harris W. Eisenstein*
Harris W. Eisenstein (Fed. Bar No. 29694)
David M. Wyand (Fed. Bar No. 23413)
Lauren M. McLarney (Fed. Bar No. 20982)
Rosenberg Martin Greenberg, LLP
25 S. Charles Street 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Fax: (410) 727-1115
heisenstein@rosenbergmartin.com
dwyand@rosenbergmartin.com
lmclarney@rosenbergmartin.com

*Attorneys for Respondents*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS .................................................................................................2

    I.    The Regulatory Scheme .................................................................................2

    II.   The MPRP ......................................................................................................3

    III.  The PSC Proceeding ......................................................................................6

LEGAL STANDARD ........................................................................................................7

ARGUMENT .....................................................................................................................8

    I.    PSEG-RT is not likely to succeed on the merits ..........................................8

    II.   PSEG-RT has not shown it will suffer irreparable harm absent injunctive relief ......9

        A.   Mountain Valley and Sage do not support injunctive relief on these facts .......11

        B.   PSEG-RT's stated harm is not irreparable ..........................................14

    III.  The balance of equities does not warrant an injunction............................22

    IV.  The public interest decisively favors denying the requested injunction ..................28

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arkansas Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012)....................................................................................26

*Blue Water Baltimore, Inc. v. Mayor & City Council of Baltimore*,
    635 F. Supp. 3d 392 (D. Md. 2022).........................................................18

*Davis v. Bd. of Educ. of Anne Arundel Cnty.*,166 Md. 118 (1934)..................9

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) ........................................................15, 17, 22

*E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004) ........................ *passim*

*Hardnett v. M&T Bank*, 204 F. Supp. 3d 851 (E.D. Va. 2016) *aff'd sub nom.*
    *Hardnett v. M&T Bank*, 699 Fed. Appx. 242 (4th Cir. 2017)................7, 8

*Hughes Network Sys., Inc. v. InterDigital Communications Corp.*,
    17 F.3d 691 (4th Cir. 1994) .......................................................................19

*J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33 (D. Md. 2020) ..........................7

*LaFontaine's Heirs at L. & Next of Kin v. LaFontaine's Heirs at L. & Next of Kin*,
    205 Md. 311 (1954) ....................................................................................27

*Mackie v. Mayor & Com'rs of Town of Elkton*,
    265 Md. 410 (1972) .............................................................................17, 27

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ............................................. *passim*

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
    889 F.2d 524 (4th Cir. 1989) ......................................................................7

*N. Border Pipeline Co. v. 86.72 Acres of Land*,
    144 F.3d 469 (7th Cir. 1998) .....................................................................14

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019).........................................................10

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) .........................................................10

*Pennsylvania Coal Co. v. Mahon*,
    260 U.S. 393 (1922)....................................................................................27

*Pers. v. Mayor & City Council of Baltimore,*
    437 F. Supp. 2d 476 (D. Md. 2006) ..................................................................19

*Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins,*
    LLC, 412 Md. 308 (2010) .......................................................................9, 10

*SH Franchising, LLC v. Newlands Homecare, LLC,*
    No. CV CCB-18-2104, 2019 WL 356658 (D. Md. Jan. 29, 2019).........................18

*State Roads Comm'n v. Jones,*
    241 Md. 246, 216 A.2d 563 (1966) ..................................................................27

*Steuart v. City of Baltimore,*
    7 Md. 500 (1855) ...........................................................................................27

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002)........................................................................................26

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008).................................................................................7, 10, 22

**Statutes & Regulations**

15 U.S.C. § 717f(h).................................................................................11, 13, 14

16 U.S.C. § 824(a) .........................................................................................2

16 U.S.C. § 824(b)(1) .....................................................................................3

16 U.S.C. § 824s (2018)...................................................................................2

COMAR 20.79.01.07 ......................................................................................14

Md. Code Ann., Real Prop. § 12-111 ........................................................ *passim*

Md. Code, Pub. Util. § 3-101...........................................................................6

Md. Code, Pub. Util. § 7-101...........................................................................6

Md. Code, Pub. Util. § 7-207...........................................................................8

Md. Code, Pub. Util. § 7-207(b)(3)(i)....................................................3, 14, 15

Md. Code, Pub. Util. § 7-207(b)(3)(v)(2) ..........................................................8

Md. Code, Pub. Util. § 7-207(c)........................................................................6

Md. Code, Pub. Util. § 7-207(d)........................................................................6

Md. Code, Pub. Util. § 7-207(f)(1) ...................................................................................6

Md. Code, Pub. Util. § 7-208(c)(1) .................................................................................15

Md. Const. Art. III, § 40 .................................................................................................26

U.S. Const. Amend. V, cl. 4 ............................................................................................26

**Other Authorities**

Brandon Shores, LLC, *Joint Offer of Settlement*,
    Federal Energy Regulatory Commission Docket No. ER24-1790-001
    (Jan. 27, 2025) ......................................................................................................29

*Constructability & Financial Analysis Report: 2022 RTEP Window 3,* 101, 109-
    111 (2023) .......................................................................................................22, 23

*Facts & Figures*, PSEG ..................................................................................................22

FERC Order 1000, 136 FERC P 61051, 2011 WL 2956837 (2011) ................................2

H.A. Wagner, LLC, *Joint Offer of Settlement*,
    Federal Energy Regulatory Commission Docket No. ER24-1787-001
    (Jan. 27, 2025) ......................................................................................................29

*In re Application of PSEG Renewable Transmission LLC*,
    Case No. 9773 (Md. Pub. Serv. Comm'n 2024) ........................................................6

*In re Application of PSEG Renewable Transmission LLC,* Case No. 9773 (Md.
    Pub. Serv. Comm'n 2024) Doc. 1, Attachment B, App'x F, *Proposed Route
    Analysis Results* ....................................................................................................16

*In re Application of PSEG Renewable Transmission LLC,* Case No. 9773 (Md.
    Pub. Serv. Comm'n 2024), Doc. No. 119, *Environmental Review Document
    Supplement* ..........................................................................................................16

Jessica Babb, *Landowners race to respond to transmission line lawsuit* (Apr. 25,
    2025, 5:11 PM) ................................................................................................13, 16

Marin Scotten, *More transmission line conflicts expected as US electricity
    demand booms*, (Apr. 15, 2025, 6:00 AM) ................................................................3

*PPL Electric Utilities Corp.*,
    188 FERC ¶ 61,084 (2024) .......................................................................................3

*Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116
    FERC ¶ 61,057 (2006) ..............................................................................................3

*PSEG Renewable Transmission LLC,*
  Petition for Declaratory Order Requesting Approval for Transmission
  Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024) ......................................4, 5, 15, 20

PJM INTERCONNECTION, L.L.C., AMENDED AND RESTATED OPERATING
  AGREEMENT, section 1.5.8(k) (2024) ......................................................................................4

PJM Interconnection, LLC, *Constructability & Financial Analysis Report: 2022
  RTEP Window 3,* 101, 109-111 (2023) ..........................................................................22, 23

*Transmission Planning and Cost Allocation by Transmission Owning and
  Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011) ............................2, 3

## INTRODUCTION

Petitioner PSEG Renewable Transmission LLC ("Petitioner" or "PSEG-RT") is a private company from New Jersey.  It does not have final authority to construct the ambitious, 67-mile transmission line across Maryland known as the Maryland Piedmont Reliability Project ("MPRP").  Nor does it have authority to acquire associated property rights by eminent domain.  Those foundational issues are pending before the Maryland Public Service Commission ("PSC"), which will rule in due course and after careful consideration of PSEG-RT's application for a Certificate of Public Convenience and Necessity ("CPCN").

