EXHIBIT 1

188 FERC ¶ 61,142
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
Mark C. Christie, David Rosner,
and Lindsay S. See.

PSEG Renewable Transmission LLC                Docket No.  EL24-103-000

ORDER GRANTING PETITION FOR DECLARATORY ORDER

(Issued August 29, 2024)

1.      On April 15, 2024, PSEG Renewable Transmission LLC (PSEG RT), pursuant to section 219 of the Federal Power Act (FPA),[1] Order No. 679,[2] and the Commission's November 15, 2012 policy statement on transmission incentives,[3] filed a petition for declaratory order (Petition) for authorization to use certain transmission rate incentives for its investment in a new approximately 70-mile 500 kV AC transmission line in Maryland (Project).  Specifically, PSEG RT requests that the Commission grant three transmission rate incentives for the Project:  (1) the ability to recover 100% of all prudently incurred costs if the Project is abandoned for reasons outside of PSEG RT's control (Abandoned Plant Incentive); (2) the deferral of prudently incurred pre-commercial costs through the creation of a regulatory asset (Regulatory Asset Incentive); and (3) use of a hypothetical capital structure of 45% equity and 55% debt until the Project is placed into service (Hypothetical Capital Structure Incentive).  As discussed below, we grant PSEG RT's Petition, effective August 30, 2024.

---

[1] 16 U.S.C. § 824s.

[2] *Promoting Transmission Inv. through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[3] *Promoting Transmission Inv. through Pricing Reform*, 141 FERC ¶ 61,129 (2012) (2012 Incentives Policy Statement).

Document Accession #: 20240829-3048        Filed Date: 08/29/2024

Docket No. EL24-103-000                                                          - 2 -

## I.   Background and Filing

### A.   PSEG RT

2.      PSEG RT states that it is a wholly owned, indirect subsidiary of PSEG.[4]  PSEG RT states that it is an affiliate of Public Service Electric and Gas Company, which is a public utility company organized under the laws of New Jersey that is engaged in, among other things, the transmission and distribution of electricity and the distribution of natural gas in New Jersey.  PSEG RT states that it will develop, build, and own a new transmission project selected through the PJM competitive solicitation process.  PSEG RT, a new transmission developer with no existing assets, notes that it is not a public utility under the FPA, and PSEG RT does not have a formula rate or any other rate schedule on file with the Commission.[5]

### B.   The Project

3.      PSEG RT states that the Project is a new 500 kV, approximately 70-mile, AC transmission line in the Piedmont Plateau region of Maryland.[6]  PSEG RT states that the Project will extend from Allegheny Power Systems' (APS) existing 500 kV Doubs Station, run for approximately 70 miles within Maryland, and connect to an interconnection or demarcation point in the service territory of Baltimore Gas and Electric Company (BG&E).[7]  PSEG RT states that from this interconnection point, BG&E will construct an approximately one-mile transmission segment on the Maryland side of the Maryland/Pennsylvania border, which will ultimately connect to a new 500 kV transmission line of approximately 12-15 miles in Pennsylvania, which will be constructed by PPL Electric Utilities (PPL).[8]  This new PPL transmission line will connect to a new 500 kV station that will also be constructed by PPL.

---

[4] Petition at 5.

[5] PSEG RT notes that it will make a separate filing pursuant to section 205 of the FPA, 18 U.S.C. § 824d, requesting the Commission's approval for a transmission formula rate template and associated implementation protocols after the Commission has issued an order granting the transmission incentives requested in this Petition.  Petition at 5-6.

[6] Petition at 6.

[7] *Id.* at 6-7.

[8] *Id.* at 7.

Docket No. EL24-103-000                                                    - 3 -

4.      PSEG RT states that the Project is part of a comprehensive set of transmission
projects that PJM Interconnection, L.L.C. (PJM) awarded to PSEG RT and a number of
other developers as part of PJM's 2022 Regional Transmission Expansion Plan (RTEP)
Window 3 competitive solicitation process.[9]  PSEG RT states that the drivers for PJM's
2022 RTEP Window 3 process were reliability violations that PJM identified resulting
from strong data center load growth activity, particularly in Northern Virginia and
Maryland, and expected deactivations of over 11,000 MW of generation in PJM.  PSEG
RT states that, on December 11, 2023, the PJM Board approved a set of transmission
upgrades to address these reliability issues, including awarding the Project to PSEG RT.[10]
PSEG RT states that PJM designated PSEG RT with the following two components of
the Project:  (1) PJM Baseline Upgrade ID No. b3800.43: Construct 31.6 miles of 500 kV
overhead AC line between the Conastone vicinity and the Doubs substation (APS zone
portion);  and (2) PJM Baseline Upgrade ID No. b3800.7: Construct 35.8 miles of 500 kV
overhead AC line between the Conastone vicinity and the Doubs substation (BG&E zone
portion).  PSEG RT states that the estimated cost for the Project is $424 million.[11]

### C.      PSEG RT's Petition for Incentives

5.      PSEG RT requests that the Commission authorize three incentives pursuant to
section 219 for its investment in the Project:  (1) the Abandoned Plant Incentive; (2) the
Regulatory Asset Incentive; and (3) the Hypothetical Capital Structure Incentive.[12]
PSEG RT states that the requested incentives are narrowly tailored to mitigate the risks
that it faces in developing the Project.[13]

---

[9] *Id.* at 7 (citing *Id.*, Ex. No. PSEG-1. Prepared Testimony of Jason Kalwa at 4
(Kalwa Testimony)).

[10] *Id.* at 7-8 (citing Kalwa Testimony at 4; PJM Interconnection, *Transmission
Expansion Advisory Committee (TEAC) Recommendations to the PJM Board PJM Staff
White Paper* (Dec. 2023), https://pjm.com/-/media/committees-
groups/committees/teac/2023/20231205/20231205-pjm-teac-board-whitepaperdecember-
2023.ashx).

[11] *Id.* at 8 (citing Kalwa Testimony at 6).

[12] *Id.* at 9.

[13] *Id.* at 3.

6.     PSEG RT requests the Commission grant the requested incentives by no later than July 1, 2024.[14]

## II.     **Notice of Filings and Responsive Pleadings**

7.     Notice of PSEG RT's filing was published in the *Federal Register*, 89 Fed. Reg. 31,196 (Apr. 24, 2024), with interventions and protests due on or before May 15, 2024.  Public Citizen, Inc and Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor for PJM, each filed timely motions to intervene.  On May 23, 2024, the Maryland Public Service Commission filed a motion to intervene out-of-time.

