## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### Northern Division

| | | |
|---|---|---|
| PSEG RENEWABLE TRANSMISSION, LLC, | * | |
| *Petitioner*, | * | |
| v. | * | **Case No. 1:25-cv-01235-ABA** |
| ARENTZ FAMILY, LP, *et al.*, | * | |
| *Respondents*. | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, IN OPPOSITION TO PSEG'S MOTION FOR PRELIMINARY INJUNCTION, OF HILL RESPONDENTS</u>

Respectfully submitted,

*/s/ Susan M. Euteneuer*
Susan M. Euteneuer (AIS# 0112110228)
SEuteneuer@PKLaw.com
Randall M. Lutz (AIS# 7012010121)
RLutz@PKLaw.com
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, Maryland 21204
410.938.8800
***Attorneys for Hill Respondents***

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION………………………………………………………………1

II.     ARGUMENT…………………………………………………………………..2

    A.  PSEG's Petition Should Be Dismissed………………………………………..2

        1.  PSEG's Application for CPCN is Unprecedented in Scope, and is Incomplete…..2

        2.  PSEG's Project Timeline Is Impossible………………………………………...8

        3.  PSEG Has Failed to Establish It Has Met All Requirements of RP § 12-111…….8

            a.  PSEG Lacks Standing……………………………………………………9

            b.  PSEG Failed to Demonstrate It Made "Every Real and Bona Fide Effort"…10

            c.  PSEG Filed This Case in the Wrong Court…………………………………..16

    B.  PSEG'S Motion For Preliminary Injunction Fails As A Matter Of Law……………21

        1.  PSEG's Application Is Not Likely to Be Granted…………………………..21

        2.  Any Harm PSEG May Incur Is Self-Inflicted……………………………………22

        3.  The Balance of Equities Tip in Favor of Rural Property Owners………………..23

        4.  Injunctive Relief Is Not In the Public Interest…………………………………...23

III.    CONCLUSION……………………………………………………………………23

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*,
    902 F.3d 432, 439–40 (4th Cir. 2018)……………………………………………..……22

*Montgomery County v. Phillips*,
    445 Md. 55 (2015)………………………………………………………………...……………17

*Moshoures v. City of N. Myrtle Beach*,
    131 F.4th 158, 164 (4th Cir. 2025……………………………………………………………17

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*,
    918 F.3d 353, 366 (4th Cir. 2019) ………………………………………………………...21

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235, 241 (1981) ………………………………………………………………………19

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
    872 F.2d 75, 80 (4th Cir. 1989) ………………………………………………………...…22

*Richmond, Fredericksburg & Potomac R.R. v. United States*,
    945 F.2d 765, 768 (4th Cir. 1991) ………………………………………………………...17

*Roe v. Dep't of Def.*,
    947 F.3d 207, 219 (4th Cir. 2020) ………………………………………………………...…21

*Tang v. Synutra Int'l, Inc.*,
    656 F.3d 242 (4th Cir. 2011) ………………………………………………………………...18

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7, 22 (2008)……………………………………………………………….……..…21

*WMATA v. One Parcel of Land*,
    514 F.2d 1350 (D.C. Cir. 1975) …………………………………………………………...15

**STATUTES**

Md. Code Ann., Natural Resources § 3-306…………………………………………….……4

Md. Code Ann., Pub. Util. §§ 3-101 to 3-111……………………………………………..3

Md. Code Ann., Pub. Util. § 3-106…………………………………………………………..3

Md. Code Ann., Pub. Util. § 7-207(b)(3)(i) ……………………………………………………2

Md. Code Ann., Pub. Util. § 7-207(b), (c), (e) ………………………………………....2

Md. Code Ann., Pub. Util. § 7-207(c)(2), (d)……………………………………………..2

Md. Code Ann., Pub. Util. § 7-207(f)(1) ……………………………………………………2

Md. Code Ann., Real Property § 12-111(b) …………………………………………..*passim*

## I.     *INTRODUCTION*

PSEG bears the burden – both in its Public Service Commission ("PSC") Certificate of Public Convenience and Necessity ("CPCN") case and its case here.  Unable to do so in either proceeding, PSEG attempts to bury its shortcomings, and, worse still, materially misrepresents them.  PSEG's Application for CPCN is incomplete and fatally flawed, and so is PSEG's Petition for Preliminary Injunction filed in this Court.

Before addressing the substance of PSEG's Motion for Preliminary Injunction, it is requested that this Court first assess whether or not PSEG has established that it has standing under Maryland's Eminent Domain statute for purposes of obtaining court-ordered access to conduct surveys on private property.  Because PSEG is not a government entity, PSEG admits that to establish standing it must demonstrate that it is *likely* to be granted a CPCN to construct a transmission line that is needed for public use.  Such approval is far from certain here.  This is largely due to the fact that PSEG's lucrative contract requires the transmission line to be operable by June 2027, and PSEG admits it can only meet that deadline if it begins construction by January 2026.  That only leaves eight months to complete the entire CPCN process, a timeline so truncated that the lead state government agency tasked with reviewing PSEG's Application calls it "implausible."  This Court should give deference to those regulators and conclude that PSEG does not meet the burden of proving it is *likely* that the PSC will grant PSEG's Application for CPCN, when it is actually *unlikely*.[1]

A second threshold consideration is that PSEG must also prove it has satisfied the stringent prerequisites for court-ordered access under Maryland's eminent domain statute, which it has not.

