**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

PSEG RENEWABLE  \*
TRANSMISSION, LLC,
                                                \*
    Petitioner,
                                                \*
        v.                                Case No. 1:25-cv-01235
ARENTZ FAMILY, LP, *et al.*,
                                                \*
    Respondents.
                                                \*

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PETITIONER PSEG RENEWABLE TRANSMISSION, LLC'S REPLY
MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Kurt J. Fischer (Bar No. 03300)
Venable LLP
210 W. Pennsylvania Avenue
Suite 500
Towson, MD 21204
(410) 494-6200
kjfischer@venable.com

J. Joseph Curran, III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7400
jcurran@venable.com
csgunderson@venable.com
klthompson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Petitioner PSEG
Renewable Transmission LLC*

### I.  INTRODUCTION

Respondents fail to rebut the Company's manifest showing of the four elements required for a preliminary injunction. The Maryland Department of Natural Resources Power Plant Research Program ("PPRP") has requested that the Company perform non-invasive field surveys that PPRP deems are necessary to assess the environmental impacts associated with the Company's application for a certificate of public convenience and necessity ("CPCN") to construct the Maryland Piedmont Reliability Project (the "Project" or the "MPRP"). The Company asks this Court to enter an order permitting the Company temporarily access Respondents' properties (the "Subject Properties") in order to perform the requested surveys, consistent with Maryland law. Delaying the Company's temporary, non-invasive survey access is unwarranted given the Company's demonstrable likelihood of success on the merits of its Petition for Injunctive Relief (ECF 1) and the irreparable harm that would result from further delay.

Unnecessarily delaying the Company's right of entry will doom the Company's CPCN application to an untenable purgatory state, where PPRP is unable to fulfill its statutory duty to assess the Project's impacts, and the PSC is consequently unable to fulfill its statutory duty to evaluate the merits of the CPCN application. Respondents cannot point to any prejudice or material harm that will occur if the Company is granted the temporary access it seeks. Respondents also misconstrue the relief requested in the Company's Motion, conflating the merits of the Company's CPCN application pending before the PSC with the Company's legal entitlement to survey access that is the lone subject of this proceeding. Respondents are incorrect on the law and the facts, and their arguments are without merit. Accordingly, the Company's Motion should be granted.

## II. THE COURT SHOULD GRANT THE COMPANY'S MOTION FOR PRELIMINARY INJUNCTION

As noted in the Company's Motion, to obtain a preliminary injunction, a petitioner must show: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 3d 466, 473 (D. Md. 2024); *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023).[1] The Company has established each of these elements, and none of Respondents' critiques withstand scrutiny.

### A. The Company Will Succeed on the Merits of its Petition, and Respondents Have Not Shown Otherwise.

Under Section 12-111 of the Maryland Annotated Code's Real Property Article ("RP"), the Company is entitled to a right of entry to conduct non-invasive surveys that PPRP states are needed to facilitate the PSC's review of the CPCN application. Because the statute expressly provides for this right of survey access, the Company's likelihood of success in the instant case is immense. Respondents' arguments to the contrary are based on an unsupported and strained interpretation of the statutory scheme that would frustrate, rather than advance, its purpose.

RP § 12-111(a) permits land surveyors acting on behalf of "the State or any of its instrumentalities or any body politic or corporate having the power of eminent domain" to enter onto real property to conduct preliminary property surveys. To receive a court order permitting its entry, a petitioner need only establish two elements: (1) that it is a qualifying entity under the statute for conducting preliminary surveys; and (2) that it made real and bona fide efforts to notify the owner in writing with respect to the proposed entry. RP § 12-111(a). The Company has established both statutory requirements and has therefore demonstrated success on the merits.

---

[1] Under Fed. R. Civ. P. 65(a), this Court has authority to consolidate a preliminary injunction proceeding with a trial and final decision on the merits. The Company has established each of the necessary elements.

