**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

PSEG RENEWABLE TRANSMISSION
LLC,

     *Plaintiff*,

     v.

ARENTZ FAMILY, LP, *et al.*,

     *Defendants*

Case No. 25-cv-1235-ABA

**MEMORANDUM OPINION**

Plaintiff PSEG Renewable Transmission LLC ("PSEG") is working to develop an approximately 67-mile high-voltage transmission line that, if built as presently planned, would traverse portions of three Maryland counties: Baltimore County, Carroll County, and Frederick County. The project is known as the Maryland Piedmont Reliability Project (the "Piedmont Project"). The Maryland Public Service Commission (the "PSC") is considering whether to issue a Certificate of Public Convenience and Necessity ("CPCN") for the project.

As part of the PSC proceeding, the Maryland Department of Natural Resources, specifically its Power Plant Research Program ("PPRP")—review by which is required for a CPCN to be granted—demanded that PSEG, among other things, perform certain surveys to enable PPRP to conduct an environmental assessment of the Piedmont Project. A number of residents along the proposed route have refused to grant PSEG access to their properties to conduct those surveys. PSEG filed this case, naming 117 of the property owners as respondents ("Respondents"). PSEG has sought a preliminary injunction granting it permission to enter the properties at issue solely to conduct the

surveys. Most of the Respondents have engaged counsel and appeared in this case, and filed motions to dismiss the complaint, and oppositions to PSEG's motion for a preliminary injunction. For the reasons that follow, the motions to dismiss will be denied, and PSEG's motion for a preliminary injunction will be granted.

## Table of Contents

I.    Background ........................................................................................................ 3

    A.    The Piedmont Project ............................................................................... 4

    B.    Public Service Commission Proceedings ................................................. 6

    C.    PSEG's Efforts to Obtain Property Access to Conduct the Surveys ....................10

    D.    This Case .................................................................................................. 22

II.   Respondents' Motions to Dismiss ............................................................. 24

    A.    Legal Standard ......................................................................................... 24

    B.    Section 12-111 Authorizes Surveys and Studies of the Type Required by PPRP ......................................................................................................... 25

    C.    PSEG Has Alleged Facts Constituting the "Bona Fide Effort[s] to Notify" Required By § 12-111 .............................................................................. 32

    D.    Abstention Is Not Warranted .................................................................. 35

    E.    The Complaint Is Not Subject to Dismissal on Exhaustion Grounds ............... 38

    F.    Respondents Have Not Shown That Additional, Non-Named Property Owners Must Be Joined Under Rule 19 ................................................... 39

    G.    Venue Is Proper in This Court ................................................................41

III.  PSEG's Motion for a Preliminary Injunction ........................................... 41

    A.    Legal Standard .........................................................................................41

    B.    Likelihood of Success on the Merits ....................................................... 42

    C.    Irreparable Harm ..................................................................................... 45

    D.    Balance of Equities .................................................................................. 49

    E.    Public Interest ......................................................................................... 50

IV.   Conclusion ................................................................................................... 52

## I.    BACKGROUND

Where defendants (or, as here, Respondents) file a motion to dismiss a complaint for failure to state a claim, the Court must "take as true the facts alleged in [the plaintiff's] complaint and draw all reasonable inferences in [its] favor." *Doe v. Univ. of N. Carolina Sys.*, 133 F.4th 305, 310 (4th Cir. 2025). The facts as set forth below are those alleged by PSEG. They include facts set forth in declarations that were filed in support of PSEG's motion for a preliminary injunction that PSEG incorporated by reference in its complaint. *See, e.g.*, ECF No. 1 ¶ 264 (incorporating declarations regarding communications with property owners); *id.* ¶ 245 (citing ECF No. 3, Declaration of Dawn Shilkoski ("Shilkoski Decl.")). They also include facts asserted by PSEG that are subject to judicial notice, such as orders issued by federal or state agencies. *See* F.R.E. 201(b); *United States v. Zayyad*, 741 F.3d 452, 463-64 (4th Cir. 2014) (holding that indisputable facts such as facts "generally known within the trial court's territorial jurisdiction" are susceptible to judicial notice); *Rogers v. Deane*, 594 F. App'x 768, 770-71 (4th Cir. 2014) (holding that the filing of an order is indisputable, but the factual findings contained therein are not).

That is the standard of review with respect to Respondents' motions to dismiss, and is the standard by which the Court sets forth the background of the parties' dispute in this Section I, and discusses Respondents' motions to dismiss in Section II. With respect to PSEG's motion for a preliminary injunction, which the Court addresses in Section III, the Court need not, and does not, *accept* as true PSEG's allegations; instead, the pertinent component of the standard for issuance of a preliminary injunction is whether PSEG has shown a likelihood of success on the merits. *See* § III.A, *infra*.

### A.     The Piedmont Project

The construction of high-voltage electric transmission lines is governed by a mix of federal and state law and agencies. The Federal Energy Regulatory Commission ("FERC") oversees planning and cost allocation through regional transmission organizations. 16 U.S.C. § 824s; FERC Order No. 1000, 136 FERC ¶ 16,051 (July 21, 2011).[1] PJM Interconnection, LLC is the regional transmission organization that includes Maryland as well as its bordering states. ECF No. 1 ¶ 1. PJM identifies system needs and recommends projects for development within its regulated territory. *Id.* Under federal law, state governments retain substantial authority to decide questions of transmission siting and construction. 16 U.S.C. § 824(b)(1). Once a transmission line goes into service, the operating company (here, PSEG) becomes subject to regulation by FERC as a public utility. *See* Md. Code Ann., Pub. Util. § 7-207(b)(3)(iii).

"For several years, PJM has observed a significant load growth in Maryland and Virginia." ECF No. 3 ¶ 9. "PJM has also been notified that approximately 11,100 MW of power generation within its region has been deactivated (i.e., retired) or is in the process of deactivating." *Id.* Although some of those deactivations have been postponed, *see* ECF Nos. 125-1 & 125-2, PJM has determined that, in order to discharge its obligation to ensure adequate transmission capacity for current and anticipated load growth, additional transmission capacity is needed. ECF No. 3 ¶ 11. "For example, PJM has observed that, absent intervention, the key 500 kV transmission lines located in Maryland will become severely overloaded, with these lines carrying 115% to 213% of their rated capacity." *Id.* ¶ 10. "Transmission lines at the 500 kV level are a critical part

---

[1] Available at https://perma.cc/L9CZ-6ZFD.

of the region's electric system and allow electricity to flow across states from where power is generated to where it is needed." *Id.* ¶ 9.

In February 2023, PJM began the process of addressing this need by soliciting proposed solutions from qualified transmission owners and developers. *Id.* ¶ 12. PJM received and analyzed a total of 72 project proposals. *Id.* PJM approved several of those "transmission enhancement proposals," including the Piedmont Project. *Id.* ¶ 13. PJM designated PSEG as the "designated entity" to develop and construct the new transmission line. ECF No. 3-1 (Designated Entity Agreement between PJM Interconnection, L.L.C. and PSEG Renewable Transmission LLC, executed April 11, 2024) (the "DEA"). The DEA requires PSEG to construct "an approximately 67-mile 500 kilovolt ('kV') alternating current ('AC') single circuit overhead transmission line," ECF No. 3 ¶ 6, to "extend from Allegheny Power System's ('APS's') existing Doubs Station, which is located in Frederick County, to an interconnection or demarcation point west of Baltimore Gas and Electric Company's ('BGE') Conastone Station in northern Baltimore County." *Id.* ¶ 7; *see also* ECF No. 3-1 at 19 (DEA's "Description of Projects").[2]

Part of PJM's agreement with PSEG includes a "Development Schedule." ECF No. 3-1 at 21. The schedule requires PSEG to meet several vital milestones. Several have already passed, including the deadlines for executing an interconnection coordination agreement (December 31, 2024), and for demonstrating adequate project financing (September 1, 2024). *Id.* PJM requires PSEG to have acquired "all necessary federal, state, county, and local site permits" by September 1, 2026. *Id.* And June 1, 2027 is the

---

[2] Citations to page numbers refer to the number appearing in the CM/ECF header for this and the other filings referenced herein, which may not align with a document's original page numbering.

"Required Project In-Service Date." *Id*. That means that by June 2027, PSEG "must . . . demonstrate," among other things, that the Project "is completed in accordance with the Scope of Work in Schedules B" of the DEA and that it "is under Transmission Provider operational dispatch." *Id*. In short, especially given the size of the project and the various regulatory approvals that PSEG must obtain, PSEG contends that time is of the essence.

### B.    Public Service Commission proceedings

To construct a high-voltage overhead transmission line in Maryland, one must first obtain a Certificate of Public Convenience and Necessity from the PSC. Md. Code Ann., Pub. Util. § 7-207(b)(1)(i). Without a CPCN, "a person may not begin construction . . . or exercise a right of condemnation with the construction." *Id*. § 7-207(b)(1)(i), (iii). PSEG, which is headquartered in Newark, New Jersey, ECF No. 3 ¶ 3, began the process for seeking issuance of a CPCN on December 31, 2024, when it filed an application with the PSC pursuant to Md. Code Ann., Pub. Util. ("PUA") § 7-207. *In re Application of PSEG Renewable Transmission LLC*, Case No. 9773 (Md. Pub. Serv. Comm'n 2024).[3]

As noted above, PJM has directed PSEG to construct a transmission line from Doubs Station in Frederick County and BGE's Conastone Station in northern Baltimore County. Part of the PSC's role as part of the larger regulatory review process is to decide whether a "need" for the project has been shown, and whether to approve the specific route that PSEG has proposed. PSEG's CPCN application included a proposed route for the project. PSEG states that its proposed route "was determined after several months of study and evaluation that included the consideration and analysis of multiple alternative

---

[3] The filings in the PSC proceeding are available at https://perma.cc/L29V-WSA4.

routes to determine the least impactful route based on environmental, social, land use, and engineering criteria." ECF No. 3 ¶ 17. The PSC's review is ongoing.

