IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| PSEG RENEWABLE TRANSMISSION LLC<br><br>*Petitioner,*<br><br>v.<br><br>**ARENTZ FAMILY, LP,** *et al.*<br><br>*Respondents*. | **Case No.** 1:25-cv-01235-ABA |

**OPPOSITION TO MOTION TO CLARIFY
THE AMENDED PRELIMINARY INJUNCTION TO
PROHIBIT HUNTING ON NOTICED SURVEY DAYS**

Respectfully submitted,

*/s/ Harris W. Eisenstein*
Harris W. Eisenstein (Fed. Bar No. 29694)
David M. Wyand (Fed. Bar No. 23413)
Lauren M. McLarney (Fed. Bar No. 20982)
Rosenberg Martin Greenberg, LLP
25 S. Charles Street 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Fax: (410) 727-1115
heisenstein@rosenbergmartin.com
dwyand@rosenbergmatin.com
lmclarney@rosenbergmartin.com

*Attorneys for Respondents*

i

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................5

    I.    Hunting in Maryland is Safe and Essential to Wildlife Management ........................5

    II.   PSEG's Requested Relief Would Violate Respondents' Legal and Constitutional Rights ...................................................................................................7

    III.  The Motion Seeks an Expansion of the Amended Preliminary Injunction to Include Additional Injunctive Relief .........................................................................11

CONCLUSION.....................................................................................................................16

Respondents, Arentz Family, LP, Barney's Farm, LLC, Charles William Bond, Morgan Davis Bond, Charlotte Ruth Bixler, Morris L. Bohlayer, Sharon A. Bohlayer, Gary J. Brockmeyer, Nancy M. Brockmeyer, Esther Johann Lentz-Buenger, Helen L. Bull, Chistopher D. Cockey, Carmen Cockey, Thomas B. Collins, Tracey W. Collins, Diane M. Cook, James R. Cook, Robert L. Donmoyer, Dorothy I. Donmoyer, Petrice Marie Donmoyer-Resh, Richard M. Doster, The Dug Hill Rod & Gun Club, Keith Emerson Ensor, Kevin Lee Ensor, Zhejun Fan, Joseph L. Gover, Raina C. Gover, HZ Properties, LLC, Bryan Hendrix, Connie Hendrix, Kimberly A. Johnston, Mohamad A. Kourani, Nada E. Kourani, Julia Lu, M & R, LLC, John D. Meader, Deborah H. Maeder, Nancy P. MacBride, Andrew D. McLean, Rebecca McLean, Carl E. Miller, Betty Lou Miller (Deceased), Catherine V. Miller, Kenneth E. Miller, Fay Ann Miller, Wayne D. Miller, Benjamin Eugene Nusbaum, Kenneth Eugene Nusbaum, Chris N. Resh, Rebecca Irene Scollan, Robert H. Stickles, Sr., Alene R. Stickles, Erich Charles Steiger, Troyer Farms, LLC, Troyer Real Estate, LLC, Matt Unkle, Tomi Unkle, Leslie Alfred White, Justin Wright, and Amy Gayle Youngblood (collectively, "Respondents"),[1] by and through their undersigned counsel, hereby oppose the Motion to Clarify the Amended Preliminary Injunction and to Prohibit Hunting on Noticed Survey Days (the "Motion") (ECF 302) filed by PSEG Renewable Transmission LLC ("PSEG").

## INTRODUCTION

What PSEG mischaracterizes as a clarification of the Amended Preliminary Injunction (ECF 268) would actually be a significant expansion of the injunction to impose restrictions that are plainly not available under Md. Code Ann., Real Prop. ("RP") § 12-111, and for which PSEG

---

[1] For ease of reference, the term "Respondents" refers to the 60 landowners represented by undersigned counsel as well as the other landowners sued in this action.

1

made no effort to meet the preliminary injunction standards under *Winter v. Natural Resources Defense Counsel, Inc.*, 555 U.S. 7, 22 (2008). PSEG asks the Court to prohibit all forms of lawful hunting on Respondents' private properties for any day on which PSEG has given notice that it *may* access property to conduct field surveys (the "Survey Work"). According to PSEG, "engaging in, or permitting, hunting while surveyors are on a property would be a violation of the Court's injunction" due to safety concerns PSEG believes are "self-evident." ECF 302 at 4-5. On this basis, PSEG asserts it is appropriate to notify Respondents that it *might* enter their properties "during a two- or three-week window," and no hunting can occur on Respondents' land during that entire window without PSEG's unilateral approval. *Id.* at 5.

