**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-1730**

PSEG RENEWABLE TRANSMISSION LLC,

Plaintiff - Appellee,

v.

ARENTZ FAMILY, LP; BARNEY'S FARM, LLC; HZ PROPERTIES, LLC; M & R, LLC; THE DUG HILL ROD AND GUN CLUB, INC.; TROYER FARMS, LLC; TROYER REAL ESTATE, LLC; ALENE R. STICKLES; ROBERT H. STICKLES, SR.; AMY GAYLE YOUNGBLOOD; ANDREW D. MCLEAN; REBECCA MCLEAN; BENJAMIN EUGENE NUSBAUM; KENNETH EUGENE NUSBAUM; BETTY LOU MILLER; CARL E. MILLER; BRYAN N. HENDRIX; CONSTANCE M. HENDRIX; CARMEN COCKEY; CHRISTOPHER D. COCKEY; CATHERINE V. MILLER; WAYNE D. MILLER; CHARLES WILLIAM BOND; MORGAN DAVIS BOND; CHARLOTTE RUTH BIXLER; CHRIS N. RESH; DOROTHY I. DONMOYER; PETRICE MARIE DONMOYER-RESH; ROBERT L. DONMOYER; DEBORAH H. MAEDER; JOHN D. MAEDER; DIANE M. COOK; JAMES R. COOK; ERICH CHARLES STEIGER; REBECCA IRENE SCOLLAN; ESTHER JOHANN LENTZ-BUENGER; FAY ANN MILLER; KENNETH E. MILLER; GARY J. BROCKMEYER; NANCY M. BROCKMEYER; HELEN L. BULL; JOSEPH L. GLOVER; RAINA C. GLOVER; JULIA LU; ZHEJUN FAN; JUSTIN WRIGHT; KEITH EMERSON ENSOR; KEVIN LEE ENSOR; KIMBERLY A. JOHNSTON; LESLIE ALFRED WHITE; MATT UNKLE; TOMI UNKLE; MOHAMAD A. KOURANI; NADA E. KOURANI; MORRIS L. BOHLAYER; SHARON L. BOHLAYER; NANCY P. MACBRIDE; RICHARD M. DOSTER; THOMAS B. COLLINS; TRACY W. COLLINS,

Defendants – Appellants,

and

DELLS GENERATION FARMS, LLC; GROVES MILL, LLC; PANORA ACRES, INC.; PETER AND JOHN RADIO FELLOWSHIP, INC.; RBC REAL ESTATE I,

LLC; SCHOOL OF LIVING; ALLAN PATRICK SANDERS; ROY FRANCIS SANDERS; ANNE F. PRICE-DAVIS; MICHAEL A. DAVIS; AUSTIN L. KALTRIDER; JOYCE E. KALTRIDER; MARLIN L. KALTRIDER; MARVIN L. KALTRIDER; SHAWN L. KALTRIDER; BARCLAY G. CARAS; PAMELA J. CARAS; BRANDON HILL; BRUCE E. DOAK; GAYLE M. DOAK; C. WILLIAM KNOBLOCH, JR. AND CAROL KNOBLOCH REVOCABLE LIVING TRUST AGREEMENT DATED JANUARY 30, 2019; CAROL J. FERTITTA; JOSEPH V. FERTITTA, III; CATHERINE M. GESTIDO; EDUARDO E. GESTIDO; CHARLES GARY ATKINSON; INDRANEE KURUPPUNAYAKE; STEPHEN GORDON ATKINSON; CHARLES WILLIAM ATKINSON; CHERYL ANN GEARY; PAUL JOSEPH GEARY; CHRISTINE D. EYRING; JOHN M. EYRING, JR.; DANIEL GEORGE SCHWARTZ; ERIK J. LENZ; FAITH J. WEEKS; MICHAEL D. HANDS, JR.; FRANCIS LEE DELL; MARIAN V. DELL; HENRY WHITAKER; KAREN A. SCHLEPER; HOECKEL FAMILY SELF SETTLED ASSET PROTECTION FAMILY IRREVOCABLE TRUST; JAMES A. O'DONNELL; PATRICIA J. O'DONNELL; JUDITH A. FIEDLER; JULIUS J. PITRONE; LINDA S. GRESOCK; THOMAS S. GRESOCK; LISA M. WARD; ZACHARY J. WARD; MABEL E. WILSON REVOCABLE DEED OF TRUST DATED 3/25/1998; MATTHEW LEE DELL; NANCY E. CRAMER; NANCY EILEEN PIERCE; PAMELA M. WILSON; ROBERT KEITH WILSON; PHYLLIS A. REHMEYER; TODD M. REHMEYER,

Defendants.

------------------------------

COUNTY COMMISSIONERS OF CARROLL COUNTY, MARYLAND,

Amicus Supporting Appellant

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Adam B. Abelson, District Judge. (1:25-cv-01235-ABA)

---

Argued: May 5, 2026 Decided: August 6, 2026

---

Before WILKINSON, RICHARDSON, and BERNER, Circuit Judges.

---

Affirmed by published opinion. Judge Berner wrote the opinion, in which Judge Wilkinson joined. Judge Richardson wrote an opinion concurring in the judgment.

---

**ARGUED:** Harris Eisenstein, David Matthew Wyand, ROSENBERG MARTIN GREENBERG, LLP, Baltimore, Maryland, for Appellants. Kurt James Fischer, VENABLE, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lauren M. McLarney, ROSENBERG MARTIN GREENBERG, LLP, Baltimore, Maryland, for Appellants. J. Joseph Curran, III, Christopher S. Gunderson, Kenneth L. Thompson, Susan R. Schipper, Emily J. Wilson, VENABLE LLP, Baltimore, Maryland, for Appellee. Timothy F. Maloney, Alyse L. Prawde, JOSEPH, GREENWALD & LAAKE, P.A., Greenbelt, Maryland, for Amicus Curiae.

---

BERNER, Circuit Judge:

Foundational principles of statutory interpretation under Maryland law direct courts to presume that the Maryland General Assembly intends for its enactments to operate together as a consistent and harmonious body of law. This court, when construing Maryland statutes, must avoid an interpretation that renders a statutory scheme unworkable. The case before us turns on these principles.

PSEG Renewable Transmission LLC (PSEG) received federal approval to construct the Maryland Piedmont Reliability Project (MPRP), a transmission line intended to address the region's emerging electricity shortage. Before construction can begin, PSEG is required to obtain a Certificate of Public Convenience and Necessity (CPCN) from Maryland's Public Service Commission (PSC). PSEG submitted a CPCN application to the PSC, which referred its review to Maryland's Power Plant Research Program (PPRP). The PPRP submitted a report to the PSC deeming the CPCN application incomplete until PSEG completes certain field-based studies. To conduct the surveys necessary for these studies, PSEG must access the properties over which the MPRP would run. The owners of these properties, the appellants in this case, refused such access.

PSEG filed suit against the property owners for injunctive relief and moved for a preliminary injunction which would permit PSEG to access the properties under Section 12-111(a) of the Maryland Code's Real Property Article. The district court granted PSEG's motion, and the property owners appealed. We conclude that the district court did not abuse its discretion in granting the preliminary injunction and thus affirm.

## I. Factual Background

The following facts are drawn from the record "as it comes to us on this preliminary, interlocutory appeal." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 213 (4th Cir. 2025). Where appropriate, we may take judicial notice of facts, including matters of public record, pursuant to Federal Rule of Evidence 201, as did the district court. *See Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508–09 (4th Cir. 2015).

Plaintiff-Appellee PSEG Renewable Transmission LLC (PSEG) is a New Jersey-based transmission development company that develops, constructs, and owns transmission projects. This case concerns a transmission line project proposed by PSEG: the Maryland Piedmont Reliability Project (MPRP). The MPRP is a high-voltage transmission line that will transmit energy to residents of Maryland and the surrounding region. It is planned to traverse approximately sixty-seven miles through three Maryland counties: Baltimore County, Carroll County, and Frederick County.

The MPRP was developed in response to a federal government solicitation for proposed solutions to a growing energy crisis centered in the Mid-Atlantic region. Some brief regulatory background will be helpful to understand the federal process relevant to this appeal.