PSEG-RT's patience has apparently waned.  Rather than working through the PSC process, PSEG-RT has walked into federal court asking the judiciary to usurp the PSC's role.  The ask is exceptional for that reason alone, and many others.  It is also unconstitutional.

PSEG-RT seeks blanket authority to "enter" and "remain on" every inch of private property owned by the one hundred seventeen (117) Respondents[1] to conduct undefined "surveys" and gather undefined "information."  ECF 75-1 at 32, 75-6 at 1.  PSEG-RT presents no logistical controls or temporal limitations to protect landowners.  It instead proposes an unrestricted right of entry extending from today until whenever the CPCN application "is granted or denied," ECF 75-1 at 32, which means months or years.  And PSEG-RT offers no compensation for this imposition, even though its open-ended entrance onto private property is for "the acquisition and future use" of such property in connection with the MPRP.  ECF 75-6 at 1.

The law does not countenance the relief PSEG-RT seeks.  As set forth in Respondents' Motion to Dismiss ("MTD"), filed concurrently and incorporated by reference herein, PSEG-RT will not succeed on the merits because PSEG-RT is not entitled to relief under Section 12-111 of

---

[1] For ease of reference, the term Respondents refers to the fifty-six (56) landowners represented by undersigned counsel as well as the other landowners sued in this action.

the Real Property Article ("RP § 12-111"). Nor has PSEG-RT shown it will suffer any harm, irreparable or otherwise. And when PSEG-RT's alleged harm is balanced against the harm to all Respondents—asked to sacrifice their private property now despite PSEG-RT having no condemnation authority and paying nothing for the unlimited right of entry—equity and the public interest both counsel against a preliminary injunction.

In summary, PSEG-RT's request is untethered from basic principles of law and equity. It also falls well short of the requirements for injunctive relief. Accordingly, and for the reasons that follow, the Court should deny PSEG-RT's Motion for Preliminary Injunction.

## STATEMENT OF FACTS[2]

### I.      The Regulatory Scheme

The construction and siting of high-voltage electric transmission lines in the United States are subject to federal planning requirements but remain under the primary authority of the States. *See* 16 U.S.C. § 824(a) (Federal Energy Regulatory Commission ("FERC") regulation "to extend only to those matters which are not subject to regulation by the States"); FERC Order 1000, 136 FERC P 61051, 2011 WL 2956837 (2011) at ¶ 107 ("We acknowledge that there is longstanding state authority over certain matters that are relevant to transmission planning and expansion, such as matters relevant to siting, permitting, and construction.").

FERC oversees planning and cost allocation through regional transmission organizations, including PJM Interconnection, L.L.C. ("PJM"), and authorizes financial incentives to encourage investment. *See* 16 U.S.C. § 824s (2018) (directing FERC to establish incentive-based rate treatments for transmission investments); *Transmission Planning and Cost Allocation by*

---

[2] This action was filed on April 15, 2025, just fifteen (15) days prior to Respondents filing the instant Opposition. Respondents and their counsel have not had a full opportunity to develop the factual record. They reserve the right to do so, if and as this litigation necessitates.

*Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011) (requiring regional transmission planning and cost allocation processes); *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 (2006) (implementing incentive-based rate treatments under FPA § 219).

PJM, for its part, identifies system needs and recommends projects for development within its regulated territory. *See PPL Electric Utilities Corp.*, 188 FERC ¶ 61,084, at P 14 (2024). However, PJM's recommendations do not authorize construction nor confer rights to access or acquire land.

The Federal Power Act preserves state jurisdiction over transmission siting and construction. *See* 16 U.S.C. § 824(b)(1). To construct a high-voltage overhead transmission line in Maryland, one must first obtain a CPCN from the PSC. Md. Code, Pub. Util. § 7-207(b)(3)(i). Without a CPCN, "a person may not begin construction… or exercise a right of condemnation with the construction." *Id.*

## II.     The MPRP

The MPRP is a proposed 67-mile, 500 kilovolt ("kV") aboveground power line project running through Baltimore, Carroll, and Frederick Counties. It is, in effect, a long "extension cord" from the Pennsylvania line through Maryland to serve the power needs of existing or future data centers in Northern Virginia. Marin Scotten, *More transmission line conflicts expected as US electricity demand booms*, (Apr. 15, 2025, 6:00 AM).[3] The proposed route cuts through multi-generational family farms and homesteads, conserved and preserved land, and property supporting myriad small businesses. *See infra* at Arg. § III.

---

[3] Available at: https://www.thebaltimorebanner.com/community/climate-environment/transmission-line-conflicts-FNBOTSALRNCK7LZYTLKQWIW3VE/ (last visited Apr. 30, 2025).

On April 11, 2024, PJM and PSEG-RT entered into a Designated Entity Agreement ("DEA") concerning the development and construction of the MPRP.  *See* ECF 3-1 (copy of DEA). The DEA sets a tight development schedule, including establishing June 1, 2027 as the milestone, or deadline, for completing the MPRP.  ECF 3-1 at 20.  If construction of the MPRP is delayed, the DEA mandates that PJM "shall conduct a re-evaluation pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement"[4] and determine whether to retain the MPRP.  *Id.* at 8 (§ 7.4).  "If based on such re-evaluation, the [MPRP] is retained in the Regional Transmission Expansion Plan and [PSEG-RT's] designation for the [MPRP] also is retained, the Parties shall modify this Agreement, including Schedules, as necessary."  *Id.*

On April 15, 2024, four (4) days after the DEA took effect, PSEG-RT filed with FERC a Petition for Declaratory Order Requesting Approval for Transmission Incentives.  *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024).[5]  In its Petition, PSEG-

---

[4] Section 1.5.8(k) of Schedule 6 of the Operating Agreement reads as follows:

**Failure of Designated Entity to Meet Milestones**. In the event the Designated Entity fails to comply with one or more of the requirements of the Operating Agreement, Schedule 6, section 1.5.8(j); or fails to meet a milestone in the development schedule set forth in the Designated Entity Agreement that causes a delay of the project's in-service date, the Office of the Interconnection shall re-evaluate the need for the Short-term Project or Long-lead Project, and based on that re-evaluation may: (i) retain the Short-term Project or Long-lead Project in the Regional Transmission Expansion Plan; (ii) remove the Short-term Project or Long-lead Project from the Regional Transmission Expansion Plan; or (iii) include an alternative solution in the Regional Transmission Expansion Plan. If the Office of the Interconnection retains the Short-term or Long-term Project in the Regional Transmission Expansion Plan, it shall determine whether the delay is beyond the Designated Entity's control and whether to retain the Designated Entity or to designate the Transmission Owner(s) in the Zone(s) where the project is located as Designated Entity(ies) for the Short-term Project or Long-lead Project. If the Designated Entity is the Transmission Owner(s) in the Zone(s) where the project is located, the Office of the Interconnection shall seek recourse through the Consolidated Transmission Owners Agreement or FERC, as appropriate. Any modifications to the Regional Transmission Expansion Plan pursuant to this section shall be presented to the Transmission Expansion Advisory Committee for review and comment and approved by the PJM Board.