## III.    **Discussion**

### A.     **Procedural Matters**

8.     Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2023), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

9.     Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d) (2023), we grant the Maryland Public Service Commission's late-filed motion to intervene given its interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

### B.     **Substantive Matters**

#### 1.     **Section 219 Statutory Requirements**

10.    In the Energy Policy Act of 2005, Congress added section 219 to the FPA, directing the Commission to establish, by rule, incentive-based rate treatments to promote capital investment in electric transmission infrastructure.[15]  The Commission subsequently issued Order No. 679, establishing the processes by which a public utility may seek transmission rate incentives pursuant to section 219.  In November 2012, the Commission issued a Policy Statement providing guidance regarding its evaluation of applications for transmission rate incentives under section 219 and Order No. 679.[16]

---

[14] *Id.* at 19.

[15] Pub. L. No. 109-58, § 1241, 119 Stat. 594 (2005).

[16] 2012 Incentives Policy Statement, 141 FERC ¶ 61,129.

Document Accession #: 20240829-3048   Filed Date: 08/29/2024
Case 1:25-cv-01235-ABA    Document 92-2    Filed 04/30/25    Page 6 of 27

Docket No. EL24-103-000                                                  - 5 -

11.     Pursuant to Order No. 679, an applicant may seek to obtain incentive rate
treatment for transmission infrastructure investments that satisfy the requirements of
section 219, i.e., the applicant must show that "the facilities for which it seeks incentives
either ensure reliability or reduce the cost of delivered power by reducing transmission
congestion."[17]  Order No. 679 established a process for an applicant to demonstrate that it
meets this standard, including a rebuttable presumption that the standard is met if:  (1) the
transmission project "result[s] from a fair and open regional planning process that
considers and evaluates projects for reliability and/or congestion and is found to be
acceptable to the Commission"; or (2) "a project has received construction approval from
an appropriate state commission or state siting authority."[18]  The Commission also stated
that "[o]ther applicants not meeting these criteria may nonetheless demonstrate that their
project is needed to maintain reliability or reduce congestion by presenting [to the
Commission] a factual record that would support such findings."[19]

### a.      PSEG RT's Request

12.     PSEG RT asserts that the Project qualifies for the Order No. 679 rebuttable
presumption because it results from the PJM RTEP process, a Commission-approved
open and transparent transmission planning process that evaluates projects for reliability
or congestion.[20]  PSEG RT states that, through the 2022 RTEP Window 3, PJM identified
the Project as among a package of transmission solutions needed to address reliability
issues.  PSEG RT concludes that the Project has been approved by the PJM Board for
inclusion in the PJM RTEP as a baseline project and is thus entitled to the rebuttable
presumption.[21]

### b.      Commission Determination

13.     The Commission has previously found that transmission projects approved
through a transmission planning process that evaluated whether the identified
transmission projects will enhance reliability and/or reduce congestion are entitled to the

---

[17] Order No. 679, 116 FERC ¶ 61,057 at P 76.

[18] *Id.* P 58.

[19] *Id*. P 57; *see also* Order No. 679-A, 117 FERC ¶ 61,345 at P 41.

[20] Petition at 10.

[21] *Id.* at 10-11.

Docket No. EL24-103-000                                                    - 6 -

rebuttable presumption established under Order No. 679.[22]  In this case, PJM's RTEP process, through which the Project was approved, evaluated whether the Project would enhance reliability and/or reduce congestion.  Accordingly, we find that the Project is entitled to the rebuttable presumption and meets the requirements of section 219.

### 2.    Order No. 679 Nexus Requirement

14.    In addition to satisfying the section 219 requirement of ensuring reliability and/or reducing the cost of delivered power by reducing congestion, Order No. 679 requires an applicant to demonstrate that there is a nexus between the incentive sought and the investment being made.  In Order No. 679-A, the Commission clarified that the nexus test is met when an applicant demonstrates that the total package of incentives requested is "tailored to address the demonstrable risks or challenges faced by the applicant."[23]  Applicants must provide sufficient support to allow the Commission to evaluate each element of the package and the interrelationship of all elements of the package.[24]  The Commission noted that this nexus test is fact-specific and requires the Commission to review each application on a case-by-case basis.[25]  We address the nexus test below for each incentive and for the total package of incentives requested.

### a.    Abandoned Plant Incentive

### i.    PSEG RT's Request

15.    PSEG RT requests the ability to recover 100% of prudently incurred abandoned plant costs if the Project is abandoned or cancelled (in whole or in part) for reasons outside PSEG RT's control, i.e., the Abandoned Plant Incentive.[26]  PSEG RT states that there are significant regulatory risks and challenges associated with the Project.[27]  PSEG RT notes, for example, that it must obtain a number of regulatory, siting, and permitting

---

[22]  *See, e.g.*, *Baltimore Gas & Elec. Co.*, 187 FERC ¶ 61,030, at P 13 (2024) (finding that a baseline upgrade included in the PJM RTEP satisfies the rebuttable presumption); *PJM Interconnection, L.L.C.*, 185 FERC ¶ 61,200, at P 15 (2023) (same).

[23]  Order No. 679-A, 117 FERC ¶ 61,345 at P 27.

[24]  2012 Incentives Policy Statement, 141 FERC ¶ 61,129 at P 10 (quoting Order No. 679-A, 117 FERC ¶ 61,345 at P 27).

[25]  Order No. 679, 116 FERC ¶ 61,057 at P 43.

[26]  Petition at 11-12.

[27]  *Id.* at 12.

Docket No. EL24-103-000                                                      - 7 -

approvals for the Project from various federal, state, and local government bodies.  PSEG
RT adds that since almost the entire route of the Project is greenfield, PSEG RT will need
to obtain new rights-of-way for the Project, which adds to the overall risk of the Project.[28]
PSEG RT also states that the Project requires PSEG RT to coordinate with three other
transmission owners who were awarded transmission projects pursuant to PJM's Window
3 process, and the completion of the Project is dependent on the successful development,
siting, and construction of projects by these other entities, which are not within PSEG
RT's control.[29]

### ii.    Commission Determination

16.    We grant PSEG RT's request for the Abandoned Plant Incentive.  In Order
No. 679, the Commission found that this incentive effectively encourages transmission
development.[30]  We find that the Project faces risks, as discussed by PSEG RT, beyond
PSEG RT's control that could lead to the Project's abandonment and that approval of the
Abandoned Plant Incentive will address those risks.  Accordingly, we find that PSEG RT
has demonstrated a nexus between the recovery of prudently incurred costs associated
with abandoned transmission projects and its planned investment in the Project.