---

[1] PSEG repeatedly claims that, unless this transmission line is operational by the deadline, the mid-Atlantic grid could become less reliable.  Instead of pursuing a project that cannot be completed, PSEG/PJM should instead go back to the proverbial drawing board *now* and develop a plausible – and responsible – plan.

PSEG's efforts to obtain access by consent have been limited and misleading, far below the efforts required before a court with jurisdiction over the matter. Therefore, this Court should not grant access. These issues and others – largely of PSEG's own making – undo PSEG's demand here for extraordinary relief, which demand should therefore be dismissed, or denied.

## II.    ARGUMENT

### A. PSEG'S PETITION SHOULD BE DISMISSED

PSEG lacks standing to obtain the relief demanded here, and this Court lacks jurisdiction to grant such relief in any event. Even if this Court could exercise jurisdiction, it should decline to do so and should instead dismiss PSEG's Petition. Before addressing these concerns, this Memorandum first provides pertinent procedural and factual background regarding PSEG's incomplete and impossible Application for permission to construct the proposed transmission line.

#### 1. PSEG's Application for CPCN is Unprecedented in Scope, and is Incomplete

All transmission line projects in Maryland require multiple regulatory approvals.[2] Pertinently, PSEG must convince the PSC to grant it a CPCN to construct its proposed overhead transmission line designed to carry more than 69,000 volts of electricity. Md. Code Ann., Public Utilities ("PU") § 7-207(b)(3)(i). The burden is on PSEG to submit a detailed CPCN application that convincingly addresses project need, and alternative routes, as well as environmental, land use, and reliability impacts. PU § 7-207(b), (c), (e). The PSC then decides whether or not to grant a CPCN by applying various factors. PU § 7-207(f)(1). This is necessarily a careful and thorough process that includes multiple stakeholder state agencies, solicitation of public comment, and providing notice to affected property owners, local governments, and elected officials. PU § 7-207(c)(2), (d). Title 3 ensures that PSC proceedings allow for public participation, intervention

---

[2] In the interest of brevity and given the shortened time to respond, a recitation of the pertinent statutory structure and authority is anticipated from other parties, so it will not be detailed here but, if needed, will be provided in the Reply.

by interested persons, and the development of a full administrative record. PU §§ 3-101 to 3-111; PU § 3-106.

Between being awarded the lucrative construction contract by PJM in April 2024 and December 31, 2024, PSEG prepared and submitted an Application to the PSC for CPCN.[3] But it was admittedly deficient. PSEG submitted approximately 500 additional pages to the PSC on February 14, 2025. *See* PSC Docket #119.

PSEG's proposed transmission line is unprecedented in its scope and impact on rural Maryland. According to documents PSG has submitted to the PSC, the line would span 67 miles, impacting 409 unique property owners, 522 acres of cultivated cropland, 51.1 acres of wetlands, 101 streams and waterbody crossings, and 245.8 acres of conservation easement land. *See, e.g.,* Exhibit 1 (PSEG Application Appendix F, Table F.1)[4] and Exhibit 2 (PSEG's Environmental Review Document Supplement dated February 2025).[5] While PSEG emphasizes in the instant action that the purpose of the transmission line is to bolster the mid-Atlantic grid, the undeniable driver of this proposed project is the overwhelming electricity demand of Data Centers in Northern Virginia. *See, e.g.,* PSC #1, p. 9 (PSEG Application for CPCN, "Large block load additions (data center development) are a significant cause of the increase in load growth activity that has continued rapidly and beyond what PJM originally anticipated. Namely, in 2022 PJM observed [that] data center load was projected to increase within northern Virginia…").

---

[3] The PSC made PSEG's December 31, 2024 Application for CPCN and all related filings in the Docket available on its website under its Case Number 9773. https://webpscxb.psc.state.md.us/DMS/case/9773 As of April 29, 2025, there were 493 entries. No login is required, and there is no charge for access. Given the magnitude of the Docket in Case No. 9773, and in the interest of brevity here, documents that available through that portal are not provided in their entirety (such as PSEG's 2,000-page Application) except where necessary. If supplying additional documents is needed, they will be provided in Reply.
[4] From PSC Docket #1.
[5] From PSC Docket #119

In an era where consensus is rare, it is noteworthy that the strong opposition to this transmission line is <u>unanimous</u>.[6]  Local news coverage showed packed rooms of angry and worried property owners during initial public hearings last year.[7]  By February 17, 2025, over 175 Petitions to Intervene were filed in the PSC case, and PSEG has consented to most of them.  Each person who is ultimately granted Party status by the PSC may then conduct discovery, develop and present expert testimony, present testimony by fact witnesses, and make arguments to the PSC about whether or not to grant the CPCN.[8]

By law, pursuant to the regulatory authority of Maryland's Department of the Environment and the Maryland Energy Administration, a division of the DNR called the Power Plant Research Program ("PPRP") first conducts an initial review of any Application for CPCN regarding the threshold question of 'completeness' of the Application.  *See* Md. Code Ann., Natural Resources ("NR") § 3-306.  On March 26, 2025, the PPRP recommended that the PSC conclude that PSEG's Application remains *incomplete* for a list of reasons concerning: (a) PSEG's failure to demonstrate that it had considered all reasonable alternatives to the proposed project as required by law, and (b) PSEG's failure to conduct any of the following required field-based environmental studies of the project right-of-way ("ROW"):

- o   Wetland Delineations – necessary for the entirety of the Project ROW.
- o   Forest Stand Delineations – necessary for the entirety of the Project ROW.
- o   Geotechnical surveys – necessary for the entirety of the Project ROW.

---

[6] Other than tepid comments filed by other utility companies.