2

1. <u>Petitioner is a "Body Politic or Corporate Having the Power of Eminent Domain," and Respondents Offer No Compelling Rebuttal of This Fact.</u>

As explained in the Company's Petition (ECF 1) filed with its Motion, as well as the sworn Declaration of Dawn Shilkoski supporting the Petition (ECF 3), the Company will be regulated as a public utility by FERC. (*See* ECF 75-1 at 19-24; ECF 3 ¶ 16). The Company is therefore a "body politic or corporate having the power of eminent domain" and is thus imbued under RP § 12-111 with the right of temporary, non-invasive survey access. Erroneously focusing only on Section 7-207 of the Maryland Annotated Code's Public Utilities Article ("PUA") (the CPCN statute), Respondents assert that the Company can obtain the power of eminent domain to conduct surveys only *after* receiving a CPCN, and thus cannot proceed and obtain survey access under RP § 12-111 unless and until a CPCN is issued for the Project. (*See* ECF 88 at 17-18; ECF 92-1 at 9, 14-15; ECF 94 at 3-4. *See generally* ECF 95-1 at 13-14 (asserting Petitioner "lacks standing")). For the reasons set forth in the Company's opposition to Respondents' motions to dismiss, Respondents' interpretation of RP § 12-111 is unworkable and unpersuasive. (ECF 103-1 at 9-16).

2. <u>The Company Made Real and Bona Fide Efforts to Obtain Respondents' Consent to Survey Access.</u>

The Arentz Respondents and Hill Respondents also argue that the Company will not succeed on the merits because the Company did not make real and *bona fide* efforts to seek consent for a right of entry under RP § 12-111. (ECF 92-1 at 16 (referencing Arentz Respondents' Motion to Dismiss; ECF 95-1 at 14-20). This argument is unpersuasive for the reasons set forth in the Company's opposition to Respondents' motions to dismiss. (ECF 103-1 at 16-21).

**B.     As Respondents Concede, Denying the Company Immediate Temporary, Non-Invasive Survey Access to Respondents' Properties Will Cause Irreparable Harm to the Company and the Public.**

There is no dispute that the Company will suffer irreparable harm absent the requested Court intervention here. The numerous actual harms that would result from a denial of the Company's Petition compound and multiply upon themselves. For example, and as discussed in the Company's Motion (ECF 75):

- If the Company is unable to obtain immediate temporary access to Respondents' properties to conduct non-invasive surveys requested by PPRP, the Company will miss the prescribed (and only) annual survey periods for the habitats of certain rare, threatened, or endangered species that are present in the general area of Respondents' properties (for example, one such species can only be surveyed between April and June) and will therefore be unable to provide PPRP with the field survey data PPRP claims it needs to assess the impacts of the Project. (*See* ECF 3-5 (March 26, 2025 Letter from PPRP to the PSC); ECF 95-7 (PPRP April 11 Response to Comments).

- If the Company cannot complete these time-sensitive surveys, PPRP will not be able to assess the impacts of the Project on behalf of itself and several other State agencies as required by statute, and the Company's Application will not be able to be deemed "administratively complete." (*See id.*)

- If PPRP cannot assess the impacts of the Project, and the application can never be deemed administratively complete, PPRP cannot present any assessment (on behalf of State agencies) to the PSC for the PSC's evaluation of the Project's impacts on certain statutorily enumerated factors, including the Project's impact on the environment. (*See* PUA § 7-207(e)).

- If the PSC cannot properly evaluate the Project's impacts on the environment and other factors as required by statute, the PSC cannot issue a decision on (*i.e.*, will be unable to either approve or deny) the Company's CPCN application.

- And if the PSC cannot issue a decision on the Company's CPCN application, the Project will not be operational by PJM's required June 2027 in-service date, which PJM forecasts would result in blackouts and voltage collapse conditions for the regional power grid serving Maryland and surrounding states.

4

These irreparable harms, which would impact not only the Company but also the public (who will be forced to bear the effects of the blackouts and voltage collapse conditions), are the foreseeable consequences that will necessarily follow the denial of the Company's Motion here.