An application for a CPCN for a transmission line must include certain "environmental, natural resources, and socioeconomic information," COMAR 20.79.01.06(K), including a "summary of the environmental and socioeconomic effects of the construction and operation of the project, including a description of the unavoidable impacts and recommended mitigation," a "copy of all studies of the environmental impact of the proposed project prepared by the applicant," and a "statement of the ability to conform to the applicable environmental standards." COMAR 20.79.04.04(B)–(D). The General Assembly has assigned responsibility for determining whether those requirements are met—or whether licensing conditions are necessary to address any anticipated environmental and socioeconomic impacts—to the Power Plant Research Program, the PPRP, which is a division of the Maryland Department of Natural Resources. Md. Code Ann., Nat. Res. § 3-303; ECF No. 3 ¶ 19. In connection with a CPCN application, PPRP acts on behalf of not only the Maryland Department of Natural Resources but also the Maryland Departments of Environment, Agriculture, Commerce, Planning, and Transportation, as well as the Maryland Energy Administration. *See* Md. Code Ann., Nat. Res. § 3-303 *et seq*.; ECF No. 3 ¶ 19 n.3.

On January 10, 2025, the PSC directed PPRP to report, by March 26, 2025, as to whether PPRP considered PSEG's application to have satisfied those regulatory requirements. ECF No. 3-4 at 3. On March 26, PPRP sent its report to the PSC. ECF No. 3-5. PPRP reported that it lacked sufficient information to make the requisite determination with respect to two categories of information.

First, PPRP requested additional information under COMAR 20.79.04.03, which requires a "description of each alternative route considered for the transmission line," including an "estimate of the capital and annual operating cost of each alternative route" and a "statement of the reason why each alternative route was rejected." PPRP acknowledged that PSEG's application included a "detailed" Routing Study that "describes how PSEG chose its proposed route from the alternatives considered," "discusses how PSEG identified the alternative routes," and "provides summary tables of the metrics evaluated when considering environmental criteria, land use criteria, social criteria, engineering criteria, and cost for each of the ten alternative routes." ECF No. 3-5 at 3. But PPRP requested that PSEG further explain "why each of the alternative routes other than the proposed route . . . were rejected"; "how each of the evaluation criteria listed in Table 1 [of the Routing Study] impacted the decision to reject alternative routes"; how PSEG determined whether or when an alternative route would have required "special design" or "unreasonable costs"; why PSEG rejected two routes that had "the highest percentage of the length of the route paralleling 138kV or greater existing transmission line corridors"; and why existing lines could not be "used or rebuilt to accommodate the Project." *Id*. at 3–4. PPRP also requested clarification regarding certain terminology in the Routing Study. *Id*. at 4. That aspect of PPRP's March 26 request is not at issue in this case.

The second category as to which PPRP concluded that PSEG's application was "incomplete" was "in meeting the requirements of COMAR 20.79.04.04 (B) and (C)." ECF No. 3-5 at 5. Those sections require that a CPCN application include the following:

> B. A summary of the environmental and socioeconomic effects
> of the construction and operation of the project, including a

> description of the unavoidable impacts and recommended mitigation; [and]
>
> C. A copy of all studies of the environmental impact of the proposed project prepared by the applicant.

COMAR 20.79.04.04.

PPRP explained that PSEG's application "lacks a sufficient summary of the environmental and socioeconomic effects from the construction and operation of the Project, *including field studies*, which are necessary to meet the requirements of COMAR 20.79.04.04(B) and (C)." ECF No. 3-5 at 5 (emphasis added). PPRP described field studies as "imperative to verify and augment initial desktop information to confirm that the Project's effects are correctly documented, ensuring that all unavoidable impacts are accurately evaluated and that appropriate mitigation is proposed." *Id.* PPRP saw this as "especially important for this Project given its significant length and impacts to land uses, which will be necessary for its construction and operation." *Id.* "Without field-based information, PPRP cannot fully evaluate the Project's impacts to Maryland's socioeconomic and natural resources." *Id.*

PPRP went on to acknowledge that some property owners were denying "necessary access to conduct field studies," which is why PSEG had put "considerable effort into providing as much desktop-based environmental information as is currently available." *Id.* But PPRP reiterated that it saw no option other than to direct PSEG to obtain access to properties in order to conduct "field studies," specifically to provide sufficient information for PPRP to "determine whether the proposed location of the ROW and transmission line poles have been positioned such that they best avoid and/or mitigate environmental and socioeconomic impacts and comply with relevant laws." *Id.*

PPRP went on to identify "five types of field studies/surveys" that it considered to be "necessary" for it to make those determinations. *Id.* For example, PPRP explained that "the desktop studies provided in the Application are limited to the proposed 150-foot-wide ROW, instead of the 550-foot study corridor." *Id.* at 6. Thus, PPRP lacked sufficient information to decide whether environmental impact (such as on streams, wetlands, or forests) could be "less impactful" if the right-of-way or "pole placement" were slightly modified by "a shift of the ROW or pole placement of up to 275 feet on either side of the centerline of the current 150-foot wide ROW." *Id.* PPRP acknowledged and agreed that PSEG needed some "flexibility to adjust the centerline up to 275 feet on each side of the proposed centerline," but was not in a position to articulate the contours of such flexibility "until field-based studies are completed for the Proposed Route." *Id.*

PPRP directed PSEG to conduct some of the required studies or surveys on "all parcels within the Project ROW [Right of Way]," while others "are only necessary for parcels that meet specific requirements." *Id.* at 5. PPRP also expressed support for the CPCN process continuing while PSEG completes the supplemental studies. *Id.* at 7 ("While PPRP considers PSEG's CPCN Application to be administratively incomplete, PPRP is not opposed to scheduling a prehearing conference for the purpose of considering motions to intervene and to set a limited procedural schedule.").

### C.    PSEG's efforts to obtain property access to conduct the surveys

The Maryland General Assembly provides a statutory right of entry onto property—including over a property owner's objection—for any state instrumentality, or any other "body politic or corporate having the power of eminent domain," so long as that entity first makes "every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry." Md. Code Ann., Real Prop., § 12-111. That

right of entry is limited in scope. The statute authorizes only "[c]ivil engineers, land surveyors, real estate appraisers, and their assistants" to enter property, and only to conduct specified tasks, all of which are tied to questions related to the potential exercise of the power of eminent domain. *Id*. § 12-111(a). Specifically, such engineers, surveyors and appraisers may:

> (1) Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement;
>
> (2) Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and
>
> (3) Enter on any private land and perform any function necessary to appraise the property.

*Id*.

The statute also provides a procedure for if such persons are "refused permission" to conduct such surveys. The state, or other authorized entity, "may apply to a law court of the county where the property, or any part of it, is located for an order directing that the person be permitted to enter on and remain on the land to the extent necessary to carry out the purposes authorized by this section." *Id*. § 12-111(b). The statute also expressly provides that if a survey authorized by § 12-111 results in damage to land or personal property, the property owner "has a cause of action for damages against the civil engineer, surveyor, real estate appraiser, or assistant and against the State, its instrumentality, or the body politic or corporate on whose behalf the person inflicting the damage was acting." *Id*. § 12-111(c). The statute also makes it a crime to damage or remove markers laid during an authorized survey, and provides that any person "who

has knowledge of an order issued pursuant to subsection (b) and who obstructs any civil engineer, surveyor, real estate appraiser, or any of their assistants acting under the authority of the order may be punished as for contempt of court." *Id.* § 12-111(d), (e).

In light of the authority and procedures set forth in § 12-111, upon receipt of PPRP's March 26 letter, PSEG immediately set about making efforts to notify the owners and occupants of affected properties. PSEG has described its efforts, with respect to each of the Respondents named in this case, in 72 declarations executed by Roger Trudeau, who is a Corporate Real Estate Transactions Manager for PSEG (ECF Nos. 4 through 29 & ECF Nos. 31 through 73). PSEG incorporated those declarations by reference into its complaint. ECF No. 1 ¶ 264. In those declarations, Mr. Trudeau explains that PSEG hired Contract Land Staff (CLS) to "support the real estate efforts pertaining to the [Piedmont Project]," including "obtaining voluntary rights of temporary access to conduct field surveys." *E.g.*, ECF No. 4 ¶ 7. CLS keeps track of its contacts with property owners in a system called CLSLiNK. *Id.* The Trudeau declarations describe and attach CLSLiNK reports containing information about each of CLS's contacts with the pertinent Respondents.

The first declaration, which pertains to property owned by Robert and Alene Stickles in Manchester, Maryland, is representative of the other Trudeau declarations. On October 28, 2024, PSEG sent letters to Mr. and Ms. Stickles. ECF No. 4-2 at 8–11. The letter explained that PJM had "determined there is a need for significantly increased transmission capacity into Maryland and the surrounding region to ensure reliability," and that PJM had, among other projects, selected PSEG to "address these reliability concerns" by building the Piedmont Project transmission line. ECF No. 4-2 at 8, 10. The letter (the "Initial Letter") went on as follows (all bolding in original):

You are receiving this letter because public records indicate you own property along the proposed route for the 150-foot wide right of way proposed for this project. Please note that at this time, PSEG is not seeking to buy an easement from you, but PSEG would like to begin discussions with you regarding the process and timing of purchasing an easement. PSEG will purchase a permanent easement across a portion of your land for the approved route, only if approved by the Maryland Public Service Commission.

**PSEG will send a letter to you during the week of November 18 to introduce the land agent assigned to you. This agent will be your direct real estate contact throughout this project.**

In the interim, PSEG would like to provide you with additional information below.

**Right of Entry (ROE)**. This is the first step in the real estate acquisition process. PSEG will be seeking temporary access to your property to perform studies necessary to verify existing site conditions and to validate public data. The ROE is not an easement and is only temporary.

**Portion of Property.** The final right of way footprint is proposed to be about 150 feet wide. The property rights sought will be a permanent easement over **a portion** of the land, in other words, **you will continue to own your property while granting certain property rights to PSEG for a fee.**

**Farming.** The majority of the proposed route will be occupied by conductor lines (wires) above the property. The conductors will be connected to H-frame structures every 1,000 or so feet. Therefore, not all property will have H-frame structures. This design allows the project route **to be farming compatible in most circumstances**, e.g., farm crops **may** be planted right up to the foundations of the structures, vegetation up to a height of 25 feet and using equipment up to a height of 20 feet, **are permissible** activities under the lines.

13

**Compensation for Crop Yield Loss or Damage.** While most of the proposed route is designed to be farming compatible there may be instances of crop yield loss. In those instances, PSEG will compensate you for that crop yield loss. Also, if damage occurs to crops or other non-restorable property during construction, PSEG will reimburse the landowner for those damages.

**Property Valuation.** PSEG will pay you for the property rights sought. Following the property studies performed under the ROE, your land agent will provide details specific to your property concerning values and compensation for the portion of land that will be needed for the easement. A local appraiser will perform a market appraisal to determine fair market value for the property rights needed for the easement. The information used in the appraisal will be provided to you. Once provided, PSEG encourages you to review that information closely and discuss any specific issues you may have or unique circumstances related to your property that may impact value with your land agent.