This sweeping request is based on the thinnest of evidence – a Facebook post and a call to PSEG to coordinate survey activities with lawful hunting activities on the land. Despite many hundreds of landowners being impacted by PSEG's activities, PSEG cites these two statements as a basis to restrict hunting on every property along the proposed MPRP route during extensive periods of time. And these two statements, presented to the Court as requiring urgent attention, occurred a month or more before PSEG filed its expedited Motion. *See* Shilkoski Declaration, ¶ 8, ECF 302-1 at 2 (noting that Victoria Issac's voicemail was left on September 9, 2025 – a month and a half before the Motion was filed); *id.* ¶ 9 (noting that Michael Davis' Facebook post was dated September 25, 2025 – a month before the Motion was filed).[2]

As a threshold matter, Respondents have no objection to protocols which keep everyone safe. As detailed below, hunting is a safe activity, already subject to reasonable regulation by the State of Maryland. Undersigned counsel have consistently advised the Respondents they represent

---

[2] Undersigned counsel does not represent Michael Davis ("Mr. Davis"). However, as reported by *The Frederick News Post,* he later posted the following in the same Facebook thread: "I made that statement about surveying at your own risk to mean just that. I have no control of people being on my or neighboring properties at time as they have permission to hunt. ... Seriously, so many people have taken this totally out of context." *See* Exhibit 1.

2

in this action that violence or threats of violence towards PSEG and its agents will not be tolerated. Undersigned counsel have also directed their clients to comply with every order entered by this Court and not interfere with PSEG's access to their properties pursuant to the Amended Preliminary Injunction.

The foregoing notwithstanding, the Motion is emblematic of PSEG's view that this Court granted blanket authority for PSEG to do what it wants, when it wants, without regard for Respondents' basic right to freely use and enjoy their land. Indeed, PSEG asserts in its Motion to Shorten Time for Responding to the Motion that allowing Respondents only 3 business days[3] to respond is appropriate because the Motion "is not complex." ECF 303 at 2. This position demonstrates that PSEG lacks a fundamental understanding of the practical and legal implications of its requested relief.

PSEG seeks to expand the Amended Preliminary Injunction, which currently only grants access to conduct surveys, to impose blanket restrictions on Respondents' lawful use of their land. Such an order would provide a completely different type of injunctive relief and would also constitute a temporary taking of Respondents' properties. *See Elvaton Towne Condo. Regime II, Inc. v. Rose*, 453 Md. 684, 705, 162 A.3d 1027, 1040 (2017) (holding that restricting a condominium unit owner's access to communally held property constitutes a temporary taking because it is a significant infringement of the owner's property rights).

Far from the reckless criminal conduct that PSEG portrays, hunting is a lawful, safe and well-regulated activity in Maryland. Hunting is essential to the preservation of sensitive

---

[3] Given the expedited timeline for responding to this Motion pursuant to this Court's Order (ECF 304) granting PSEG's Motion to Shorten Time to Respond to the Motion (ECF 303) and subsequent Order granting Respondents 2 additional days to respond (ECF 306), the declarations submitted as exhibits to this Opposition are a representative sampling of the positions of many more individual Respondents.

3

ecosystems in Maryland and beyond. It is also a source of profit, food, and pleasure for many Respondents in this and other lawsuits filed by PSEG.

PSEG's proposal is untenable. Respondents cannot be required to "request permission" to hunt *on their own properties* "within the two-to-three-week window" selected by PSEG, then wait "two business days" for PSEG to authorize or reject lawful hunting. ECF 302 at 5. Nor can PSEG have sole and absolute discretion to prohibit hunting on private land for any reason or no reason at all. If granted, the Motion would give PSEG more than access rights; PSEG would have effective control over Respondents' properties. This would not only violate Respondents' constitutionally guaranteed property rights, it would also cause cascading harms both to the thriving—and overwhelmingly safe—hunting environment enjoyed by many Respondents and to the larger Maryland ecosystem which relies on hunting as a means of species and land management.