The Federal Energy Regulatory Commission (FERC) is a government agency that regulates the interstate transmission of energy resources, including electricity. *See* 16 U.S.C. § 824. It oversees the planning and cost allocation of new transmission infrastructure through regional transmission organizations like PJM Interconnection, LLC (PJM), which covers parts of the Mid-Atlantic and Midwest, including the State of

Maryland. *See id.* § 824s (governing transmission infrastructure investment). Once a transmission line enters service, its operating company may become subject to federal regulation by FERC as a federal public utility. *See* Md. Code Ann., Pub. Util. (PU) § 7-207(b)(3)(iii). Thus, PSEG will be regulated as a federal public utility if the MPRP enters service. Still, state governments retain substantial authority under federal law to decide questions of transmission siting and construction. *See* 16 U.S.C. § 824(a) (preserving state authority); PU § 7-207 (governing public utility companies). The interplay between federal and state regulation lies at the heart of this case.

For several years, PJM has observed a significant growth in electricity use in Maryland and Virginia that threatens to overload the energy grid by 2027. To respond to this increase and the retirement of power generation facilities in the region, PJM determined that the region needs additional transmission capacity. In February 2023, PJM solicited proposed solutions. PSEG submitted a proposal to develop and construct the MPRP. PJM selected the proposal and, in April 2024, entered into a Designated Entity Agreement (DEA) with PSEG to develop and construct the MPRP. The DEA includes a development schedule with several milestone dates that PSEG is required to meet. Relevant here, the DEA requires PSEG to have acquired all necessary federal, state, county, and local site permits by September 1, 2026. It also requires PSEG to have the MPRP in-service by June 1, 2027. These milestone dates are not set in stone, however. They may be extended by PJM.

Having obtained federal approval, PSEG sought the necessary permits as required by the State of Maryland. Maryland requires entities seeking to construct a transmission

line in the state to first obtain a Certificate of Public Convenience and Necessity (CPCN) from the Maryland Public Service Commission (PSC). *See* PU § 7-207(b)(3)(i). PSC is an independent state agency that regulates "each public service company that engages in or operates a utility business in" the state. *Bd. of Cnty. Comm'rs of Wash. Cnty. v. Perennial Solar, LLC*, 212 A.3d 868, 875 n.12 (Md. 2019). Without a CPCN, "a person may [not] acquire by condemnation . . . any property or right necessary for the construction or maintenance of the transmission line." PU § 7-207(b)(3)(v)(2).

PSEG submitted its CPCN application to the PSC in December 2024. *See In re Application of PSEG*, Case No. 9773 (Md. Pub. Serv. Comm'n 2024), https://webpscxb.pscmaryland.com/DMS/case/9773 [https://perma.cc/RK3P-D3AV] (last visited June 30, 2026). The PSC then began its review, which is still ongoing, to assess whether PSEG has shown a need for the MPRP and whether to approve the proposed route for the MPRP. As part of its application, PSEG was required to submit, among other information, certain "environmental, natural resources, and socioeconomic information." Md. Code Regs. (COMAR) 20.79.01.06(K) (detailing CPCN application filing requirements). This includes a "summary of the environmental and socioeconomic effects of the construction and operation of the project" and copies "of all studies of the environmental impact of the proposed project prepared by the applicant." COMAR 20.79.04.04(B)–(C). The PSC is not responsible for determining whether the CPCN application is complete, however. The Maryland General Assembly assigned that responsibility to the Power Plant Research Program (PPRP), a division of the Maryland

Department of Natural Resources. *See* Md. Code Ann., Nat. Res. (NR) § 3-303 (governing PPRP).

In January 2025, the PSC directed PPRP to determine whether PSEG's CPCN application was complete. The PPRP reported in March 2025 that it lacked sufficient information to make the requisite determination. Relevant here, PPRP needed field studies of the environmental and socioeconomic effects of the construction and operation of the MPRP in order to determine whether the route for the MPRP was acceptable.

PSEG was unable to complete the required field studies without accessing the properties through which the MPRP would run. Many of these properties are owned by private landowners, including the Arentz Family and 116 other defendant-appellants (collectively, the Property Owners), who would not permit PSEG onto their properties. The properties at issue differ greatly. Some of the Property Owners operate multi-generational farms. Others have forest and wetlands conservation and preservation easements. Several operate commercial businesses on their properties.

Lacking the requisite field studies, PSEG opted to submit its CPCN application with desktop studies that it completed using secondary sources and without accessing the properties. In its report to the PSC on PSEG's CPCN application, PPRP made clear that the desktop studies could not be verified and that field studies were necessary. While PPRP acknowledged that PSEG lacked "the necessary access to conduct field studies," PPRP continued to require the studies. Parties' Joint Appendix (J.A.) 258. Thus, PSEG's application was found "administratively incomplete." J.A. 260. PPRP estimates that it takes approximately thirty months to assess a CPCN application after it is filed.

PSEG sought access from the Property Owners to conduct the requisite field studies. It asserted a right under Section 12-111(a) of the Maryland Code's Real Property Article to access "private land to make surveys" and to "obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement." Md. Code Ann., Real Prop. (RP), § 12-111(a)(1) (governing property access rights of entities having power of eminent domain). Whether PSEG likely possesses this right of access is the question before us. Most relevant to the factual background, though, is that PSEG proceeded as if it had this right. PSEG notified the Property Owners that it would seek access to their land and requested their consent.[1] The Property Owners refused, and this suit followed.

## II. Procedural History

PSEG filed suit against the Property Owners for injunctive relief and moved for a preliminary injunction permitting it "to enter onto the properties [of the Property Owners] and to remain on the property to the extent necessary to make surveys . . . or obtain information relating to the acquisition and future use of the properties in connection with the [MPRP]." J.A. 1744; *see also* RP § 12-111(b) (providing cause of action to enforce right of access in Section 12-111(a)). The Property Owners opposed the preliminary injunction.

[1] The parties do not contest the district court's finding that this notice satisfied the requirements of Section 12-111(a).

Following a hearing, the district court issued a memorandum opinion granting PSEG a preliminary injunction. *PSEG Renewable Transmission LLC v. Arentz Fam., LP*, 788 F. Supp. 3d 705 (D. Md. 2025). The district court found that PSEG met its burden on each of the four *Winter* factors necessary to obtain a preliminary injunction: likelihood of success on the merits, irreparable harm, the balance of equities, and the public interest. *See id.* at 735; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Interpreting Section 12-111 of the Maryland Code's Real Property Article based on its "text, statutory and regulatory context, legislative history, and purpose," *PSEG*, 788 F. Supp. 3d at 727, the district court concluded that PSEG had demonstrated a likelihood of success on the merits, *id.* at 735–37. The right to access "any private land to make surveys" under Section 12-111(a) can be invoked only by certain persons "acting on behalf of the State or of any of its instrumentalities or any body politic or corporate having the power of eminent domain[.]" RP § 12-111(a). The district court found that PSEG likely qualifies as a "body politic or corporate having the power of eminent domain." *PSEG*, 788 F. Supp. 3d at 726–730, 735. The parties primarily disputed—and continue to dispute on appeal—the second part of this finding, whether PSEG has the power of eminent domain.

Although State entities inherently possess the power of eminent domain, *Mayor & City Council of Balt. City v. Valsamaki*, 916 A.2d 324, 335 (Md. 2007), it is less clear when an applicant to become a federal public utility, like PSEG, gains that power. To answer that question, the Property Owners pointed to Section 7-207(b)(3)(v) of the Maryland Code's Public Utility Article, which prohibits an entity that will be regulated as a federal public utility from "acquir[ing] [property] by condemnation" until it is issued "a [CPCN] for the

construction of an overhead transmission line[.]" PSEG responded that although Section 7-207(b)(3)(v) conditions the exercise of the power of eminent domain to condemn property on receiving a CPCN, it asserts that the power of eminent domain is granted earlier in the permitting process for purposes of access to conduct surveys under Section 12-111(a).

Agreeing with PSEG, the district court reasoned that PSEG obtained the power of eminent domain, for purposes of Section 12-111(a), when it was directed to conduct the requisite surveys by PPRP, acting on behalf of the Maryland Department of Natural Resources and other state agencies. *PSEG*, 788 F. Supp. 3d at 727–28. As such, the district court found that, PSEG will be acting "at the direction of, and in some senses on behalf of, state agencies" that possess eminent domain power when conducting the studies. *Id.* at 728. That PSEG was "select[ed] by PJM for this project" added legitimacy to this direction. *Id.* at 729.

Because field studies are required as a condition of granting a CPCN, the district court explained, requiring PSEG to obtain a CPCN before it could gain access to conduct the surveys on which the studies are based would render the statutory scheme unworkable. *Id.* at 727–29. Significantly, Section 12-111(a) allows entities to conduct surveys "for the purpose of determining *whether* eminent domain" should be "exercised." *Id.* at 728. For this reason, the issuance of the CPCN is the determination that eminent domain can be exercised under Section 7-207(b)(3)(v), and thus an applicant must be permitted access under Section 12-111(a) before receiving a CPCN. *Id.* at 729. The Property Owners also argued that the statutory scheme would remain unworkable even under PSEG's

interpretation because Section 12-111 does not permit geotechnical surveys, which the Property Owners contend are required for the CPCN application. The district court rejected this argument. *Id.* at 730.