PJM INTERCONNECTION, L.L.C., AMENDED AND RESTATED OPERATING AGREEMENT, section 1.5.8(k) (2024), https://www.pjm.com/pjmfiles/directory/merged-tariffs/oa.pdf (last visited Apr. 30, 2025).
[5] Available at: https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20240415-5328 (last visited Apr. 30, 2025)

RT described the MPRP as "a major, linear transmission project that faces significant risks and challenges." *Id.* at 2. "PSEG-RT faces significant siting, permitting, environmental, and construction risks and challenges because the Project is subject to a host of federal and state regulatory approvals and permits, including the need to obtain a" CPCN from the PSC, "which is expected to be a comprehensive and potentially lengthy process." *Id.* at 3. PSEG-RT also noted that the MPRP "is a greenfield project for most of the project route, which poses uncertainty and risk." *Id.* at 31 (Prepared Testimony of Jason Kalwa at 9). Further, the "in-service date of June 1, 2027" means "an aggressive timeline to execute and complete all construction activities." *Id.* PSEG-RT must also "manage ROW permitting and land acquisition risks associated with the greenfield line routes in a compressed period of time[,]" as it "will need to obtain ROWs, rights-of-entry, easements, and temporary access agreements, and in these efforts, may encounter local opposition from landowners." *Id.* "To mitigate these risks and challenges," PSEG-RT sought three transmission incentives, including "the ability to recover 100% of all prudently incurred costs if the Project is abandoned for reasons outside of PSEG RT's control." *Id.* at 2.

On August 29, 2024, FERC issued an Order Granting Petition for Declaratory Order ("FERC Order"), attached hereto as **Exhibit 1.** Endorsing PSEG-RT's position, FERC found "that the Project faces risks, as discussed by PSEG RT, beyond PSEG RT's control that could lead to the Project's abandonment and that approval of the Abandoned Plant Incentive will address those risks." *Id.* at ¶ 16. That finding led FERC to conclude that PSEG-RT can recover "100% of prudently incurred costs expended on and after the date of [the FERC Order], if the Project is abandoned for reasons beyond PSEG RT's control." *Id.* at ¶ 17. Recognizing that "PSEG RT will expend significant capital during the planning, permitting, development, pre-construction, and construction phases of project development," FERC will also "allow PSEG RT to recover pre-

commercial costs, as well as start-up and development costs, after the Project goes into service." *Id.* at ¶ 21.

## III.    The PSC Proceeding

On December 31, 2024, PSEG-RT filed its Application for a CPCN with the PSC.  ECF 1 at ¶ 2.  As of April 30, 2025, PSEG-RT and other interested parties had made nearly five hundred (500) filings in the PSC proceeding.  *In re Application of PSEG Renewable Transmission LLC*, Case No. 9773 (Md. Pub. Serv. Comm'n 2024).[6]

The CPCN process combines the general procedural protections applicable to all PSC proceedings under Md. Code, Pub. Util. § 3-101 *et seq.*, with additional substantive requirements for transmission projects under Md. Code, Pub. Util. § 7-101 *et seq.*  Title 3 ensures that PSC proceedings allow for public participation, intervention by interested persons, and the development of a full administrative record. Title 7 requires that an applicant submit a detailed CPCN application addressing project need, alternative routes, and environmental, land use, and reliability impacts.

Upon receipt of PSEG-RT's CPCN Application, the PSC followed its standard practice, to include coordinating a multi-agency review, soliciting public comment, and providing notice to affected property owners, local governments, and elected officials.  Md. Code, Pub. Util. § 7-207(c).  Public hearings in each affected jurisdiction will follow.  *Id.* at § 7-207(d).  Finally, the PSC will "take final action" on PSEG-RT's CPCN Application "after due consideration" of, among other factors, the need for the MPRP, alternative routes, and the environmental and land use impacts.  *Id.* at § 7-207(f)(1).

---

[6] All filings in the PSC proceeding are available here: https://webpscxb.psc.state.md.us/DMS/case/9773 (last visited Apr. 30, 2025).

On April 15, 2025, with the PSC still weighing whether the MPRP can advance and whether PSEG-RT can acquire property rights to construct the proposed transmission line, PSEG-RT filed this action. ECF 1. That same day, PSEG-RT filed a Motion for Preliminary Injunction seeking the right to immediately "enter" and "remain on" private property owned by Respondents "to make surveys, run lines or levels, or obtain information relating to the acquisition and future use of the properties in connection with the" MPRP. ECF 75-6 at 1. Also on that same day, PSEG-RT filed with the Maryland State Department of Assessments and Taxation, for the first time, a registration to do business in Maryland, *see* **Exhibit 2**, falsely asserting that it had not done business in Maryland prior to April 15, 2025.

## LEGAL STANDARD

Preliminary injunctions are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 526 (4th Cir. 1989) ("A preliminary injunction is, of course, 'an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought.'") (quoting *Federal Leasing v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir. 1981)). In determining whether to issue a preliminary injunction, a court must consider four factors: (1) whether the plaintiff "is likely to succeed on the merits," (2) whether the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief," (3) whether "the balance of equities tips in [plaintiff's] favor," and (4) whether "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "All four requirements must be met in order for a preliminary injunction to be granted." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 58 (D. Md. 2020) (citing *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011)); *see also Hardnett v. M&T Bank,*

204 F. Supp. 3d 851, 862 (E.D. Va. 2016) ("The failure to show any one of the relevant factors mandates denial of the preliminary injunction.") *aff'd sub nom. Hardnett v. M&T Bank*, 699 Fed. Appx. 242 (4th Cir. 2017).

## ARGUMENT

PSEG-RT cannot satisfy any of the factors for injunctive relief.  In fact, this action is legally deficient.  *See generally* Respondents' MTD.  For those and other reasons that follow, PSEG-RT's request for a preliminary injunction should be denied.

### I.  PSEG-RT is not likely to succeed on the merits.

As explained more fully in Respondents' MTD, PSEG-RT cannot succeed on the merits because its sole claim for relief is not available to PSEG-RT under Section 12-111 of the Real Property Article ("RP § 12-111"). PSEG-RT is not an entity "having the power of eminent domain" and therefore cannot use any access rights granted by the statute.

For a private company planning to operate an overhead transmission line in Maryland, the only possible source of eminent domain authority is found in the Maryland statute relating to a "certificate of public convenience and necessity" ("CPCN") codified at Section 7-207 of the Public Utilities Article ("PU § 7-207"). Under this statute, an entity does not have the power of eminent domain unless and until it is issued a CPCN. Subparagraph (b)(3)(v)(2) provides: "*On issuance of a certificate of public convenience and necessity* for the construction of an overhead transmission line, a person may acquire by condemnation, in accordance with Title 12 of the Real Property Article, any property or right necessary for the construction or maintenance of the transmission line." (Emphasis added). There is no other statute by which the legislature has delegated eminent domain authority to a private entity prior to the issuance of a CPCN.

From a policy perspective, it makes sense to require a private (even out-of-state) entity to go through an approval process *before* that entity is given the State's power of eminent domain. This case perfectly illustrates why Maryland law would require an approval process. PSEG-RT is a foreign entity having no previous connection to the State of Maryland. It did not ever register to do business in Maryland until the day this lawsuit was filed.

PSEG-RT seeks to stretch RP § 12-111 beyond its plain language to meet some perceived policy goal. PSEG-RT claims that RP § 12-111 must be interpreted to allow PSEG-RT to enter and remain on private property to gather information PSEG-RT claims it needs for the CPCN application. But just because an entity claims it needs information does not mean that it has the right to the information and certainly does not mean that the legislature intended to allow the entity to infringe on private property rights to get the information. "[S]tatutes of eminent domain are to be strictly construed." *Davis v. Bd. of Educ. of Anne Arundel Cnty.*, 166 Md. 118 (1934).