17.    Consistent with Commission policy, the Abandoned Plant Incentive for the Project
would be available to PSEG RT for 100% of prudently incurred costs expended on and
after the date of this order, if the Project is abandoned for reasons beyond PSEG RT's
control.[31]  We will not determine the prudence of any costs incurred prior to the
abandonment, if any, unless and until PSEG RT seeks such recovery in a future FPA
section 205 filing.[32]

---

[28] *Id.* at 12-13.

[29] *Id.* at 13.

[30] Order No. 679, 116 FERC ¶ 61,057 at PP 163-166; *see also, e.g.*, *Midcontinent
Indep. Sys. Operator, Inc.*, 153 FERC ¶ 61,296, at P 28 (2015); *TransCanyon DCR,
LLC,*, 152 FERC ¶ 61,017, at P 41 (2015) (*TransCayon*).

[31] Order No. 679, 116 FERC ¶ 61,057 at P 163; *see San Diego Gas & Elec. Co. v.
FERC*, 913 F.3d 127, 137-38 (D.C. Cir. 2019) (*SDG&E*); *see also, e.g.*, *NextEra Energy
Transmission Midwest, LLC*, 166 FERC ¶ 61,169, at P 21 (2019); *GridLiance W. Transco
LLC*, 164 FERC ¶ 61,049, at P 20 (2018); *Pac. Gas & Elec. Co.*, 163 FERC ¶ 61,187, at
P 14 (2018); *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,039, at P 28
(2023).

[32] Order No. 679, 116 FERC ¶ 61,057 at PP 165-66.  In the event that PSEG RT
seeks abandoned plant recovery for costs expended during the time period prior to the

### b.  Regulatory Asset Incentive

### i.  PSEG RT's Request

18.    PSEG RT seeks authorization to establish a regulatory asset for certain costs that PSEG RT has incurred and will continue to incur prior to the Project's commercial operation date that do not meet the requirements to be capitalized or otherwise included in construction work in progress, i.e., the Regulatory Asset Incentive.[33]  PSEG RT states that the Regulatory Asset Incentive will address risks and challenges posed by the Project and will provide PSEG RT with up-front regulatory certainty regarding cost recovery, which will assist in attracting capital.[34]

19.    PSEG RT proposes to amortize this regulatory asset over a period of five years from the commercial operation of the Project.[35]  PSEG RT also requests authorization to accrue carrying charges on the regulatory asset balance from the date the Commission accepts the regulatory asset until the regulatory asset is fully amortized.  PSEG RT proposes to calculate the carrying charges based on its debt costs and a return on equity (ROE) that is ultimately approved by the Commission for PSEG RT.[36]  PSEG RT states that it will restrict the compounding of interest to ensure that such compounding does not

---

effective date of this order, they would be eligible to seek recovery of 50% of their prudently incurred costs, consistent with prior precedent.  *See, e.g.*, *San Diego Gas & Elec. Co.*, 154 FERC ¶ 61,158, *order on reh'g*, 157 FERC ¶ 61,056 (2016), *aff'd*, *SDG&E*, 913 F.3d 127.

[33] Petition at 13-15.  PSEG RT states that these costs include "early precommercial and formation costs, project development costs, costs to support planning and bid development activities, including engineering and consultant fees, legal fees, administrative expenses, travel expenses, and development surveys, and expenses incurred prior to the filing of the application and prior to the time costs first flow to customers."  *Id.* at 13 (citing *NextEra Energy Transmission Midwest, LLC*, 161 FERC ¶ 61,140, at PP 22-26 (2017); *Transource Kan., LLC*, 151 FERC ¶ 61,010, at PP 17-19 (2015)).

[34] *Id.* at 13-14.

[35] *Id.* at 14.

[36] *Id.* at 14.  PSEG RT notes that it does not currently have a Commission-approved ROE and intends to file for an ROE along with its formula rate template and associated implementation protocols in the future.  PSEG RT states that for purposes of calculating the carrying charges on the regulatory asset balance, PSEG RT proposes to use the ROE that is ultimately approved by the Commission in that future proceeding.

Document Accession #: 20240828-3010    Filed Date: 08/28/2024
Case 1:25-cv-01235-ABA    Document 92-2    Filed 04/30/25    Page 10 of 27

Docket No. EL24-103-000                                        - 9 -

result in a higher amount of interest than is allowed for Allowance for Funds Used During Construction (AFUDC).

20.    PSEG RT states that the Regulatory Asset Incentive will allow PSEG RT to recover costs incurred prior to the commercial operation date of the Project.[37]  PSEG RT states that it will make a future section 205 filing to demonstrate that its pre-commercial operation costs related to the Project are just and reasonable before recovering the regulatory asset in transmission rates.

## ii.    **Commission Determination**

21.    We grant PSEG RT's request for the Regulatory Asset Incentive for the Project. This incentive will allow PSEG RT to recover pre-commercial costs, as well as start-up and development costs, after the Project goes into service.  We recognize that the Project is PSEG RT's first transmission facility, that PSEG RT does not have facilities in operation, that PSEG RT is not yet charging rates under a tariff, and that PSEG RT has not requested construction work in progress incentive treatment.  Thus, during the Project's development period, PSEG RT will expend significant capital during the planning, permitting, development, pre-construction, and construction phases of project development without other sources of regular cash flow.  Therefore, we find that PSEG RT has demonstrated a nexus between the requested incentive and the risks and challenges of the Project because this incentive will provide PSEG RT with added upfront regulatory certainty and can reduce interest expenses.[38]  The Regulatory Asset Incentive will also facilitate the financing of the Project on reasonable terms.[39]

22.    We also grant PSEG RT's request to amortize the regulatory asset over five years, consistent with rate recovery.[40]  Specifically, we grant PSEG RT's request for authorization to amortize the carrying charges related to the deferred pre-commercial costs associated with the Project by debiting Account 566, Miscellaneous Transmission Expenses, and crediting Account 182.3, Other Regulatory Assets, consistent with Commission precedent.[41]  The carrying charge should not result in a higher amount of

---

[37] *Id.* at 15.

[38] *DesertLink, LLC*, 156 FERC ¶ 61,118, at P 21 (2016).

[39] *See, e.g.*, *Republic Transmission, LLC*, 161 FERC ¶ 61,036, at P 21 (2017).

[40] *See, e.g.*, *LS Power Grid Ca., LLC*, 182 FERC ¶ 61,201, at P 30 (2023).

[41] *See, e.g.*, *S. Cent. MCN LLC*, 153 FERC ¶ 61,099, at P 24 (2015); *TransCanyon*, 152 FERC ¶ 61,017 at P 32; *NextEra Energy Transmission W., LLC*, 154 FERC ¶ 61,009, at P 33 (2016) (*NEETWest*).

interest than is allowed for construction expenditures that accrue AFUDC,[42] and the compounding of interest should be no more frequent than semi-annually. Additionally, we grant PSEG RT's request, effective August 30, 2024, to record the deferred pre-commercial and formation costs and to begin accruing carrying charges. If these costs are disallowed in a future rate proceeding, then they must be written off to Account 426.5, Other Deductions.