[7] *See, e.g.,* https://www.thebaltimorebanner.com/community/climate-environment/maryland-piedmont-reliability-project-pseg-CX5JMSWYENBLLFS3FQQZXIH73A/ (July 17, 2024) https://www.fredericknewspost.com/news/economy_and_business/agriculture/residents-angry-dissatisfied-with-answers-during-forum-on-pseg-transmission-line/article_a6cdc64d-ad3c-502a-aab5-25c8cdffa59e.html; (August 1, 2024); https://foxbaltimore.com/news/local/weve-had-enough-locals-shout-down-power-company-demand-action-to-stop-mprp-maryland-piedmont-reliability-project-pseg-power-hunt-valley-angry-residents (November 12, 2024); https://www.wypr.org/wypr-news/2024-11-13/hundreds-decry-mprp-at-baltimore-county-public-hearing (November 13, 2024);

[8] Because the PSC has not yet ruled on the Petitions to Intervene, none of the potential intervenors has the right yet to initiate discovery.

      o   Sensitive Species Project Review Areas (SSPRA) surveys - the SSPRA field surveys should be conducted on those parcels identified by the DNR Wildlife Heritage Service (WHS).

      o   Maryland Historical Trust (MHT) required field surveys - the MHT field surveys should be conducted on those parcels identified by MHT as being of concern.

*See* <u>Exhibit 3</u> (The Report of the PPRP as to the Administrative Completeness of the CPCN Application by PSEG).[9]  Upon completing those required studies:

> PSEG will also need to revise its Environmental Review Document (ERD) to incorporate the results of these studies/surveys…to specifically detail all unavoidable impacts and recommended mitigation for the following:
>
>     o   Impacts on streams, wetlands, and their buffers
>
>     o   Impacts on forests
>
>     o   Impacts on the Monocacy Scenic River and its tributaries
>
>     o   Impacts on the tributaries of the Deer Creek Scenic River
>
>     o   Impacts on Sensitive Species habitat
>
>     o   Impacts on historical and/or archeological areas of concern

*Id.*  Thus, completing the environmental field-based studies is not the end-goal, but a step toward PSEG developing detailed plans to mitigate environmental impacts on the studies area.[10]

Apparently anticipating an adverse finding, PSEG objected to the PPRP's unfavorable completeness finding that same day,[11] as well as objecting to PPRP's recommended approach to resolving the completeness issues.  *See* <u>Exhibit 4</u> (PSEG's Motion).[12]  PSEG moved for entry of a scheduling order instead, effectively proposing that the PSC initiate the CPCN approval process

---

[9] PSC Docket #245.

[10] PSEG relies on the decision by the Circuit Court for Harford County, Maryland in *Transource* in support of its contention that pre-CPCN access can be granted under RP § 12-111(b).  *See* PSEG Memorandum, 75-1, at p. 18, and Exhibit 4 thereto.  PSEG relies on that case for the wrong reason.  Since *Transource* was decided in June 2018, and the utility's counsel here also represented Transource in that case, the fact that the PPRP would require field-based environmental studies should have been incorporated into PSEG's planning for this case and not rushed at the last minute.

[11] PSEG claims that the legal authority cited by the PPRP "does not specify that field surveys are needed to support any of the information about the project comprising the filing requirements."  *Id.*

[12] PSC Docket #246.

in parallel path while PSEG conducts the additional studies described by the PPRP. *Id.  See also* Exhibit 5 (Scheduling Order Proposed by PSEG's Motion).  PSEG's suggested scheduling order would, in PSEG's stated view, facilitate completion of the CPCN process in time for PSEG to initiate construction in January 2026 for a "mandatory in-service date" of June 2027. *See* Exhibit 4, pp 1-2.

On April 11, 2025, the "PPRP strongly objected to PSEG's unrealistically optimistic procedural schedule set forth in its Motion," emphasized the importance of field studies to the regulatory review of the proposal, accuses PSEG of a "mischaracterization" regarding the legal authority for requiring those studies, and again urged that PSEG's Application be completed *before* any substantive CPCN proceedings begin. *See* Exhibit 6 (PPRP's Response to PSEG's Motion).[13] In its Response, the PPRP disagreed that PSEG's proposed schedule is consistent with that of other projects, explaining that "those cases are not comparable."  The PPRP explained:

> The projects being reviewed in these cases are not representative of comparable transmission line cases, as they were between 2.8 to 25.5 miles long and located within an existing ROW in Maryland.   The MPRP, a 67-mile greenfield transmission line project proposed to be located within a new ROW is not comparable, and the review period proposed is wholly inadequate.

*Id.* at p. 2.  According to the PPRP, the only "sufficiently comparable" project that would assist in estimating the time needed to complete the CPCN process was the Transource project, which was half the size of PSEG's and "took approximately 30 months from its CPCN application filing to issuance of a final order." *Id.* at p. 5.

The PPRP respected PSEG's demand for urgency by agreeing to an early scheduling conference, but the PPRP was unmoved by PSEG's claims about its looming contractual deadline with PJM, calling them "implausible."  The PPRP emphasized the significant impacts that the

---

[13] PSC Docket #450.

proposed project would have on Maryland if built, and concluding that PSEG had not yet demonstrated a "factual basis for the significantly ambitious deadline":

> Like the Applicant's proposed procedural schedule, given the size of the greenfield project and the timing of its CPCN application, PJM's deadline for this Project is also implausible and predicated on unverified assumptions. A 67-mile greenfield transmission line traversing three Maryland counties will substantially impact both Maryland's resources and its residents…Given the potential for significant adverse impacts from such a project to Maryland's environment, residents, and economy, accelerating the CPCN review should only be considered after a factual basis for the significantly ambitious deadline is clearly shown by Applicant.