Respondents do not cite any support in arguing against the irreparability of the Company's harm. Indeed, there is none. Instead, Respondents ignore the clear facts demonstrating the harm to the Company and the public or misstate the law to argue their point. For example, without citing any evidence or support, the Arentz Respondents incorrectly assert that the Company's ability to meet the June 1, 2027 in-service date is "speculative," (*see* ECF 92-1 at 20, 21). But to make this argument, the Arentz Respondents must ignore the extensive evidence the Company has provided showing the critical need for the Project to be placed in service by June 2027 and its consequent detailed plan to effectuate the planned in-service date. (*See* ECF 1 at 16, 41-43; ECF 75-1 at 10-12).[2] In addition, the Arentz Respondents speculate that the Project could be delayed beyond its June 2027 in-service date due to general "uncertain[ies]," (ECF 92-1 at 17-18), and Radio Fellowship speculates that "the assumptions" underlying the need for the Project could change (ECF 88 at 28), but neither Respondent offers any support for these allegations beyond mere conjecture. Respondents' speculations cannot undermine the actual evidence of irreparable harm that the Company has shown would result from the denial of its Motion. (*See* ECF 1 at 16, 41-43; ECF 75-1 at 10-12). Similarly, the Arentz Respondents' invocation of PUA § 7-208 to support their arguments is legally incorrect.[3]

---

[2] Paradoxically, the Arentz Respondents cite one of the pieces of Company witness testimony filed in the CPCN proceeding that contains the detailed explanation of the critical necessity of the Project that they claim is missing. (*See* ECF 92-1 at 21-22 (citing Company Witness Jason Kalwa's Direct Testimony filed in the PSC's CPCN docket for the Project)). Citations to this testimony support the Company's point, not the Arentz Respondents'.

[3] PUA § 7-208(c) provides that a CPCN applicant must wait two years from the date of application for a CPCN for the "*[j]oint construction* of generating station and transmission lines" to begin construction (unless waived by the Commission for good cause) (emphasis added). PUA § 7-208 does not apply because the Company is not constructing any generating station associated with the Project.

5

Perhaps most importantly, Respondents cannot (and do not attempt to) rebut the fact that the Company will be stuck in an irreparable and impossible position if it is denied access to the properties to conduct the environmental surveys that *every* State agency, *every* County government, *every* environmental group, and certain of the Respondents themselves,[4] argue the Company must provide to advance the CPCN case to its ultimate conclusion. (*See, e.g.*, ECF 75-3 at 3 (Comments from Frederick County); ECF 75-4 at 3 (Comments from Baltimore County); ECF 3-5 at 5 (March 25 Letter from PPRP to the PSC)). Permanent entrenchment in that purgatory state is the untenable but certain result of Respondents' argument against a preliminary injunction here.[5] The financial and in-service date harms the Company cited in its Motion are other foreseeable, consequential harms that will necessarily follow if preliminary relief is not granted.[6] (*See* ECF 75-1 at 28-30).

Additionally, the Arentz Respondents' attempts to distinguish two cases cited in the Company's Motion, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019), and *East Tennessee Natural Gas Company v. Sage*,

---

[4] Respondents Charles William Bond and Morgan Bond, Christopher D. Cockey and Carmen Cockey, Zhejun Fan and Julia Lu, Kenneth Miller and Fay Ann Miller, Wayne D. Miller and Catherine V. Miller, Erich C. Steiger, Leslie A. White, and Justin White, who are all members of the Arentz Respondents group, filed comments in the PSC docket expressly supporting PPRP's requirement that the Company obtain field surveys prior to, and to facilitate, the Commission's review of the CPCN application. These comments are available in the PSC docket at: https://webpscxb.psc.state.md.us/DMS/case/9773.

[5] Radio Fellowship's assertion that this harm is "speculative" (ECF 88 at 28) is demonstrably false, as shown above, and Radio Fellowship accordingly does not cite any support for its contention nor suggest any alternative outcomes of its interpretation.