For more information please visit the FAQ section of www.MPRP.com.

Once again, PSEG will send a letter to you during the week of November 18 to introduce the land agent assigned to you. The agent will be your direct real estate contact throughout this project and will be able to answer your specific questions.

**Please be advised that only a PSEG/Contract Land Staff-badged representative has the authority to discuss the project with you.**

PSEG will continue to stay engaged with you as this process moves forward. If you have any questions, please email us at PSEG-MPRP@pseg.com or call the MPRP project hotline at 1-833-451-MPRP (6777).

*Id.* at 8–9 & 10–11.

On November 18, 2024, PSEG sent follow-up letters (the "Follow-Up Letters"),

explaining that PSEG would be filing a CPCN application, and reiterating the request for

"temporary access to your property to evaluate its suitability for the project." *Id.* at 3, 6. It explained, "Please note that a temporary right of entry is not an easement and does not grant permanent property rights or construction rights, and does not obligate you to grant an easement. PSEG will purchase easements for the project route only if approved by the Maryland Public Service Commission." *Id.* (bolding omitted).

PSEG followed up with the Stickles residents again on December 5, by phone. PSEG's records summarize the call as follows:

> Agent Warren LaRiviere spoke with Alene Stickles. She and her husband are opposed to the project. I explained that the current alignment is from desktop only and PSEG needs to validate its proposed alignment with field studies including soil samples for any locations where the towers may be, as well as cultural surveys. I said that we can also make considerations for tower placement (a little latitude due to line slack) and line placement if the current proposed is not palatable. She said she would discuss with her husband but don't think they would be in agreement with PSEG coming on the property. I told her I would appreciate that and call back mid-week next week.

ECF No. 4-1 at 1. PSEG called again on December 20, at which point Ms. Stickles "said no to granting a [right of entry]." *Id.*

In addition to the Initial Letters and Follow-Up Letters, as to some of the Respondents PSEG also sent them letters entitled "Temporary Right of Entry Form." One example is Roy Francis Sanders. ECF No. 5-2 (Temporary Right of Entry Form dated Nov. 27, 2024). The letter to Mr. Sanders reads as follows (all bolding and underlining in original):

> Dear Roy Francis Sanders, et al.:
>
> PSEG Renewable Transmission LLC (**PSEG**) would like to evaluate your Property in connection with its upcoming

application to the Maryland Public Service Commission for a Certificate of Public Convenience and Necessity (**CPCN**) for the Maryland Piedmont Reliability Project (**MPRP**). This evaluation will require temporary access to your Property to conduct studies to determine whether the Property is suitable for the MPRP.

**This document <u>does</u> <u>NOT</u> grant an easement or construction rights and <u>does</u> <u>NOT</u> obligate Owner to grant an easement.**

1. **Monetary Consideration**. In consideration for this temporary right of entry, PSEG will pay Owner a one-time fee in the amount of **ONE THOUSAND DOLLARS** ($1,000.00). PSEG's agent, Contract Land Staff LLC, is authorized to provide check payment to Owner upon full execution.

2. **Temporary Right of Entry (ROE)**. Owner will allow PSEG, its employees, contractors, subcontractors, and agents, a temporary right of entry upon and across the Property for the purposes of conducting its preliminary analyses and site studies which may include but not be limited to: appraisals, property boundary and utility surveys, engineering studies, wetland delineation, environmental assessment/ investigation and geo-technical borings (**Preliminary Analysis**). PSEG will provide Owner or its designated representative with at least forty-eight (48) hours advance notice prior to initial entry on the Property by contacting _____ at **phone**: _____ or **email**:_____.

3. **Disturbance/Liability**. PSEG agrees, to the extent practicable, to conduct its Preliminary and activities pursuant to this ROE Owner harmless from any losses, claims, liabilities, damages, obligations, payments, costs and expenses arising directly as a result of the conduct of the activities permitted under this ROE.

4. **Duration/Term**. This temporary right of entry will begin upon full signing by all Parties and Maryland Public Service Commission or termination by PSEG.

> 5. **Permitting**. If necessary, PSEG, at its own cost and
> expense, shall obtain all permits and other approvals
> necessary for its Preliminary Analysis. Owner agrees to
> cooperate with PSEG to provide any needed owner consents,
> signatures or authorizations necessary for PSEG to submit
> applications for such permits PSEG will provide Owner with a
> copy of the application(s) filed.
>
> If acceptable, please countersign both copies of this
> document. Should you have any questions please feel free to
> contact **William Spradlin** at [contact information].

*Id.* at 4–5 (letter dated Nov. 27, 2024, signed by PSEG on Dec. 6, 2024).

The declarations reflect that PSEG made similar efforts with respect to each of the Respondents named in this case, as follows. In the "Letters" column, "I" refers to an Initial Letter, "F" refers to a Follow-Up Letter, and "TREF" refers to a Temporary Right of Entry Form.

| Property owner(s) | Letters | Other contact(s) | Refused entry? |
|---|---|---|---|
| Robert Stickles & Alene Stickles (ECF No. 4) | 10/28/24 (I), 11/18/24 (F) | 12/5/25, 12/20/24 | Yes |
| Roy Francis Sanders & Allan Patrick Sanders (ECF No. 5) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF), 12/3/24 (F), 1/9/25 (F) | 12/16/24, 1/3/25, 1/6/25, 1/8/25, 1/23/25, 2/27/25, 3/3/25 | Yes |
| Amy Gayle Youngblood (ECF No. 6) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF), 12/3/24 (F), 2/10/25 (F) | 12/10/24, 1/6/25, 1/16/25, 1/30/25, 2/3/25, 2/11/25, 2/14/25 | Yes |
| Andrew D. McLean & Rebecca McLean (ECF No. 7) | 10/28/24 (I), 11/18/24 (F) | 12/18/24, 12/31/24, 1/7/25, 1/8/25 | Yes |
| Ann F. Price-Davis & Michael A. Davis (ECF No. 8) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/16/24, 1/21/25, 1/24/25 | Yes |
| Arentz Family, LP (ECF No. 9) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/5/24 | Yes |

| Property owner(s) | Letters | Other contact(s) | Refused entry? |
|---|---|---|---|
| Marvin L. Kaltrider, Joyce E. Kaltrider, Austin L. Kaltrider, Marlin L. Kaltrider & Shawn L. Kaltrider (ECF No. 10) | 10/28/24 (I), 11/18/24 (F) | 12/20/24, 12/30/24, 12/31/24, 1/7/25, 1/13/25, 1/23/25 | Yes |
| Barclay G. Caras & Pamela J. Caras (ECF No. 11) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/12/24, 12/17/24, 1/7/25 | Yes |
| Barney's Farm, LLC (ECF No. 12) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/13/24, 1/8/25 | Yes |
| Benjamin Eugene Nusbaum & Kenneth Eugene Nusbaum (ECF No. 13) | 10/28/24 (I), 11/18/24 (F) | 12/19/24, 1/7/25, 1/17/25, 1/23/25, 1/27/25 | Yes |
| Betty Lou Miller & Carl E. Miller (ECF No. 14) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/17/24, 1/8/25, 1/14/25, 1/23/25 | Yes |
| Brandon Hill (ECF No. 15) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 11/22/24 | Yes |
| Bruce E. Doak & Gayle M. Doak (ECF No. 16) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF) | 12/16/24, 12/18/24, 12/19/24, 12/27/24 | Yes |
| Bryan N. Hendrix & Constance M. Hendrix (ECF No. 17) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 11/18/24, 12/10/24, 1/21/25 | Yes |
| C. William Knobloch, Jr. & Carol Knobloch Revocable Living Trust Agreement (ECF No. 18) | 10/28/24 (I), 11/18/24 (F) | 12/23/24, 12/27/24, 1/3/25 | Yes |
| Carmen Cockey & Christopher D. Cockey (ECF No. 19) | 10/28/24 (I), 11/18/24 (F) | 12/18/24 | Yes |
| Carol J. Fertitta & Joseph V. Fertitta, III (ECF No. 20) | 10/28/24 (I), 11/18/24 (F) | 12/20/24 | Yes |
| Catherine M. Gestido & Eduardo E. Gestido (ECF No. 21) | 10/28/24 (I), 11/18/24 (F) | 12/18/24 | Yes |
| Catherine V. Miller & Wayne D. Miller (ECF No. 22) | 10/28/24 (I), 11/18/24 (F) | 12/18/24, 12/30/24, 12/31/24, 1/2/25 | Yes |
| Charles Gary Atkinson, Stephen Gordon Atkinson, & Indranee Kuruppunayake (ECF No. 23) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF), 1/9/25 (F) | 12/16/24, 1/9/25, 1/23/25 | Yes |

| Property owner(s) | Letters | Other contact(s) | Refused entry? |
|---|---|---|---|
| Charles William Bond & Morgan Davis Bond (ECF No. 24) | 10/28/24 (I), 11/18/24 (F) | 12/10/24, 12/12/24 | Yes |
| Charlotte Ruth Bixler (ECF No. 25) | 10/28/24 (I), 11/18/24 (F) | 12/12/24, 12/16/24, 12/20/24, 12/27/24, 1/3/25, 1/9/25 | Yes |
| Cheryl Ann Geary & Paul Joseph Geary (ECF No. 26) | 10/28/24 (I), 11/18/24 (F) | 12/2/24 | Yes |
| Chris N. Resh, Dorothy L. Donmoyer, Petrice Marie Donmoyer-Resh, & Robert L. Donmoyer (ECF No. 27) | 10/28/24 (I), 11/18/24 (F) | 12/16/24 | Yes |
| Christine D. Eyring & John M. Eyring, Jr. (ECF No. 28) | 10/28/24 (I), 11/18/24 (F) | 12/6/24, 12/16/24 | Yes |
| Daniel George Schwartz (ECF No. 29) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/5/24, 12/12/24 | Yes |
| Deborah H. Maeder & John D. Maeder (ECF No. 31) | 10/28/24 (I), 11/18/24 (F) | 12/20/24, 12/23/24, 12/30/24, 1/7/25 | Yes |
| Dells Generation Farms, LLC (ECF No. 32) | 10/28/24 (I), 11/18/24 (F) | 12/5/24, 12/12/24 | Yes |
| James R. Cook & Diane M. Cook (ECF No. 33) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF), 1/29/25 (F) | 12/5/24, 12/16/24, 12/17/24, 12/20/24, 12/27/24, 1/3/25, 1/9/25, 1/23/25, 1/29/25, 1/31/25, 2/10/25, 2/12/25 | Yes |
| Erich Steiger & Rebecca Scollan (ECF No. 34) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/16/24, 1/7/25, 1/10/25 | Yes |
| Thomas B. Collins & Tracy W. Collins (ECF No. 35) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/20/24, 12/27/24 | Yes |
| Erik J. Lentz (ECF No. 36) | 10/28/24 (I), 11/18/24 (F) | 11/27/24 | Yes |
| Esther Johann Lentz-Buenger (ECF No. 37) | 10/28/24 (I), 11/18/24 (F) | 11/4/24, 11/25/24 | Yes |
| Richard M. Doster, Jr. (ECF No. 38) | 10/28/24 (I), 11/18/24 (F) | 12/17/24, 1/7/25 | Yes |
| Michael D. Hands, Jr. & Faith J. Weeks (ECF No. 39) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/5/24, 12/9/24, 12/16/24, 1/4/25, 1/15/25 | Yes |
| Fay Ann Miller & Kenneth E. Miller (ECF No. 40) | 10/28/24 (I), 11/18/24 (F) | 11/30/24, 12/9/24, 12/16/24 | Yes |