PSEG's expanded injunctive relief is also well beyond anything authorized by RP § 12-111, which allows pre-condemnation access but does not permit a court to impose use restrictions on private property. RP § 12-111(e) provides the appropriate remedy if access is obstructed, authorizing a court to enforce its orders using contempt procedures if someone knowingly "obstructs" the ordered survey activity. PSEG's Motion, however, does not invoke the remedy that is expressly provided under the statute. PSEG instead seeks a blanket restriction of lawful activity without evidence and without any showing that the relief is available or warranted under the law.

PSEG controls the methods and means of its Survey Work. It is only reasonable for PSEG to tell Respondents exactly when and where surveyors will enter their private properties and to do so in a manner that is respectful of Respondents' on-site activities. Permitting PSEG to provide notice that access *may* occur over a multi-week period and barring private landowners from freely

4

using and enjoying their property during that entire period would unreasonably expand the already-broad Amended Preliminary Injunction. The Motion should be denied.

## ARGUMENT

### I.  Hunting in Maryland is Safe and Essential to Wildlife Management.

Hunting is not inherently dangerous. It is a lawful activity that is closely and safely regulated under Maryland law. The Maryland General Assembly has recognized that "hunting is a valued part of the State's cultural and social heritage that provides unique recreational benefits to residents" and "plays an important part in the State's economy" by contributing to tax revenues, employment, and supporting the "conservation, preservation, and management of the State wildlife, natural areas, and related resources." Md. Code Ann., Natural Resources ("NR") § 10-102(a). Thus, the General Assembly has affirmatively granted Maryland residents a "right to hunt" subject to enacted regulations and restrictions. *Id.* at § 10-102(b).

Existing Maryland law already ensures that hunting is a safe activity, even on public lands, which are peacefully shared with non-hunters every year. Indeed, hunters are some of the most responsible firearms owners. *See* ¶18, Declaration of Carmen Cockey ("Cockey Decl."), attached hereto as Exhibit 2. Contrary to PSEG's contention that hunting is inherently dangerous, the 2024 Maryland Hunting Accident Report[4] demonstrates that the incidence of hunting accidents in Maryland is extremely low, with zero fatal injuries and only 5 non-fatal 2-party injuries[5] reported in 2024. All of the reported victims were hunters; there were zero reported injuries to non-hunters. *See* Accident Report.

---

[4] *See* Maryland Hunting Accident Report FY24, *Maryland Department of Natural Resources,* https://dnr.maryland.gov/nrp/Documents/2024-Maryland-Hunting-Accident-Report.pdf ("Accident Report").

[5] The Accident Report, n. 4, *supra*, also indicates that most injuries were self-inflected, and that only 1 out of the 5 victims of 2-party injuries reported in 2024 was wearing hunter orange, which promotes hunter safety. *See* Fluorescent Orange and/or Pink Clothing Requirements & Exceptions, *Maryland Department of Natural Resources,* available at: https://dnr.maryland.gov/wildlife/pages/hunt_trap/fo_requirements.aspx (last visited Oct. 31, 2025).

Citing NR § 10-410(g), PSEG argues that "Maryland laws governing hunting recognize the dangers associated with hunting near human beings who are not otherwise aware that such hunting is occurring." ECF 302 at 4. But NR §10-410(g) says no such thing. It merely requires a person "other than the owner or occupant" to create a "safety zone" around a residence or similar building during lawful hunting.[6] Contrary to NR §10-410(g), PSEG asks this Court to enjoin the "owner or occupant" from using their own land to conduct lawful activities.

Hunting is more than the act of firing at wild game for profit, sustenance, or sport. It is also a valuable wildlife management tool used by both state and federal agencies to reduce "conflicts between people and wildlife" and provide "incentives for the conservation of wildlife, habitats, and ecosystems…" NR §10-212 (5); *see also* 50 C.F.R. §§ 31.2, 32.1, and 32.39. Accordingly, in addition to establishing hunting as a legal right in Maryland, the General Assembly has found that "[h]unting is an environmentally acceptable activity that occurs and can be provided for on State public lands without adverse effects on other uses of the lands." NR § 10-212 (6).