The district court noted that its conclusion accorded with "the most analogous case any of the parties have identified," *Transource Maryland, LLC v. Scott et al.*, No. 12-C-18-000549 (Harford Cnty. Cir. Ct. June 24, 2018). *Id.* at 729. There, a Maryland state court "granted a petition by Transource Maryland, a subsidiary of a transmission line construction company, for an order authorizing entry under § 12-111." *Id.* The Maryland court "held that § 12-111 authorizes entry before issuance of a CPCN" because "[n]o other reading makes sense." *Id.* (citation and quotation marks omitted). Hence, the district court concluded that PSEG satisfied the first *Winter* factor.

The district court next considered whether PSEG satisfied the remaining *Winter* factors.

On the question of irreparable harm, the district court concluded that PSEG was likely to suffer harm in the form of "lost revenues," resulting from a delay in construction, that PSEG would not be able to recover. *Id.* at 739. Without the permission granted in the preliminary injunction to access the properties to conduct the surveys, construction of the MPRP will be delayed indefinitely. Relying on Fourth Circuit precedent, the district court reasoned that economic losses that would, absent a preliminary injunction, likely result from delays in the construction of a large public infrastructure project constitute irreparable harm. *Id.* at 738 (citing *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216–19 (4th Cir. 2019) and *E. Tenn. Nat. Gas Co.*

*v. Sage*, 361 F.3d 808, 828–29 (4th Cir. 2004)). The district court also rejected attempts by the Property Owners to distinguish this precedent. *Id.* at 739. Although the district court acknowledged that economic losses do not generally constitute irreparable harm, it reasoned that they do here because they "would *not* be recoverable at the end of litigation." *Id.* (quoting *Mountain Valley*, 915 F.3d at 218).

The district court next concluded that the balance of equities weighs in PSEG's favor. *Id.* at 739–40. The Property Owners would suffer only "temporary, limited, non-invasive" access to their properties by PSEG to conduct surveys. *Id.* at 739. Because the injunction provides only "the narrow right of entry to conduct studies" permitted by Section 12-111(a), the district court found that any harm which could result from the actual construction of the transmission line itself was not relevant to this inquiry. *Id.* If harm to the properties does occur while PSEG carries out the surveys, the district court noted that Section 12-111(c) provides the Property Owners "a cause of action for damages." *Id.* at 740.

Finally, the district court concluded that the preliminary injunction was in the public interest. *PSEG*, 788 F. Supp. 3d at 740. It reasoned that advancing energy infrastructure projects, like the MPRP, "is generally in the public interest." *Id.* (citing *Mountain Valley*, 915 F.3d at 221–22 and *Sage*, 361 F.3d at 830). The district court also found significant that the PPRP, which the Maryland General Assembly tasked with assessing the environmental and socioeconomic effects of the MPRP, determined that conducting the surveys "is necessary for [the PPRP] to discharge its statutory duties." *Id.*

Having concluded that PSEG met its burden as to all four *Winter* factors, the district court granted the preliminary injunction. *Id.* The district court subsequently amended the preliminary injunction to clarify its scope.

The Property Owners timely appealed both the original and amended preliminary injunction orders. The district court denied the Property Owners' motion to stay the preliminary injunction pending appeal. The Property Owners then moved to stay the injunction before this court, which we denied. The County Commissioners of Carroll County, Maryland, filed an amicus brief in support of the Property Owners.

We exercise jurisdiction over this interlocutory appeal of the grant of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1).

## III. Analysis

On appeal, the Property Owners argue that the district court abused its discretion in finding that PSEG is likely to succeed on the merits, as well as in finding that PSEG satisfied the remaining *Winter* factors. They also contend that the preliminary injunction is improper because it is mandatory in nature.

This court reviews a district court's grant of a preliminary injunction under the deferential abuse of discretion standard. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). Although "a clear error in factual findings or a mistake of law" is grounds for reversal, we "may not reweigh evidence the district court considered." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 274 (4th Cir. 2025). Nor may we "reverse so long as the district court's account of the evidence is plausible in light of the record viewed in its entirety."

*Real Time Med. Sys.*, 131 F.4th at 224 (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020)). Moreover, we may affirm a preliminary injunction "on any ground appearing in the record, including theories not relied upon or rejected by the district court." *Jensen v. Md. Cannabis Admin.*, 151 F.4th 169, 174 (4th Cir. 2025) (quoting *United States v. McHan*, 386 F.3d 620, 623 (4th Cir. 2004)).

To obtain a preliminary injunction, a plaintiff must demonstrate that she has met all four *Winter* factors, that: 1) she will likely succeed on the merits; 2) she will likely suffer irreparable harm in the absence of a preliminary injunction; 3) the balance of equities weighs in her favor; and 4) the public interest favors the preliminary injunction. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter*, 555 U.S. at 20).

Because this action is brought pursuant to diversity jurisdiction and the claims involve Maryland statutes and regulations, we must apply the substantive law of the State of Maryland to determine the likelihood of success on the merits. *See, e.g.*, *Real Time Med. Sys.*, 131 F.4th at 224–25 (applying state law to determine likelihood of success, the first *Winter* factor); *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) ("While we apply our own procedural jurisprudence regarding the factors to consider in granting a preliminary injunction, we apply [state] law to determine whether Plaintiff has met the first of these factors by demonstrating a substantial likelihood of success on the merits of his underlying diversity action." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). We apply federal standards to the other three *Winter* factors. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.

1991); *Cap. Tool & Mfg. Co. v. Maschinenfabrik Herkules*, 837 F.2d 171, 172–73 (4th Cir. 1988).

We discern no abuse of discretion in the district court's grant of the preliminary injunction. We first consider whether the preliminary injunction is mandatory and then address each *Winter* factor in turn.

A. Whether the Preliminary Injunction is a Mandatory One

The Property Owners argue that the preliminary injunction is improper because it is a mandatory injunction. A mandatory injunction is one that does not "preserve the status quo[.]" *Pashby*, 709 F.3d at 320. If we conclude that a preliminary injunction is mandatory in nature, then "our review must be more searching." *Sage*, 361 F.3d at 830 (citation and quotation marks omitted). Under this searching review, we may affirm the preliminary injunction "only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).

The Property Owners contend that the preliminary injunction is mandatory because it grants the relief sought by PSEG in its complaint, thereby altering the status quo. The district court recognized this, noting that it was "sensitive to the fact that the relief PSEG [sought] in the form of a preliminary injunction is largely congruent with the final relief that PSEG seeks through its complaint," but nevertheless granted the preliminary injunction. *PSEG*, 788 F. Supp. 3d at 736.

In determining whether a preliminary injunction is mandatory, we consider only the "preliminary injunction's tendency to preserve the status quo," which is the "last

uncontested status between the parties [that] preceded the controversy." *Pashby*, 709 F.3d at 320 (citation omitted). Whether the preliminary injunction affords final relief is not the relevant inquiry.

Ultimately, here, we need not decide whether the preliminary injunction preserves the status quo. This is because "the circumstances are sufficiently demanding for the award of mandatory relief." *Sage*, 361 F.3d at 830 (affirming grant of mandatory preliminary injunction in part because the preliminary injunction was necessary to meet a deadline to construct an energy infrastructure project). The remainder of our decision explains why this is so.

B. Likelihood of Success on the Merits

We turn now to the *Winter* factors, beginning with the first, and most contested factor: likelihood of success on the merits. The parties dispute whether PSEG possesses the power of eminent domain necessary to access private property under Section 12-111(a) of the Maryland Code's Real Property Article.

To resolve a question of state law, we look to "decisions of the state's highest court and, if those decisions do not resolve the matter, 'predict how [that] court would rule on the state law issue in question.'" *Real Time Med. Sys.*, 131 F.4th at 224 (quoting *Koppers Performance Chems., Inc. v. Argonaut-Midwest Ins. Co.*, 105 F.4th 635, 640 (4th Cir. 2024)). While "the decisions of [state] intermediate appellate courts constitute the next best indicia of what state law is," these decisions "are never binding and may be disregarded" if we are "convinced by other persuasive data that the highest court of the state would

decide otherwise." *Id.* (quoting *Colo. Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC*, 60 F.4th 148, 154 (4th Cir. 2023)). We may also look to "canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." *Moore v. Equitrans, L.P.*, 27 F.4th 211, 220 (4th Cir. 2022) (citation omitted).