Moreover, this Court is not permitted to add to the statute actually passed by the legislature to fill some perceived policy gap. "Even though a certain provision, which has been omitted from a statute, appears to be within the obvious purpose or plan of the statute, and to have been omitted merely by inadvertence, nevertheless, the court is not at liberty to add to the language of the law; and the court must hold that the Legislature intended to omit the provision, however improbable that may appear in connection with the general policy of the statute." *Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins*, LLC, 412 Md. 308, 327 (2010) (quoting *Rogan v. B & O R. Co.*, 188 Md. 44, 54, 52 A.2d 261, 266 (1947)). Similarly, the United States Supreme Court has explained: "If courts felt free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal, we would risk failing to 'tak[e] ... account of' legislative compromises essential to a law's passage and, in that way, thwart rather than honor 'the effectuation of

congressional intent.'" *New Prime Inc. v. Oliveira*, 586 U.S. 105, 120–21 (2019) (quoting *Board of Governors, FRS v. Dimension Financial Corp*., 474 U.S. 361, 374 (1986)). Under both Maryland and federal law, PSEG-RT cannot appeal to policy, divorced from the actual text of RP § 12-111. As the Court in *Rosemann* noted, "[i]f the situation brought to light by this case is an oversight, it is a matter for the Legislature to correct," not the Court. *Rosemann*, 412 Md. at 327.

For these reasons, and the reasons set forth in Respondents' MTD, PSEG-RT is not likely to succeed on the merits.

## II.    PSEG-RT has not shown it will suffer irreparable harm absent injunctive relief.

"[A] party seeking a preliminary injunction must prove that he or she is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) (*quoting Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in original) (citation omitted). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). The "possibility" of harm, however severe, is not enough. *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)) (*per curiam*).

In an effort to clear this high bar, PSEG-RT argues that it will suffer irreparable injury absent immediate and unfettered access to private property owned by the Respondents. PSEG-RT's supposed harm is twofold: (1) without preliminary relief, PSEG-RT might not meet the June 1, 2027, in-service date for the MPRP; and (2) if construction of the MPRP is delayed, PSEG-RT might incur financial losses. This harm is not irreparable. Rather, it is exaggerated and illusory, *see infra* at Arg. § II(B), and the precedent on which PSEG-RT relies undermines its cause.

### A. *Mountain Valley and Sage do not support injunctive relief on these facts.*

PSEG-RT places great emphasis on two Fourth Circuit cases, *Mountain Valley*, *supra*, and *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004). But the procedural and substantive differences between *Mountain Valley* and *Sage*, on the one hand, and this case, on the other, could not be more stark.

*Mountain Valley* and *Sage* are eminent domain cases. In each, a gas company who possessed a CPCN and therefore had eminent domain authority under the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(h), brought condemnation proceedings against landowners from whom the company could not voluntarily acquire property rights. Within those proceedings, the gas companies sought injunctive relief for immediate possession of the condemned land.

Unlike this case, the landowners in *Mountain Valley* and *Sage* conceded that the gas companies had the right to take private property by force of eminent domain. *Mountain Valley*, 915 F.3d at 209 ("On appeal, the landowners do not dispute the grant of partial summary judgment to Mountain Valley, conceding that Mountain Valley has the substantive right to take easements by eminent domain."); *id.* at 216 ("There is no question, then, that Mountain Valley may take easements across the properties at issue, making this the rare preliminary-injunction case in which success on the merits is guaranteed."); *Sage*, 361 F.3d at 820 ("(The landowners now concede that

ETNG has a legal right to take the property.)"); *id.* at 829-30 ("ETNG has a determination on the merits that it has a right to condemn the landowners' property, and the landowners now concede that ETNG possesses this right. Success on the merits for ETNG is therefore apparent.")

Accordingly, the pivotal question before the Fourth Circuit was not whether the gas companies could condemn private property, but ***when*** the condemnors could take possession of property they had condemned. "Thus," the Fourth Circuit clarified, "the only question before us is whether Mountain Valley may gain access to those easements now, or whether it must wait to start construction until the district courts can sort out just compensation." *Mountain Valley*, 915 F.3d at 209; *see also Sage*, 361 F.3d at 818 ("The main question in this appeal is whether a gas company can obtain immediate possession through the equitable remedy of a preliminary injunction."). In affirming the entry of injunctive relief, the Fourth Circuit held that a district court's "equitable power to grant the remedy of immediate possession through the issuance of a preliminary injunction" is conditioned on a finding that the party seeking possession "has the substantive right to condemn property." *Sage*, 361 F.3d at 828; *see also Mountain Valley*, 915 F.3d at 215.

This case differs from *Mountain Valley* and *Sage* on every level. *First*, because PSEG-RT does not have the right to condemn private property, *see* Respondents' MTD at § IV(A)(i), it did not and could not bring an eminent domain action. In PSEG-RT's own words, only after "the issuance of a CPCN" will it "be authorized by law to proceed with eminent domain cases to acquire the properties necessary to construct the MPRP." ECF 1 at ¶ 250. In *Mountain Valley* and *Sage*, by contrast, the gas companies sought immediate access to property after filing eminent domain proceedings.

*Second*, whether PSEG-RT ever secures the power of eminent domain is an open question before the PSC. *See* Respondents' MTD at § IV(B). There were no questions regarding the condemnors' eminent domain authority in *Sage* or *Mountain Valley*. In fact, the Fourth Circuit reasoned that a favorable determination on "the substantive right to condemn" is a prerequisite to a court "grant[ing] the remedy of immediate possession through the issuance of a preliminary injunction." *Sage*, 361 F.3d at 828. Because PSEG-RT may never have that right, its ask for injunctive relief is premature.

*Third*, in *Mountain Valley* and *Sage*, the condemnors "assured through 'reasonable, certain, and adequate' means that [the landowners] will be compensated fairly" by depositing with the court their estimate of just compensation. *Mountain Valley*, 915 F.3d at 212-13;[7] *see also Sage*, 361 F.3d at 824-25. PSEG-RT, by contrast, has done nothing to ensure that Respondents will receive just compensation for the proposed sweeping imposition on their private land. *See* Jessica Babb, *Landowners race to respond to transmission line lawsuit,* (Apr. 25, 2025, 5:11 PM) ("we will not be providing compensation for the temporary right of entry...") [8] Such action is unconstitutional. *See infra* at Arg. § III (right to compensation for temporary takings).

*Fourth*, *Sage* and its progeny only authorize the district courts to grant "immediate possession in a Natural Gas Act condemnation." *Mountain Valley*, 915 F.3d at 215. This is not a condemnation case, nor is it brought under the NGA.

---

[7] In *Mountain Valley*, the lower courts required "a deposit in an amount several times the estimated value of each easement. During the pendency of the proceedings, each Landowner would be entitled to draw on that fund, up to the estimated value of the easement across its property. The district courts also required Mountain Valley to post a surety bond in an amount double each easement's estimated value, conditioned on its payment of just compensation at the conclusion of proceedings." *Id.* at 212-13.

[8] Available at: https://digitaledition.baltimoresun.com/infinity/article_share.aspx?guid=2edac0cb-1777-40dd-b075-e4701cc0acfb (last visited Apr. 30, 2025).

In sum, the cases PSEG-RT cites as "instructive" on the issue of irreparable harm lend no support for the relief it seeks. ECF 75-1 at 25. And substantively, the specific items PSEG-RT references as the basis for its harm fall woefully short of what the law deems irreparable.

### B. PSEG-RT's stated harm is not irreparable.

In the first instance, PSEG-RT argues it will suffer irreparable harm absent injunctive relief because, without such relief, it cannot put the MPRP into service by June 1, 2027. This argument relies exclusively on the Fourth Circuit's reasoning in *Mountain Valley* and *Sage*. Again, those cases involved a condemnor's right to take immediate possession of property after a valid exercise of eminent domain under the NGA. PSEG-RT does not have the right to condemn, under the NGA or otherwise. "Without having that right in substantive law determined," PSEG-RT cannot "invoke equity." *Sage*, 361 F.3d at 828; *see also N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 472 (7th Cir. 1998) ("Northern Border cannot gain immediate possession of the property through a preliminary injunction because it did not present an argument grounded in substantive law establishing a preexisting entitlement to the property.").