23.     While we allow PSEG RT to record its prudently incurred costs as a regulatory asset, PSEG RT must make a filing pursuant to section 205 to demonstrate that the pre-commercial and general startup costs are just and reasonable before PSEG RT includes them in rates. In that filing, PSEG RT must establish that the costs included in the regulatory asset are costs that would otherwise have been chargeable to expense in the period incurred, but were deferred consistent with the authorization granted herein, and parties will be able to challenge the reasonableness of costs at that time.[43]

### c.      **Hypothetical Capital Structure Incentive**

### i.      **PSEG RT's Request**

24.     PSEG RT requests a hypothetical capital structure of 45% equity and 55% debt until the Project is placed into service.[44] PSEG RT states that, consistent with its bid commitment, PSEG RT will use a capital structure of 45% equity and 55% debt once the Project is placed into service. PSEG RT states that allowing the use of the Hypothetical Capital Structure Incentive until the Project is placed into service mitigates the financing risks and challenges during the permitting and construction phase of the Project and will improve PSEG RT's access to capital.[45]

25.     PSEG RT states that it intends to fund the Project with a combination of debt and equity contribution, and as the development of the Project progresses, PSEG RT will require additional capital contributions. PSEG RT states that during the permitting and construction phases of the Project, the debt-to-equity ratio in PSEG RT's capital structure

---

[42] *See, e.g.*, *TransCanyon*, 152 FERC ¶ 61,017 at P 32; *NEETWest*, 154 FERC ¶ 61,009 at P 33.

[43] *See, e.g.*, *NextEra Energy Transmission W.*, 162 FERC ¶ 61,195, at P 20 (2018); *GridLiance W. Transco LLC*, 160 FERC ¶ 61,003, at P 35 (2017).

[44] Petition at 15.

[45] *Id.* at 15-16.

could fluctuate significantly, so it is important for PSEG RT to be able to use a hypothetical capital structure.[46]

26.    PSEG RT states that, as a new transmission developer with no existing assets, its actual capital structure could fluctuate significantly during the development and construction phases of the Project based on the amount, timing, and frequency of capital infusions (both borrowings and equity infusions) that are needed to fund construction. PSEG RT states that granting PSEG RT's request to use the Hypothetical Capital Structure Incentive will help to mitigate the financing risks and challenges during the permitting and construction phase of the Project and improve PSEG RT's access to capital.[47]

### ii.    **Commission Determination**

27.    We grant PSEG RT's request for the Hypothetical Capital Structure Incentive for the Project.[48]  As a nonincumbent transmission developer, PSEG RT has no existing assets, and its actual capitalization will fluctuate during the development and construction phases of the Project.  We find that the Hypothetical Capital Structure Incentive will assist PSEG RT in raising capital during the construction phase of the Project and in financing the Project at reasonable rates while its actual debt-to-equity ratio varies. Moreover, nonincumbent transmission developers have a particular need for the hypothetical capital structure incentive because it establishes certain financial principles that incumbent transmission owners currently have in place but that remain undetermined for nonincumbent transmission developers.[49]  We note that the Commission has previously granted hypothetical capital structures with the same debt-to-equity ratio

---

[46] *Id.* at 16.

[47] *Id.* at 16-17.

[48] PSEG RT indicates that it made a bid commitment to use the same capital structure when the Project is placed into service.  We note, however, that our grant of the Hypothetical Capital Structure Incentive is not an authorization to continue to use the hypothetical capital structure once the Project is placed in service.

[49] *Mid-Atlantic Offshore Dev., LLC*, 186 FERC ¶ 61,116, at P 46 (2024); *DesertLink, LLC*, 156 FERC ¶ 61,118 at PP 36-37; *see also, e.g.*, *TransCanyon*, 152 FERC ¶ 61,017 at PP 39-40; *Xcel Energy Sw. Transmission Co., LLC*, 149 FERC ¶ 61,182, at P 22 (2014); *Xcel Energy Transmission Dev. Co., LLC*, 149 FERC ¶ 61,181, at P 13 (2014).

requested by PSEG RT.[50]  Accordingly, we find that PSEG RT has demonstrated a nexus
between the requested incentive and the risks and challenges faced by the Project.

### d.    **Total Package of Incentives**

### i.    **PSEG RT's Request**

28.    PSEG RT states that the requested incentives address different types of risks faced
by the Project.[51]  PSEG RT states that Abandoned Plant Incentive is targeted to mitigate
the risk of unrecovered costs in the event the Project is cancelled for reasons out of PSEG
RT's control, including, for example, if PSEG RT is unable to obtain the necessary
regulatory approvals for the Project.  PSEG RT states that the Abandoned Plant Incentive
provides a mechanism for PSEG RT to recover prudently incurred costs in limited
circumstances, thereby reducing the risk to PSEG RT of unrecovered costs associated
with the Project's abandonment.  PSEG RT states that the Regulatory Asset Incentive
will allow PSEG RT to recover pre-commercial operation costs from inception of the
Project through commercial operation that are not capitalized or otherwise included in
construction work in progress but were incurred before such expenses could be recovered
as current expenses.  PSEG RT notes that the Regulatory Asset Incentive will provide
regulatory certainty, rate stability, and improve cash flow, which it states will help
facilitate the development and construction of the Project.[52]  PSEG RT states that the
Hypothetical Capital Structure Incentive will help mitigate significant financing risks
present during the permitting and construction phases of the Project by allowing PSEG
RT to apply a stable debt-to-equity ratio, which provides a pragmatic approach to address
the company's fluctuating capital structure.[53]

---

[50]  *See, e.g.*, *LS Power Grid Ca., LLC*, 171 FERC ¶ 61,222, at P 29 (2020);
*Midcontinent Indep. Sys. Operator, Inc. Dairyland Power Coop.*, 161 FERC ¶ 61,301, at
PP 16, 19 (2017).

[51]  Petition at 17.

[52]  *Id.* at 17-18.

[53]  *Id.* at 18.