*Id.* at p. 6. From this alone, this Court should decline to accept the contentions from PSEG that it is likely to be granted a CPCN. Indeed, from this scathing rebuke by a key decisionmaker in the CPCN process, it is more likely that PSEG's contract with PJM will be terminated for frustration of purpose than that the project will break ground in January 2026.

Governments of the three impacted Maryland Counties, who Petitioned to Intervene in the CPCN process, also objected to PSEG's proposed schedule, pointing out the "inequities" of PSEG's one-sided approach, particularly where PSEG's Application is "woefully incomplete" and the schedule would preclude the important participation of impacted local governments. *See, e.g.,* Exhibit 3 to PSEG's Motion for Preliminary Injunction (Comments of Baltimore County) ("Taken together, the deficiencies in PSEG's Application make it impossible for Baltimore County to give reasoned and complete consideration of the Project's potential effects on the County. PSEG is seeking to put the proverbial cart before the horse in setting a final deadline for a decision by the Commission and attempting to set dates for a procedural schedule when its Application remains woefully incomplete…").

The PSC has not yet ruled on the threshold question of completeness of PSEG's Application for CPCN, nor has the PSC determined who will be granted status as an intervening party, and no schedule has been set for the CPCN merits hearing and pre-hearing process. Perhaps

most importantly, PSC must determine whether or not the Application has any viability, since, according to the PPRP, there appears to be no chance of meeting the PSEG/PJM contractual deadlines.

## 2. *PSEG's Project Timeline Is Impossible*

PSEG insists it <u>must</u> start construction on the proposed transmission line by January 2026 to meet its contractual obligations. *See* PSC Docket #333 (PSEG Completeness Determination Response Letter (April 10, 2025)) p. 1. Because the PPRP found that PSEG's Application for CPCN is incomplete, Baltimore County describes it as "woefully incomplete," and both of those stakeholders – and others – strongly oppose PSEG's proposed schedule, PSEG's project timeline seems impossible. Consequently, even if the concept of PSEG's proposed transmission line project were acceptable – which is certainly not a given – and even if PSC agreed to some reasonable acceleration of its process, it is folly for PSEG to claim that after a year of its short window has already elapsed with little progress, it could still meet its impossibly ambitious timeline. For this reason alone, PSEG's demand to enter private property for this doomed project must be denied.

Instead of wasting time tilting at windmills, it would be better for Marylanders and our electrical grid if PSEG/PJM would withdraw PSEG's fatally flawed Application for CPCN, revisit the issues created in Virginia by that state's power-hungry data centers, and develop a Virginia-based solution.

## 3. *PSEG Has Failed to Establish It Has Met All Requirements of RP § 12-111*

Eminent domain is a sovereign power reserved for government entities and should only be exercised in exceptional circumstances. PSEG relies on Md. Code Ann., Real Property ("RP") § 12-111(b), a provision within Maryland's Eminent Domain laws, as the legal authority for demanding a court order granting access to private property:

> (a)    Civil engineers, land surveyors, real estate appraisers, and their assistants acting on behalf of the State or any of its instrumentalities or any body politic or corporate having the power of eminent domain after every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry may:
>
> > (1)    Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement;
> >
> > (2)    Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and
> >
> > (3)    Enter on any private land and perform any function necessary to appraise the property.
>
> (b)    If any civil engineer, surveyor, real estate appraisers, or any of their assistants is refused permission to enter or remain on any private land for the purposes set out in subsection (a), the person, the State, its instrumentality, or the body politic or corporate on whose behalf the person is acting may apply to a law court of the county where the property, or any part of it, is located for an order directing that the person be permitted to enter on and remain on the land to the extent necessary to carry out the purposes authorized by this section.

*Id.* Applied here, this statute contains a three-prong test. PSEG failed to satisfy any of these prongs.

### a. PSEG Lacks Standing

First PSEG must demonstrate that it "[has the power of eminent domain" in order to claim any rights under this statute. RP § 12-111(b). No power of eminent domain has been conveyed on PSEG by the PSC, nor has PSEG established that this is likely to happen. The company is not under any 'order' by a federal agency to construct this transmission line, and the PPRP is more than dubious PSEG can establish that it will complete the CPCN process within the rushed timeframe required by PSEG's contract. Rather, for the reasons described above, it is increasingly *unlikely* that PSEG would be able to construct the transmission line in time to meet its contract deadline, and therefore PSC is *unlikely* to grant PSEG's Application.

This case could establish a dangerous precedent if merely submitting a slapdash application for CPCN or some other government project would suffice to assert eminent domain powers under

RP § 12-111(b).  It is not hyperbole to conclude this approach would create a slippery slope, effectively removing one of the key requirements for injunctive relief:  Likelihood of success on the merits.  Instead, this requirement would devolve into allowing a utility company to gain court-approved access to private property at will upon submitting the shoddiest of applications for CPCN, thereby diluting the state and federal constitutional protections against takings of private property.