[6] Respondents' attempts to paint the Company's harms as solely "financial" and therefore not "irreparable" are unavailing. As noted in the Company's Motion, the Company will suffer irreparable financial harm from a denial of its Petition here, but the Company has also demonstrated that this is not the only irreparable harm the Company has demonstrated will occur. (*See* ECF 75-1 at 25-29; ECF 1 ¶¶ 259-262). In addition, the Arentz Respondents' and Radio Fellowship's argument that all monetary harms are compensable through the DEA is incorrect. (ECF 92-1 at 24-28; ECF 88 at 27-28). First, it is impossible to know what portion of Petitioner's expended costs could be recovered at this juncture. Second, the existence of some financial recovery mechanisms in the event of project abandonment changes nothing about the fact that the Company and Marylanders generally will be irreparably harmed by an unstable electrical grid, prone to rolling blackouts and system-wide failures forecasted to occur if the Project fails to meet its in-service date. This argument—that the Company's harm is illusory because the in-service date is "flexible" under the DEA—is a red herring.

6

361 F.3d 808 (4th Cir. 2004), are unavailing. Contrary to the Arentz Respondents' contention (ECF 92-1 at 18) and as discussed in the Company's Motion and opposition to Respondents' motions to dismiss (ECF 103), the Company has the power of eminent domain. (*See* ECF 75-1 at 19-21; ECF 103-1 at 9-16). *Mountain Valley* and *Sage* are not distinguishable on this point. Moreover, the Arentz Respondents emphasize the procedural posture of *Mountain Valley* in an attempt to distinguish it from the instant case on the "irreparable harm" prong. But the Fourth Circuit did not uphold the district court's findings of irreparable harm in *Mountain Valley* on the basis of the procedural posture. Rather, the Fourth Circuit held an immediate need for survey access to the subject properties was present because without such survey access, the petitioners were likely to suffer drastic and non-compensable injury, including the inability to proceed with their project or meet their in-service deadline—just like the facts at hand. *See Mountain Valley Pipeline*, 915 F.3d at 216-19. The Company has shown here that its harm is actual, imminent, and irreparable.

### C.     The Balance of the Equities Overwhelmingly Favors the Company.

In contrast to the direct and irreparable harm that the Company will suffer if it is unable to obtain temporary access to Respondents' properties, Respondents have not alleged any cognizable injury or prejudicial impact that would result from granting a preliminary injunction that enforces the Company's right of temporary, non-invasive survey access.

The Arentz Respondents characterize their alleged harm in this case as "damage [to] Maryland's farming industry," "disrupt[ion] of familial living quarters built adjacent to conserved and preserved land," and "forever damage [to] land earmarked for commercial use." (ECF 92-1 at 29- 31). Similarly, Radio Fellowship alleges "serious disruptions to ongoing ranch operations and … potential safety risks," as well as "reputational harm" and "lost business". (ECF 88 at 29). These concerns are speculative at best. Indeed, granting the Company its temporary, limited, non-

invasive survey access right—the lone subject of this proceeding—would not cause these injuries. The Arentz Respondents do not attempt to draw a link between the Company's temporary, limited, and non-invasive survey access and such "forever damage." Rather, as both the Arentz Respondent and Radio Fellowship concede, (*see* ECF 92-1 at 31 ("Every landowner is understandably fearful of losing property rights to a high-voltage transmission line."); ECF 88 at 28 (noting that Respondents "have widely called for" the Company to abandon its route)), their concerns go solely to the merits of the PSC's CPCN evaluation and approval or denial of the Project. In other words, Respondents anticipate that granting the preliminary injunction would advance the CPCN proceeding toward a resolution, which is merely a function of the orderly regulatory process that RP § 12-111 facilitates. Their alleged harms "arise not from the grant of preliminary relief but from construction of the [transmission line] itself." *Mountain Valley*, 915 F.3d at 220; *see* ECF 88 at 29-30; ECF 92-1 at 31. That issue is squarely before the PSC and is irrelevant to this proceeding. *See id*. As the Fourth Circuit held in *Mountain Valley*, this is insufficient to overcome the heavy weight of the equities in the Company's favor.