| Property owner(s) | Letters | Other contact(s) | Refused entry? |
|---|---|---|---|
| Phyllis A. Rehmeyer & Todd M. Rehmeyer (ECF No. 41) | 10/28/24 (I), 11/18/24 (F) | 12/16/24, 1/9/25, 1/14/25, 1/15/25, 1/17/25, 1/21/25 | Yes |
| Francis L. Dell & Marian V. Dell (ECF No. 42) | 10/28/24 (I), 11/18/24 (F) | 12/23/24 | Yes |
| Gary J. Brockmeyer & Nancy M. Brockmeyer (ECF No. 43) | 10/28/24 (I), 11/18/24 (F) | 12/20/24, 12/23/24 | Yes |
| Groves Mill, LLC (ECF No. 44) | 10/28/24 (I), 11/18/24 (F) | 12/5/24, 12/9/24, 12/12/24 | Yes |
| Helen L. Bull (ECF No. 45) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF), 1/29/25 (F) | 12/18/24, 12/30/24, 12/31/24, 1/7/25, 1/10/25, 1/23/25, 2/3/25, 2/5/25, 3/10/25 | Yes |
| Henry Whitaker & Karen A. Schleper (ECF No. 46) | 10/28/24 (I), 11/18/24 (F) | 12/18/24 | Yes |
| The Hoeckel Family Self-Settled Asset Protection Family Irrevocable Trust of September 28, 2023 (ECF No. 47) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/12/24, 1/9/25, 1/14/25 | Yes |
| Robert Keith Wilson & Pamela M. Wilson (ECF No. 48) | 10/28/24 (I), 11/18/24 (F) | 12/16/24, 12/30/24, 12/31/24, 1/7/25, 1/10/25 | Yes |
| HZ Properties, LLC (ECF No. 49) | 10/28/24 (I), 11/18/24 (F) | 12/13/24 | Yes |
| Nancy P. Macbride (ECF No. 50) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF), 2/25/25 (F) | 12/5/24, 2/19/25, 2/25/25 | Did Not Respond |
| James A. O'Donnell & Patricia J. O'Donnell (ECF No. 51) | 10/28/24 (I), 11/18/24 (F) | 12/12/24, 1/3/25, 1/9/25, 1/16/25, 1/28/25, 1/30/25 | Yes |
| Joseph L. Gover & Raina C. Gover (ECF No. 52) | 10/28/24 (I), 11/18/24 (F) | 12/20/24, 2/20/25 | Yes |
| Nancy Eileen Pierce (ECF No. 53) | 10/28/24 (I), 11/18/24 (F) | 12/20/24 | Yes |
| Judith A. Fiedler (ECF No. 54) | 10/28/24 (I), 11/18/24 (F) | 12/10/24, 1/6/25 | Yes |
| Morris L. Bohlayer & Sharon A. Bohlayer (ECF No. 55) | 10/28/24 (I), 11/18/24 (F) | 12/16/24, 1/10/25 | Yes |

| Property owner(s) | Letters | Other contact(s) | Refused entry? |
|---|---|---|---|
| Zhejun Fan & Julia Lu (ECF No. 56) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/5/24, 12/17/24 | Yes |
| Julius J. Pitrone (ECF No. 57) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/5/24 | Yes |
| Justin Wright (ECF No. 58) | 10/28/24 (I), 11/18/24 (F) | 12/20/24, 1/3/25, 1/7/25, 1/13/25, 1/14/25 | Yes |
| Matthew Lee Dell (ECF No. 59) | 10/28/24 (I), 11/18/24 (F) | 12/19/24, 12/23/24 | Yes |
| Matt Unkle & Tomi Unkle (ECF No. 60) | 10/28/24 (I), 11/18/24 (F) | | Yes |
| Keith Emerson Ensor & Marilyn Ann Ensor (ECF No. 61) | 10/28/24 (I), 11/18/24 (F), 11/27/24 (TREF), 2/17/25 (F) | 12/12/24, 1/6/25, 1/14/25, 1/27/25, 2/6/25, 2/18/25, 2/20/25 | Yes |
| Mabel E. Wilson Revocable Deed of Trust Dated March 25, 1998 (ECF No. 62) | 10/28/24 (I), 11/18/24 (F) | 12/20/24, 1/10/25, 1/14/25 | Yes |
| Kimberly A. Johnston (ECF No. 63) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/20/24 | Yes |
| Leslie Alfred White (ECF No. 64) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/11/24 | Yes |
| Lisa M. Ward & Zachary J. Ward (ECF No. 65) | 10/28/24 (I), 11/18/24 (F) | 12/19/24, 12/20/24 | Yes |
| Thomas S. Gresock & Linda S. Gresock (ECF No. 66) | 10/28/24 (I), 11/18/24 (F) | 12/10/24, 1/6/25, 1/14/25 | Yes |
| M & R, LLC (ECF No. 67) | 10/28/24 (I), 11/18/24 (F) | 12/16/24, 1/6/25, 1/17/25, 1/27/25, 1/30/25 | Yes |
| Panora Acres, Inc. (ECF No. 68) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/20/24 | Yes |
| Troyer Real Estate, LLC (ECF No. 69) | 10/28/24 (I), 11/18/24 (F) | 12/17/24 | Yes |
| Peter and John Radio Fellowship, Inc. (ECF No. 70) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/18/24, 1/2/25 | Yes |
| RBC Real Estate I, LLC (ECF No. 71) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/13/24, 1/8/25, 1/14/25, 2/4/25, 2/7/25 | Yes |
| Troyer Farms, LLC (ECF No. 72) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/17/24 | Yes |
| School of Living (ECF No. 73) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/18/24, 1/7/25 | Yes |

| Property owner(s) | Letters | Other contact(s) | Refused entry? |
|---|---|---|---|
| The Dug Hill Rod and Gun Club, Inc. (ECF No. 74) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/5/24, 12/9/24, 12/12/24, 12/17/24, 1/3/25, 1/9/25, 1/13/25 | Yes |
| Nancy E. Cramer (ECF No. 83) | 10/28/24 (I), 11/18/24 (F) | 12/20/24 | Yes |
| Mohamad A. Kourani & Nada E. Kourani (ECF No. 84) | 10/28/24 (I), 11/18/24 (F), 12/3/24 (F) | 12/6/24 | Yes |

### D.     This case

After Respondents refused (and in some instances repeatedly refused) to allow temporary access to their properties for PSEG to conduct the surveys required by PPRP, PSEG filed this case on April 15, 2025. Its complaint asserts a single cause of action, for injunctive relief pursuant to Md. Code Ann., Real Property ("RP") § 12-111.

PSEG accompanied its complaint with a motion for a preliminary injunction. ECF No. 75. PSEG contends that it is likely to prevail on the merits because it qualifies as a "body politic or corporate" that has the "power of eminent domain" within the meaning of § 12-111(a). *Id.* at 19–24. It contends it has taken "real and bona fide efforts" to notify Respondents, and that those efforts are more than sufficient because not only has it repeatedly notified each Respondent, but each Respondent has acknowledged receipt and, further, has affirmatively refused PSEG entry to conduct the required field studies. *Id.* at 24–25. It contends that it is likely to suffer irreparable harm without preliminary relief because, among other things, "it will not be able to timely complete the surveys and gather the information requested by PPRP," and thereby cause delay of the type that the U.S. Court of Appeals for the Fourth Circuit in similar cases has held qualifies as irreparable harm. *Id.* at 25–31. And it contends that the balance of equities weighs in

favor of preliminary relief, and that granting preliminary relief would be in the public interest. *Id.* at 31–32.

Most Respondents have engaged counsel, entered appearances, and filed motions to dismiss and briefs in opposition to PSEG's motion for a preliminary injunction. ECF No. 88 (brief in opposition to preliminary injunction by Peter and John Radio Fellowship, Inc.); ECF No. 89 (motion to dismiss by Arentz Family *et al.*); ECF No. 92 (brief in opposition to preliminary injunction by Arentz Family *et al.*); ECF No. 94 (brief in opposition to preliminary injunction by Dells Generation Farms, LLC *et al.*); ECF No. 95 (motion to dismiss and opposition to preliminary injunction by Brandon Hill *et al.*); ECF No. 101 (motion to dismiss by Peter and John Radio Fellowship, Inc.). The Arentz Family group has also filed a motion to defer consideration of PSEG's motion pending the Court's ruling on Respondents' motions to dismiss. ECF No. 93. Two additional Respondents subsequently filed a notice joining and adopting several of those motions. ECF No. 112.

PSEG, for its part, filed a response to the motions to dismiss, ECF No. 103, a reply in support of its motion for a preliminary injunction, ECF No. 105, and an opposition to the Arentz Family group's motion to defer consideration of the preliminary injunction motion, ECF No. 106. PSEG also filed a chart tracking which Respondents have appeared, moved to dismiss, etc. ECF No. 104.

The Court, having previously set a briefing schedule and scheduled a preliminary injunction hearing on May 19, 2025, ECF No. 108, held a status conference on May 8, 2025, regarding the scope and structure of the hearing. Respondents requested to postpone consideration of the motion on PSEG's motion for a preliminary injunction until after a ruling on Defendants' motion to dismiss and after a period of discovery. The

Court denied that request, and clarified that the hearing set for May 19 would be on all pending motions, but also granted leave for any party who wished to submit additional evidence or argument to do so in advance of the hearing.