Most of the property affected by the proposed route of the MPRP is Maryland farmland. The Maryland Grain Producers Utilization Board has found that, other than lack of rain, there is no greater threat to crop production in central Maryland than deer. *See* Baile Decl. ¶ 10-11. Farmer-Respondents depend on hunting to reduce the overabundant deer population and protect their crops from being eaten. *See* Declaration of Melvin E. Baile, Jr. ("Baile Decl.",) attached hereto as <u>Exhibit 3</u>; Declaration of Nancy Gardetto ("Gardetto Decl."), attached hereto as <u>Exhibit 4</u>; Declaration of

---

[6] NR §10-410(g)(1) provides: "Except as provided in paragraphs (2) and (3) of this subsection, a person, other than the owner or occupant, while hunting for any wild bird or mammal may not shoot or discharge any firearm or other deadly weapon within 150 yards, known as the 'safety zone', of a dwelling house, residence, church, or other building or camp occupied by human beings, or shoot at any wild bird or mammal while it is within this area, without the specific advance permission of the owner or occupant." Subsection (2) bars hunting "within 300 yards of a public or nonpublic school during school hours or at a time when a school–approved activity is taking place." Subsection (3) provides expanded "safety zone" requirements for archery hunters.

6

Amanda Green ("Green Decl."), attached hereto as Exhibit 5; Declaration of Debbra Hattery ("Hattery Decl."), attached hereto as Exhibit 6; Declaration of David N. Klein, Jr. ("Klein Decl."), attached hereto as Exhibit 7. Loss of income from crop damage is a significant problem for farmer-Respondents, especially considering that a herd of deer can devastate an entire corn or soybean field in a season. *See* Hattery Decl. at ¶¶ 9-12; Baile Decl. ¶¶ 10-11, 13, 16; Gardetto Decl. ¶¶ 12-13; Klein Decl. ¶ 8; Green Decl. ¶ 7. Last year, Maryland hunters harvested 84,201 deer during the combined archery, firearms, and muzzleloader seasons, representing more than a 15% increase from the prior year, and a 10% increase over the five-year average.[7] Removing weeks of opportunities for wildlife management during peak hunting season will have devastating consequences in rural Maryland and beyond. *See* Cockey Decl. at ¶¶ 8-12, 17; Baile Decl. ¶¶ 10-11, 13, 16; Hattery Decl. ¶¶ 9-12.

## II.   PSEG's Requested Relief Would Violate Respondents' Legal and Constitutional Rights.

The Fifth Amendment concerns the rights to use and enjoy private property, which are inherent in the bundle of rights that accompany property ownership. *See United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945), *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) ("the protection of private property is indispensable to the promotion of individual freedom"); *Painter v. Town of Forest Acres*, 97 S.E.2d 71, 73 (S.C. 1957) ("Property consists not merely in its ownership and possession but an unrestricted right of use, enjoyment, and disposal. Anything which destroys one or more of these elements to that extent, destroys the property itself. It must be conceded that the substantial value of property lies in its use.").

---

[7] *See* Maryland Hunters Harvest 84,201 Deer for 2024-2025 Season, *Maryland Department of Natural Resources* (Feb. 14, 2025), available at: https://news.maryland.gov/dnr/2025/02/14/maryland-hunters-harvest-84201-deer-for-2024-2025-season/ (last visited Oct. 31, 2025).

Notwithstanding the pending interlocutory appeal, Respondents understand they must cooperate with the Amended Preliminary Injunction and all orders issued by this Court, that any efforts to protect their property rights must be confined to lawful methods, and that violence in any form is intolerable. Indeed, Respondents agree that safety is paramount. But PSEG's proposed solution to the safety concerns raised in its Motion—to notify Respondents that surveyors might enter their properties "during a two- or three-week window" and Respondents may "request permission to hunt" *on their own properties* during said window by "sending an email" to PSEG, to which PSEG must respond "within two business days" (ECF 302 at 5)—is an intolerable imposition upon Respondents' constitutional rights under the Second, Fifth, and Fourteenth Amendments.