We begin by discussing the Maryland law relevant to our analysis. We then apply this law and conclude that the district court did not abuse its discretion in finding that PSEG met its burden to demonstrate a likelihood of success on the merits.

*i. Relevant Maryland Law*

Two areas of Maryland law are relevant here: eminent domain and statutory interpretation.

First, eminent domain. Maryland governmental entities have the inherent power of eminent domain "to take privately owned property . . . and convert it to public use, subject to reasonable compensation." *Valsamaki*, 916 A.2d at 335 (citation omitted) (explaining that this inherent power is circumscribed by the Maryland and the United States constitutions). "Condemnation," the process by which property is taken, "is a function of the State's power of eminent domain." *Id.* The Maryland General Assembly has exclusive discretion over the "mode and manner of the exercise" of this power. *J.L. Matthews, Inc. v. Md.-Nat'l Cap. Park & Plan Comm'n*, 792 A.2d 288, 297 (Md. 2002) (citation omitted). The General Assembly may delegate this power and limit its use by "provid[ing] that there be a necessity for the taking [of property]." *Id.* (citation omitted).

Next, statutory interpretation. "The goal of statutory construction is to discern and carry out the intent of the Legislature." *Westminster Mgmt., LLC v. Smith*, 312 A.3d 741, 758 (Md. 2024) (citation omitted). An undefined term must be interpreted in the first instance by its "ordinary and popular meaning," looking to "dictionary definitions as a starting point." *Id.* (citation omitted). A court, however, may not "read statutory language in a vacuum" or confine its interpretation "of a statute's plain language to the isolated section alone." *Lockshin v. Semsker*, 987 A.2d 18, 29 (Md. 2010). It must, rather, view the plain language "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* "Presuming the General Assembly intends its enactments to operate together as a consistent and harmonious body of law," a court must "seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Westminster Mgmt.*, 312 A.3d at 758 (citation and quotation marks omitted). In so doing, a court must also read "statutes on the same subject" together and harmonize them "to the extent possible[.]" *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671 (Md. 2001). This inquiry requires consideration of whether a statutory construction would result in a

consequence contrary to the General Assembly's intent in passing that statute. *Chesapeake Charter, Inc. v. Anne Arundel Cnty. Bd. of Educ.*, 747 A.2d 625, 628 (Md. 2000).[2]

*ii. The Power of Eminent Domain*

Section 12-111(a) of the Maryland Code's Real Property Article permits persons "acting on behalf of the State or of any of its instrumentalities or any body politic or corporate having the power of eminent domain" to access "any private land to make surveys . . . or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement." To determine the plain meaning of "having," we must first consult "those dictionaries that were contemporaneous at the time" the General Assembly added this term to the language of Section 12-111(a). *Md. Overpak Corp. v. Mayor & City Council of Balt.*, 909 A.2d 235, 254 n.20 (Md. 2006). The plain meaning of "having," which first appeared in Section 12-111(a) in 1963, 1963 Md. Laws, Ch. 52, is the present participle of the verb "have" that denotes the ongoing "hold[ing] [of something] in possession as property" or "in one's use, service, or affection or at one's disposal," Webster's Seventh New Collegiate Dictionary

[2] The Property Owners contend that statutes granting the power of eminent domain must be construed strictly. The district court did not apply this principle, however, because "this case is not about whether . . . eminent domain [should] be exercised. This case is only about whether, under § 12-111, PSEG is entitled to conduct certain studies as directed by PPRP." *PSEG*, 788 F. Supp. 3d at 729–30. We note no abuse of discretion in this conclusion. Even if we construe the statutes strictly, we would affirm the district court's finding that PSEG demonstrated a likelihood of success on the merits because "the purpose and intention of the Legislature when clearly manifested in the [eminent domain] statute should not be defeated by any narrow, strained, forced, or artificial construction of its language." *Davis v. Bd. of Educ. of Anne Arundel Cnty.*, 170 A. 590, 591 (Md. 1934).

381 (1963). By choosing to employ the present participle of "have," the General Assembly clearly intended that the possession of eminent domain power be present and continuing.

In accordance with this definition, PSEG must presently possess the power of eminent domain in order to invoke the right of access provided in Section 12-111(a). We must therefore resolve when, or whether, PSEG obtained that power for purposes of access under Section 12-111(a).

The Property Owners contend that PSEG cannot possess the power of eminent domain until it has been issued a CPCN. They draw this requirement from the text of Section 7-207(b)(3)(v) of the Maryland Code's Public Utility Article, which provides that an entity that will be regulated as a federal public utility, like PSEG, "may acquire by condemnation . . . any property or right necessary for the construction or maintenance of the transmission line" only "[o]n issuance of a [CPCN]."

We agree with the district court that requiring PSEG to obtain a CPCN before accessing property under Section 12-111(a) would render the statutory scheme unworkable, "illogical, unreasonable, [and] inconsistent with common sense." *Lawrence v. State*, 257 A.3d 588, 601 (Md. 2021) (citation omitted). The General Assembly could not have intended for a federal public utility to obtain a CPCN before it could access properties to conduct the field surveys required for the CPCN application. *See Chesapeake*, 747 A.2d at 628 (forbidding construction of statute that would result in a consequence contrary to the legislature's intent in passing that statute). Such an interpretation would undermine the presumption that the General Assembly "intends its enactments to operate

together as a consistent and harmonious body of law[.]" *Westminster Mgmt.*, 312 A.3d at 758 (citation omitted).

The General Assembly intended for applicants to become a federal public utility to have a path to obtain a CPCN. If PSEG could not access property to conduct field surveys required for a CPCN application, it would have no viable path. The "findings from" this access are "necessary for determining" whether the power to exercise eminent domain will ultimately be granted. *King v. Mayor & Council of Rockville*, 447 A.2d 118, 122 (Md. Ct. Spec. App. 1982). That is the purpose of Section 7-207(b)(3)(v), to condition the exercise of eminent domain to condemn property on the issuance of a CPCN. *See J.L. Matthews*, 792 A.2d at 297 (explaining that legislature can place limits on exercise of inherent eminent domain power); *Valsamaki*, 916 A.2d at 335 (describing "[c]ondemnation [as] a function of the State's power of eminent domain"). PSEG must be able to seek access under Section 12-111(a) before it can receive a CPCN.

Thus, the district court did not abuse its discretion in finding that PSEG likely gained the power of eminent domain for purposes of access under Section 12-111(a) before the issuance of a CPCN. We also agree with the district court's conclusion that PSEG likely gained this power for purposes of Section 12-111(a) when PPRP directed it to complete the necessary field studies. As the district court explained, PPRP acts on behalf of Maryland state agencies. *PSEG*, 788 F. Supp. 3d at 727–28. Accordingly, PSEG would be effectively conducting the surveys to complete these studies at the direction of state

agencies.[3] *Id.* The DEA between PJM and PSEG adds legitimacy to the PPRP's delegation of this power to PSEG to conduct the surveys required to apply for a CPCN, without which the MPRP could never be constructed.

The district court appropriately consulted *Transource* as a highly analogous Maryland state court ruling. *Id.* at 729 (citing *Transource*, No. 12-C-18-000549). In that case, Transource, a private energy company, sought access under Section 12-111 to conduct the surveys required to obtain a CPCN. In holding that Transource had the right of access, the state court reasoned that a CPCN cannot be granted until an entity gains access to conduct the surveys necessary for its CPCN application. Thus, the state court concluded that Transource must have gained the power of eminent domain for purposes of Section 12-111(a) before it was issued a CPCN.

The Property Owners raise three arguments regarding why the district court was wrong. None are compelling.

First, the Property Owners contend that *Transource* is not persuasive because the state court assumed that Transource was a state electric company that already possessed the power of eminent domain. Not so. If that were true, the state court would have no reason

[3] Our colleague has written separately to emphasize in part that PSEG cannot constitute a "person" that may act on behalf of Maryland or its instrumentalities under Section 12-111. We agree, and clarify that the significance of PPRP's direction does not obviate the requirement that PSEG possess the power of eminent domain. Rather, PPRP's direction to PSEG demonstrates that Maryland has delegated eminent domain power to PSEG for the purpose of access under Section 12-111(a).

to consider whether Transource had the power of eminent domain. *See Valsamaki*, 916 A.2d at 335 (explaining that state entities inherently possess eminent domain power).