Further, whether PSEG-RT can meet the June 1, 2027, in-service date is inherently speculative. Multiple events independent of this litigation stand in PSEG-RT's way. The primary unknown is when and how the PSC will decide the CPCN application. PSEG-RT presents a favorable outcome as a *fait accompli*, but the PSC has said no such thing. And the PSC may not decide the application for many months.

While COMAR 20.79.01.07 imposes a one-year deadline for decisions on electric generating station CPCN applications, there is no equivalent statutory or regulatory deadline for the PSC to take action on transmission line applications, as here. And unless PSEG-RT obtains a CPCN, it can neither "begin construction" nor "exercise a right of condemnation." Md. Code, Pub.

Util. § 7-207(b)(3)(i); *see also* ECF 1 at ¶ 250 (The PSC will decide whether PSEG-RT can proceed "with eminent domain cases to acquire properties necessary to construct the MPRP…").

More critically, an application for a CPCN involving transmission line construction requiring eminent domain "shall" be filed "at least 2 years before construction of the facility will commence." Md. Code, Pub. Util. § 7-208(c)(1). PSEG's CPCN application was filed on December 31, 2024, ECF 75-1 at 7, so even if it secures a CPCN, it arguably cannot begin construction prior to December 31, 2026.[9] It follows that any potential harm to PSEG-RT if its CPCN application is not brought to "final resolution with enough time that the Company may begin construction on the MPRP in January 2026 and, in turn, place the MPRP into service by June 1, 2027," ECF 75-1 at 25, is of PSEG-RT's own making.

What's more, even if PSEG-RT had authority to acquire property rights and begin construction in January 2026, it is speculation to conclude that PSEG-RT could construct a 67-mile transmission line across Maryland in under eighteen (18) months. As with every construction project, a host of factors may cause delay, including labor shortages, challenges with the procurement of material, and legal obstacles.

Far from establishing a "*present* threat of irreparable harm" absent injunctive relief, *Direx Israel, Ltd.*, 952 F.2d at 816 (emphasis added), whether PSEG-RT can hit a mid-2027 in-service date even with injunctive relief is a matter of conjecture. PSEG-RT needs a swift and favorable outcome at the PSC plus a near flawless execution on its construction plans. In PSEG-RT's own words, "the project route" itself "poses uncertainty and risk," and "an in-service date of June 1, 2027," means "an aggressive timeline to execute and complete all construction activities." *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for

---

[9] Respondents recognize that the PSC "may waive the 2-year requirement on a showing of good cause," Md. Code, Pub. Util. § 7-208(c)(1), but note that PSEG-RT has neither made nor attempted to make such a showing.

Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024), at 31 (Prepared Testimony of Jason Kalwa at 9). PSEG-RT must also "manage ROW permitting and land acquisition risks associated with the greenfield line routes in a compressed period of time…, and in these efforts, may encounter local opposition from landowners." *Id.*

PSEG-RT targets 117 landowners in this action. Hundreds more own land along the proposed MPRP route. *See In re Application of PSEG Renewable Transmission LLC,* Case No. 9773 (Md. Pub. Serv. Comm'n 2024) Doc. 1, Attachment B, App'x F, *Proposed Route Analysis Results,* at F-3 ("Unique property owners within ROW (count) 409") (attached hereto as **Exhibit 3**).[10] While PSEG-RT concedes it "cannot proceed piecemeal," ECF 75-1 at 28, it has done just that by seeking access to "certain properties along the proposed route" and not others. *Id.* at 7. This lawsuit "impacts ninety (90) parcels," PSEG-RT told *The Baltimore Sun,* so "[t]here will be additional filings over the next few months." *See* Jessica Babb, *Landowners race to respond to transmission line lawsuit,* (Apr. 25, 2025, 5:11 PM). Considering that PSEG-RT has plans to file more litigation in the coming months, that separate litigation could easily derail plans to put the MPRP in service by June 1, 2027. Similarly, because PSEG-RT's surveying needs extend well beyond the private property owned by Respondents, a preliminary injunction in this case will not fully address PSEG-RT's stated harm. *See also* Respondents' MTD at § IV(C).

The character and frequency of PSEG-RT's surveying needs is also a mystery. Its pre-suit requests to enter Respondents' land reference "preliminary analyses and site studies which may include but not be limited to: appraisals, property boundary and utility surveys, engineering

---

[10] In addition, PSEG-RT needs to fortify existing roads and construct "new access routes." *See In re Application of PSEG Renewable Transmission LLC,* Case No. 9773 (Md. Pub. Serv. Comm'n 2024), Doc. No. 119, *Environmental Review Document Supplement,* at 2. "There are an estimated 303 access roads on and off the MPRP ROW inclusive of preferred and alternative options. The access roads average 16 feet to 25 feet wide so large equipment including a drill, crane, concrete trucks and structure sections can be delivered to the site." *Id.* Large construction equipment traversing rural land will do permanent damage to the land on the proposed MPRP route and the surrounding land that PSEG-RT occupies during construction.

studies, wetland delineation, environmental assessment/investigation and geo-technical borings." ECF 5-2 at 4, 6-2 at 6, 16-2 at 5, 23-2 at 4, 33-2 at 7, 45-2 at 8, 50-2 at 6, 61-2 at 6.  There are no temporal[11] or locational limitations on the proposed studies, no hint of logistical planning to accomplish these studies without disrupting on-site activities, and no guardrails on the qualifications of those who may study the land.  Equally concerning, PSEG-RT is asking the Court to authorize "geo-technical borings" while simultaneously telling the PSC such borings "are not legally authorized prior to the issuance of a CPCN without the express approval of the property owner."  *Compare id. with* PSEG-RT's April 10, 2025 Letter to the PSC (attached hereto as **Exhibit 4**), at 6.  If, in fact, PSEG-RT needs geo-technical borings to secure a CPCN and has no legal basis to obtain them, that is one more reason PSEG-RT might not meet the in-service date even with injunctive relief.  *See Mackie v. Mayor & Com'rs of Town of Elkton*, 265 Md. 410, 420-22 (1972) (predecessor statute to Md. Code Ann., Real Prop. § 12-111 does not authorize state instrumentalities having power of eminent domain to enter land to make geological investigations); *see also* Respondents' MTD at § IV(A)(ii).

Put simply, PSEG-RT's potential injury is "conditioned on possible future events," *Direx Israel, Ltd.*, 952 F.2d at 816, any of which could frustrate PSEG-RT's ability to put the MPRP in service by June 1, 2027.  Beyond the inordinate risk of meeting an aggressive construction schedule, PSEG-RT confronts uncertainty at the PSC, uncertainty around mass land acquisition, uncertainty around unfiled litigation, and uncertainty around surveying needs.  Each uncertainty may prevent the MPRP from going into service, in mid-2027 or ever, irrespective of what happens

---

[11] PSEG-RT's proposed Order provides that "Petitioner shall give a Respondent not less than 24 hours' notice that Petitioner will enter on the Respondent's property by taping a notice on the front door of the Respondent" and "Petitioner may give one notice for entry on multiple days."  ECF 75-6 at 8.  If entered, PSEG-RT could provide a single notice to each Respondent on Day 1 and then complete the various analyses and site studies anywhere and everywhere on private land until the PSC process concludes.  This would amount to an unconstitutional taking.  *See infra* at Arg. § III.

in this case. That may be "problematic" for PSEG-RT, but it is not enough to warrant injunctive relief. *Id.* PSEG-RT simply cannot establish that a preliminary injunction, standing alone, will avert irreparable injury. *See, e.g., Blue Water Baltimore, Inc. v. Mayor & City Council of Baltimore*, 635 F. Supp. 3d 392, 403 (D. Md. 2022) ("the mere possibility of irreparable harm in the absence of the requested relief is not sufficient to support the issuance of a preliminary injunction"); *SH Franchising, LLC v. Newlands Homecare, LLC*, No. CV CCB-18-2104, 2019 WL 356658, at *5 (D. Md. Jan. 29, 2019) (because movant "is not suffering actual and imminent harm and instead has shown only the mere possibility of future harm," movant could not establish a likelihood of "irreparable harm absent a preliminary injunction").