Docket No. EL24-103-000                                                    - 13 -

## ii.     **Commission Determination**

29.     As noted above, in Order No. 679-A, the Commission clarified that its nexus test is met when an applicant demonstrates that the total package of incentives requested is tailored to address the demonstrable risks or challenges faced by the applicant.[54] Applicants must provide sufficient support to allow the Commission to evaluate each element of the package and the interrelationship of all elements of the package.[55] The Commission noted that this nexus test is fact-specific and requires the Commission to review each application on a case-by-case basis. The Commission has, in prior cases, approved multiple rate incentives for particular projects.[56] For the reasons discussed above, we find that PSEG RT has demonstrated that each of the requested incentives that we authorize here, and the incentives package as a whole, addresses the risks and challenges faced by PSEG RT in undertaking the Project.

30.     Finally, as a result of the Commission approving the requested transmission rate incentives, PSEG RT must submit FERC-730 reports annually.[57]

The Commission orders:

     (A)     PSEG RT's request for the Abandoned Plant Incentive is hereby granted, effective August 30, 2024, as discussed in the body of this order.

     (B)     PSEG RT's request for the Regulatory Asset Incentive is hereby granted, effective August 30, 2024, as discussed in the body of this order.

---

[54] Order No. 679-A, 117 FERC ¶ 61,345 at P 27; 2012 Incentives Policy Statement, 141 FERC ¶ 61,129 at P 10.

[55] 2012 Incentives Policy Statement, 141 FERC ¶ 61,129 at P 10 (quoting Order No. 679-A, 117 FERC ¶ 61,345 at P 27).

[56] Order No. 679, 116 FERC ¶ 61,057 at P 55; *see also Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,246, at P 35 (2015).

[57] FERC-730 annual reports must be filed by public utilities that have been granted incentive rate treatment for specific transmission projects. 18 C.F.R. § 35.35(h) (2023). These reports contain actual, projected, and incremental transmission investment information.

Document Accession #: 20240829-3040 Filed Date: 08/29/2024

Docket No. EL24-103-000                                                                                    - 14 -

      (C)     PSEG RT's request for the Hypothetical Capital Structure Incentive is hereby granted, effective August 30, 2024, as discussed in the body of this order.

By the Commission.  Commissioner Christie is dissenting in part with a separate statement
                               attached.
                               Commissioner See is concurring.
                               Commissioner Chang is not participating.

( S E A L )

                                      Debbie-Anne A. Reese,
                                      Acting Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PSEG Renewable Transmission LLC                    Docket No.  EL24-103-000

(Issued August 29, 2024)

CHRISTIE, Commissioner, *dissenting in part*:

1.      I dissent in part from today's order, specifically from the grant of the Abandoned Plant and the Hypothetical Capital Structure Incentives for a PSEG Renewable Transmission LLC (PSEG RT) transmission project that was approved as part of the PJM 2022 Regional Transmission Expansion Plan (RTEP) Window 3 (Window 3 Projects).[1] As I have consistently stated, the Abandoned Plant Incentive is nothing more than a transfer of wealth from consumers to transmission developers and risk from developers to consumers.  It is *long* past time for the Commission to revisit its "check-the-box" practice of granting transmission incentives, including as set forth in Order No. 679.[2]  The longer the Commission does nothing to address these unfair transfers of wealth and risk, the more consumers are exploited.  And, as I explain below, there is a workable compromise available to the Commission to balance consumer protection and developer interests.[3]

2.      This case graphically illustrates the fundamental unfairness of the Commission's practices regarding incentives.  First, it is noteworthy that in this case *no necessary state approval to construct has been given to PSEG RT's project*.[4]  Instead, to justify granting

---

[1] *See* Order at PP 3-4.  Today's order notes that the estimated cost of the project is $424 million and that "PSEG RT states that the drivers for PJM's 2022 RTEP Window 3 process were reliability violations that PJM identified resulting from strong data center load growth activity, particularly in Northern Virginia and Maryland, and expected deactivations of over 11,000 MW of generation in PJM."  *Id*. P 4.

[2] *Promoting Transmission Inv. through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[3] *See infra* PP 12-15.

[4] *See, e.g.*, Petition, Ex. PSEG-1 (Kalwa Testimony) at 7:14-8:3 (emphasis added). ("The Project is a major transmission project and requires a number of regulatory approvals and permits.  Among other things, PSEG RT will need to apply for and obtain a Certificate of Public Convenience and Necessity (CPCN) from the Maryland Public Service Commission (the Maryland PSC).  This is one of the Project's most significant

the incentive, the order states that "[t]he Commission has previously found that projects approved through a transmission planning process that evaluated whether the identified transmission projects will enhance reliability and/or reduce congestion are entitled to the rebuttable presumption established under Order No. 679."**5**  That justification is one of the major problems with this Commission's incentives policies.  No state CPCN proceeding has been conducted reviewing both need and prudence, yet the Commission grants the incentive anyway.  Although the regional transmission planning process is only one rebuttable presumption established in Order No. 679 allowing qualification for incentive rate treatment, reliance on regional transmission planning *in lieu of* state approval to construct is one of the major problems with FERC's policy.**6**  This practice is indefensible and always has been.

3.      With all due respect to PJM's transmission planning process—and I do respect it along with planning processes in other RTOs/ISOs—the regional planning process in a transmission planning organization is *not* remotely the equivalent of a serious, litigated state CPCN (or its individual state equivalent) process, which includes witness cross-examination and is open to intervenors such as consumer advocates.  FERC's long-time

---

required regulatory approvals.  The process for obtaining a CPCN is expected to be thorough and potentially lengthy.  The CPCN application must include comprehensive information regarding the Project, including, among other things: (1) an explanation of the need for the project; (2) a description of the effect of the Project on system stability and reliability; (3) a description of the consequences if the Project is delayed or not approved; (4) an explanation of the cost effectiveness of the Project, including an estimate of capital and annual operating costs; (5) a description of the impact of the Project on the State economy; (6) construction and engineering details; and (7) all impacts associated with the Project.  *PSEG RT intends to submit its CPCN application to the Maryland PSC in the third quarter of 2024*.").

     **5** Order at P 13 (footnote omitted).

     **6** Order No. 679 provides a few avenues for rebuttable presumptions.  As noted and relevant, the first is project approval in a regional transmission planning process and the second is where a project has received state approval to construct.  However, Order No. 679 suggests that regional transmission planning processes determine whether a given project is needed, whether it is the better solution, and whether it is the most cost-effective option in light of other alternatives (e.g., generation, transmission, and demand response).  Order No. 679, 116 FERC ¶ 61,057 at P 58.  Stated differently, Order No. 679 interprets the regional transmission planning process to be the equivalent of a state CPCN.  And of course, almost all transmission incentives granted to date have been based on the regional transmission planning process rebuttable presumption, not any state approval to construct or, better yet, approval in a state CPCN proceeding.

policy of ignoring whether a state CPCN proceeding took place before granting incentives is one of the central issues that must be reconsidered. As a former state regulator, I know firsthand how important it is to conduct credible state CPCN proceedings that evaluate the need and cost of a proposed project. It is especially timely now, in light of the recent Pennsylvania federal district court decision in *Transource*,[7] that this Commission must make it clear once again—as it did in Order No. 1000[8]—that while FERC regulates RTOs and ISOs such as PJM, in no way does that regulatory oversight represent any intent to preempt the states' decades-old authority to conduct CPCN proceedings that consider issues of need and prudence. Absent such an *ex ante* evaluation at the state level, FERC should *not* grant any incentives to a transmission project and should revisit its policy allowing that to occur. The absence of state CPCN approval alone should result in a default practice of denying incentives until the state has acted. But there are additional reasons for denying incentives, as this case illustrates.