**b.  PSEG Failed to Demonstrate It Made "Every Real and Bona Fide Effort"**

Second, PSEG must demonstrate that it has made "***every*** real and bona fide effort" to gain access to the private property by notifying the property owner(s) about the required access.  RP § 12-111(b) (Emphasis supplied).  Such efforts would have to have been "real and bona fide," meaning genuine, good faith efforts.  At a *minimum*, here, PSESG would certainly have to specify to the property owners:

(1) What sort of survey would be performed (*e.g.,* wetlands delineations, forest stand delineations, geotechnical surveys, sensitive species surveys, and/or Maryland Historical Trust surveys, as applicable);

(2) The purpose of the survey(s) (*e.g.*, for environmental compliance and mitigation, for valuation for future taking, *etc.*),

(3) The amount of time such surveys would take to complete (Two hours? Two days?);

(4) Where on the property the survey would be performed (just the ROW or the entire parcel?); and

(5) The identity of the bonded and insured person(s) and company(ies) conducting the survey(s).

To constitute genuine efforts, the communications would need to be clear, accurate, and consistent, the proposed surveys would need to be coordinated with the property owner's schedule, and PSEG would provide the property owner copies of the surveys.  Furthermore, PSEG would have to make "***every*** real and bona fide effort," not just the barest minimum of attempts.  PSEG would lose all credibility by entirely changing approaches midstream.

PSEG failed to satisfy the level of effort required by RP § 12-111(b).  While PSEG's vendor, Contract Land Staff (who has not been authorized to conduct business in Maryland for almost a decade), may have made *some* efforts, PSEG certainly did not make the exhaustive efforts required under the statute.  Nor did PSEG make "every ***real and bona fide***" – or genuine – effort.  The form letter sent to property owners was issued by a "land agent" who wrote about a "market appraisal to determine the fair market value for the property rights needed for the easement" and under the bold heading "**Property Valuation**," said they "will provide details specific to your property concerning values and compensation for the portion of land that will be needed for the easement."  *See* PSEG Exhibit 15-2 (In re: Respondent Brandon Hill).  There was no mention whatsoever in the form letter about conducting wetland, forest, or sensitive species surveys:

**Property Valuation.** PSEG will pay you for the property rights sought. Following the property studies performed under the ROE, your land agent will provide details specific to your property concerning values and compensation for the portion of land that will be needed for the easement. A local appraiser will perform a market appraisal to determine fair market value for the property rights needed for the easement. The information used in the appraisal will be provided to you. Once provided, PSEG encourages you to review that information closely and discuss any specific issues you may have or unique circumstances related to your property that may impact value with your land agent.

For more information please visit the FAQ section of www.MPRP.com.

Once again, PSEG will send a letter to you during the week of November 18 to introduce the land agent assigned to you. The agent will be your direct real estate contact throughout this project and will be able to answer your specific questions.

**Please be advised that only a PSEG/Contract Land Staff-badged representative has the authority to discuss the project with you.**

PSEG will continue to stay engaged with you as this process moves forward. If you have any questions, please email us at PSEG-MPRP@pseg.com or call the MPRP project hotline at 1-833-451-MPRP (6777).

Thank you,

The MPRP Project Team

*Id.* (From the PSEG Form Letter).

Mr. Hill has lived in rural Baltimore County, Maryland his entire life. *See* Exhibit 7 (Affidavit of Respondent Brandon Hill). In 2021, when he was just 27 years old, he purchased 60 acres of farmland near where his parents had raised him. He and his wife are gradually converting the land into a sustainable food forest, including planting special blight-resistant hybrid chestnut trees and numerous other native and beneficial trees, shrubs, flowers, and herbs. Mr. Hill is gravely concerned about the devastation this transmission line would wreak on his special farm – particularly the damage to the sensitive habitat, wetlands, and property held in conservation easements to preserve agricultural land from development. *Id.*

Environmental impacts are of paramount importance to Mr. Hill, but none were addressed by PSEG's limited contact efforts. Upon receipt of the PSEG form letter, *above*, Mr. Hill declined the request to meet with a land agent about property value, writing, "How audacious and telling it

is that PSEG is willing to send out a Real-estate agent before any kind of surveyor.  Especially an environmental surveyor."  *See* Exhibit 7-A (November 2024 Letter from PSEG).

Respondent Carol Knobloch, who had not engaged counsel before this case, had assumed a giant corporation like PSEG would probably be granted some access to her farm anyway, so she decided to learn more about PSEG's offer to pay her $1,000 after receiving a form letter from PSEG's contractor.  *See* Exhibit 8 (Affidavit of Carol Knobloch) and Exhibit 8-A (November 18, 2024 Letter).  Because she had expressed interest in learning more, PSEG's Manager Corporate Real Estate Transactions Roger Trudeau sent her a letter agreement setting forth the property access terms to which PSEG would agree.  *See* Exhibit 8-B (Trudeau Letter of November 27, 2024).  In its Motion PSEG suspiciously omitted any mention of multiple communications with Ms. Knobloch regarding her initial willingness to consider access.  More specifically, PSEG prepared an incomplete Affidavit by Trudeau which omitted key facts regarding his communications with property owners about access, and PSEG failed to provide to this Court a copy of the Trudeau Letter sent to Ms. Knobloch.  In omitting these highly relevant communications from its filing, PSEG materially mischaracterizes its efforts to gain access, the access PSEG actually demanded from property owners, and the reasons why those property owners reasonably declined.  PSEG's duplicity should doom its Petition for extraordinary relief.

PSEG disingenuously claims that has made good faith efforts to obtain the non-invasive studies that the PPRP requested, but that is demonstrably false.  *See* 75-1 at p. 7 (PSEG's Memorandum of Law in Support of its Motion for Preliminary Injunction) (Claiming that "the PPRP "requested that the Company conduct several **non-invasive** field measured surveys…" (emphasis supplied) so PSEG "has undertaken real and bona fide efforts over the course of months to obtain Respondents' consent to enter the Subject Properties to **conduct these surveys**."