  Moreover, any alleged harms that Respondents attribute to the Company's request for temporary, non-invasive survey access are premised on a mischaracterization of the access the Company seeks. For example, the Arentz Respondents contend that that "indefinite access to sensitive farmland could result in biosecurity breaches, including, as one example, exposing livestock to pathogens from surveyor movement between farms," and "could also cause physical damage to fields, fencing, irrigation systems, or conservation practices." (ECF 92-1 at 29). But the Company is *not seeking* "indefinite access," a "blanket right of entry," or unconditional and "unfettered" access to Respondents' properties, as Respondents allege. (*See* ECF 92-1 at 29-31). Rather, as stated throughout its Petition for Injunctive Relief, Motion for Preliminary Injunction,

8

and supporting documents (ECF 1, 3, 75, and 75-1), the Company seeks temporary access to these properties to conduct non-invasive surveys: wetland delineations, habitat assessments, and threatened or endangered species surveys.[7] And as the Company has repeatedly noted, this is the only type of access permitted (and to which it is entitled) under RP § 12-111. The Company is not asking the Court to do anything more than what is provided for by statute.

In fact, RP § 12-111 expressly provides for, and the Company has expressly agreed to abide by, conditions to alleviate any potential impacts on Respondents' properties from the non-invasive surveys sought here and to compensate Respondents for any damage inadvertently caused to their property during the survey process. The Company has already stated that it will agree to any conditions on its temporary access fashioned by this Court, including conditions to replace any topsoil disturbed by non-invasive survey activities like setting lines or markers, and conditions to reimburse Respondents for any property or agricultural products inadvertently damaged by the Company's agents, employees, or consultants (which, as the Company has stated, RP § 12-111 already requires).[8]

---

[7] As noted *supra*, while PPRP requested that the Company perform certain invasive surveys (such as geotechnical surveys) that would require the Company to disturb the land or conduct underground boring, the Company is not legally authorized to conduct any surveys that involve invasive activities on private property prior to the issuance of a CPCN without the express approval of the property owner. *See Mackie v. Mayor and Com'rs of Town of Elkton*, 265 Md. 410, 418-19 (1972), (survey authority extends only to activities similar to "making surveys, running lines or levels, [or] setting stakes, markers[, and] monuments" that are "innocuous and temporary[,] effecting only minimal incidental damage and little, if any, disturbance"). The Company also has explained to PPRP that it is not authorized to conduct invasive surveys, such as geotechnical surveys, as these are not permitted by law without the express approval of the property owner. (*See* ECF 92-5 at 7 (Company Response to PPRP Completeness Recommendation)). The Company thus does not seek the Court's authorization for access to Respondents' properties to conduct any invasive surveys.

[8] The Harford County Circuit Court's Order in the *Transource* case discussed at length in the Company's Motion (*Transource Maryland, LLC v. Scott*, Case No. 12-C-18-000549 (Harford Cty. Cir. Ct.)) specified conditions to Transource Maryland, LLC's right of entry. A copy of the Harford County Circuit Court's decision in *Transource* was attached to the Company's Petition for Injunctive Relief as Exhibit 4 (ECF 1-4), and a copy of the Order that sets forth the conditions of entry is attached to the instant Reply as **Exhibit 1**. The Company leaves to the Court's discretion any conditions to be fashioned on its right of entry under RP § 12-111 and will abide by all such conditions. For example purposes only, the Company notes that such conditions could include (but need not be limited to):

(1) a condition that the Company serve a copy of the Court's order granting a right of entry on all Respondents via overnight, certified mail, restricted delivery and by hand delivery to the Respondents at the Subject Properties (if Respondents do not answer the front door at their Subject

9

Finally, Respondents' allegation that the Company's right of temporary, non-invasive survey access will constitute a "taking" without compensation lacks legal support. (*See* ECF 88 at 29; ECF 92-1 at 31-34). Maryland courts have repeatedly indicated the opposite: "Authorized temporary occupancy or momentary entry for purposes of survey or inspection is *not* a taking and may be done without compensation." *Lafontaine's Heirs v. Lafontaine's Heirs*, 205 Md. 311, 320 (1954) (emphasis added); *see also Steuart v. Baltimore*, 7 Md. 500, 516 (1855) ("The constitutional prohibition against taking private property for public use, until compensation is first paid or tendered, means *taking* the property from the owner, and *actually* applying it to the use of the public. It does not mean the preliminary measures necessary in such cases. To hold that compensation must be paid or tendered, before a survey should be made, or other preparatory steps taken, would be a construction of the constitution not required by its language, or necessary for