In advance of the May 19 hearing, Respondents filed additional evidence, including FERC stipulations and agreements related to the continued operation of the Brandon Shores Power Plant and the H.A. Wagner Generating Station, ECF Nos. 125-1 & 125-2, declarations of two proffered experts, one related to certain incentives that FERC has granted to PSEG, ECF No. 125-3, and the other related to the likelihood that PSEG will meet its construction goals, ECF No. 125-4, and a declaration from counsel regarding discovery that Respondents would seek if PSEG's complaint is not dismissed, ECF No. 125-5.

## II.    RESPONDENTS' MOTIONS TO DISMISS

### A.    Legal Standard

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a complaint fails "to state a claim upon which relief can be granted," even assuming the truth of the alleged facts, the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6).

To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). As noted above, when considering such a

motion, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

Respondents argue PSEG's complaint does not state a claim on which relief can be granted. Not all Respondents assert all of the arguments addressed below; these are the arguments that one or more Respondent assert. For the following reasons, none of those reasons provides a basis for dismissal, and the motions to dismiss will be denied.

## B.    Section 12-111 authorizes surveys and studies of the type required by PPRP

PSEG has brought its claim under Maryland Code, Real Property, § 12-111, which, as explained above, authorizes any "body politic or corporate having the power of eminent domain" to "[e]nter on any private land" to, among other things, "make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement," so long as the agency or company has made "every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry." Md. Code Ann., Real Property, § 12-111(a). PSEG contends § 12-111 authorizes it to enter Respondents' properties to conduct the surveys required by PPRP. Respondents contend that although PSEG *seeks* an order from the PSC authorizing eminent domain for the construction of the new transmission line, PSEG does not *yet* "hav[e] the power

of eminent domain," and thus PSEG has not stated a claim on which relief can be granted under § 12-111.[4]

PSEG's construction of the statute is the only one consistent with the text, statutory and regulatory context, legislative history, and purpose of § 12-111. For the following reasons, PSEG is a "body . . . corporate having the power of eminent domain" within the meaning of the statute.

As always, the first and most important step in interpreting a statute is its text. *Scriber v. State*, 437 Md. 399, 410 (2014) (quoting *Stoddard v. State*, 395 Md. 653, 661 (2006)). Section 12-111(a) provides in full as follows:

> Civil engineers, land surveyors, real estate appraisers, and their assistants acting on behalf of the State or of any of its instrumentalities or any body politic or corporate having the power of emine nt domain after every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry may:
>
> > (1) Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement;
> >
> > (2) Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and
> >
> > (3) Enter on any private land and perform any function necessary to appraise the property.

---

[4] The Hill Respondents frame this argument as one of "standing"; it is not an Article III standing argument, but rather an argument that PSEG has not stated a claim on which relief can be granted because "[n]o power of eminent domain has been conveyed on PSEG by the PSC, nor has PSEG established that this is likely to happen." ECF No. 95-1 at 13.

RP § 12-111(a). Several aspects of the text strongly reveal that the General Assembly intended the statute to apply to circumstances like the one here.

First, the phrase "having the power of eminent domain" is expressly in the context of an agency or other entity seeking "*acquisition* or *future* public use of the property." *Id.* (emphases added). Under Respondents' proposed construction, only entities that have *already* been granted authorization to take property through eminent domain would be eligible to enter property to make surveys, etc. But that would render meaningless the reference to obtaining information for a future acquisition or future public use of the property. Just as with respect to federal statutes, under Maryland law the General Assembly is presumed to "intend[] its enactments to operate together as a consistent and harmonious body of law," and thus courts "seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Town of Upper Marlboro v. Prince George's Cnty. Council*, 480 Md. 167, 193 (2022) (citation omitted). The General Assembly clearly did not consider an entity to only be entitled to authority to enter property under § 12-111 if the property at issue has already been taken through eminent domain.

Second, the statute expressly authorizes "surveys" of property, not only for "acquisition or future public use of the property" but also "for any governmental report, undertaking, or improvement." RP § 12-111(a). The PPRP is a division of the Maryland Department of Natural Resources. In connection with a CPCN application, the PPRP acts on behalf of not only the Department of Natural Resources but also the Maryland Departments of Environment, Agriculture, Commerce, Planning, and Transportation, as well as the Maryland Energy Administration. *See* Md. Code Ann., Nat. Res. § 3-303 *et seq.*; ECF No. 3 ¶ 19 n.3. Here, PPRP, on behalf of those various agencies, has directed

that PSEG conduct field studies so that PPRP can itself conduct the evaluation that, in turn, is mandated by law. *See* Md. Code Ann., Nat. Res. § 3-306(b)(1) (requiring PPRP to "complete an independent environmental and socioeconomic project assessment report"); *id.* § 3-306(b)(2) (requiring PPRP to submit proposed licensing conditions within six months of an application's completion); COMAR 20.79.04.04(B) & (C) (quoted above, describing the portions of a CPCN application pertinent to PPRP's review). And PPRP itself has determined that the field studies at issue are "necessary" for PPRP to discharge those obligations. *See e.g.*, ECF No. 3-5 at 5 ("[T]he field-based studies listed below *are necessary* and have yet to be conducted for the proposed route and, thus, are not included in the Application.") (emphasis added).

Third, the field studies are to be conducted at the direction of, and in some senses on behalf of, state agencies. Respondents do not dispute that "the State" and its "instrumentalities" qualify as entities that have "the power of eminent domain." Respondents also do not dispute that PPRP is an instrumentality of the state. Here, PPRP is the entity that has directed that the studies at issue happen, and that they happen on Respondents' property. Thus, PSEG, in conducting the surveys and effectuating PPRP's directive, is at least in part acting "on behalf of the State or [one] of its instrumentalities." Respondents argue that PSEG does not qualify as an "agent" of PPRP, DNR, or any other State agency. ECF No. 89-1. PSEG may or may not be an "agent" under agency law principles, but that is beside the point for purposes of interpreting § 12-111. Here, PPRP is a government agency, and is the entity that has directed that PSEG conduct the studies that PPRP needs to determine whether the project complies with the statutory and regulatory requirements that are within PPRP's purview.

Fourth, the other sections of § 12-111 buttress the conclusion that PSEG qualifies as a "having the power of eminent domain" within the meaning of § 12-111(a). Subsection (b), for example, envisions the scenario—which has arisen here—that a civil engineer, surveyor or appraiser has been "refused permission to enter or remain" on property that has been proposed for the exercise of eminent domain. That section authorizes an order permitting the relevant persons "to enter on and remain on the land *to the extent necessary* to carry out the purposes authorized by this section" (emphasis added). Section 12-111 does not authorize the exercise of eminent domain itself—which is ordinarily a permanent or indefinite act—but rather the exercise of surveys and the like, for the purpose of determining *whether* eminent domain will be exercised. By authorizing entry "to the extent necessary" to, for example, "make surveys" or "obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement," subsection (b) further confirms that the General Assembly considered entities like PSEG to qualify as entities "having the power of eminent domain" within the meaning of subsection (a).

Several other considerations, beyond the four corners of the statute, also strongly support the conclusion that PSEG qualifies as an entity "having the power of eminent domain" within the meaning of § 12-111.

PSEG is an electric transmission line development company, and has already been authorized by PJM and FERC, at least preliminarily, to move forward with the project. Under the Federal Power Act, 16 U.S.C. § 791a *et seq*., Congress provided FERC with broad powers and authority to regulate "the transmission of electric energy in interstate commerce." 16 U.S.C. § 824(a). FERC, in turn, has charged PJM with planning and maintaining the electric transmission system for its region in accordance

29

with FERC-mandated reliability criteria and standards. *See* FERC Order No. 1000, 136 FERC ¶ 16,051. PJM, in turn, has selected PSEG to construct the transmission line, and has entered into the detailed Designated Entity Agreement with PSEG, ECF No. 3-1, that imposes an in-service deadline of June 1, 2027, *id.* at 21. And FERC has issued an order formally accepting the filing of the PJM-PSEG agreement (although such acceptance for filing does not "constitute approval" of the project). ECF No. 3-3.

Respondents argue, in essence, that until the PSC approves the CPCN application, PSEG cannot be the type of company that the General Assembly considered to be of the type "having the power of eminent domain." *See* ECF No. 95-1 at 13-14; ECF No. 92-1 at 13-16. The construction of new transmission lines frequently requires the exercise of eminent domain. The Court need not (and does not) decide whether PSEG would have qualified as "having the power of eminent domain" for § 12-111 at the very outset—before its selection by PJM, before FERC's acceptance of the Designated Entity Agreement, and before PPRP's directive to conduct field studies. Here, given PSEG's business, the nature of the Piedmont Project, and given its selection by PJM for this project and PPRP's asserted need for PSEG to conduct field studies, PSEG qualifies as a "having the power of eminent domain" within the meaning of § 12-111.

The provisions of other statutes further confirm this conclusion. Under Public Utility Article section 7-207, until a CPCN has been issued, a transmission line carrying a voltage exceeding 69,000 volts cannot begin to be constructed, and no property can be "acquire[d] by condemnation, in accordance with Title 12 of the Real Property Article." Md. Code Ann., Pub. Util. Art. 7-207(b)(3). Title 12 is the portion of the Real Property code that governs "Eminent Domain." Md. Code Ann., Real Prop. § 12-101 *et seq*. In other words, as a matter of law no eminent domain can be exercised until *after* a CPCN

has issued. Under Respondents' proposed statutory construction, a § 12-111 survey, in order to assess (as here) whether a CPCN should be issued, could not be conducted until after an entity could begin actual condemnation proceedings. That is clearly not what the General Assembly had in mind.

And in *Transource Maryland, LLC v. Scott et al.*, No. 12-C-18-000549 (Harford Cnty. Cir. Ct. June 24, 2018), the most analogous case any of the parties have identified, the Harford County Circuit Court (then-Judge, now-Justice Eaves) granted a petition by Transource Maryland, a subsidiary of a transmission line construction company, for an order authorizing entry under § 12-111. ECF No. 75-5 (memorandum opinion). The court there expressly analyzed whether a § 12-111 petition may be granted "before the Maryland Public Service Commission issues the Petitioner a Certificate of Public Convenience and Necessity." *Id*. at 4. It held that § 12-111 authorizes entry before issuance of a CPCN, and "[n]o other reading makes sense." *Id*. at 9.

Respondents' remaining arguments do not counsel otherwise.