PSEG's proposed solution is backwards. It vests PSEG with sole and absolute discretion to permit or prohibit lawful acts on Respondents' private land and unreasonably expands PSEG's existing temporary access rights under the Amended Preliminary Injunction. PSEG admits that its proposal "may impact hunting periods established by law." ECF 302 at 5. But the true impact does not allow room for equivocation. PSEG's proposed solution tramples Respondents constitutional rights and also threatens Respondents' right to hunt in the first place, given that many Maryland hunting seasons last for three weeks or less.[8] *See* ¶ 6, Declaration of William Conger ("Conger Decl."), attached hereto as Exhibit 8; ¶¶ 10-11, Declaration of Richard Shawver ("Shawver Decl."), attached hereto as Exhibit 9; Baile Decl. at ¶¶ 13-16. For example, muzzleloader hunting for antlerless white-tailed deer in Region B[9] is only permitted on the following days: October 16-

---

[8] *See* Maryland Hunting Seasons Calendar for 2025-2026, *Maryland Department of Natural Resources*, https://dnr.maryland.gov/huntersguide/Documents/Hunting_Seasons_Calendar.pdf ("Calendar") (last visited Oct. 31, 2025).

[9] Respondents' properties are in Deer Management Region B. COMAR 08.03.03.06(A)(2)(b).

18, 2025; October 20-25, 2025; and December 20, 2025-January 3, 2026. *See* Calendar at 1. This split season consists of approximately 3 weeks total. Similarly, the general firearms season for antlerless white-tailed deer runs from November 29-December 13, 2025, and January 9-11, 2026. *See id.* As another example, the fall season for wild turkey spans nine days, from November 1-9, 2025. *Id.* Only two additional days are provided for hunting wild turkey in the winter, on January 22-24, 2026. *Id.* The Calendar provides numerous other examples of short hunting seasons in Maryland.[10] Thus, a two- or three-week prohibition on hunting could easily cause Respondents to miss an entire hunting season. Even more alarming is the fact that PSEG has posted multiple and overlapping notices on some Respondents' properties, providing for access for six weeks or more even though the Survey Work typically only takes a couple of days. *See* Cockey Decl. at ¶¶ 13-16; Gardetto Decl. ¶¶ 8-9. These notices are unnecessarily overbroad and are not in the spirit of the access permitted under RP § 12-111, which is the basis for the Amended Preliminary Injunction.

Many Respondents hunt for sustenance. *See* Baile Decl. ¶¶ 8-9; Cockey Decl. ¶ 7; Gardetto Decl. ¶ 7; Green Decl. ¶ 7. Where an abundance of venison is harvested during wildlife management efforts, it is donated to feed the community. *See* Baile Decl. at ¶ 9. If the Motion is granted, it will affect hunter-Respondents ability to feed themselves and their families. *See* Baile Decl. ¶ 9; Cockey Decl. ¶ 10; Conger Decl. ¶¶ 5-6; Gardetto Decl. ¶ 15; Shawver Decl. ¶¶ 8-10.

In addition to affecting Respondents' own rights to hunt on their land, PSEG's proposed relief also impacts other hunters whom Respondents have licensed to hunt on their land pursuant to NR § 10-411. *See* ¶¶ 17-20, Declaration of Victoria Isaac ("Isaac Decl."), attached hereto as Exhibit 10; Baile Decl. ¶ 8; Cockey Decl. ¶ 7; Conger Decl. ¶ 6; Gardetto Decl. ¶ 7; Shawver Decl.

---

[10] In addition to those already listed, at least a dozen other 2025-2026 Maryland hunting seasons last for approximately two weeks or less. *See* Calendar, *supra*, n. 6.

9

¶¶ 10-11. Many farmer-Respondents lease or license the right to hunt on their properties for the purpose of protecting their crops and livestock from deer and predators. *See* Baile Decl. ¶¶ 7-8, ¶¶ 11-16; Cockey Decl. ¶ 8; Gardetto Decl. ¶¶ 12-15; Hattery Decl. ¶¶ 9-12; Klein Decl. ¶ 8. Additionally, several Respondents have formal lease agreements under which they lease these hunting rights in exchange for payment. *See* Conger Decl. ¶ 5; Hattery Decl. ¶ 7; Klein Decl. ¶ 6. Leases for the 2025-26 hunting season, which is currently approaching its busiest and most popular weeks, have already been signed and paid in full, and the tenants expect the benefit of their bargain. *See* Hattery Decl. ¶¶ 7, 12; Klein Decl. ¶¶ 6, 8. If the Motion is granted, it would unfairly disrupt these leases and licenses and could affect Respondents' business obligations and reputations. *See* Hattery Decl. ¶ 12.