Second, the Property Owners contend that the statutory scheme remains workable even if a CPCN is required for access because the PPRP can exercise its statutory power to perform the surveys itself. Although Section 3-305(f)(1) of the Maryland Code's Natural Resources Article empowers PPRP "to enter upon private property to . . . conduct . . . studies related to . . . potential overhead transmission lines," it does not require PPRP to do so. In situations where PPRP declines to conduct the surveys itself, the same unworkability issue would arise unless the applicant is able to conduct the surveys. By directing PSEG to conduct the surveys, PPRP implicitly declined to exercise its Section 3-305(f)(1) power. Further, PSEG cannot ask PPRP to exercise this power. While "an electric company" may make such a request, NR § 3-305(f)(1), PSEG is not an "electric company" because it does not yet, and might never, "physically transmit[ ] or distribute[ ] electricity in the State to a retail electric customer," PU § 1-101(i)(1).

Third, the Property Owners contend that the scheme remains unworkable even if PSEG has access because Section 12-111 does not permit geotechnical surveys, which assess the subsurface conditions of a building site. The parties agree that Section 12-111 does not give license to conduct such surveys because they typically cause more than "minimal incidental damage." *See Mackie v. Mayor & Comm'rs of Town of Elkton*, 290 A.2d 500, 505 (Md. 1972). PSEG, however, "does not seek authority to conduct any such geotechnical surveys," *PSEG*, 788 F. Supp. 3d at 730, and has informed PPRP that Maryland law prohibits it from doing so.

Nor do the regulations detailing the CPCN application requirements explicitly require geotechnical surveys. *Compare* COMAR 20.79.01.06 (general CPCN filing requirements) *and* COMAR 20.79.04.01–.04 (CPCN filing requirements for transmission lines) *with* COMAR 20.79.03.03 (CPCN filing requirements for generating stations explicitly requiring "geotechnical report"). The Property Owners rely on PPRP's report to suggest that such surveys are required. This report cannot itself impose a requirement untethered from any statute or regulation, however. Once again, requiring geotechnical surveys would create the same unworkability problem: PSEG would be incapable of completing the required surveys. The district court properly rejected this argument, and we do so as well.

At this preliminary stage, PSEG "need not show a certainty of success" and has met its burden to show clearly that it is likely to succeed on the merits. *See Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271, 287 (4th Cir. 2026) (quoting *Pashby*, 709 F.3d at 321). In so concluding, the district court did not abuse its discretion.

C. Irreparable Harm

Next, we address the second *Winter* factor: irreparable harm. PSEG must clearly show that it is "likely to suffer irreparable harm in the absence of preliminary relief," *Winter*, 555 U.S. at 20, that is "neither remote nor speculative, but actual and imminent," *Mountain Valley*, 915 F.3d at 216 (quoting *Direx*, 952 F.2d at 812). Harm is irreparable when it "cannot be fully rectified by the final judgment after trial." *Id.* (citation omitted).

The district court did not clearly err in concluding that PSEG demonstrated it is likely to suffer irreparable harm, absent the preliminary injunction, in the form of lost revenues. *See Gilliam v. Foster*, 61 F.3d 1070, 1078 n.5 (4th Cir. 1995) (en banc) ("[W]e review the finding of irreparable harm for clear error." (citation omitted)). Specifically, the district court found that without access to conduct the field surveys—a necessary step to securing a CPCN—construction of the MPRP was likely to be perpetually delayed, causing PSEG to lose revenue that it could not later recover. *PSEG*, 788 F. Supp. 3d at 739. In so finding, the district court relied heavily on two Fourth Circuit cases that both involved the construction of natural gas pipelines: *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019), and *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004).

At the outset, we agree with the district court that *Mountain Valley* and *Sage* are relevant despite the differences between them and the case before us. *PSEG*, 788 F. Supp. 3d at 739. Both decisions stand for the principles that an obstruction at one stage of large-scale energy infrastructure construction can hinder and derail the entire project, and that potential lost revenues from delayed construction constitutes irreparable harm. *Mountain Valley*, 915 F.3d at 216–19; *Sage*, 361 F.3d at 828–29.

The Property Owners contend that the harm to PSEG is monetary, speculative, and impermissibly conditioned on possible future events. We disagree.

Although monetary losses are generally not considered irreparable, they may be considered so if they are unrecoverable or "threaten[ ] a party's very existence by, for instance, driving it out of business before litigation concludes." *Mountain Valley*, 915 F.3d

at 218. That is the case here, and the district court did not clearly err in concluding so. PSEG would have no viable path to construct the MPRP without an injunction. Absent an injunction, PSEG would be unable to conduct the surveys required to complete its CPCN application. Without a completed application, PSEG would not be able to receive the CPCN necessary to begin constructing the MPRP. An unconstructed energy infrastructure project can yield no revenue. The longer it takes PSEG to obtain access to conduct the surveys, the longer it would have to wait for the MPRP to produce revenue. Revenue would be lost with each passing day, and could never be recovered.

Nor is the harm of lost revenues speculative. The Property Owners contend that PSC might not grant PSEG the CPCN even if it is able to complete its application. This contention misinterprets the prohibition on speculative harm. Irreparable harm need only be likely; it need not be certain. *Winter*, 555 U.S. at 22. What is certain is that PSEG cannot complete its CPCN application without the access authorized by the preliminary injunction and PSC is unlikely to grant a CPCN until PSEG completes its application.

The Property Owners argue that the harm of lost revenues is impermissibly conditioned on future events because it assumes that PSC will grant PSEG the CPCN. The Property Owners point to two cases in support of this argument: *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802 (4th Cir. 1991), and *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517 (4th Cir. 2003). In both, the alleged harm depended on a series of events that had yet to occur. Thus, the plaintiffs could seek relief at "some later point" and still "satisfactorily forestall the occurrence of the expected harm." *Microsoft*, 333 F.3d at 530 (emphasis omitted); *see Direx*, 952 F.2d at 815–16 (similar). Here, by

contrast, PSEG must access the properties now to complete its CPCN application and avoid losing revenue. *See Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres*, 910 F.3d 1130, 1165 (11th Cir. 2018) (finding irreparable harm "caused by an inability to access Defendants' properties, not [by] the possibility that future delay [to in-service date] could conceivably occur based on other factors that might never occur").

The Property Owners also fault PSEG for not offering sufficiently detailed projections of the revenue it stands to lose. *Cf. Mountain Valley*, 915 F.3d at 217 (estimating lost revenues of "$40 to $50 million per month"). The district court acted well within its discretion to infer from other facts that PSEG might plausibly lose revenue if the MPRP is never constructed. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (explaining, on review of bench trial decision, that finding is not clearly erroneous when based on inferences and other plausible interpretations of the record evidence).

Finally, the Property Owners assert that, even with the injunction, PSEG would miss the in-service milestone date of June 2027 set in the DEA. PSEG estimated that it could only meet this milestone date if it began construction by January 2026. Construction cannot begin until the CPCN is granted, however, and the PPRP estimated that it would need approximately thirty months to assess PSEG's application after it is filed. Although this timeline means that the application could only be assessed by mid-2027 at the earliest, the in-service milestone date may be extended. Thus, it could plausibly be met.

For these reasons, the district court did not clearly err in concluding that PSEG demonstrated it would likely suffer irreparable harm absent the injunction.

D. Balance of Equities

PSEG must also demonstrate that the harms it would suffer absent the preliminary injunction "outweigh the harm[s]" to the Property Owners from the access provided by the injunction. *Mountain Valley*, 915 F.3d at 221. Weighing these harms, the district court concluded that the balance of equities favors PSEG. It reasoned that the harms asserted by the Property Owners would result from the construction of the MPRP, not from the "narrow right of entry to conduct studies" granted by the injunction. *PSEG*, 788 F. Supp. 3d at 739. This access would be "temporary, limited, [and] non-invasive," and the Property Owners could recover any damage to their land or personal property through the cause of action provided under Section 12-111(c). *Id.* at 739–40. Conversely, PSEG would suffer the irreparable harm of "prospective financial losses" absent injunctive relief. *Id.* at 739.

We discern no abuse of discretion in the district court's conclusion. The Property Owners contend that the district court overlooked that this access constitutes a temporary taking without compensation by interfering with their property rights to exclude and depressing their property values. We disagree.

For one, the district court did not overlook this argument. It acknowledged that "the right to exclude is one of the essential sticks in the bundle of property rights" and noted that "common law has long recognized exceptions to the right." *Id.* at 736 (citation and quotation marks omitted). "One such exception is the right of a public utility to enter upon privately owned land for the purpose of making surveys preliminary to instituting a proceeding for taking by eminent domain." *Id.* (citation and quotation marks omitted).

Access under Section 12-111(a), which codified a common law right, is an exception to the right to exclude. *See Steuart v. City of Baltimore*, 7 Md. 500, 516 (1855).