Plus, June 1, 2027 is a provisional deadline. As PSEG-RT writes, its obligation "to construct and place the MPRP into service by June 1, 2027" comes from the DEA executed by PJM and PSEG-RT. ECF 75-1 at 7; *see also* ECF 3-1 (copy of DEA). It is true that the DEA sets June 1, 2027 as the milestone, or deadline, for completing the MPRP. ECF 3-1 at 20. However, it is equally true that a failure to meet the in-service deadline does not automatically trigger termination of the DEA. In that circumstance, PJM "shall conduct a re-evaluation" and determine whether to retain the MPRP. *Id.* at 8 (§ 7.4). If that re-evaluation results in PJM retaining both the MPRP and PSEG-RT's designation for the MPRP, "the Parties shall modify this Agreement, including Schedules, as necessary." *Id.* This leaves open the possibility that PJM may modify the in-service date, particularly if any delay is beyond PSEG-RT's control.

Much like it is speculation to conclude that PSEG-RT will suffer any harm, let alone irreparable harm, for failing the milestone deadline, it is also speculation to conclude that PSEG-RT will incur irreparable financial losses if the MPRP does not proceed rapidly. PSEG-RT posits that, absent injunctive relief for open-ended access to private property, it "would be required to

redraw the proposed line for the MPRP and submit a new CPCN application" to the PSC. ECF 75-1 at 30. In that circumstance, PSEG-RT claims it would "again incur" roughly $2.9 million in siting, environmental, and consulting fees plus "significant legal fees" and other costs. *Id.*

Economic losses generally do not constitute irreparable harm. *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date,… weighs heavily against a claim of irreparable harm.") (quoting *Sampson v. Murray,* 415 U.S. 61, 90 (1974) (quoting *Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir. 1958)); *see also Pers. v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006). Even if this were a rare case in which monetary damage alone could constitute irreparable injury, PSEG-RT is unlikely to suffer any economic losses under any circumstance.

On August 29, 2024, FERC issued its Order Granting Petition for Declaratory Order (*i.e.,* the FERC Order). *See* Ex. 1. The FERC Order came in response to PSEG-RT's request for "transmission rate incentives" for the MPRP, including "the ability to recover 100% of all prudently incurred costs if the Project is abandoned for reasons outside of PSEG RT's control (Abandoned Plant Incentive)." FERC Order at 1; *id.* at ¶ 15 ("PSEG RT requests the ability to recover 100% of prudently incurred abandoned plant costs if the Project is abandoned or cancelled (in whole or in part) for reasons outside of PSEG RT's control, i.e., the Abandoned Plant Incentive."). In support, PSEG-RT cited the "significant regulatory risks and challenges associated with the" MPRP, including, "for example, that it must obtain a number of regulatory, siting, and permitting approvals for the Project from various federal, state, and local government bodies."

*Id.* PSEG-RT also highlighted the "need to obtain new rights-of-way for the Project, which adds to the overall risk of the Project." *Id.*

In its Petition seeking the FERC Order, PSEG-RT laid bare the pervasive risks and challenges confronting this "major, linear transmission project." *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024), at 2. Jason Kalwa, Director – Projects Onshore Technical for PSEG Services Corporation, offered the following testimony:

**Q. What risks and challenges does PSEG RT face in developing and building the Project?**

A. PSEG RT faces significant risks in developing and constructing the Project, including (1) the need for the Company to apply and obtain a host of regulatory approvals and permits for the Project, as well as obtain the necessary rights-of-way for the Project; (2) the need for PSEG RT to coordinate the development and construction of the Project with three other developers who were awarded transmission projects pursuant to PJM's Window 3 competitive solicitation process; and (3) the aggressive schedule that PSEG RT must implement to meet PJM's required in-service date for the Project.

\*   \*   \*

**Q. In addition to the regulatory risks associated with these required regulatory approvals, does PSEG RT face other risks in developing the Project?**

A. Yes, the Project faces risks associated with the need for the Project to obtain necessary rights-of-way ("ROW"). The Project is a greenfield project for most of the project route, which poses uncertainty and risk. With an in-service date of June 1, 2027, the Project faces an aggressive timeline to execute and complete all construction activities. The Project must manage ROW permitting and land acquisition risks associated with the greenfield line routes in a compressed period of time. For instance, PSEG RT will need to obtain ROWs, rights-of-entry, easements, and temporary access agreements, and in these efforts, may encounter local opposition from landowners.

**Q. Does the Project face other risks?**

A. Yes…

\*   \*   \*

-20-

**Q. What would be the consequences if PSEG RT were unable to obtain one or more of the required regulatory approvals or the necessary rights of way for the Project?**

A. In the event PSEG RT is unable to obtain the necessary regulatory approvals or permits or the necessary rights-of-way for the Project, the Project could be cancelled or abandoned (in whole or in part) for reasons that are beyond PSEG RT's control. In addition, as noted, the Project depends upon the successful construction of other transmission upgrades by other developers. If these other upgrades are not constructed, this too could result in the Project being abandoned for reasons beyond PSEG RT's control.

*Id.* at 23, 29, 31-32 (Prepared Testimony of Jason Kalwa at 1, 7, 9-10).

FERC explicitly found "that the Project faces risks, as discussed by PSEG RT, beyond PSEG RT's control that could lead to the Project's abandonment and that approval of the Abandoned Plant Incentive will address those risks." FERC Order at ¶ 16. Based on that finding, FERC concluded that PSEG-RT can recover "100% of prudently incurred costs expended on and after the date of [the FERC Order], if the Project is abandoned for reasons beyond PSEG RT's control." *Id.* at ¶ 17. FERC also recognized "PSEG RT will expend significant capital during the planning, permitting, development, pre-construction, and construction phases of project development," so it granted PSEG-RT's request "to recover pre-commercial costs, as well as start-up and development costs, after the Project goes into service." *Id.* at ¶ 21.

Given that PSEG-RT has a path to recover 100% of its expenses, its claim of irreparable economic harm absent injunctive relief is inaccurate. By comparison, the hundreds of citizens affected by the MPRP merely insist that PSEG-RT follow the law before forcibly co-opting private property for corporate gain. That PSEG-RT may incur costs along the way, albeit fully reimbursable, is a byproduct of its conscious decision to pursue a transmission line extending from the Maryland-Pennsylvania border to the Maryland-Virginia border through greenfields rather

-21-

than brownfields or existing easements.  And PSEG-RT made that decision because it stands to reap a rich return on investment.  *See infra* at Arg. § III.

In summary, PSEG-RT has not shown "a present or immediate need for preliminary relief." *Direx Israel, Ltd.*, 952 F.2d at 816.  "Remembering that preliminary injunctions are 'extraordinary remedies' involving the exercise of 'very far-reaching power' to be granted only 'sparingly' and 'in limited circumstances,' the grant of such relief in this case, where the harm" to PSEG-RT is "not present or immediate but merely problematic, conditioned on possible future events, would seem contrary to" the Fourth Circuit's "stated rule: A plaintiff, seeking preliminary relief, must show the present threat of irreparable harm." *Id.*

### III.    The balance of equities does not warrant an injunction.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)).  In weighing whether to grant such relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)).  Here, the balance of equities tips decidedly in favor of the Respondents.