4.      Second, putting aside the flawed notion that regional transmission planning is somehow equivalent to a state CPCN proceeding, another major problem is that FERC's practice in granting transmission incentives has become a "check-the-box" exercise. Order No. 679 contemplates a fact-specific, careful evaluation of balancing the needs of consumers and the benefits to investors based on the nature of the transmission projects at issue.[9] In no Commission order issued in my time as a commissioner has there been anything other than a cursory analysis with the barest mention of the specifics of the underlying transmission projects. Every transmission developer seems to cite the same reasons for the same incentives—*e.g.*, the Abandoned Plant Incentive mitigates

---

[7] *Transource Pennsylvania, LLC v. DeFrank*, No. 1:21-CV-01101, 2023 WL 8457071 at *6-*7, *17 (M.D. Pa. Dec. 6, 2023) (finding, *inter alia*, that by rescinding Transource's provisional certificate of public convenience after engaging in its state analysis and finding insufficient evidence to establish "need" under Pennsylvania law for the project, the Pennsylvania Public Utility Commission (PUC) is "attempting to supplant the role of the RTO and expand its state authority into the regulatory territory occupied by the federal government. . . . Because the PUC's decision presents an obstacle to achieving federal objectives, it is conflict preempted and violates the Supremacy Clause.").

[8] *See, e.g.*, *Transmission Plan. & Cost Allocation by Transmission Owning and Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051, at PP 227, 253 n.231, 287 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, at P 342, *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. V. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

[9] *See* Order No. 679, 116 FERC ¶ 61,057 at PP 21-29.

regulatory risks[10] and the Hypothetical Capital Structure mitigates financing risks,[11] etc. Coincidentally, these are reasons identified in Order No. 679 and parroted by developers in every proceeding.[12]  And to date, FERC has not contested the now too familiar reasons to actually attempt to evaluate whether each (and every, it seems) transmission project truly faces the same risks as the last.  Thus, whether the total package of incentives is tailored to address the demonstrable risks and challenges faced by the applicant undertaking the project, as required by Order No. 679-A,[13] is questionable at best.

5.     But even assuming today's order could be construed as consistent with the Commission's existing policies in Order No. 679, in my view those policies concerning the various incentives regularly awarded by this Commission produce rates that are unjust and unreasonable.  A core principle of utility law and regulation for decades is that consumers can be forced to pay costs only for assets that are "used and useful" to them. In Order No. 679, the Commission determined that it may be necessary to depart from this long-standing ratemaking principle to "address the substantial challenges and risks in constructing new transmission."[14]  In my prior statements, I questioned, among other concerns, whether the Commission's determination of whether "substantial challenges and risks" exist when granting the Construction Work In Progress (CWIP) Incentive, Abandoned Plant Incentive, and other incentives has become nothing more than a "check-the-box" exercise.[15]

---

[10] *See, e.g.*, Petition at 12-13.

[11] *See, e.g.*, *id.* at 15-16.

[12] *See, e.g.*, Order No. 679, 116 FERC ¶ 61,057 at P 165 (providing that regulatory risk signals the need for the Abandoned Plant Incentive); *id.* P 131 (finding Hypothetical Capital Structures can foster transmission investment in appropriate circumstances).

[13] *See* Order No. 679-A, 117 FERC ¶ 61,345 at PP 6, 21, 27, 40.

[14] *See* Order No. 679, 116 FERC ¶ 61,057 at PP 26, 117.

[15] *See, e.g.*, *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation & Generator Interconnection*, Order No. 1920, 187 FERC ¶ 61,068 (2024) (Christie, Comm'r, dissenting at P 118) (Order No. 1920 Dissent), https://www.ferc.gov/news-events/news/e-1-commissioner-christie-dissent-transmission-planning-and-cost-allocation-rule; *Baltimore Gas & Elec. Co.*, 187 FERC ¶ 61,030 (2024) (Christie, Comm'r, dissenting at P 6), https://www.ferc.gov/news-events/news/commissioner-christies-dissent-award-incentives-exelon-er24-1313; *PJM Interconnection, L.L.C.*, 185 FERC ¶ 61,200 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/e-7-commissioner-christies-concurrence-exelons-application-abandoned-plant; *The Potomac Edison Co.*, 185 FERC ¶ 61,083

Docket No. EL24-103-000                                                    - 5 -

6.    In particular:

> The Commission's incentive policies—particularly the CWIP
> Incentive, which allows recovery of costs *before* a project has
> been put into service—run the risk of making consumers "the
> bank" for the transmission developer; but, unlike a real bank,

---

(2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-concerning-potomac-edisons-abandoned-plant; *Montana-Dakota Utils. Co.*, 185 FERC ¶ 61,015 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-montana-dakota-utilities-co-regarding; *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,136 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-midcontinent-independent-system-operator-inc-0; *GridLiance W. LLC*, 184 FERC ¶ 61,129 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-gridliance-west-regarding-transmission; *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,034 (2023) (Christie, Comm'r, dissenting at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-dissent-award-transmission-incentives-nipsco-er23-1904; *Otter Tail Power Co.*, 183 FERC ¶ 61,121 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/e-18-commissioner-christies-concurrence-otter-tail-power-company-regarding; *LS Power Grid Cal., LLC*, 182 FERC ¶ 61,201 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-ls-power-grid-regarding-transmission-incentives; *Nev. Power Co.*, 182 FERC ¶ 61,186 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-nv-energy-regarding-transmission-incentives; *The Dayton Power and Light Co.*, 182 FERC ¶ 61,147 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-dayton-power-and-light-company-regarding; *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,039 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-midcontinent-independent-system-operator-inc; *NextEra Energy Transmission Sw., LLC*, 180 FERC ¶ 61,032 (2022) (Christie, Comm'r, concurring at P 2) (July 2022 Concurrence), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-nextera-energy-transmission-southwest-llc; *NextEra Energy Transmission Sw., LLC*, 178 FERC ¶ 61,082 (2022) (Christie, Comm'r, concurring at P 2) (February 2022 Concurrence), https://www.ferc.gov/news-events/news/commissioner-mark-c-christie-concurrence-nextera-energy-transmission-southwest-llc. *See also DCR Transmission, L.L.C.*, 184 FERC ¶ 61,199 (2023) (Christie, Comm'r, concurring at P 6), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-dcr-transmission-regarding-transmission-cost.