(emphasis supplied)).   As the Trudeau Letter proves, rather than trying to obtain benign, non-invasive environmental field studies, PSEG *actually* demanded the property owner sign a much more onerous access contract, which:

- Would grant access to whomever PSEG sent for "preliminary analysis and site studies" to possibly include:

  - "Appraisals"

  - "Property boundary and utility surveys"

  - Unspecified "engineering studies" and "environmental assessment/investigation"

  - "Wetland delineation"

- Would allow invasive testing of the property called "Geo-technical borings" and

- Would give access to the <u>entire</u> property, comprised of dozen – if not hundreds – of acres, for all of these purposes, rather than the 700' wide area in which PSEG proposed to build the transmission line.

> **2. Temporary Right of Entry (ROE).** Owner will allow PSEG, its employees, contractors, subcontractors, and agents, a temporary right of entry upon and across the Property for the purposes of conducting its preliminary analyses and site studies which may include but not be limited to: appraisals, property boundary and utility surveys, engineering studies, wetland delineation, environmental assessment/investigation and geo-technical borings (**Preliminary Analysis**). PSEG will provide Owner or its designated representative with at least forty-eight (48) hours advance notice prior to initial entry on the Property by contacting _____ at **phone:**_____ **or email:**_____.

*See* <u>Exhibit 8-B</u>.  Additionally, this agreement would allow PSEG to invade the property with a veritable battalion of consultants for virtually any purpose, including the ability to ***perform an unlimited number of invasive geotechnical borings*** throughout the property.  *Id.*

While non-invasive surveys could be considered pre-taking activity for which a right of eminent domain might not necessarily need to be fully established, invasive testing such as soil

borings are and should be considered "takings" under eminent domain law.[14]  *See, e.g., WMATA v. One Parcel of Land*, 514 F.2d 1350 (D.C. Cir. 1975).  In upholding the lower court's grant of a temporary taking for the purpose of making eight soil borings, the D.C. Circuit Court of Appeals described that plaintiff was planning to build the DC Metro and "sought to condemn 'a temporary and assignable right of use and occupancy, together with the right of ingress and egress, for a period of thirty (30) days,…for the purposes of entering [the property] with appropriate drilling equipment for the purposes of making eight (8) test borings, each four (4) inches in diameter" in order to "determine the composition of the subsoil…to ascertain the feasibility of the project, [and] to complete an environmental impact analysis…".  *Id.* at 1351.

PSEG readily admitted that its many contractors would disrupt the property owner's use of their property, and offered a vague assurance that it would "minimize" those impacts "to the extent practicable":

> **3.  Disturbance/Liability.** PSEG agrees, to the extent practicable, to conduct its Preliminary Analysis in a manner that will be minimally disruptive to Owner's uses of the Property. The entry and activities pursuant to this ROE will be at PSEG's sole risk, and PSEG will indemnify and hold Owner harmless from any losses, claims, liabilities, damages, obligations, payments, costs and expenses arising directly as a result of the conduct of the activities permitted under this ROE.

*See* <u>Exhibit 8-B</u>.

Setting aside these issues with soil borings, the rest of the proposed surveying and evaluation might have initially seemed workable, because the letters were sent outside of the time farmers would not have to be concerned about young crops being trampled or dug up, and PSEG said it would indemnify the property owner for any losses caused by the contractors.  Any such momentary solace would have been extinguished by the next section of the Trudeau Letter, which

---

[14] Where, like here, 'quick take' is not authorized by law.

stated the duration of the access agreement would be until PSEG terminated it (or CPCN were denied):

> **4. Duration/Term.** This temporary right of entry will begin upon full signing by all Parties and terminate upon the earlier of a denial of PSEG's CPCN application by the Maryland Public Service Commission or termination by PSEG.

*See* Exhibit 8-B.  This certainly appears that, for anyone signing the Trudeau Letter, PSEG would likely retain the right to access the property for many years and for all of the vague and expansive purposes mentioned in paragraph 2.  A paltry payment of $1,000 is plainly unreasonable for such access, and, when including soil borings, that payment clearly fails to contemplate the required financial considerations for a "taking."

For all of these reasons, Ms. Knobloch was entirely reasonable in <u>not</u> perceiving PSEG's efforts, particularly the Trudeau Letter, as a good faith effort to gain reasonable access to her farm, so she declined.[15]  *See* Exhibit 8.[16]

### c.  PSEG Filed This Case in the Wrong Court

Third, if PSEG had actually made "every real and bona fide effort" but were not granted access for the survey, PSEG "may apply to a law court of the county where the property, or any part of it, is located for an order."  This is logical.  A local court, either state or federal ("a" law court), would rule on legal implications of local property matters.   All of the properties impacted by the proposed transmission line are located in Baltimore County, Carroll County, and Frederick

---

[15] Instead of acknowledging its own failures in not making "every reasonable and bona fide effort" to gain consent to perform non-invasive environmental studies of the properties, PSEG instead tries to shift blame to the grassroots organization Stop MPRP for supporting rural property owners.  It is irrelevant who may have suggested to these property owners that they are not required to acquiesce to unreasonable demands for access by the utility company, which the Trudeau letter plainly is.

[16] It would be correct to assume that there has been sharing of information in the farming community about this complex and serious matter, so while not every one of the Hill Respondents received the Trudeau Letter, all of them reasonably declined access by PSEG.