---

Property when the Company attempts delivery, the Company shall affix the Court's order by tape to the front door);
(2) a condition that Petitioner shall file an affidavit with this Court demonstrating compliance with the service requirements of the Order;
(3) a condition that Petitioner, its agents, employees, or consultants, must wait at least five (5) days after service of the Court's order to enter upon and remain on the Subject Properties for the purpose of conducting field surveys and to obtain information relevant to the acquisition of the Subject Property or its future public use as an electric transmission line as permitted by Section 12-111 of the Real Property Article of the Annotated Code of Maryland;
(4) Respondents shall not in any manner interfere with or obstruct the persons authorized to enter onto his property by the Court's order;
(5) Petitioner and its agents, employees or consultants who enter onto the Subject Property shall have a copy of this Order with them;
(6) Petitioner, when surveying, running lines or levels and setting stakes or markers under the provisions of this Order, shall replace the topsoil in a manner which will approach the level of compaction and contour was when removed. Petitioner shall reimburse Respondents for any agricultural products destroyed or damaged by its agents, employees, or consultants. Petitioner shall further be responsible for any other damage that may be incurred as a result of the entry onto Respondents' land pursuant to this Order; and
(7) Petitioner and its agents, employees or consultants shall only enter upon the Subject Properties during normal working hours, 8:30 A.M. to 6:00 P.M.
*See* Ex. 1 (*Transource* Order).

10

the protection of private rights.").[9]  Respondents' argument is contrary to law, and the Court should accord it no weight.

### D. The Company's Immediate Temporary, Non-Invasive Survey Access is in the Public Interest.

The Company has shown definitively that the Court's affirmance of its temporary, non-invasive access rights under RP § 12-111 is in the public interest.[10]  In contrast, Respondents advance no independent basis to show that the preliminary injunction sought here contravenes the public interest.  The public interest in granting the Company its right to access Respondents' properties to conduct surveys is demonstrated by the fact that *every* State agency, *every* County government, and *every* environmental group who has spoken on the topic in the Company's pending CPCN proceeding has said that the requested surveys are instrumental to identifying, understanding, and mitigating the environmental impacts of the MPRP.  (*See, e.g.*, ECF 75-3 at 3 (Comments from Frederick County stating that "Basic principles of fairness to all the State agencies required to review and analyze the application … require that PSEG provide [field survey data] to complete the application before the application moves through the evaluation and analysis phase."); ECF 75-4 at 3 (Comments from Baltimore County stating that "the Commission cannot give 'due consideration' to the factors enumerated in [PUA] § 7-207(e) if the Application is administratively incomplete."); ECF 3-5 at 5 (March 25 Letter from PPRP to the PSC stating that "Without field-based information, PPRP cannot fully evaluate the Project's impacts to Maryland's socioeconomic and natural resources.").

---

[9] The case cited in the Arentz Respondents' Opposition, *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012), is inapposite.  That case addressed "recurrent floodings" and held that recurrent floodings are "not categorically exempt" from Takings Clause liability.  This is wholly distinct from the facts here, and this case does not support the Arentz Respondents' legal argument.

[10] As the Company's Petition explains, PJM—which oversees a region of thirteen states and the District of Columbia, and which acts pursuant to authority conferred upon it by FERC—has identified significant risks to the region's electric grid.  (ECF 1 ¶¶ 244-45).  If these risks are not addressed, overall system reliability for customers throughout PJM's region—not just in Maryland—could be compromised.  (*Id*. ¶ 246.)