First, Respondents argue that "'statutes of eminent domain are to be strictly construed.'" ECF No. 89-1 at 16 (quoting *Davis v. Bd. of Educ. of Anne Arundel Cnty*., 166 Md. 118 (1934)). But this case is not about whether the Piedmont Project should be approved and a CPCN be issued and eminent domain be exercised. This case is only about whether, under § 12-111, PSEG is entitled to conduct certain studies as directed by PPRP.

Second, Respondents argue that PSEG cannot qualify under § 12-111 because PSEG, and its land agent (CLS) were "not registered to do business in Maryland." ECF No. 89-1 at 14–15. But § 12-111 does not limit the pertinent corporate entities to those based in Maryland or registered to do business in Maryland.

31

Third, Respondents argue that even if PSEG has the power of eminent domain within the meaning of § 12-111, "a significant portion of the relief PSEG-RT is requesting is not available." ECF No. 89-1 at 20. That argument refers to a "Temporary Right of Entry Form" that PSEG provided to some property owners. That form, which is quoted above, included, in a section entitled "Temporary Right of Entry," that by signing the form the property owner "will allow PSEG . . . a temporary right of entry upon and across the Property for the purposes of conducting its preliminary analyses and site studies which may include but not be limited to . . . geo-technical borings." *E.g.*, ECF No. 5-2 at 4. But PSEG does not seek authority to conduct any such geotechnical surveys. The inclusion of that type of survey, in a draft form, as a potential type of study that "may" have been conducted—but that PSEG now disclaims—provides no basis for denying PSEG entry to which it is entitled under § 12-111.

For these reasons, PSEG qualifies as a corporate entity "having the power of eminent domain" within the meaning of the statute.

### C.    PSEG has alleged facts constituting the "bona fide effort[s] to notify" required by § 12-111

As explained above, an agency or company "having the power of eminent domain" does not automatically or immediately have the right to enter property to conduct the types of surveys and studies authorized by § 12-111. Before entering, such agency or company must make "every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry." Md. Code, Real Property, § 12-111(a). Respondents argue that PSEG has not alleged facts sufficient to state a claim that it has made "every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry." ECF No. 39-1 at 24–25; ECF No. 95-1 at 14–20.

32

As an initial matter, for purposes of a motion to dismiss, a court must accept a plaintiff's factual allegations as true, and here PSEG has alleged with specificity, through the Trudeau declarations—which PSEG incorporated by reference in its complaint—the notifications that PSEG has provided to each owner. *See* ECF No. 1 ¶ 264. Beyond that, the complaint and the documents incorporated therein reflect that "each Respondent has refused consent for the Company to enter their property." *Id.*

Nonetheless, Respondents argue that the written notices that PSEG issued were deficient because they "never identified PSEG-RT as the entity seeking entry onto private properties," an "omission" they describe as "even more significant given the fact that PSEG-RT was not registered to do business in Maryland at the time of these communications." ECF No. 89-1 at 24. This argument is contradicted by Respondents' next argument, where they acknowledge that the notices "stat[ed] that 'PSEG' wanted temporary access 'to perform studies;' (e.g., ECF 71-2 at 8) or 'to evaluate [the property's] suitability for the project.'" ECF No. 89-1 at 25. In any event, the notices, on their face, expressly gave notice to the property owners that (1) PSEG is the entity working to develop the Piedmont Project; (2) PJM had selected the Piedmont Project because of a need for increased transmission capacity; (3) PSEG is in the process of seeking approval from the PSC to build the project; (4) the recipients were receiving the letters because public records indicate that they own property along the proposed route for the 150-foot-wide right of way for the project; (5) PSEG was "seeking temporary access to [the] property to evaluate its suitability for the project"; and (6), of particular pertinence, that PSEG was seeking temporary access to the property "*to perform studies* necessary to verify existing site conditions and to validate public data." *See, e.g*., ECF No. 4-2 at 6–11 (emphasis added).

Respondents also argue that some of PSEG's notices were deficient because they "sought a right of entry to perform a number of different surveys or studies, including 'geo-technical borings,' which are not permitted under RP § 12-111(a)." ECF No. 29-1 at 25. For the subset of Respondents who received a Temporary Right of Entry Form, those forms did include language that referred to "geo-technical borings," as noted above. But in seeking relief in this case, as noted above, PSEG does *not* contend that it is authorized to conduct "geo-technical borings," has expressly disclaimed any intention of conducting any "geo-technical borings" (other than potentially some tests on small soil samples), and does not seek any order authorizing it to do so. The relevant question here is whether PSEG's writings gave Respondents notice of the type of studies that PSEG *does* intend to do—namely those the PPRP has required it to do. For the reasons explained above, the written notices clearly did so.

Finally, Respondents rely heavily on the requirement in § 12-111 that PSEG make "*every* real and bona fide effort to notify [Respondents] in writing with respect to the proposed entry." RP § 12-111(a) (emphasis added). The upshot of Respondents' argument seems to be that if there are more written notices that PSEG hypothetically could have sent to Respondents, then PSEG cannot have made "every" effort to notify Respondents. But that cannot be what the General Assembly meant in § 12-111(a). The plain language of § 12-111(a), particularly when § 12-111 is read as a whole, makes clear that when the state or another "body politic or corporate" has "the power of eminent domain" within the meaning of the statute, it may not begin to conduct surveys, set stakes or markers, or take the other steps authorized by § 12-111 until after it has given the property owners notice, in writing, about the proposed entry. The statute does not require an endless notification loop. Here, as to each Respondent, PSEG has issued

notice, in writing, to each Respondent, about the proposed entry. That is all that § 12-111 requires.

For these reasons, PSEG's complaint more than adequately alleges that it has made "every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry" as required by Maryland Code, Real Property, § 12-111(a).

### D.    Abstention is not warranted

Respondents argue that, regardless of whether PSEG is entitled to a right of entry under § 12-111, this Court should "decline to exercise jurisdiction" under the abstention doctrine originally set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943). ECF No. 89-1 at 26–31. "*Burford* permits abstention when federal adjudication would 'unduly intrude' upon 'complex state administrative processes' because either: (1) 'there are difficult questions of state law . . . whose importance transcends the result in the case then at bar'; or (2) federal review would disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361–63 (1989)).

Respondents argue that *Burford* abstention is warranted for five reasons. First, they argue that "the PSC is currently considering whether PSEG-RT's application is incomplete" but "in this action, PSEG-RT asks this Court to find that such information is required for its application, *and* that it will suffer irreparable harm if it cannot enter Respondents' properties to obtain it." ECF No. 89-1 at 26, 27. Second, Respondents argue that "if PSEG-RT's application is held to be complete, the PSC will determine whether to approve it, *i.e.,* whether the proposed transmission line is needed and in the public's interest," and in this case, as part of the preliminary injunction analysis, PSEG

"asks this Court to prematurely conclude that the proposed transmission line is in fact needed and in the public's interest." *Id.* at 28. Third, Respondents argue that "the PSC must determine the appropriate location and timing of the project" but here PSEG "asks this Court to find that it must enter Respondents' properties now, or it will suffer irreparable consequences." *Id.* at 28–29. Fourth, Respondents argue that "this case is akin to an eminent domain proceeding" and eminent domain is "a fundamentally local issue regulated by the state." *Id.* at 29 (citing cases). Fifth, Respondents argue that because the Federal Power Act expressly "extend[s] only to those matters which are not subject to regulation by the States," 16 U.S.C. § 824(a), and in Maryland the PSC has exclusive authority to regulate the construction and location of transmission lines in the state," Md. Code Ann., Pub. Util. § 2-113, the regulatory structure itself counsels in favor of abstention.

There is no question that the underlying disputes in this case are largely governed by state law and administered by state agencies. And the fact that PSEG's claim arises in the context of a proceeding that, if PSEG prevails, may result in the exercise of eminent domain, is another factor that arguably militates in favor of abstention. But "[a]bstention doctrines," including *Burford*, "constitute extraordinary and narrow exceptions to a federal court's duty to exercise the jurisdiction conferred on it." *Martin*, 499 F.3d at 363 (cleaned up). Under *Burford*, courts must "balance the state and federal interests to determine whether the importance of difficult state law questions or the state interest in uniform regulation *outweighs* the federal interest in adjudicating the case at bar," *id.*—a balance that "only rarely favors abstention." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996).

Respondents have not shown that this case rises to the type of "extraordinary and narrow" circumstances that justify *Burford* abstention. As for the first *Burford* category ("difficult questions of state law . . . whose importance transcends the result in the case then at bar"), this Court's interpretation of § 12-311 may very well inform subsequent cases. But that alone would not support abstention; cases in federal court routinely involve interpretations of state law.

Respondents also have not shown that this Court's adjudication of this case would "disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern." *See Martin*, 499 F.3d at 364. The PSC's regulatory review process, aided by the PPRP's expertise, is ongoing. This Court's adjudication of PSEG's complaint and request for an injunction would not "disrupt" any of those state agencies or their reviews or proceedings; if anything, this Court's prompt adjudication of the case will *aid* those state agencies in discharging their statutory and regulatory obligations.

At bottom, Respondents' request that this Court take the "extraordinary" step of abstaining in this case is based on their concern that doing so risks treading on matters of exclusive and sensitive state authority. Those concerns do not justify abstention because the issues before this Court are discrete and narrow. Deciding that PSEG has the "power of eminent domain" *for purposes of § 12-111* has no bearing on whether the PSC should *grant* PSEG's application for a CPCN, but rather solely on whether PSEG has a right under state law to move forward with the studies the PPRP has directed PSEG to conduct. Similarly, although one of the factors the Court considers in connection with PSEG's motion for a preliminary injunction (discussed below) is whether an injunction is in the "public interest," *Frazier v. Prince George's Cnty., Md.*, 86 F.4th 537, 543 (4th Cir. 2023), that remains a discrete analysis that is focused on

37

whether permitting PSEG to conduct the state-mandated studies is in the public interest, not whether construction of the Piedmont Project is in the public interest, which is for state authorities to decide, not this Court.

For these reasons, Respondents have not shown that the complaint should be dismissed on *Burford* grounds.

### E.    The complaint is not subject to dismissal on exhaustion grounds

Next, Respondents argue that PSEG has "failed to exhaust the PSC's special administrative remedies." ECF No. 89-1 at 31. By this, Respondents mean two things.

First, Respondents frame as an "exhaustion" issue the fact that the PSC "has not yet determined that PSEG-RT's application is incomplete and, therefore, has not yet decided whether PSEG-RT (or anyone else, for that matter) needs to enter Respondents' properties." *Id.* But that turns the § 12-111 process on its head. PPRP has concluded that the field studies it has directed are necessary for it to determine *whether* PSEG's application is administratively complete.