Hunting is also a recreational sport and a time-honored tradition and rite of passage for many. *See* Green Decl. at ¶¶ 7-10; Gardetto Decl. ¶ 7, ¶¶ 10-11. Young hunters learn important life skills by hunting with their families. *See* Green Decl. ¶¶ 9-10. A prohibition on legal hunting on Respondents' private properties would strip Respondents and their families of these short, seasonal opportunities for recreation and family bonding.

PSEG's requested relief would also violate Respondents' "right to keep and bear arms," which is protected by the Second and Fourteenth Amendments. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). While "the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia, [it] does not suggest that preserving the militia was the only reason Americans valued the ancient right; most [Americans] undoubtedly thought it even more important for self-defense and hunting." *Dist. of Columbia v. Heller*, 554 U.S. 570, 599 (2008). Accordingly, any regulation of an individuals' Second Amendment rights, including the right to bear arms for the purpose of hunting,

must be "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

In addition to all the harms outlined above, PSEG's requested relief runs afoul of the public trust doctrine, which holds that certain natural resources, such as wild game, are preserved for public use and enjoyment, and the government has a duty to protect them for the benefit of the public. *See Leonard v. Earle*, 155 Md. 252, 141 A. 714, 716 (1928), *aff'd*, 279 U.S. 392 (1929). Under this doctrine, the state holds title to lands and waters in trust for the people, ensuring they may be used for hunting, fishing, and other public purposes *free from private interference*. *See id.*; *see also* NR § 10-212 (a)(7) (poaching is a violation of the public trust doctrine). PSEG is effectively asking this Court to give it the right to say when and where Respondents can take wildlife from their own private properties. Under the public trust doctrine, only the State has that power. A private entity like PSEG cannot be allowed to dictate when and where Marylanders hunt wild game, which is held in trust by the State for the benefit of all.

### III. The Motion Seeks an Expansion of the Amended Preliminary Injunction to Include Additional Injunctive Relief.

The fact that PSEG styled the Motion as a simple request for clarification of the Amended Preliminary Injunction is proof that PSEG has adopted an overbroad view of the injunction, contrary to its assurances to this Court in requesting the relief. Respondents previously argued in their Memorandum in Support of Opposition to Petitioner's Motion for Preliminary Injunction that PSEG's proposed order granting the preliminary injunction was overbroad.[11] ECF 92-1 at 7.

---

[11] Specifically, Respondents argued that PSEG "presents no logistical controls or temporal limitations to protect landowners. It instead proposes an unrestricted right of entry extending from today until whenever the CPCN application 'is granted or denied,' … which means months or years. And PSEG offers no compensation for this imposition, even though its open-ended entrance onto private property is for 'the acquisition and future use' of such property in connection with the MPRP." ECF 92-1 at 7. Respondents raised similar arguments in their Memorandum in Support of Motion to Stay Preliminary Injunction Pending Appeal (ECF 258-1).

11

Respondents also raised this concern with the Court at oral argument and were assured by PSEG's counsel that any preliminary injunction would be "narrowly tailored" to protect Respondents' property rights.

> Specifically, Emily Wilson, counsel for PSEG, stated:
>
> But I would like to emphasize, Your Honor, that we know that you have a proposed order before you in the record. That order was designed to accommodate for this variety of need[s] that we see property to property. But it is not the company's intention to have unfettered…undefined access to these properties and the Company is absolutely very willing and expects to work with respondents and their counsel and the Court, as necessary, to fashion an appropriately ***narrowly tailored*** set of relief that permits the Company to get the surveys that PPRP has requested, while also ***making the disruptions to the respondents as minimal as possible***.

*See* May 19, 2025 Hearing Transcript at 18-19, attached hereto as <u>Exhibit 11</u> (emphasis added). Despite the foregoing, the Amended Preliminary Injunction was entered in substantially the same form as PSEG's proposed order, and PSEG has interpreted and enforced the Amended Preliminary Injunction in the broadest sense possible.