Nor did the district court legally err in so reasoning. The access provided by Section 12-111(a) does not constitute a taking under either the Takings Clause of the Fifth Amendment to the United States Constitution or the prohibition on the taking of private property without just compensation in Section 40 of Article III of the Maryland Constitution. "[G]overnment-authorized physical invasions" that "are consistent with longstanding background restrictions on property rights" do not constitute a taking under the Fifth Amendment. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021). Further, the brief and minimal access provided by Section 12-111(a) "comes nowhere close to the frequent, extended physical presence at issue in *Cedar Point*." *PSEG*, 788 F. Supp. 3d at 737. Maryland's highest court has similarly recognized that the "constitutional prohibition against taking private property for public use" in the Maryland Constitution does not apply to "preliminary measures necessary" to determine whether to condemn a property, such as the access provided under Section 12-111(a). *Mackie*, 290 A.2d at 503–04 (quoting *Steuart*, 7 Md. at 516).

Further, the diminution in property value from such access, if any, does not constitute a taking in violation of either the United States Constitution or the Maryland Constitution. The Supreme Court has long recognized "that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking" in violation of the Fifth Amendment. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993). To the same effect, Maryland's highest court has

held that diminution in property value "during the period prior to a formal condemnation" is recoverable only "in the condemnation action." *Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Highway Admin.*, 880 A.2d 307, 319 (Md. 2005).

The district court thus did not abuse its discretion in concluding that "the balance of equities tips in PSEG's favor." *PSEG*, 788 F. Supp. 3d at 740.

E. Public Interest

Last, we must consider whether PSEG demonstrated that the injunction "is in the public interest," the fourth *Winter* factor. *Winter*, 555 U.S. at 20. The district court concluded that it is for two reasons. First, advancing projects that satisfy energy demands, like the MPRP, generally benefits the public. *PSEG*, 788 F. Supp. 3d at 740 (citing *Mountain Valley*, 915 F.3d at 221–22 and *Sage*, 361 F.3d at 830). Second, the PPRP, in furtherance of its statutory duties, directed PSEG to conduct the studies in the report finding its CPCN application administratively incomplete. *Id*.

The Property Owners contend that the district court's conclusion on this factor was an abuse of discretion. They point out that the companies in *Mountain Valley* and *Sage* had been issued federal CPCNs based on findings that the large-scale energy infrastructure projects at issue in those cases would benefit the public. By contrast, the Property Owners assert that there was no such finding here. They also note that FERC and PJM have contingency plans to address the energy crisis should the MPRP fail.

These contentions do not undermine the district court's conclusion. This court in *Sage* reasoned that "the pipeline will make gas available for electric power generation

plants," separate from the CPCN's finding of public interest. 361 F.3d at 830. We also recognized in *Mountain Valley* that the CPCN is not "dispositive of the public interest inquiry[.]" 915 F.3d at 222. Further, no evidence undermines PJM's present determination that the MPRP is necessary to address the looming energy crisis. Even so, disputing the MPRP's necessity goes to the decision to construct it, not to the purpose of the injunction: access to conduct surveys. *Id.* (criticizing argument "addressed to the pipeline project generally rather than" the subject of preliminary injunction). Granting access to conduct the surveys serves the public interest because the surveys will help determine whether and how best to build the MPRP. If the MPRP would cause environmental harm, for example, that would be revealed through the surveys. Indeed, as in *Sage*, "the circumstances are sufficiently demanding for the award of mandatory relief." 361 F.3d at 830.

Accordingly, the district court did not abuse its discretion in finding that the public interest favors the preliminary injunction.

## IV. Conclusion

PJM has identified a significant need for additional power generation in the region. The Maryland General Assembly intended for prospective federal public utilities, like PSEG, to help bridge this gap. To do so, PSEG must have a viable path to obtain a CPCN. The access it seeks is a necessary step on that path, and delaying this permitting process could exacerbate the very energy crisis that the MPRP was intended to prevent.

We are sympathetic to the concerns raised by the Property Owners. "The right to exclude is 'one of the most treasured' rights of property ownership." *Cedar Point*, 594 U.S.

at 149 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). The preliminary injunction, however, is narrow. PSEG is only permitted to conduct the surveys required to complete its CPCN application. The studies resulting from this injunction may reveal environmental and socioeconomic concerns that would need to be considered through a state review process outside this courthouse. Through that process, the Property Owners would have an opportunity to raise their opposition, if any, to the construction of the MPRP.

We thus conclude that the district court did not abuse its discretion and affirm the order granting PSEG's motion for a preliminary injunction. The "exigencies of the situation demand such relief." *Wetzel*, 635 F.2d at 286.

*AFFIRMED*

RICHARDSON, Circuit Judge, concurring in the judgment:

I agree that the district court did not abuse its discretion in granting the preliminary injunction, and I concur in the Court's judgment. But I take a different path to get there. Applying Maryland's purposive method of statutory interpretation, I would reach the same result on the statutes' own terms.

## I. MARYLAND'S PURPOSIVISM: INTERPRETING TEXT IN LIGHT OF PURPOSE

"[A] federal court sitting in diversity is obliged to apply state law principles to resolve" questions of statutory interpretation, "utilizing such principles as enunciated and applied by the state's highest court." *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 482 (4th Cir. 2007).[1] So here, we must interpret Maryland's statutes as Maryland's Supreme Court would.

Maryland's courts are avowed purposivists. Their "primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Lockshin v. Semsker*, 987 A.2d 18, 28 (Md. 2010). But Maryland courts primarily look for that purpose where the General Assembly left it: in the enacted text. *Berry v. Queen*, 233 A.3d 42, 49 (Md. 2020).

So Maryland courts start with the text. "To ascertain the intent of the General Assembly," Maryland courts "begin with the normal, plain meaning of the language of the statute." *Id.* The "plain language must be viewed within the context of the statutory

---

[1] *See* Abbe R. Gluck, *Intersystemic Statutory Interpretation: Methodology as "Law" and the* Erie *Doctrine*, 120 Yale L.J. 1898 (2011); *cf.* Stephen E. Sachs, *Finding Law*, 107 Calif. L. Rev. 527, 571 (2019).

scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Lockshin*, 987 A.2d at 29; *Westminster Mgmt., LLC v. Smith*, 312 A.3d 741, 758 (Md. 2024). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose," the court's "inquiry as to legislative intent ends ordinarily and [the court] appl[ies] the statute as written, without resort to other rules of construction." *Lockshin*, 987 A.2d at 28–29.

"If the language of the statute is ambiguous . . . then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment under consideration." *Montgomery Cnty. v. Phillips*, 124 A.3d 188, 192 (Md. 2015) (cleaned up). Courts may deem a statute ambiguous "either inherently or by reference to other relevant laws or circumstances." *Bd. of Educ. of Balt. Cnty. v. Zimmer-Rubert*, 973 A.2d 233, 242 (Md. 2009) (quoting *Arundel Corp. v. Marie*, 860 A.2d 886, 894 (Md. 2004)); *see also Elsberry v. Stanley Martin Cos.*, 286 A.3d 1, 13 (Md. 2022). So statutory ambiguity is not limited to facial ambiguity—other laws or external circumstances can sometimes render otherwise clear text ambiguous.

As a court interprets an ambiguous provision, its "job . . . is to resolve that ambiguity in light of" the statute's purpose, "using all the resources and tools of statutory construction at [the court's] disposal." *Phillips*, 124 A.3d at 192 (quoting *Stoddard v. State*, 911 A.2d 1245, 1250 (Md. 2006)). These tools include legislative history, case law, statutory structure, and other Maryland statutes. *See id.*; *Anderson v. Council of Unit Owners of Gables on Tuckerman Condo.*, 948 A.2d 11, 19 (Md. 2008). Courts also consider "the relative rationality and legal effect of various competing constructions."

*Phillips*, 124 A.3d at 192 (quoting *Stoddard*, 911 A.2d at 1250). Ultimately, "the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Lockshin*, 987 A.2d at 29.

Still, Maryland courts do not disregard the text, even when resolving ambiguities. While a court's "[c]onsideration of the plain meaning of the statutory language does not entail a bare, isolated, or literal reading of the statutory language," *Elsberry*, 286 A.3d at 12, Maryland courts "do not construe a statute with 'forced or subtle interpretations' that limit or extend its application." *Lockshin*, 987 A.2d at 29 (quoting *Lonaconing Trap Club, Inc. v. Dep't of Env't*, 978 A.2d 702, 709 (Md. 2009)). And they "may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute." *Price v. State*, 835 A.2d 1221, 1226 (Md. 2003). Simply put, interpreting text in light of purpose still requires interpreting text.