Context is appropriate.  On the one hand, PSEG-RT is a subsidiary of Public Service Enterprise Group, Inc., a publicly traded company headquartered in New Jersey.  ECF 80.  Public Service Enterprise Group, Inc.'s market cap exceeds $40 billion, with a reported $54.6 billion in total assets and $10.3 billion in total revenue in 2024. *Facts & Figures*, PSEG, https://corporate.pseg.com/aboutpseg/companyinformation/factsandfigures (last visited Apr. 30, 2025).  Estimates suggest that PSEG-RT and its publicly-traded parent will earn tens of millions of dollars from the MPRP. *See* PJM Interconnection, LLC, *Constructability & Financial Analysis*

*Report: 2022 RTEP Window 3,* 101, 109-111 (2023).[12]  In addition, as explained *supra*, PSEG-RT's economic risk for pursuing the MPRP is fully mitigated by the FERC Order guaranteeing 100% reimbursement should the project not proceed as planned.

Respondents, on the other hand, occupy a far different class.  They are a group of 117 private citizens, small businesses, and non-profit entities who happen to own property along the proposed MPRP route.

Most of the affected property is Maryland farmland.  *See* Declaration of Matthew Lee Dell ("Dell Decl."), attached hereto as **Exhibit 5**; Declaration of Raina Gover ("Gover Decl."), attached hereto as **Exhibit 6**; Declaration of Charles Bond ("Bond Decl."), attached hereto as **Exhibit 7**; Declaration of Joanne Frederick ("Frederick Decl."), attached hereto as **Exhibit 8**. Many farmer-Respondents operate working farms with livestock requiring controlled environments, including disease management and biosecurity practices, or row crops and permanent plantings vulnerable to damage if foreign foot traffic or equipment is introduced.  Dell Decl. at ¶¶ 6, 9, 11-13; Gover Decl. at ¶ 3, 10-11; Bond Decl. at ¶ 10.  On the latter point, the proposed MPRP route cuts through 522.6 acres of cultivated cropland.  Ex. 3 at F-3.

Indefinite access to sensitive farmland could result in biosecurity breaches, including, as one example, exposing livestock to pathogens from surveyor movement between farms.  Gover Decl. at ¶ 10.  Such access could also cause physical damage to fields, fencing, irrigation systems, or conservation practices. Gover Decl. at ¶ 10; Dell Decl. at ¶¶ 9, 11-14; Bond Decl. at ¶ 11. In either circumstance, Maryland's farming industry will be damaged.

For farmers, their land is more than just their livelihood; it is also their legacy. Dell Decl. at ¶ 11. Farmland is often passed down from one generation to the next. A disruption to

---

[12]     Available   at:   https://www.pjm.com/-/media/DotCom/committees-groups/committees/teac/2023/20231205/20231205-2022-rtep-window-3-constructability--financial-analysis-report.pdf (last visited Apr. 30, 2025).

accommodate PSEG-RT could upend multi-generational family farms. *Id.*; Frederick Decl. at ¶¶ 4-6. This harm to Maryland agribusiness is particularly egregious given that PSEG-RT may never secure PSC approval to build its transmission line.

The same is true for property which serves as homestead to many Respondents. Like the farmer-Respondents, the homeowner-Respondents derive immense benefit from their land. Bond Decl. at ¶¶ 3, 12-13; Frederick Decl. at ¶¶ 4-6. Parcels across the proposed MPRP route benefit from conservation and preservation easements, including easements in favor of the Maryland Agricultural Land Preservation Foundation as well as forest conversation and wetland easements. Dell Decl. at ¶ 4; Frederick Decl. at ¶ 7. The proposed route runs through 245.8 acres of conserved land, and lies just 500 feet from another 1,801.7 acres of conserved land. Ex. 3 at F-2. These easements preserve sensitive ecosystems and foster a serene living environment. Frederick Decl. at ¶ 13; Gover Decl. at ¶ 12. To disrupt familial living quarters built adjacent to conserved and preserved land before PSEG-RT has the right to advance its plans is to cause premature and unnecessary harm to landowners.

The small business-Respondents will face comparable hardship if PSEG-RT can enter their private property for months on end. One property, known as the River Valley Ranch ("RVR"), is utilized as a year-round youth camp, retreat center, and outdoor education facility serving over 10,000 guests annually. *See* Respondent Peter and John Radio Fellowship, Inc.'s Opp. to Motion for Preliminary Injunction at Ex. 1. Each year, RVR hosts approximately 8,000 minors on-site. *Id.* at ¶ 7. From May through August, the busiest and most financially significant season, RVR operates residential summer camps serving approximately 2,500 children. *Id.* Outside the summer months, RVR hosts children almost daily, including through school field trips, weekend youth group events, and seasonal retreats. *Id.* A blanket right of entry for indeterminate surveying with

no temporal limitations will upset, if not jeopardize, this invaluable use.  *See also* Gover Decl. at ¶ 3, 12.

Landowners with plans to conduct future business on their property suffer a similar fate, because PSEG-RT's unfettered access may forever damage land earmarked for commercial use. Frederick Decl. at ¶¶ 15-17.

Every landowner is understandably fearful of losing property rights to a high-voltage transmission line.[13]  Yet to reiterate, the PSC has not determined whether PSEG-RT can build the MPRP and acquire associated property rights.  That decision may come months or years from now. Uncertainty notwithstanding, PSEG-RT asks the Court to authorize the immediate entry onto private property for unknown duration to conduct undefined surveys.  In PSEG-RT's telling, it needs authority to "enter" and "remain on" private property owned by the 117 Respondents "to make surveys, run lines or levels, or obtain information" from now until the date on which its CPCN application "is granted or denied."  ECF 75-6 at 1.  Such authority, if granted, would burden Respondents' property with a right-of-entry lasting through this calendar year, at a minimum, and perhaps far longer.  Worse, the encumbrance would be for the specific purpose of "acquisition and future use of the properties in connection with the" MPRP.  *Id.*

In simple terms, PSEG-RT seeks to burden every Respondents' property with an open-ended, boundary-to-boundary easement under the auspice that PSEG-RT might exercise eminent domain in the future.  Beyond the fact that PSEG-RT does not have condemnation authority and its mere announcement of the MPRP has caused a diminution in value to every property along the proposed route, the relief PSEG-RT seeks qualifies as a compensable, temporary taking.  And yet, flouting its legal obligations once more, PSEG-RT offers no compensation for an encumbrance

---

[13] In the interest of brevity, this Opposition does not include Declarations from all Respondents.  Respondents reserve the right to produce additional evidence supporting their positions, by Declaration or otherwise, if and as appropriate.

that would interfere with the Respondents' use and enjoyment of their land, and likely render the land unsaleable indefinitely.

The obligation to pay just compensation when taking private property for public use is a bedrock principle of state and federal law.  Md. Const. Art. III, § 40; U.S. Const. Amend. V, cl. 4. When a condemnor "physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).  This duty applies equally to temporary and permanent takings.  As the Supreme Court has explained:

> Furthermore, our decisions confirm that takings temporary in duration can be compensable. This principle was solidly established in the World War II era, when "[c]ondemnation for indefinite periods of occupancy [took hold as] a practical response to the uncertainties of the Government's needs in wartime." *United States v. Westinghouse Elec. & Mfg. Co.,* 339 U.S. 261, 267, 70 S.Ct. 644, 94 L.Ed. 816 (1950). In support of the war effort, the Government took temporary possession of many properties. These exercises of government authority, the Court recognized, qualified as compensable temporary takings. See *Pewee Coal Co.,* 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809; *Kimball Laundry Co. v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945).
>
> \*     \*     \*
>
> Ever since, we have rejected the argument that government action must be permanent to qualify as a taking. Once the government's actions have worked a taking of property, "no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *First English,* 482 U.S., at 321, 107 S.Ct. 2378. See also *Tahoe–Sierra,* 535 U.S., at 337, 122 S.Ct. 1465 ("[W]e do not hold that the temporary nature of a land-use restriction precludes finding that it effects a taking; we simply recognize that it should not be given exclusive significance one way or the other.").