Document Accession #: 20240829-3040     Filed Date: 08/29/2024

Docket No. EL24-103-000                                                                                   - 6 -

> which gets to charge interest for the money it loans, under our
> existing incentives policies the consumer not only effectively
> "loans" the money through the formula rates mechanism, but
> also pays the utility a profit, known as Return on Equity, or
> "ROE," for the privilege of serving as the utility's *de facto*
> lender.[16]

Further, just as the CWIP Incentive effectively makes consumers the bank for
transmission developers, the Abandoned Plant Incentive effectively makes them the
insurer of last resort as well.  This incentive allows transmission developers to recover
from consumers the costs of investments in projects that fail to materialize and thus do
not benefit consumers.  Just as consumers receive no interest for the money they
effectively loan transmission developers through the CWIP Incentive, they receive no
premiums for the insurance they provide through the Abandoned Plant Incentive if the
project is never built.  And if the CWIP Incentive is a *de facto* loan and the Abandoned
Plant Incentive is *de facto* insurance — both provided by consumers — then the RTO
participation adder, which increases the transmission owner's ROE above the market cost
of equity capital, is an involuntary gift from consumers.[17]  There has been and continues
to be something really wrong with this picture.

7.      If the Commission determines it is appropriate to channel risks to consumers,
those risks must be carefully weighed and considered and not simply be mitigated at the
expense of consumers in an exercise of "check-the-box."  Any decision that is a result of
this "check-the-box" exercise cannot be anything but unjust and unreasonable.  Until the
Commission develops a meaningful analysis that does not simply transfer risk to and
extract wealth from consumers, I cannot in good conscience support the outcome here.

---

[16] Order No. 1920 Dissent at P 118 (citing, *inter alia*, February 2022 Concurrence
at P 3 (emphasis in original); July 2022 Concurrence at P 3 (citation omitted)); *see also
Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation &
Generator Interconnection*, Notice of Proposed Rulemaking, 179 FERC ¶ 61,028 (2022)
(Transmission Planning and Cost Allocation NOPR) (Christie, Comm'r, concurring at
P 15) ("CWIP is, of course, passed through as a cost to consumers, making consumers
effectively an involuntary lender to the developer . . . .  Consumers should be protected
from paying CWIP costs during this potentially long period before a project actually
enters service, if it ever does."), https://www.ferc.gov/news-events/news/commissioner-
christies-concurrence-e-1-regional-transmission-planning-and-cost.

[17] *See, e.g.*, *Rockland Elec. Co.*, 178 FERC ¶ 61,232 (2022) (Christie, Comm'r,
concurring at P 4), https://www.ferc.gov/news-events/news/commissioner-christies-
concurrence-rockland-electric-er22-910.

Document Accession #: 20240823-3010   Filed Date: 08/23/2024

Docket No. EL24-103-000                                                                 - 7 -

8.      In early 2021, the Commission voted to approve a supplemental notice of proposed rulemaking which proposed, among other things, to limit the RTO participation adder to the three years following a transmitting utility's initial membership in an RTO.[18] I joined in that vote and continue to support such a time limit.  *More than three years* after that vote, no further action has been taken on that supplemental notice of proposed rulemaking.  And although the Commission initially proposed to eliminate the CWIP Incentive in the Transmission Planning and Cost Allocation NOPR,[19] the Commission then reversed course and declined to adopt that proposal in Order No. 1920.  It instead chose to reject what should have been the easiest of decisions for the Commission if Order No. 1920 were truly about fulfilling its duty to protect consumers, which is its primary duty under the Federal Power Act (FPA).[20]  This continuing failure to protect consumers by eliminating the CWIP Incentive was one of the pillars of my dissent to Order No. 1920.[21]

9.      Despite the appearance of action by the Commission to address unfair and excessive transmission costs to consumers from incentives and other Commission

---

[18] *Elec. Transmission Incentives Policy Under Section 219 of the Fed. Power Act*, Supplemental Notice of Proposed Rulemaking, 175 FERC ¶ 61,035, at P 9 (2021).

[19] 179 FERC ¶ 61,028 at P 333 & n.530.  This proposal was "a major step forward in consumer protection and . . . a big reason I am voting for [the Transmission Planning and Cost Allocation NOPR]."  *Id.* (Christie, Comm'r, concurring at P 15).

[20] Order No. 1920, 187 FERC ¶ 61,068 at P 1547.  Of course, Order No. 1920 was not about fulfilling the Commission's duty to protect consumers.  Order No. 1920 rationalized this decision to walk back the removal of the CWIP Incentive by finding that any action on the CWIP Incentive is more appropriately considered in a separate proceeding where incentives can be comprehensively evaluated for all regional transmission facilities.  However, as I have stated in my dissent to Order No. 1920, I regard that as nothing more than an excuse for a continuing failure to act.  Order No. 1920 Dissent at P 119.

[21] Order No. 1920 Dissent at P 119 ("[I]nstead of adopting the proposal to remove the CWIP Incentive, [Order No. 1920] chose to side with developers and special interest groups, rather than with consumers."); *id.* P 120 ("[Order No. 1920] . . . is astoundingly silent on the consumer impact of retaining the CWIP Incentive."); *id.* P 121 ("Unfortunately, this is simply a continuation of the Commission punting on any meaningful reevaluation of transmission incentives. . . .  By walking back the removal of the CWIP Incentive, [Order No. 1920] reveals . . . its failure to protect consumers as required by the FPA."); *see also, e.g.*, *id.* PP 18-19.

policies,[22] the record of the past three years shows that *nothing* has been accomplished to reform these incentives. Indeed, this order is yet another graphic example of why I have repeatedly argued that the Commission needs to revisit Order No. 679 and its "check-the-box" practice of granting the array of incentives offered to transmission developers, including the Abandoned Plant and Hypothetical Capital Structure Incentives addressed in this order, as well as the CWIP Incentive and the RTO participation adder.[23]

10.    Finally, as a sobering case study, "'attention *must be paid*'" to the Potomac-Appalachian Transmission Highline (PATH) project "because of the major lessons – and warnings – it holds for long-term regional transmission planning driven by policy goals, the substantial costs that go with such projects, and how FERC's policies inflate those costs to consumers."[24]    As I explained:

> The PATH project was planned as a long-distance, high-voltage transmission line crossing three states that was approved for construction and regional cost allocation through selection for PJM's regional transmission expansion plan (RTEP).  PATH applied for certificates of public need in three states – West Virginia, Virginia, and Maryland – none of which ever issued a certificate.  PJM later removed PATH from the RTEP, and it was never built.