County, Maryland.  If PSEG had wanted to avail itself of the option of seeking a court order ("may"), it was required to file that request in the proper jurisdiction (in "a law court of the county where the property, or any part of it, is located").  The plaintiff bears the burden of proving subject matter jurisdiction.  *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  Applying the plain language of RP § 12-111, this Court, sitting in diversity in Baltimore City, Maryland, does not meet the statute's requirements.  Accordingly, this Court lacks subject matter jurisdiction over this case and should dismiss it, F.R.C.P. 12 (b)(1), or, in the alternative, should decline to exercise jurisdiction in the interest of judicial economy and fairness.

Anticipating this issue, PSEG would ask this Court to read the phrase "may" as meaning the next words in the statute, "apply to a law court of the county where the property, or any part of it, is located for an order" as being a purely optional.  *See* PSEG Memorandum of Law p. 18, FN 2. (PSEG concedes that "RP § 12-111(b) identifies the County in which the property sits as an appropriate venue" but believes that RP § 12-111(b) "does not assert 'exclusive' jurisdiction for right of entry petitions in state court" due to the use of the term "may.").  That is absurd.  Since RP § 12-111(b) sets forth the remedy for the denied entity to request an order granting access to the subject property, the provision can only logically be read as setting forth the particulars for such a request.  Otherwise, there would be no need for the words "of the county where the property, or any part of it, is located for an order" in the statute.  Courts should give meaning, if possible, to every word in a statute, construing the statute so that no word, clause, sentence, provision, or part would be rendered superfluous.  *See, e.g., Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 164 (4th Cir. 2025) and *Montgomery County v. Phillips*, 445 Md. 55 (2015).  Following the canon against surplusage, surely the party seeking extraordinary relief under an eminent domain statute,

demanding access to private property over the objection of the property owner, may not read out a provision of the statute governing the process for seeking such relief.[17]

Because the jurisdictional provision of RP § 12-111 has not been tested before, this Court's interpretation of it would be a matter of first impression. In the alternative, this Court could dismiss the Petition by applying the doctrine of *forum non conveniens*, because "when an alternative forum has jurisdiction to hear the case . . . or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems,' the court may, in the exercise of its sound discretion, dismiss the case." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). "[A] district court must determine whether the alternative forum is: 1) available; 2) adequate; and 3) more convenient in light of the public and private interests involved." *Tang v. Synutra Int'l, Inc.*, 656 F.3d 242 (4th Cir. 2011). All three of these conditions are satisfied here and support the conclusion that Maryland State court is the more appropriate forum for PSEG's demands.

Here, PSEG moves for a "preliminary injunction and final judgment that will permit it to immediately enter the Subject Properties for the limited purpose of conducting the surveys requested by PPRP (the Power Plant Research Program) on behalf of the State Agencies (Maryland Energy Administration and the Maryland Departments of the Environment, Agriculture, Commerce, and Planning) and as authorized by law." *See* PSEG Memorandum of Law p. 8. The Maryland Circuit Court where the subject property is located is an adequate and available forum for PSEG's request for a preliminary injunction because *Maryland law itself*, RP § 12-111(b), *provides the remedy* for exercising eminent domain power if a landowner should refuse entry onto

---

[17] Such a read of the plain language of the statute does not preclude federal court as a proper venue in all instances. Instead, this rule emphasizes that such an extraordinary proceeding should not take place far from where the subject property is located. If the subject property were located in the same county as a federal court, the federal court sitting in diversity could conceivably rule.

their property.  In pertinent part, RP § 12-111(b) states that the entity desiring to exercise eminent domain power "may apply to a law court where the property. . . is located for an order directing that the person be permitted to enter the land."  *Id.*  Furthermore, should the PSEG desire to obtain a preliminary injunction in Maryland, Maryland Rule 15-501 *et seq*. sets forth the appropriate State procedure.  Federal Courts need not get involved.

Second, the balancing of the *private interest* factors affecting the convenience of the litigants and *public interest* affecting the convenience of the forum, weigh in favor of this case being brought in state court.  *Piper Aircraft Co.*, 454 U.S. at 426 (1981).  "*Private interests* include the parties' relative ease of access to sources of proof, access to witnesses, ability to compel testimony, . . . and the enforceability of a judgment." *Id.*  Multiple Maryland State agencies are already so heavily involved in this matter, it is in the best interest and convenience of both PSEG and Respondents that this matter be brought in State courts as well.  PSEG is not a typical out-of-state business – indeed, the whole purpose of PSEG's action is to try and facilitate the utility's goal of approving a multi-year $500 Million+ construction project across three Maryland Counties. The interests of those three Counties must be addressed in this case.  RP § 12-111 is a statute that has not been heavily litigated, particularly the provision concerning filing the case in the county where the property is located, and it would be beneficial for state common law on this statute to be expanded.  While a federal court, sitting in diversity can provide statutory interpretation, there are good reasons not to do so here.  Among them is the fact that PSEG has taken a position that would render part of the statute surplusage.

Third, this would not unduly delay or inconvenience PSEG.  Any complaints by PSEG that this would require piecemeal litigation would be hollow, since PSEG is admittedly planning to file

more lawsuits just like this one.[18]  Indeed, PSEG would have to do so, because PSEG deliberately

chose *not* to name all of the property owners along the planned transmission line route in this

action.  Notably missing are a number of property owners who are represented by counsel before

the PSC.  This deliberate omission begs the question of whether PSEG can be taken seriously in

its claims of imminent doom.  Surely there can be no real time crunch if PSEG feels there is ample

time for piecemeal litigation.  The only other logical explanation is that PSEG knows its demanded

relief should be denied, so PSEG is hoping to push this outrageous project through with such haste

that busy farmers focused on planting season will not have time to oppose them.  If there were

truly an imminent concern for the grid, and if PSEG were in the right in its planned approach to

address it, PSEG would have been fully engaged during the past year (not just a few months),

diligently working to obtain environmental field studies across the entire planned pathway of this

transmission line.