Additionally, there is a strong public interest in the timely completion of the Company's pending CPCN proceeding (which the requested surveys are needed to accomplish) given the forthcoming regional electric grid reliability impacts that the MPRP is designed to address. The Arentz Respondents ignore the hundreds of pages of analysis and explanatory testimony that the Company provided in the CPCN proceeding to support PJM's projections, [11] and instead contend that "the Company offers scant evidence" for the projected severe consequences to the electric grid. (ECF 92-1 at 34). This is incorrect. As noted in the Company's Petition, Motion, and supporting sworn declarations, PJM's projections are supported by overwhelming data and analysis in the CPCN proceeding. (*See, e.g.*, ECF 1 at 16, 41-43; ECF 75-1 at 10-12; ECF 3 ¶¶ 9-15). The Arentz Respondents also assert that "the lights will remain on in Maryland irrespective of whether" the Company's Motion is granted. (ECF 92-1 at 35). This assertion is directly contradicted by the evidence cited in the Company's Petition and Motion. (*See, e.g.*, ECF 1 at 16, 41-43; ECF 75-1 at 10-12; ECF 3 ¶¶ 9-15).

The Arentz Respondents' assertion that the Company wants this Court to "usurp the role" of the PSC is incorrect. (*See* ECF 92-1 at 35 (citing Respondents' Motion to Dismiss at § IV(B))). The opposite is true: the PSC has no jurisdiction to enforce RP § 12-111, and the Company's Petition only asks the Court to enforce the Company's rights under that statute. The Company is not seeking (nor is the Court empowered to make) any decision evaluating the merits of the Company's CPCN application or the Project. Enforcing the Company's rights under RP § 12-111 is a discrete function that, under Maryland law, is an entitlement a public utility may seek on an *ex parte* basis. RP § 12-111 only requires the Court to determine whether the Company has survey

---

[11] As noted in n.2, *supra*, Respondents' selective acknowledgement and use of the Company's testimony and data—citing excerpts from Company witness testimony filed in the CPCN proceeding to serve their position, while ignoring the pages of the same testimony that directly undermine their position—is telling.

rights to enter onto the Subject Properties and whether the Company made real and bona fide efforts with respect to each Respondent but was refused entry. The Court's analysis of these two narrow questions will not intrude upon—let alone overlap with—the questions to be decided by the PSC. In fact, the Court's denial of temporary, non-invasive survey access would "usurp" the PSC's power, as it would block PPRP from submitting its statutorily required assessment of the Project's environmental impacts, consequently blocking the PSC from carrying out its statutory duty to fully evaluate the CPCN application. *See* Md. Code Ann., Nat. Res. § 3-306(b); PUA § 7-207.

The Arentz Respondents' contention that the Court's affirmance of the Company's statutory rights will cause a "sweeping, unpaid encumbrance" that will "thumb the scale" of the PSC's evaluation of the CPCN in the Company's favor is not true. (*See* ECF 92-1 at 35). Under this theory, facilitating the PSC's exercise of a statutory duty to evaluate a CPCN application constitutes a "thumb on the scale," while weaponizing the federal court to obstruct the PSC from exercising its statutory duty constitutes the "public interest." This cannot be.

## CONCLUSION

For the foregoing reasons, the Company respectfully asks this Court to enter a preliminary injunction that permits the Company to enter Respondents' Properties to conduct the surveys and gather the information required by PPRP. Pursuant to Federal Rule of Civil Procedure 65(a)(2), the Company respectfully requests that the Court advances trial on the merits of the Company's Petition and consolidate it with a hearing on the Company's motion.

Date: May 5, 2025                              Respectfully submitted,

*/s/ Kurt J. Fischer*
Kurt J. Fischer (Bar No. 03300)
Venable LLP
210 W. Pennsylvania Avenue
Suite 500
Towson, MD 21204
(410) 494-6200
kjfischer@venable.com


J. Joseph Curran III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
(410) 244-7400
jcurran@venable.com
csgunderson@venable.com
klthompson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Petitioner PSEG Renewable Transmission LLC*

**CERTIFICATE OF SERVICE**

      I hereby certify on this 5th day of May, 2025, I electronically filed and served the foregoing on all counsel of record via the Court's CM/ECF system.

                                                        */s/ Susan R. Schipper*
                                                        Susan R. Schipper