Second, Respondents try a different tack, contending that despite PPRP deeming PSEG's application *incomplete* due to the lack of field studies, the PSC and/or PPRP may deem PSEG's application "complete" even *without* field studies, and that will mean that, for § 12-111 purposes, an order granting access to Respondents' properties will not be "necessary to carry out the purposes authorized by [§ 12-111]." *Id.* But PSEG's allegations, and the current record, establish that PPRP's position is that field studies *are* necessary for the CPCN process to move forward.

38

**F.    Respondents have not shown that additional, non-named property owners must be joined under Rule 19**

Respondents next argue that one property owner along the proposed right-of-way who has not been named as a respondent, Ms. Congxin Xie, must be joined as a party, and because she—like PSEG—is a citizen of New Jersey, and thus her joinder would destroy diversity jurisdiction, requiring dismissal. ECF No. 89-1 at 32–37.

Federal Rule of Civil Procedure 19 provides certain rules for when a person who is not a party must be joined as a party. Rule 19(a) applies where the person "is subject to service of process" and where joinder of that person "will not deprive the court of subject-matter jurisdiction." Rule 19(b) applies where a person is "required to be joined if feasible" but that person "cannot be joined." Under Rule 19(b), "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The rule then lays out "factors for the court to consider" in deciding whether, in the absence of joinder, the case should be dismissed. *Id*. These factors "include":

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* Under Federal Rule of Civil Procedure 12(b)(7), Respondents bear the burden to "show that the person who was not joined is needed for a just adjudication." *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005).

Respondents' argument boils down to its assertion that because Ms. Xie owns a property that is "in the path of the [Piedmont Project] and is the proposed site for two H-frame transmission structures" and thus "is situated in a similar position to the Respondents named in this case," and because "any order in PSEG-RT's favor in this case necessarily increases the likelihood that it will gain access to [Ms. Xie's] Property in the future," ECF No. 89-1 at 35–36, "in equity and good conscience, the action . . . should be dismissed." Fed. R. Civ. P. 19(b).

These circumstances come nowhere close to justifying dismissal under Rules 19(b) or 12(b)(7). PSEG has expressly disclaimed any intention to seek an order in this case directed at any property owner who has not been named and served as a respondent in this case. An order authorizing PSEG to enter the named Respondents' properties would not prevent the Court from "accord[ing] complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). Disposing of the claims in this case also would not "impair or impede" Ms. Xie's "ability to protect [her] interest" within the meaning of Rule 19(a)(1)(B). In the event a subsequent proceeding was filed related to conducting studies on Ms. Xie's property, she could assert any defenses she believes she has; although a decision by this Court may be cited as "persuasive authority" in such a proceeding, ECF No. 89-1 at 35, Respondents cite no authority for the proposition that such potential effect would justify *dismissal* of this complaint under Rule 19(b).

### G.    Venue is proper in this Court

Finally, the Hill Respondents argue that PSEG "filed this case in the wrong court," and that § 12-111 confers jurisdiction exclusively on the state courts of Maryland. ECF No. 95-1 at 20–25. None of the other Respondents make this argument; the Arentz Family Respondents, for example, expressly disclaim any argument that this Court lacks subject matter jurisdiction. *See* ECF No. 89-1 at 29 n.12 (agreeing that § 12-111 "does not divest this Court of diversity jurisdiction . . . ."). And for good reason. Although a federal court sitting in diversity looks to state law to define the substantive rights of the parties, a state "cannot limit the subject matter jurisdiction of federal courts, even in diversity cases." *Wideman v. Innovative Fibers LLC*, 100 F.4th 490, 496–97 (4th Cir. 2024). Here, complete diversity of citizenship undisputedly exists between the parties, and thus this Court has subject matter jurisdiction over the case. There is also no basis for this Court to dismiss on *forum non conveniens* grounds, as the Hill Respondents argue in passing. ECF No. 95-1 at 22 (arguing, "this Court could dismiss the Petition by applying the doctrine of *forum non conveniens* . . . .").

*     *     *

For these reasons, all of Respondents' motions to dismiss (ECF Nos. 89, 95, 101) will be denied.

## III.    PSEG'S MOTION FOR A PRELIMINARY INJUNCTION

That leaves the question of whether PSEG is entitled to a preliminary injunction.

### A.    Legal standard

To obtain a preliminary injunction, a plaintiff must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an

injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543

(4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A

party seeking preliminary injunctive relief must satisfy all four factors. *Real Truth About*

*Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559

U.S. 1089 (2010). And a preliminary injunction, being an "extraordinary remedy," may

"only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

### B.    Likelihood of success on the merits

PSEG's complaint asserts a single cause of action: for injunctive relief pursuant to

§ 12-111. As discussed in detail above, so long as PSEG (1) qualifies as a "body politic or

corporate having the power of eminent domain" within the meaning of the statute, and

(2) makes "every real and bona fide effort to notify the owner or occupant in writing

with respect to the proposed entry," then it is entitled to "[e]nter on any private land" to,

among other things, "make surveys, run lines or levels, or obtain information relating to

the acquisition or future public use of the property or for any governmental report,

undertaking, or improvement." Md. Code Ann., Real Property, § 12-111(a).

The first element of the cause of action presents what is largely a question of law.

And for the reasons discussed above, PSEG qualifies as a "body . . . corporate having the

power of eminent domain" within the meaning of the statute.

The second element that PSEG must satisfy to have a right to enter Respondents'

properties to conduct the studies required by PPRP is whether its efforts to "notify"

Respondents' "in writing" with respect to the "proposed entry" are adequate. That is a

mixed question of fact and law, turning on (a) what steps PSEG has taken to give such

written notice, and (b) whether those steps are sufficient under the statute. As for the

factual question, Respondents do not seriously dispute that all of the letters set forth in the table above (§ I.C) were sent, and were received by Respondents. The Court need not decide whether PSEG has definitively established that it sent the written notices to Respondents; the question at this time is whether PSEG has shown a likelihood that it sent the written notices and that they satisfied the statutory requirements. PSEG has clearly made that showing.

The Court is sensitive to the fact that the relief PSEG is seeking in the form of a preliminary injunction is largely congruent with the final relief that PSEG seeks through its complaint as final relief. Accordingly, the Court has scrutinized the underlying evidence, including not only the written notices, but also the records of oral communications between PSEG and CLS representatives, on one hand, and Respondents, on the other. Respondents apparently dispute some of the precise oral communications that occurred, or whether they occurred. But PSEG obviously need not show that Respondents *agreed* to allow the surveys to be conducted; that dispute is what gave rise to this litigation. And as discussed above, although § 12-111 refers to "every real and bona fide effort" being required to "notify" a landowner, that does not mean PSEG must cycle through endless written notices; here, PSEG has issued at least two written notices to each Respondent. Indeed, with respect to every Respondent but one, the Respondents affirmatively refused PSEG's requests, thereby acknowledging receipt of the written notice. PSEG has readily shown a likelihood of success on the merits of its claim that it has complied with the notification required by § 12-111.

With respect to most of the other defenses Respondents have lodged—on venue, exhaustion, abstention, and joinder grounds—those arguments fail for the reasons discussed above.

Finally, Respondents argue that PSEG has not shown a likelihood of success on the merits because entering Respondents' land to conduct the studies PPRP has requested itself constitutes a taking, for which just compensation would have to be paid. The only case Respondents cite for this proposition is *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). There, the Supreme Court explained that "a physical appropriation is a taking whether it is permanent or temporary," and the "duration of an appropriation—just like the size of an appropriation . . . —bears only on the amount of compensation." *Id*. at 153. But as the *Cedar Point* Court itself explained, "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights," consistent with "traditional common law privileges to access private property," including "enter[ing] property in the event of public or private necessity." *Id*. at 160–61 (citing Restatement (Second) of Torts §§ 196, 197 (1964)). In other words, *entry* by a government agency or at government direction (or "invasion" in the language of *Cedar Point*) does not necessarily constitute an "appropriation."

While "the right to exclude is one of the essential sticks in the bundle of property rights," common law "has long recognized exceptions to the right." *Klemic v. Dominion Transmission, Inc.*, 138 F. Supp. 3d 673, 688 (W.D. Va. 2015). One such exception is the right of a public utility "to enter upon privately owned land for the purpose of making surveys preliminary to instituting a proceeding for taking by eminent domain." *Id*. (citing Restatement (Second) of Torts §§ 159, 191–211 (1964)). In *Cedar Point*, the intrusion at issue was held to constitute a taking because the government had "appropriated a right of access to the growers' property, allowing union organizers to traverse it at will for three hours a day, 120 days a year"—in other words, to conduct

44

disruptive activities on businesses' own properties, up to 360 hours per year, year after

year. *Id.* at 152. The right of entry that PSEG seeks here, and to which § 12-111 entitles it,

comes nowhere close to the frequent, extended physical presence at issue in *Cedar*

*Point*—especially because § 12-111 itself requires that if PSEG "damages or destroys any

land or personal property," it must pay the property owner to repair the damage. Md.

Code Ann., Real Prop., § 12-111(c).

For these reasons, PSEG has made a strong showing that it is likely to succeed on

the merits.

### C.    Irreparable harm

A party seeking a preliminary injunction must next "demonstrate a likelihood of

irreparable injury—not just a possibility—in order to obtain preliminary relief," in other

words "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S.

at 21. "To establish irreparable harm, the movant must make a 'clear showing' that it will

suffer harm that is 'neither remote nor speculative, but actual and imminent.'"