As PSEG concedes, it "typically gives notice that it will enter properties during a two- or three-week window," ECF 302 at 5, even though PSEG does not require weeks of access to complete its Survey Work. In most cases, after notifying Respondents that survey activity may occur during a multi-week period, PSEG's surveyors show up for one or two days during the noticed period. *See* Cockey Decl. ¶¶ 13-14; Hattery Decl. ¶ 14; Isaac Decl. ¶¶ 9-10. Many Respondents have reached out to the land agent assigned to them (their "Land Agent") to ask for additional information about the date, time, and location of Survey Work and to advise them when and where hunting would be taking place on their properties. *See* Cockey Decl. ¶¶ 14-16; Hattery Decl. ¶ 14; Isaac Decl. ¶¶ 9-10. In many cases, Respondents and Land Agents have successfully collaborated to keep the surveyors safe and minimize disruptions to Respondents. *See* Hattery Decl. ¶¶ 14-16. However, in other cases, the Land Agents have been less accommodating, insisting

on following their predetermined schedule regardless of Respondents' reasonable requests to reschedule for a more convenient date. Victoria Issac, who is represented by undersigned counsel, clearly left her September 9 voicemail in an attempt to coordinate access with PSEG, which is precisely what landowners should do. PSEG's Land Agent, however, was not willing to work with her on coordinating access. *See* Isaac Decl. ¶¶ 8-16. That PSEG is unwilling to provide the specific date(s), time(s), and location(s) of Survey Work as a matter of course further demonstrates that the Amended Preliminary Injunction is not "narrowly tailored" and is, in fact, overbroad, at least as PSEG has interpreted it.

PSEG alleges in the Motion that "Dawn Shilkoski the MPRP project manager, gave direction that Survey Work on those properties be stopped where property owners suggested that they would permit hunting notwithstanding the presence of surveyors." ECF 302 at 3-4. Similarly, in her October 20, 2025 Declaration attached as Exhibit 1 to the Motion, Ms. Shilkoski states: "I authorized the stop of survey work on the properties where the Property Owner suggested that he or she intended to permit hunting while surveyors were on his or her property." ECF 302-1 at 3.

Despite PSEG's representations that it ordered its surveyors to stop work at Ms. Isaac's property due to safety concerns raised by her voicemail message, PSEG has attempted to continue Survey Work at Ms. Isaac's property while its Motion is pending. *See* Issac Decl. ¶¶ 8-16. On October 22, 2025, two days *after* Ms. Shilkoski signed her Declaration (ECF 302-1 at 4), Land Agents posted a notice on Ms. Isaac's door seeking access from October 27 – November 14. *Id*. at ¶ 9, Ex. A. Land Agents then contacted Ms. Isaac on October 27, three days *after* PSEG filed its Motion, to advise Ms. Isaac of their plans to survey her property on October 29 and 30. *See id.* at ¶10, Ex. B. Land Agents insisted upon access, and did access Ms. Isaac's property on these dates despite Ms. Isaac's reasonable request to reschedule for the following week. *See id.* at ¶ 11-15,

13

Exs. C-D. These facts directly contradict Ms. Shilkowski's sworn representations to this Court. More critically, PSEG's activities at Ms. Isaac's property while this Motion is pending demonstrate that the requested relief is unnecessary.

Respondents understand that, at present, PSEG has this Court's authority to complete the Survey Work. Specifically, the Amended Preliminary Injunction permits PSEG to "enter onto the properties of Respondents and to remain on the property to the extent reasonably necessary to make surveys, run lines or levels, or obtain information…as authorized by Md. Code Ann., Real Prop. §12-111." ECF 268 at 1. However, neither the Amended Preliminary Injunction nor RP §12-111 authorizes PSEG to place restrictions upon Respondents' use of their private property in connection with Survey Work. RP § 12-111(a) authorizes access by entities "having the power of eminent domain," but does not authorize those entities to restrict how landowners may use their properties.[12] Nor does RP § 12-111(b) allow the Court to restrict the use of affected properties, permitting only "an order directing that the person be permitted to enter on and remain on the land to the extent necessary to carry out the purposes authorized by this section." PSEG's Motion seeks an order restricting how landowners can use their own properties,[13] which goes well beyond the scope of RP § 12-111(b). Curiously, PSEG has made no effort to invoke the remedy that is expressly provided under the statute against Ms. Isaac or Mr. Davis, which is to seek a contempt order against anyone with knowledge of the Court's order "who obstructs any civil engineer,

---

[12] RP § 12-111 authorizes entities "having the power of eminent domain" to: "(1) Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement; (2) Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and (3) Enter on any private land and perform any function necessary to appraise the property."