With these principles in mind, I turn to the statutes at issue.

## II. PSEG IS LIKELY TO SUCCEED ON ITS CLAIM

The preliminary injunction turns on PSEG's likelihood of success on its claim of access under two statutes: Md. Code, Real Prop. § 12-111 and Md. Code, Pub. Util. § 7-207.

### A. Section 12-111 Requires PSEG To Be A "Body Politic Or Corporate Having The Power Of Eminent Domain"

Start with § 12-111. Taking a purposive approach, we first look to the plain meaning of the text, discerning that plain meaning in light of context and purpose. Section 12-111(a) states, in relevant part: "Civil engineers, land surveyors, real estate

appraisers, and their assistants acting on behalf of the State or of any of its instrumentalities or any body politic or corporate having the power of eminent domain" may "[e]nter on any private land" to perform certain enumerated tasks. § 12-111(a). But they may only enter private land "after [making] every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry." *Id.* If a private landowner nonetheless refuses entry to "any civil engineer, surveyor, real estate appraiser, or any of their assistants," then subsection (b) permits "the person, the State, its instrumentality, or the body politic or corporate on whose behalf the person is acting" to apply to a court "for an order directing that the person be permitted to enter on and remain on the land to the extent necessary to carry out" the tasks listed in subsection (a). § 12-111(b).

The statute does three things. It identifies the professionals who may enter, describes the tasks they may perform, and authorizes the professionals and specified principals to seek a court order when a landowner refuses access.

In this case, PSEG wants a court order that permits those working on its behalf to conduct studies on private property. Section 12-111(b) permits four parties to do this: "the person," "the State," the State's "instrumentality," or "the body politic or corporate" having the power of eminent domain. PSEG, as a New Jersey limited liability company, is not the State of Maryland or one of its instrumentalities. So it may only request a court order if it is a "person" or a "body politic or corporate." What do these terms mean? We find out by considering their plain meaning in context and in light of the statute's purpose.

### 1. PSEG is not "the person" who may seek a court order under § 12-111(b)

"Person" is a broad word, but context narrows it. Section 12-111(b) reads in full:

> If any civil engineer, surveyor, real estate appraiser, or any of their assistants is refused permission to enter or remain on any private land for the purposes set out in subsection (a) of this section, the *person*, the State, its instrumentality, or the body politic or corporate *on whose behalf the person is acting* may apply to a law court of the county where the property, or any part of it, is located for an order directing that *the person* be permitted to enter on and remain on the land to the extent necessary to carry out the purposes authorized by this section.

(emphasis added). In context, "the person" refers back to the "civil engineer, surveyor, real estate appraiser, or any of their assistants" who is refused permission to enter the private property. The text says "the person" not "a person," so we know the person is a particular one. And the statute goes on to list "the body politic or corporate *on whose behalf the person is acting*," referring to the same person from the beginning of the list. We know from § 12-111(a) that the parties "acting on behalf of" others are the engineers, surveyors, appraisers, and their assistants, further supporting that "the person" refers to them, not just any person. Finally, the statute specifies that "the order" will "direct[] that *the person* be permitted to enter on and remain on the land." In the context of subsection (b), this indicates that "the person" must be the civil engineers, surveyors, and appraisers, because those are the people who were denied entry at the beginning of the sentence. The added context of subsection (a), which only permits the civil engineers, surveyors, and appraisers to enter private property in the first place, solidifies this conclusion.

So PSEG can be "the person" under § 12-111 only if it is a civil engineer, surveyor, real estate appraiser, or one of their assistants. It is none of them.[2]

**2. PSEG could be a "body politic or corporate having the power of eminent domain"**

Since PSEG is not "the person" who can request an injunction, it can only get a court order if it is a "body politic or corporate," "having the power of eminent domain," "on whose behalf the person is acting." § 12-111(b), (a).[3] The "body politic or corporate" element is not contested. PSEG is a limited liability company—an entity the law treats as

---

[2] The district court found, in the alternative, that PSEG could request an injunction under § 12-111(b) because it was acting "on behalf of" the Power Plant Research Program. *See PSEG Renewable Transmission, LLC v. Arentz Fam., LP*, 788 F. Supp. 3d 705, 728 (D. Md. 2025). The majority "agree[s] with the district court's conclusion that PSEG likely gained" the power to enter private property "for purposes of Section 12-111(a) when [the Power Plant Research Program] directed it to complete the necessary field studies." Majority Op. at 22. The logic goes like this: Because PSEG is a "person" acting on behalf of an instrumentality of Maryland—the Program—PSEG itself does not need to possess the power of eminent domain in order to request a court order (as it would if PSEG were the body politic or corporate on whose behalf the person is acting). But this theory is wrong.

As explained above, "the person" acting on behalf of the State, its instrumentality, or the body politic or corporate, may request an injunction under § 12-111(b), but "the person" must be a "civil engineer, surveyor, real estate appraiser, or any of their assistants." PSEG is none of these. So the fact that PSEG may have acted on behalf of the Power Plant Research Program is irrelevant: In order for the alternative theory to work, PSEG would have to both be acting on behalf of the Program *and* be an engineer, surveyor, appraiser, or one of their assistants. The district court only found the former, which is not enough.

[3] Subsection (a) speaks of "any body politic or corporate *having the power of eminent domain*." Subsection (b) speaks of "*the* body politic or corporate on whose behalf the person is acting," without repeating the qualifier. But the definite article in subsection (b), just as it does for "the person," points back to the entity subsection (a) has described. And it could not be otherwise: Subsection (b) enforces the entry that subsection (a) authorizes, so it cannot supply a right of entry for those acting on behalf of an entity subsection (a) leaves out.

a person distinct from its members, capable of holding property and suing in its own name. The property owners do not argue that the phrase excludes such an entity, and I accept that concession at this stage.

The tricky part is "having the power of eminent domain." The majority correctly concludes that § 12-111 requires present possession. Majority Op. at 20–21. "Having" means having—not hoping to have, and not qualifying to have someday. Text, context, and purpose all point the same way.

So what is the power one must presently have? Maryland's Supreme Court has defined the "power of eminent domain" as "the inherent power of a governmental entity to take privately owned property, especially land, and convert it to public use, subject to reasonable compensation for the taking." *Mayor & City Council of Balt. City v. Valsamaki*, 916 A.2d 324, 335 (Md. 2007) (cleaned up). This power "adheres to sovereignty and requires no constitutional authority for its existence." *Lore v. Bd. of Pub. Works*, 354 A.2d 812, 814 (Md. 1976). So the power of eminent domain is something the State has by virtue of its sovereignty. Other entities possess the power only when the General Assembly confers it. *See Chevy Chase Land Co. v. United States*, 733 A.2d 1055, 1075 (Md. 1999) ("[T]he power of eminent domain [is] a power reserved only to the government and those the government has annointed [sic].").

The power of eminent domain is not limitless. One can have the power of eminent domain without having the legal ability to presently exercise the power with respect to particular property. *See, e.g.*, *Bouton v. Potomac Edison Co.*, 418 A.2d 1168, 1169 (Md. 1980) ("[A] certificate is a prerequisite to the exercise of the Company's right of eminent

domain."). The "mode and manner of the exercise of the power of Eminent Domain is exclusively vested in the judgment and discretion of the Legislature." *Utilities, Inc. of Md. v. Wash. Suburban Sanitary Comm'n*, 763 A.2d 129, 133–34 (Md. 2000) (quoting *Ridgely v. Mayor & City Council of Baltimore*, 87 A. 909, 912 (Md. 1913)); *see also Cnty. Comm'rs of Frederick Cnty. v. Schrodel*, 577 A.2d 39, 47 (Md. 1990) ("In Maryland the General Assembly has demonstrated that it will place preconditions on a utility's exercise of eminent domain power, when the Legislature concludes that the conditions are appropriate."). So possessing the power is only half the story.

The State and its delegates alike can hold the power without being free to use it. Both the federal and Maryland constitutions limit the exercise of eminent domain power by allowing only takings "for public use" and requiring the payment of "just compensation" for the taken property. *See* U.S. Const. amend. V; Md. Const. art. III, § 40; *Schrodel*, 577 A.2d at 45–46. And the Maryland General Assembly has placed additional limits on the power's exercise through legislation—most prominently through Title 12 of the Real Property Article, which lays out the rules and procedures governing nearly all condemnation proceedings in Maryland. Md. Code, Real Prop. §§ 12-101 *et seq*. Title 12 does *not*, however, grant any eminent domain power. It only governs the exercise of power already possessed or granted. When the General Assembly wishes to delegate eminent domain power, it does so through separate legislation. And this legislation often places additional limits on the power's exercise, beyond those imposed by Title 12.