*Arkansas Game & Fish Comm'n v. United States,* 568 U.S. 23, 32-33 (2012)

The risk of losing property rights to eminent domain is a risk inherent to private landownership.  To mitigate that risk, takings jurisprudence contemplates two important features:

(1) the party taking property rights has secured the power of eminent domain; and (2) the condemnor has paid just compensation for the imposition.  PSEG-RT has done neither.

As Justice Holmes wrote more than a century ago: "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Mackie*, 265 Md. at 422 (quoting Justice Holmes with approval); *State Roads Comm'n v. Jones*, 241 Md. 246, 250, 216 A.2d 563, 565 (1966) (same).  Yet, Justice Holmes cautioned: "When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears."  *Pennsylvania Coal Co.*, 260 U.S. at 415.

PSEG-RT has made Justice Holmes' fear a reality.  It claims entitlement to a right-of-entry, indefinite both in scope and duration, while ignoring the constitutional guarantee of just compensation. A "desire to improve the public condition," however strong, "is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id.*[14]

To permit PSEG-RT to forcibly enter private land *without* the power of eminent domain and *without* paying anything for such entry is to permit PSEG-RT to violate the state and federal constitutions.[15]  There is no greater harm to private landowners.  And when this extreme harm is

---

[14] The cases cited by PSEG-RT concerning the constitutionality of pre-condemnation surveys do not support the extensive right of entry that PSEG-RT asks this Court to provide. *Steuart v. City of Baltimore*, 7 Md. 500 (1855) involved an ordinary land survey necessary for the condemnation proceedings, and the court expressly stated that "an entry to grade, or to prepare the ground" would be illegal. *Id*. at 516. Likewise, in *LaFontaine's Heirs at L. & Next of Kin v. LaFontaine's Heirs at L. & Next of Kin*, 205 Md. 311 (1954), the court indicated that "[a]uthorized temporary occupancy or momentary entry for purposes of survey or inspection is not a taking," but also indicated that "actual entry upon land and its devotion to public use for more than a momentary period" was a taking. *Id*. at 320, 322.

[15] *Mountain Valley* and *Sage* are again supportive of Respondents' position.  In each case, the Fourth Circuit reasoned that the payment of just compensation into court for the landowners' benefit mitigated any harm arising from the condemnors taking immediate possession of the condemned land.  *Mountain Valley*, 915 F.3d at 219-20;[15] *see also Sage*, 361 F.3d at 829.

balanced against the hypothetical harm PSEG-RT presents as irreparable, the answer is clear: an injunction cannot issue.

**IV.    The public interest decisively favors denying the requested injunction.**

Granting a preliminary injunction is not in the public interest, either. As explained above, such relief would advance the economic interests of a publicly-traded company while trampling the constitutional rights of hundreds of private citizens.

PSEG-RT, for its part, presents calamity absent injunctive relief. It claims that "if the MPRP is not in service by June 1, 2027, the consequences to the region's electric grid will be severe," with "millions of residential and commercial consumers… experiencing rolling blackouts and grid collapse." ECF 75-1 at 10. An injunction will "avoid this nightmare scenario," writes PSEG-RT. *Id.* at 32.

As a threshold matter, PSEG-RT offers scant evidence for its dire predictions. The PSC may deny the CPCN application or delay a decision well into 2026, either of which would prevent PSEG-RT from putting the MPRP in service by June 1, 2027. And that is not PSEG-RT's only obstacle. PSEG-RT faces many challenges, as it freely admits, including those associated with (i) securing approvals from various federal, state, and local government bodies, (ii) acquiring property rights from hundreds of landowners, and (iii) meeting a compressed construction schedule. *See supra* at Arg. § II(B). Even assuming, *arguendo*, that regional energy demand could surpass supply at some point in the future, it is pure speculation to conclude that the injunctive relief PSEG-RT seeks will rebalance the scale.

The geopolitical landscape on energy matters is constantly evolving. The trend toward renewable energy sources, such as wind and solar, is at odds with recent efforts to strengthen protections for conventional energy sources, such as fossil fuels. PJM, for its part, has contingency

plans in place should the MPRP and a broader package of grid upgrades not materialize.[16]  In fact, the agreement between PJM and PSEG-RT expressly contemplates that the MPRP may be delayed or cancelled. ECF 3-1 at 8 (§ 7.4).  FERC, too, understands this risk, as evidenced by its award of broad economic protections to PSEG-RT should the MPRP stall or fail.  *See* Ex. 1.  Despite what PSEG-RT suggests, the lights will remain on in Maryland irrespective of whether this Court grants the unconstitutional relief PSEG-RT seeks.

On that point, and as addressed in Respondents' MTD, PSEG-RT is asking the federal court to usurp the role of the state Public Service Commission.  *See* Respondents' MTD at § IV(B). It is for the PSC, not this or any other court, to determine whether the MPRP can advance.  *Id.*  In fact, PSEG-RT's arguments to the PSC for granting a CPCN mirror its arguments for injunctive relief.  The public interest is best served by compelling PSEG-RT to work through the PSC process and otherwise follow the law, not maneuver around it.

This is particularly important given what is at stake.  If PSEG-RT secures injunctive relief, a sweeping, unpaid encumbrance will burden private land along the MPRP's proposed route for the pendency of the PSC proceeding.  ECF 75-6 at 1.  Such relief would thumb the scale in PSEG-RT's favor, at least implicitly, while the PSC process moves forward.  And if PSEG-RT prevails at the PSC, an "aggressive" construction schedule will lead to the hasty acquisition of property rights from hundreds of landowners in three Maryland counties without regard for the communities, families, and small businesses destroyed in the wake.  Those with everything at risk

---

[16] Subject to ratification by FERC, two fossil fuel-powered generating stations in Maryland will remain open through at least May 31, 2029.  *See* Brandon Shores, LLC, *Joint Offer of Settlement*, Federal Energy Regulatory Commission Docket No. ER24-1790-001, at Attachment A, ¶ 2.2 (Jan. 27, 2025) (available as document labelled "Clean Tariff" at https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250127-5185&optimized=        false&sid=a310d18a-4d78-4f34-81e9-574438bcac51) (last visited Apr. 30, 2025); H.A. Wagner, LLC, *Joint Offer of Settlement*, Federal Energy Regulatory Commission Docket No. ER24-1787-001, at Attachment A, ¶ 2.2 (Jan. 27, 2025) (available as document labelled "Clean Tariff" at https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250127-5187&optimized= false&sid=a310d18a-4d78-4f34-81e9-574438bcac51) (last visited Apr. 30, 2025).

make one simple ask: that PSEG-RT fulfill all legal requirements before jeopardizing their property and their future.  The law is on their side.

## **<u>CONCLUSION</u>**

A preliminary injunction is an extraordinary remedy, awarded only upon a clear showing that plaintiff is likely to succeed on the merits, that plaintiff is likely to suffer irreparable harm, that the balance of equities weighs in favor of an injunction, and that the public interest, too, favors injunctive relief.  PSEG-RT has satisfied none of these elements.  Accordingly, Respondents respectfully request that the Court deny PSEG-RT's Motion for Preliminary Injunction.