> Even though not a single ounce of steel was ever put in the ground, PATH's developers have been collecting money from retail customers in the PJM states ever since it was approved for PJM's RTEP.  Since 2008, the total amount that consumers have been forced to pay to PATH's developers has been approximately $250 million – that's right, let me repeat: consumers have paid roughly *$250 million* for a project that

---

[22] *See, e.g.*, Notice of Technical Conference, *Transmission Planning and Cost Management*, Docket No. AD22-8-000 (Apr. 21, 2022); [Fifth] Supplemental Notice of Technical Conference, *Transmission Planning and Cost Management*, Docket No. AD22-8-000 (Oct. 8, 2022); Notice Inviting Post Technical Conference Comments, *Transmission Planning and Cost Management*, Docket No. AD22-8-000 (Dec. 23, 2022).

[23] I recognize that the CWIP Incentive and the RTO participation adder are not at issue in this specific proceeding.

[24] *Potomac-Appalachian Transmission Highline, LLC*, 185 FERC ¶ 61,198 (2023) (Christie, Comm'r, concurring at P 1) (emphasis in original) (quoting Arthur Miller, *Death of a Salesman*, Act 1 (1949)), https://www.ferc.gov/news-events/news/e-4-commissioner-christies-concurrence-letter-order-approving-path-settlement-er12.

Document Accession #: 20240823-3010    Filed Date: 08/23/2024

Docket No. EL24-103-000                                                           - 9 -

> was never built nor found needed by a single state regulator.
> Adding insult to consumers' injury, that amount was caused
> and inflated by a whole host of Commission-approved
> transmission incentives.[25]

11.     Among the multitude of incentives available to PATH was the very Abandoned Plant Incentive PSEG RT requests here.  It is well past time for the Commission to address the unfairness of "check-the-box" awards of incentives to transmission developers at the expense of consumers.

12.     There is an obvious and workable compromise solution that would maintain sufficient incentives to satisfy the Energy Policy Act of 2005 – the statutory justification for the Commission's vast array of incentives offered up to developers over the past 20 years – yet restore some badly needed balance in terms of fairness to consumers.  The Commission could revise the list of rebuttable presumptions in favor of the award of incentives in Order No. 679 to only one:  *where a state commission has granted a transmission project a CPCN (or equivalent) after evaluating the project for need and prudence*.

13.     This new rebuttable presumption would be superior to the existing rebuttable presumption regarding state action that looks only at whether there exists state approval to construct.  A state approval to construct does not necessarily include a serious review and a finding of need and prudence as in a state CPCN proceeding.  And, without such a review and finding, ratepayers are on the hook for the costs of transmission projects that ultimately may never get built because they were never found to be necessary or prudent as to cost to begin with, which is exactly what happened with the infamous PATH project, which never received a state CPCN yet cost consumers a quarter billion dollars for a project in which a single ounce of steel never entered the ground.  In contrast, the revised rebuttable presumption I propose would more closely align with the goal articulated by Congress in FPA section 219 in the first place:  to incentivize "transmission of electric energy in interstate commerce by public utilities *for the purpose of benefitting consumers* by ensuring *reliability* and reducing the cost of delivered power by *reducing transmission congestion*."[26]

14.     This compromise would ensure that transmission incentives ultimately are awarded to projects that are worthwhile from the state-focused, consumer-oriented perspective and that the resulting rates are just and reasonable under the FPA.  Importantly, from the point at which a state commission has evaluated a project for need and prudence and has approved that project, the project developer would fairly have a

---

[25] *Id.* PP 2-3 (emphasis in original) (footnote omitted).

[26] 16 U.S.C. § 824s(a) (emphases added).

Docket No. EL24-103-000                                                                                      - 10 -

reliance interest (to borrow a term from equity courts) in seeing its project come to
fruition with the state's support.  In that case, transmission incentives would be
appropriate because the project would have been deemed needed and cost-effective in a
serious state CPCN proceeding, and, should it ultimately not be built due to reasons
beyond the control of the developer, recovery of the costs of the project to date along
with incentives would presumptively be fair to the developer who proceeded with due
diligence to build the project with the state's imprimatur.[27]

15.     This compromise on incentives would also be consistent with what I have said
repeatedly as a former state commissioner who voted to approve CPCNs for more than a
hundred transmission projects, including regional and, in some cases, extremely
controversial, projects, and that is this:  Necessary transmission projects, especially large
regional projects that face intense opposition, will ultimately *not* get built without the
active support and cooperation of the states.

16.     Costs associated with the Commission's inaction have been mounting and will
continue to mount and be inflicted on consumers.  We have failed to act for three years.
It is time to act now.

---

[27] An example of this situation is the Cardinal-Hickory Creek transmission line
being developed in several Midwestern states.  Although the Wisconsin Public Service
Commission has approved Wisconsin's portion of the Cardinal-Hickory Creek
transmission line in a comprehensive CPCN proceeding in 2019, the transmission line
has been held up in litigation from opponents since then and is still subject to certain
regulatory approvals.  *See Joint Application of American Transmission Company LLC,*
*ITC Midwest LLC, and Dairyland Power Cooperative, for Authority to Construct and*
*Operate a New 345 kV Transmission Line from the Existing Hickory Creek Substation in*
*Dubuque County, Iowa, to the Existing Cardinal Substation in Dane County, Wisconsin,*
*to be Known as the Cardinal-Hickory Creek Project*, Final Decision, Wisconsin Public
Service Commission, Docket No. 5-CE-146 (Sept. 26, 2019),
https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=376391; Jeffrey Tomich,
*What's next after legal win for contentious Midwest power line*, E&E News (Aug. 3,
2023), https://www.eenews.net/articles/whats-next-after-legal-win-for-contentious-
midwest-power-line/.  See also, discussed herein, the infamous history of the PATH
project, which never received a state CPCN but ended up costing consumers almost a
quarter billion dollars.

Document Accession #: 20240823-3040 Filed Date: 08/23/2024

Docket No. EL24-103-000                                                                      - 11 -

For these reasons, I respectfully dissent in part.

_____

Mark C. Christie
Commissioner

Document Accession #: 20240823-3040    Filed Date: 08/23/2024

Document Content(s)

EL24-103-000.docx..........................................................1