There is an additional point this Court should consider regarding PSEG's efforts to pursue

injunctive relief from this Court.  As noted above, PSEG's proposed transmission line would

admittedly impact 245.8 acres of conservation easement land.  For instance, when Mr. Hill

purchased his farm, it was subject to an agricultural conservation easement to prevent the property

from being developed commercially, and that easement would likely be impacted by PSEG's

transmission line project.  *See* Exhibit 7 and Exhibit 7-B (1987 Deed of Easement between the

then-property owner and the State of Maryland to the use of the Maryland Agricultural Land

Preservation Foundation of the Department of Agriculture).  In pursuing an extensive program of

rural conservation easements, the State of Maryland has made a clear commitment to agricultural

preservation through significant monetary payments and tax incentives.  *Id.*  PSEG's demand for

---

[18] https://foxbaltimore.com/news/local/pseg-plans-file-additional-lawsuits-amid-transmission-fight-residents-vow-to-fight-them (April 28, 2025).

relief here is silent as to the interests of the State of Maryland in those easements, whether Maryland is a necessary or proper party to any proceeding impacting those easements, and, if so, if the State has consented to the action as would be required by Eleventh Amendment.

### B. **PSEG'S MOTION FOR PRELIMINARY INJUNCTION FAILS AS A MATTER OF LAW**

It is well-settled law that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)).  A party seeking a preliminary injunction must establish four things:  that it is (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) that "the balance of equities tips in [its] favor"; and (4) that an injunction is "in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter*, 555 U.S. at 20).  Failing to meet all four of these prongs is fatal, and PSEG's Petition fails to meet any of them, so this Court must deny the request for preliminary relief.

### 1. ***PSEG's Application Is Not Likely to Be Granted***

As further detailed above, the PPRP is firmly opposed to the unprecedented 'parallel' CPCN process PSEG says is required to meet its contractual deadline, and it is unlikely that PSEG will convince PSC to ignore the PPRP's concerns regarding this approach.  Even if this Application were uncontested, the timeframe would be implausible.  Because PSEG's massive proposal is heavily contested by hundreds, and all of their perspectives must be considered by the PSC, the

timeframe is impossible. Accordingly, even without considering its merits (or lack thereof),[19] PSEG's Application is not likely to be granted.

### 2. *Any Harm PSEG May Incur Is Self-Inflicted*

While PSEG casts aspersions at others for its predicament, it is undeniable that PSEG was awarded the lucrative PJM contract over a year ago knowing that it required a highly ambitious completion date, yet PSEG's Application remains substantially incomplete (and not only because of the missing field-based environmental studies). In the year that has elapsed since then, while PSEG and its army of lawyers and experts have been prolific in generating massive documents they claim support their cause, these efforts have been unfocused and inefficient. PSEG's solution is that everyone else – the PSC, the PPRP, multiple state and local governments, and over four hundred property owners – must now embrace PSEG's impossible demands to complete the CPCN process with incomplete information and at breakneck pace.

PSEG itself has decidedly not expended the level of effort that is required even for a typically paced CPCN, for instance, only making ***some*** efforts – but certainly not "***every*** reasonable and bona fide" effort – to obtain property access before filing this action. Even assuming arguendo its efforts were sufficient (and not grossly improper), PSEG admittedly wrote to property owners but did not file this action until months later. PSEG's own slow action "indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989); *see also Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439–40 (4th Cir. 2018) (considering passage of time when analyzing whether a party has suffered irreparable harm).

---

[19] For instance, PSEG avers that the grid *could* suffer issues as of June 2027, this dated assumption fails to account for many valid considerations, including new legal requirements for co-location of power supplies for data centers, and this applies old assumptions concerning two powerplants being retired sooner than is now planned.

3.   ***The Balance of Equities Tip in Favor of Rural Property Owners***

As further detailed above, PSEG focuses only on its lucrative contract and downplays the interests of hundreds of rural property owners who reasonably declined the utility's highly problematic requests for access to private land.  Applying the facts of this case, the balance of equities tip in favor of the rural property owners.

4.   ***Injunctive Relief Is Not In the Public Interest***

The Hill Respondents certainly do not take the position that grid reliability is unimportant. Rather, the concern here is that PSEG's plan to destroy hundreds of acres of productive crop land, ruin multi-generational family farms, and devastate sensitive habitat is harmful to Maryland, and yet <u>this</u> project is not necessary to improve grid reliability.

Another component of the public interest in this case bears further mention here.  If PSEG's reckless approach to a serious and complex CPCN process were countenanced here, it would help set a dangerous precedent by lowering the proverbial bar of what constitutes acceptable conduct by commercial businesses building utility infrastructure.  While a less demanding regulatory process would certainly benefit wealthy utility companies like PSEG, it would plainly not be in the public interest.

Having failed to meet any of the four requirements for preliminary injunctive relief, PSEG's Motion must be denied.

### III.     <u>CONCLUSION</u>

Because PSEG is unlikely to get permission to construct the transmission line, the utility lacks standing to seek extraordinary relief under Maryland's eminent domain laws, and its Petition must be denied, or, in the alternative, denied for this and the other grounds set forth in this Memorandum.