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes*

*Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough*

*Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Irreparable means the injury "cannot be

fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N*

*Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

PSEG argues it will suffer three types of irreparable harm absent a preliminary

injunction. They overlap, but are conceptually distinct. First, PSEG argues that if the

project is delayed, "it will not be able to timely complete the surveys and gather the

information requested by PPRP," thereby "prevent[ing] [PSEG's] CPCN application

from proceeding to a final resolution with enough time that [PSEG] may begin

constructions on the MPRP in January 2026," as required under the DEA. ECF No. 75-1 at 25. In other words, PSEG argues that delay in and of itself, even if unaccompanied by concrete costs or other harm, would satisfy the irreparable harm standard. Second, PSEG argues that not only will delay in conducting the PPRP-required surveys cause delays in the CPCN process and thereby delay completion of the project, but those delays themselves will cause irreparable monetary harm in the form of "anticipated financial losses attributable to a construction delay," that PSEG could not recover, through this litigation or otherwise. *Id*. at 29–30. Third, PSEG argues that it will suffer irreparable harm because Defendants "are preventing [PSEG] from freely exercising its statutory right to enter their properties," and "[w]here a plaintiff has lost or will lose a right that is codified and guaranteed by state, the loss of the right is not compensable in any future proceeding, and the plaintiff has no way of otherwise restoring the lost right, the plaintiff has shown irreparable harm." ECF No. 167 at 13.[5]

The Fourth Circuit has repeatedly held that where a large public infrastructure project would be delayed in the absence of a preliminary injunction, and where those delays would likely result in economic losses that would be unrecoverable in the litigation, such delay-related costs qualify as irreparable harm under the preliminary injunction legal framework. *Mountain Valley Pipeline,* 915 F.3d at 216–19; *East*

---

[5] PSEG also points to out-of-pocket expenses it has *already* incurred as another form of irreparable harm. Because the Court concludes below that PSEG has shown that it is likely to suffer irreparable harm going forward if a preliminary injunction is not issued, the Court need not and does not decide whether costs that PSEG has already incurred, and that it contends would not be recoverable or reimbursable, constitute irreparable injury that would further support a preliminary injunction. The Court focuses herein on *future* injuries that PSEG contends it would incur (and that it would not otherwise recover or be reimbursed for) if a preliminary injunction does not issue.

*Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 828–29 (4th Cir. 2004). In *Mountain Valley* and *Sage,* the projects were natural gas pipelines that FERC had approved; land was to be taken by eminent domain, but there remained disputes about what compensation would be paid. *Mountain Valley*, 915 F.3d at 209; *Sage*, 361 F.3d at 820. In those cases, the developers faced substantial out-of-pocket costs, and lost revenue, during any period of time in which they would be forced to delay construction of the pipelines. *Mountain Valley*, 915 F.3d at 217–18; *Sage*, 361 F.3d at 829–30. The Fourth Circuit held that those costs, and lost revenues, were irreparable harm that entitled those plaintiffs to preliminary injunctions permitting them to begin construction.

In some respects, as Respondents point out, *Mountain Valley* and *Sage* are distinguishable. First, the *Mountain Valley* and *Sage* plaintiffs had already been granted the right to take land by eminent domain, whereas here the PSC is in the process of deciding whether to grant that right (and is waiting to do so until PPRP weighs in). Second, unlike in *Mountain Valley* and *Sage*, at least some of the out-of-pocket costs that PSEG has incurred, or may incur, may be reimbursed by FERC under certain "incentives" that FERC has granted for the project. *See* ECF No. 125-3 (declaration of Scott Molony, former FERC Chief Accountant, attaching and describing an August 2024 FERC order granting PSEG certain "incentives," including the possibility of being reimbursed certain out-of-pocket costs); ECF No. 167 at 11–12 (PSEG's response to the Molony declaration).[6] In addition to arguing those distinctions from *Mountain Valley*

---

[6] The question of whether, or how, the FERC incentives inform the preliminary injunction analysis arose just before the preliminary injunction hearing, through Respondents' supplemental filing on May 15, 2025. ECF No. 125. The Court granted all parties the opportunity to submit supplemental briefs or evidence on that issue. The

and *Sage*, Respondents argue that "[e]conomic losses generally do not constitute irreparable harm," and "[e]ven if this were a rare case in which monetary damage alone could constitute irreparable injury, PSEG-RT is unlikely to suffer any economic losses under any circumstance." ECF No. 92-1 at 25 (citing *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)).

Notwithstanding these distinctions from *Mountain Valley* and *Sage*, PSEG has shown irreparable harm sufficient to justify issuance of a preliminary injunction, specifically in the form of lost revenues that PSEG would incur in the absence of an injunction (the second of the three categories listed above). "[W]hen economic losses would *not* be recoverable at the end of litigation . . . that is enough to take [a] case out of the ordinary presumption against treating economic losses as irreparable injury." *Mountain Valley*, 815 F.3d at 218. In *Mountain Valley* and *Sage*, the Fourth Circuit held that "prospective economic injuries flowing from a delay in pipeline construction" qualified as irreparable injury, justifying a preliminary injunction. *Id.*; *Sage*, 361 F.3d at 828–29. That component of the irreparable harm in those cases applies squarely here. Like in *Mountain Valley*, PSEG has asserted that it will incur prospective financial losses such as loss of revenue and carrying costs as a result of delaying or possibly missing the deadline to construct the Piedmont Project. *See* ECF No. 75-1 at 29–30 ("The Company will also suffer irreparable harm in the form of monetary harm if its construction of the MPRP is delayed.") (citing *Mountain Valley*, 915 F.3d at 217–19). If the project is delayed, PSEG is likely to lose any revenue it would otherwise have

---

parties did so on May 27 at 29, and June 2 and 5. ECF No. 167 (PSEG); ECF Nos. 247 & 253 (Arentz Respondents); ECF No. 248 (Hill Respondents); ECF No. 249 (Dell Respondents); ECF No. 250 (Peter and John Radio Fellowship).

received had PSEG been able to meet the June 1, 2027 in-service deadline. In short, PSEG has established that, in the absence of conducting these surveys, PSEG risks a level of delay that will almost certainly entail some prospective financial harms.

Because PSEG has shown that the project could be substantially delayed in the absence of an injunction, and that it likely will suffer substantial monetary harm from anticipated future financial losses (such as loss of revenue) as a result of the delay, PSEG has satisfied the irreparable harm element for a preliminary injunction.[7]

### D.    Balance of Equities

"In deciding whether to grant injunctive relief, the Court must weigh the balance of the equities and the relative harms to the parties." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 437 (D. Md. 2024) (citing *Scotts Co. v. United Inds. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002)). Respondents argue that the balance of equities tips in their favor because (1) "[i]ndefinite access to sensitive farmland could result in biosecurity breaches . . . [or] physical damage," (2) some Respondents may be interrupted in conducting other business on their properties, such as summer camps and retreat centers, and (3) Respondents may not receive compensation for PSEG's entries to conduct the studies. ECF No. 92-1 at 28-34.[8] PSEG contends that the order it

---

[7] As noted above, PSEG adds that it is likely to suffer *additional* irreparable harms, beyond the likely loss of revenue, in the absence of a preliminary injunction. Because PSEG has satisfied the irreparable harm element on the basis of future lost revenue alone, the Court need not and does not decide whether these additional asserted forms of future injury bolster PSEG's entitlement to a preliminary injunction.

[8] On the last point, although PSEG has offered compensation to property owners who agree to permit access, *see, e.g.*, ECF No. 5-2 at 4, PSEG's position is that no compensation is *required* because a limited entry to conduct the studies that PPRP has ordered do not constitute a taking.

seeks is for a "temporary, limited, non-invasive survey access right," and the harms that Defendants allege they will suffer would be a result of the construction of the transmission line itself (for which any affected property owners would receive just compensation), not the narrow right of entry to conduct studies that they seek to exercise here. ECF No. 105-1 at 8–9. PSEG further asserts that it only seeks the type of access permitted under § 12-111; it is not seeking authorization to conduct invasive geotechnical surveys. *Id.* at 10 n.7.

As discussed above, PSEG has made a strong showing that it is likely to succeed on the merits, and PSEG has also shown that it will suffer prospective financial losses that constitute irreparable harm if the preliminary injunction is not granted. On balance, given that (1) the studies PSEG seeks to conduct would be minimally invasive, (2) PSEG only seeks a temporary right of entry (not permanent), and (3) Respondents may file a cause of action for damages in the event that any land or personal property is damaged or destroyed as a result of the surveys, the balance of equities tips in PSEG's favor.

### E.    Public Interest

Finally, PSEG contends that preliminary relief is in the public interest because "[i]f the MPRP is not timely constructed and placed into operation, the reliability of an electric grid that serves millions of residential and commercial electricity consumers will be put at risk." ECF No. 75-1 at 32. Respondents , on the other hand, contend that granting preliminary relief "would subvert the ongoing CPCN administrative process," and "shift financial risks onto the public inappropriately." ECF No. 88 at 41. Respondents further cite to "the public opposition to the MPRP" as "underscor[ing] where the public interest truly lies." *Id.*

As the Fourth Circuit held in *Mountain Valley* and *Sage*, advancing projects like this one is generally in the public interest. *Mountain Valley*, 915 F.3d at 221–222; *Sage*, 361 F.3d at 830. In *Sage*, the Fourth Circuit found that, independent of FERC's approval, the construction of the interstate gas pipeline at issue there not only "serves the public interest because, among other things, it will bring natural gas to portions of southwest Virginia for the first time," but also "[o]n a larger scale, the pipeline will make gas available for electric power generation plants, [and a] delay in construction would postpone these benefits." *Sage*, 361 F.3d at 830. *Mountain Valley* echoed this conclusion and clarified that it is "not to say . . . that a FERC certificate necessarily will be dispositive of the public interest inquiry under *Winter*." *Mountain Valley*, 915 F.3d at 222. The relief PSEG seeks here is narrow and temporary. And most importantly, the PPRP, which is an arm of the Maryland Department of Natural Resources, and which the General Assembly has tasked with assessing environmental and socioeconomic effects of projects like this one, *see* Md. Code Ann., Nat. Res. § 3-303, has determined that conducting the studies at issue here is necessary for it to discharge its statutory duties. The Court sees no reason to second-guess the PPRP's determination that conducting these studies would be in the public interest. In short, PSEG has shown that issuance of a preliminary injunction is in the public interest.[9]

---

[9] The Court need not, and does not, opine on whether construction of a transmission line, and specifically on the route proposed by PSEG, would be in the public interest. That is a determination for the PSC to make; it is not an issue presented by PSEG's petition in this case.

## IV.    CONCLUSION

For these reasons, PSEG has stated a cognizable claim under Maryland Code, Real Property § 12-111, for entry onto Respondents' properties to conduct the studies set forth in the PPRP's March 26, 2025 letter (ECF No. 3-5), and Respondents have not identified any valid basis for dismissal of the complaint. Accordingly, Respondents' motions to dismiss (ECF Nos. 89, 95 & 101) will be denied. And because PSEG has shown a likelihood of success on the merits and irreparable harm, and because the balance of equities and public interest support issuance of a preliminary injunction, PSEG's motion for a preliminary injunction (ECF No. 75) will be granted. A separate order and preliminary injunction follow.

Date:  June 20, 2025                    _____/s/_____
                                        Adam B. Abelson
                                        United States District Judge

52