[13] The only reference to the "use of the property" in RP § 12-111 is in subsection (d), which expressly allows a landowner to remove a "stake, marker, monument, or other landmark" if it "interferes with the proper use of the property." Contrary to PSEG's contentions, RP § 12-111 is intended to preserve a landowner's "proper use of the property," while also allowing surveyors to do their work, but when these two are in conflict, the "proper use of the property" takes priority.

surveyor, real estate appraiser, or any of their assistants acting under the authority of the order." RP § 12-111(e). Indeed, the Motion presents no evidence of obstruction. PSEG instead seeks a blanket prohibition of lawful hunting on the hundreds of parcels in the path of its unapproved transmission line.

Although PSEG's Motion is styled as a request for clarification, PSEG is really asking this Court to issue an entirely new type of injunctive relief. Because preliminary injunctions are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," PSEG must demonstrate that it meets the four factors for the requested additional injunctive relief before this Court could grant its request. *Winter* 555 U.S. at 22. It has made no such showing here.

In summary, there is no legal basis for PSEG's request. It is unreasonable and inequitable to limit Respondents' use and enjoyment of their properties, including the right to hunt or permit hunting on private land, for weeks at a time, for PSEG's mere convenience. Such limitations would not only infringe upon Respondents' private property rights, they would also have devastating financial consequences for farmer-Respondents who rely on legal hunting to protect their crops and livestock and cause cascading damage to farms across rural Maryland and the larger Maryland ecosystem. PSEG must be called upon to do what it told this Court it would do: complete the Survey Work in a manner that "mak[es] the disruptions to the respondents as minimal as possible." Ex. 10 at 18-19. This means telling Respondents precisely when and where surveyors will enter Respondents' properties, not giving notice that access may occur over a multi-week period and that lawful activity is barred during that time.

Instead of clarifying the Amended Preliminary Injunction to require Respondents to "request permission" from PSEG to hunt on their own land, the Court should clarify that the

Amended Preliminary Injunction is "narrowly tailored" by requiring PSEG to inform Respondents of the exact date, time, and location of its planned Survey Work. Such relief is a necessary step to ensure that PSEG's Survey Work is compatible with lawful activities on private land. PSEG should have no objection to such relief given its prior representations to the Court.

## CONCLUSION

To ensure that the Preliminary Injunction is narrowly tailored to minimize disruptions and allow Respondents to freely and fully enjoy their properties, to include exercising their right to hunt on a maximum number of days without endangering surveyors, Respondents respectfully request that this Court (i) deny the Motion, and (ii) amend the Amended Preliminary Injunction to require PSEG to: (a) provide notice of the specific date(s) and time(s) on which it intends to perform Survey Work on Respondents' properties as well as the physical location of said work; (b) provide seventy-two (72) hours' notice of Survey Work during any Maryland hunting season to allow Respondents sufficient time to advise hunters of the impending Survey Work; and (c) in an abundance of caution, instruct surveyors to wear hunter orange or pink when conducting Survey Work during any Maryland hunting season.

Respectfully submitted,

*/s/ Harris W. Eisenstein*
Harris W. Eisenstein (Fed. Bar No. 29694)
David M. Wyand (Fed. Bar No. 23413)
Lauren M. McLarney (Fed. Bar No. 20982)
Rosenberg Martin Greenberg, LLP
25 S. Charles Street 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Fax: (410) 727-1115
heisenstein@rosenbergmartin.com
dwyand@rosenbergmatin.com
lmclarney@rosenbergmartin.com

*Attorneys for Respondents*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 31st day of October 2025, a copy of Respondents' Opposition to Motion to Clarify the Amended Preliminary Injunction to Prohibit Hunting on Noticed Survey Days and proposed Order were served through the CM/ECF System on all counsel of record.

                                        */s/ Harris W. Eisenstein*
                                        Harris W. Eisenstein