For example, Md. Code, Pub. Util. § 5-411 delegates eminent domain power to water companies. By stating that "[a] water company may acquire by condemnation . . .

any land or water rights," the statute delegates the power of eminent domain to water companies. *Id.* But the statute also places limits on the exercise of that power by permitting condemnation only of "land or water rights that the company is authorized to acquire to lay pipes or construct its work," requiring any condemnation action to comply with Title 12, and allowing water companies to condemn property only if the company cannot reach an agreement with the owner. Other Maryland statutes delegate eminent domain power in this same way, using the same or similar language to grant the power, and then placing limits on its exercise. *See, e.g.*, Md. Code, Pub. Util. §§ 5-403, 5-404.

In short: The State inherently has the power of eminent domain, but the General Assembly may delegate that power to other entities and place limits on its exercise. Having the power of eminent domain is not the same as exercising that power. And placing limits on the exercise of the power does not negate the underlying delegation. A power held subject to a condition on its exercise is presently held; the condition limits the use, not ownership, of the right. This means that PSEG is a body "having the power of eminent domain" only if the legislature conferred that power on it. But if the General Assembly has delegated the power to PSEG, the existence of limits on the power's exercise does not remove the delegation itself. So I next consider whether any statute delegates the eminent domain power to PSEG.

**B. Section 7-207 Likely Confers The Power Of Eminent Domain On PSEG**

The second statute at issue is Md. Code, Pub. Util. § 7-207. I conclude that § 7-207(b)(3) likely supplies the needed delegation.

Start with § 7-207(b)(3)(v), which states:

> 1. This subparagraph applies to the construction of an overhead transmission line for which a certificate of public convenience and necessity is required under this section.
> 2. On issuance of a certificate of public convenience and necessity for the construction of an overhead transmission line, a person may acquire by condemnation, in accordance with Title 12 of the Real Property Article, any property or right necessary for the construction or maintenance of the transmission line.

Clause (2) of subparagraph (v) is best read to do two things. First, it grants the power of eminent domain to "a person." It does this by stating that "a person may acquire by condemnation . . . any property or right." *Id.* Second, it restricts when and how that power may be exercised in three ways: Acquisition is limited to property necessary for constructing the transmission line, after issuance of a certificate, and in compliance with Title 12 of the Real Property Article. *See Bouton*, 418 A.2d at 1169.

The broader text of § 7-207 confirms that Maryland's legislature recognizes a difference between having the power of eminent domain and the ability to presently exercise that power through condemnation. For example, subparagraph (b)(3)(i) provides that until a certificate is obtained, a person may not do two things: (1) "begin construction of an overhead transmission line" or (2) "exercise a right of condemnation with the construction." Neither prohibition addresses having the capacity to do something; they address the ability to *exercise* that capacity. Nothing in a certificate gives an applicant the capacity to build; the applicant can build, but the subparagraph forbids it until the Commission grants a certificate. The second prohibition works the same way. It bars the exercise of a right of condemnation—language that presupposes a right exists. A restriction on the use of a power does not imply the power's absence. *See also* § 7-

207(b)(2) (absent a certificate and a capacity finding, "a person may not exercise a right of condemnation in connection with the construction of a generating station"). In this scheme, the General Assembly wrote the distinction between holding the power and being allowed to use it.

Other statutes in Maryland's Public Utilities Article illustrate how the General Assembly both delegates the power of eminent domain and limits its exercise. The Maryland statute delegating the power of eminent domain to water companies is one example. *See* Md. Code, Pub. Util. § 5-411. Section 5-411 first grants the condemnation power: "A water company may acquire by condemnation . . . any land or water rights." *Id.* Then the statute places limits on the delegation. But those limits do not negate the initial delegation of the power.

Section 5-411 is not alone in following this approach. *See, e.g.*, Md. Code, Pub. Util. § 5-403(b)–(c) (delegating the power of eminent domain to gas companies by stating they "may acquire by condemnation, in accordance with Title 12 of the Real Property Article, rights-of-way or easements necessary [for gas pipelines]" and placing additional limits on its exercise in (c)); Md. Code, Pub. Util. § 5-404(b) (delegating eminent domain power to certain oil pipeline companies by stating they "may acquire by condemnation, in accordance with Title 12 of the Real Property Article, any property necessary to" operate and construct certain pipelines); Md. Code, Transp. § 5-417(a) (granting eminent domain power to "political subdivision[s]" by stating they "may acquire, by purchase or, if unable to agree on terms, by condemnation, any property, including any air right or interest, needed to establish or operate" airports and related facilities). The General Assembly, thus,

often uses a formula for sharing the sovereign's power: Identify the class of grantees, say they "may acquire by condemnation," and fence in the power's use. Section 7-207(b)(3)(v) likely follows this formula.

That leaves the "who" question: To whom does subparagraph (v) grant the power? Section 1-101 of Maryland's Public Utility Article, of which § 7-207 is a part, lays out definitions that apply throughout. Section 1-101(w) defines "person" broadly as "an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity." Md. Code, Pub. Util. § 1-101(w). Read in isolation, that definition would extend subparagraph (v)'s grant to every individual, fiduciary, and entity in Maryland. But Maryland does not read statutory language in isolation. *See Westminster Mgmt.*, 312 A.3d at 758 ("Our search for legislative intent begins with the text of the provision we are interpreting, viewed not in isolation but 'within the context of the statutory scheme to which it belongs.'" (quoting *Nationstar Mortg. LLC v. Kemp*, 258 A.3d 296, 308 (Md. 2021))). Here, the statute likely only delegates the power of eminent domain to the kind of person who may receive a certificate.

Subparagraph (v)'s own conditions do the narrowing. Subparagraph (v) applies only to "the construction of an overhead transmission line for which a certificate . . . is required." § 7-207(b)(3)(v)(1); *see also* § 7-207(b)(3)(v)(2) (power of eminent domain may be exercised only "on issuance" of that certificate). And only an applicant who satisfies subparagraph (iii) may obtain such a certificate. So while "a person" means what § 1-101(w) says, the only persons who can ever satisfy this subparagraph and possess the

right of eminent domain are the class of persons that subparagraph (iii) makes eligible. *Cf.* § 7-207(b)(3)(i) ("[U]nless a certificate . . . for the construction is first obtained from the Commission, a person may not begin construction" of a transmission line or "exercise a right of condemnation.").

Finally, the question § 12-111 actually asks: Does a person hold the power of eminent domain when the General Assembly has delegated it subject to a condition not yet satisfied? Maryland's cases suggest the answer is yes. Maryland's Supreme Court has recognized certificates as a "prerequisite to the exercise of the Company's right of eminent domain," *Bouton*, 418 A.2d at 1169, and the General Assembly often "place[s] preconditions on a utility's exercise of eminent domain power," *Schrodel*, 577 A.2d at 47.[4] Both formulations distinguish an underlying right from a condition on its exercise. *See also* § 7-207(b)(3)(i) (prohibiting a person from "exercis[ing] a right of condemnation" before certification). PSEG appears to hold the power subparagraph (v) delegates. What it may not do is use it until the Commission grants a certificate. Section 12-111 asks the first question, not the second.[5]

---

[4] Both *Bouton* and *Schrodel* were describing former Md. Code art. 78, § 54A, the predecessor to § 7-207.

[5] The property owners answer that § 7-207(b)(3)(v)(2)'s introductory phrase "[o]n issuance" fixes the time when the power itself arises. It's true that this phrase fixes timing but, for the reasons I have explained, it likely does so for when the power may be exercised. Every delegation in this family carries conditions, and every condition is about timing. A water company may condemn once it cannot agree with the owner. Md. Code, Pub. Util. § 5-411(1). A gas corporation may condemn once it serves local consumers along its route. § 5-403(c)(1). An oil pipeline corporation may condemn once the Commission, after a public hearing, finds the acquisition to be in the public interest. § 5-404(b), (e) (granting (Continued)

* * *

Read whole, this scheme's parts fit and seem to serve the General Assembly's purpose. Subparagraph (iii) names the eligible applicants. Subparagraph (v) arms that class with a project-specific power of condemnation subject to conditions on its exercise. Subparagraph (i) holds that power in check until the commission grants a certificate. Section 12-111 then permits the applicants' engineers and surveyors to gather the information needed to evaluate the requested certificate. Because PSEG has shown that it likely belongs to the class presently holding that conditional power, I respectfully concur in the judgment.

---

the power and then conditioning its use on a Commission order). And Title 12 governs the manner of exercising nearly every condemnation in Maryland. A certificate is § 7-207's version of the same instruction.